# BRAZIL

## Extradition

*Treaty and additional protocol signed at Rio de Janeiro January 13, 1961, and June 18, 1962, respectively;*
*Ratification advised by the Senate of the United States of America May 16, 1961, and October 22, 1963, respectively;*
*Ratified by the President of the United States of America May 29, 1961, and October 29, 1963, respectively;*
*Ratified by Brazil August 25, 1964;*
*Ratifications exchanged at Washington November 17, 1964;*
*Proclaimed by the President of the United States of America November 20, 1964;*
*Entered into force December 17, 1964.*

————

BY THE PRESIDENT OF THE UNITED STATES OF AMERICA

### A PROCLAMATION

WHEREAS a treaty of extradition between the United States of America and the United States of Brazil was signed at Rio de Janeiro on January 13, 1961 and an additional protocol thereto was signed at Rio de Janeiro on June 18, 1962, the originals of which treaty and additional protocol, being in the English and Portuguese languages, are word for word as follows:

(2093)                    TIAS 5691

## TREATY OF EXTRADITION BETWEEN THE UNITED STATES OF AMERICA AND THE UNITED STATES OF BRAZIL

The United States of America and the United States of Brazil, desiring to make more effective the cooperation of their respective countries in the repression of crime, have resolved to conclude a treaty of extradition and for this purpose have appointed the following Plenipotentiaries:

The President of the United States of America: His Excellency John Moors Cabot, Ambassador of the United States of America to Brazil, and

The President of the United States of Brazil: His Excellency Horacio Lafer, Minister of State for External Relations,

Who, having communicated to each other their respective full powers, found to be in good and due form, agree as follows:

### ARTICLE I

Each Contracting State agrees, under the conditions established by the present Treaty and each in accordance with the legal formalities in force in its own country, to deliver up, reciprocally, persons found in its territory who have been charged with or convicted of any of the crimes or offenses specified in Article II of the present Treaty and committed within the territorial jurisdiction of the other, or outside thereof under the conditions specified in Article IV of the present Treaty; provided that such surrender shall take place only upon such evidence of criminality as, according to the laws of the place where the fugitive or person so charged shall be found, would justify his commitment for trial if the crime or offense had been there committed.

### ARTICLE II

Persons shall be delivered up according to the provisions of the present Treaty for prosecution when they have been charged with, or to undergo sentence when they have been convicted of, any of the following crimes or offenses:

1. Murder (including crimes designated as parricide, poisoning, and infanticide, when provided for as separate crimes); manslaughter when voluntary.

2. Rape; abortion; carnal knowledge of (or violation of) a girl under the age specified by law in such cases in both the requesting and requested States.

3. Malicious wounding; willful assault resulting in grievous bodily harm.

TIAS 5691

4. Abduction, detention, deprivation of liberty, or enslavement of women or girls for immoral purposes.

5. Kidnapping or abduction of minors or adults for the purpose of extorting money from them or their families or any other person or persons, or for any other unlawful end.

6. Bigamy.

7. Arson.

8. The malicious and unlawful damaging of railways, trains, vessels, aircraft, bridges, vehicles, and other means of travel or of public or private buildings, or other structures, when the act committed shall endanger human life.

9. Piracy, by the law of nations; mutiny on board a vessel or an aircraft for the purpose of rebelling against the authority of the Captain or Commander of such vessel or aircraft; or by fraud or violence taking possession of such vessel or aircraft.

10. Burglary, defined to be the breaking into or entering either in day or night time, a house, office, or other building of a government, corporation, or private person, with intent to commit a felony therein; housebreaking.

11. Robbery.

12. Forgery or the utterance of forged papers.

13. The forgery, falsification, theft or destruction of the official acts or public records of the government or public authority, including Courts of Justice, or the uttering or fraudulent use of the same.

14. The fabrication or the utterance, circulation or fraudulent use of any of the following objects: counterfeit money, whether coin or paper; counterfeit titles or coupons of public debt, created by national, state, provincial, territorial, local. or municipal governments; counterfeit bank notes or other instruments of public credit; and counterfeit seals, stamps, dies, and marks of State or public administration.

15. The introduction of instruments for the fabrication of counterfeit coins or bank notes or other paper currency as money.

16. Embezzlement by any person or persons hired, salaried or employed, to the detriment of their employers or principals.

17. Larceny.

18. Obtaining money, valuable securities or other property by false pretenses, or by threats of injury.

19. Receiving any money, valuable securities or other property knowing the same to have been unlawfully obtained.

20. Fraud or breach of trust by a bailee, banker, factor, trustee, executor, administrator, guardian, director or officer of any company or corporation or by anyone in any fiduciary capacity.

21. Willful non-support or willful abandonment of a minor or other dependent person when death or serious bodily injury results therefrom.

TIAS 5691

22. Perjury (including willfully false expert testimony); subornation of perjury.

23. Soliciting, receiving, or offering bribes.

24. The following offenses when committed by public officials: extortion; embezzlement.

25. Crimes or offenses against the bankruptcy laws.

26. Crimes or offenses against the laws of both countries for the suppression of slavery and slave trading.

27. Crimes or offenses against the laws relating to the traffic in, use of, or production or manufacture of, narcotic drugs or cannabis.

28. Crimes or offenses against the laws relating to the illicit manufacture of or traffic in substances injurious to health, or poisonous chemicals.

29. Smuggling, defined to be the act of willfully and knowingly violating the customs laws with intent to defraud the revenue by international traffic in merchandise subject to duty.

30. Aiding the escape of a prisoner by force of arms.

31. Use of explosives so as to endanger human life or property.

32. Procuration, defined as the procuring or transporting of a woman or girl under age, even with her consent, for immoral purposes, or of a woman or girl over age, by fraud, threats, or compulsion, for such purposes with a view in either case to gratifying the passions of another person; profiting from the prostitution of another.

33. The attempt to commit any of the above crimes or offenses, when such attempt is made a separate offense by the laws of the Contracting States.

34. Participation in any of the above crimes or offenses.

## ARTICLE III

Except as otherwise provided in the present Treaty, the requested State shall extradite a person accused or convicted of any crime or offense enumerated in Article II only when both of the following conditions exist:

1. The law of the requesting State, in force when the crime or offense was committed, provides a possible penalty of deprivation of liberty for a period of more than one year; and

2. The law in force in the requested State generally provides a possible penalty of deprivation of liberty for a period of more than one year which would be applicable if the crime or offense were committed in the territory of the requested State.

## ARTICLE IV

When the crime or offense has been committed outside the territorial jurisdiction of the requesting State, the request for extradition need not be honored unless the laws of the requesting State and those of the requested State authorize punishment of such crime or offense in this circumstance.

TIAS 5691

The words "territorial jurisdiction" as used in this Article and in Article I of the present Treaty mean: territory, including territorial waters, and the airspace thereover, belonging to or under the control of one of the Contracting States; and vessels and aircraft belonging to one of the Contracting States or to a citizen or corporation thereof when such vessel is on the high seas or such aircraft is over the high seas.

## ARTICLE V

Extradition shall not be granted in any of the following circumstances:

1. When the requested State is competent, according to its laws, to prosecute the person whose surrender is sought for the crime or offense for which that person's extradition is requested and the requested State intends to exercise its jurisdiction.

2. When the person whose surrender is sought has already been or is at the time of the request being prosecuted in the requested State for the crime or offense for which his extradition is requested.

3. When the legal proceedings or the enforcement of the penalty for the crime or offense committed has become barred by limitation according to the laws of either the requesting State or the requested State.

4. When the person sought would have to appear, in the requesting State, before an extraordinary tribunal or court.

5. When the crime or offense for which the person's extradition is requested is purely military.

6. When the crime or offense for which the person's extradition is requested is of a political character. Nevertheless

a. The allegation by the person sought of political purpose or motive for the request for his extradition will not preclude that person's surrender if the crime or offense for which his extradition is requested is primarily an infraction of the ordinary penal law. In such case the delivery of the person being extradited will be dependent on an undertaking on the part of the requesting State that the political purpose or motive will not contribute toward making the penalty more severe.

b. Criminal acts which constitute clear manifestations of anarchism or envisage the overthrow of the bases of all political organizations will not be classed as political crimes or offenses.

c. The determination of the character of the crime or offense will fall exclusively to the authorities of the requested State.

## ARTICLE VI

When the commission of the crime or offense for which the extradition of the person is sought is punishable by death under the laws of

GOVERNMENT EXHIBIT 1_20-MJ-8171-BER_005

the requesting State and the laws of the requested State do not permit this punishment, the requested State shall not be obligated to grant the extradition unless the requesting State provides assurances satisfactory to the requested State that the death penalty will not be imposed on such person.

## ARTICLE VII

There is no obligation upon the requested State to grant the extradition of a person who is a national of the requested State, but the executive authority of the requested State shall, subject to the appropriate laws of that State, have the power to surrender a national of that State if, in its discretion, it be deemed proper to do so.

## ARTICLE VIII

The Contracting States may request, one from the other, through the channel of their respective diplomatic or consular agents, the provisional arrest of a fugitive as well as the seizure of articles relating to the crime or offense.

The request for provisional arrest shall be granted provided that the crime or offense for which the extradition of the fugitive is sought is one for which extradition shall be granted under the present Treaty and provided that the request contains:

1. A statement of the crime or offense of which the fugitive is accused or convicted;

2. A description of the person sought for the purpose of identification;

3. A statement of the probable whereabouts of the fugitive, if known; and

4. A declaration that there exist and will be forthcoming the relevant documents required by Article IX of the present Treaty.

If, within a maximum period of 60 days from the date of the provisional arrest of the fugitive in accordance with this Article, the requesting State does not present the formal request for his extradition, duly supported, the person detained will be set at liberty and a new request for his extradition will be accepted only when accompanied by the relevant documents required by Article IX of the present Treaty.

## ARTICLE IX

The request for extradition shall be made through diplomatic channels or, exceptionally, in the absence of diplomatic agents, it may be made by a consular officer, and shall be supported by the following documents:

1. In the case of a person who has been convicted of the crime or offense for which his extradition is sought: a duly certified or authenticated copy of the final sentence of the competent court.

TIAS 5691

2. In the case of a person who is merely charged with the crime or offense for which his extradition is sought: a duly certified or authenticated copy of the warrant of arrest or other order of detention issued by the competent authorities of the requesting State, together with the depositions upon which such warrant or order may have been issued and such other evidence or proof as may be deemed competent in the case.

The documents specified in this Article must contain a precise statement of the criminal act of which the person sought is charged or convicted, the place and date of the commission of the criminal act, and they must be accompanied by an authenticated copy of the texts of the applicable laws of the requesting State including the laws relating to the limitation of the legal proceedings or the enforcement of the penalty for the crime or offense for which the extradition of the person is sought, and data or records which will prove the identity of the person sought.

The documents in support of the request for extradition shall be accompanied by a duly certified translation thereof into the language of the requested State.

## ARTICLE X

When the extradition of a person has been requested by more than one State, action thereon will be taken as follows:

1. If the requests deal with the same criminal act, preference will be given to the request of the State in whose territory the act was performed.

2. If the requests deal with different criminal acts, preference will be given to the request of the State in whose territory the most serious crime or offense, in the opinion of the requested State, has been committed.

3. If the requests deal with different criminal acts, but which the requested State regards as of equal gravity, the preference will be determined by the priority of the requests.

## ARTICLE XI

The determination that extradition based upon the request therefor should or should not be granted shall be made in accordance with the domestic law of the requested State, and the person whose extradition is desired shall have the right to use such remedies and recourses as are authorized by such law.

## ARTICLE XII

If at the time the appropriate authorities of the requested State shall consider the documents submitted by the requesting State, as required in Article IX of the present Treaty, in support of its request for the extradition of the person sought, it shall appear that such documents do not constitute evidence sufficient to warrant extradition

GOVERNMENT EXHIBIT 1_20-MJ-8171-BER_007

under the provisions of the present Treaty of the person sought, such person shall be set at liberty unless the requested State or the proper tribunal thereof shall, in conformity with its own laws, order an extension of time for the submission by the requesting State of additional evidence.

### ARTICLE XIII

Extradition having been granted, the surrendering State shall communicate promptly to the requesting State that the person to be extradited is held at its disposition.

If, within 60 days counting from such communication—except when rendered impossible by *force majeure* or by some act of the person being extradited or the surrender of the person is deferred pursuant to Articles XIV or XV of the present Treaty—such person has not been delivered up and conveyed out of the jurisdiction of the requested State, the person shall be set at liberty.

### ARTICLE XIV

When the person whose extradition is requested is being prosecuted or is serving a sentence in the requested State, the surrender of that person under the provisions of the present Treaty shall be deferred until the person is entitled to be set at liberty, on account of the crime or offense for which he is being prosecuted or is serving a sentence, for any of the following reasons: dismissal of the prosecution, acquittal, expiration of the term of the sentence or the term to which such sentence may have been commuted, pardon, parole, or amnesty.

### ARTICLE XV

When, in the opinion of competent medical authority, duly sworn to, the person whose extradition is requested cannot be transported from the requested State to the requesting State without serious danger to his life due to his grave illness, the surrender of the person under the provisions of the present Treaty shall be deferred until such time as the danger, in the opinion of the competent medical authority, has been sufficiently mitigated.

### ARTICLE XVI

The requesting State may send to the requested State one or more duly authorized agents, either to aid in the identification of the person sought or to receive his surrender and to convey him out of the territory of the requested State.

Such agents, when in the territory of the requested State, shall be subject to the applicable laws of the requested State, but the expenses which they incur shall be for the account of the State which has sent them.

TIAS 5691

### ARTICLE XVII

Expenses related to the transportation of the person extradited shall be paid by the requesting State. The appropriate legal officers of the country in which the extradition proceedings take place shall, by all legal means within their power, assist the officers of the requesting State before the respective judges and magistrates. No pecuniary claim, arising out of the arrest, detention, examination and surrender of fugitives under the terms of the present Treaty, shall be made by the requested State against the requesting State other than as specified in the second paragraph of this Article and other than for the lodging, maintenance, and board of the person being extradited prior to his surrender.

The legal officers, other officers of the requested State, and court stenographers in the requested State who shall, in the usual course of their duty, give assistance and who receive no salary or compensation other than specific fees for services performed, shall be entitled to receive from the requesting State the usual payment for such acts or services performed by them in the same manner and to the same amount as though such acts or services had been performed in ordinary criminal proceedings under the laws of the country of which they are officers.

### ARTICLE XVIII

A person who, after surrender by either of the Contracting States to the other under the terms of the present Treaty, succeeds in escaping from the requesting State and takes refuge in the territory of the State which has surrendered him, or passes through it in transit, will be detained, upon simple diplomatic request, and surrendered anew, without other formalities, to the State to which his extradition was granted.

### ARTICLE XIX

Transit through the territory of one of the Contracting States of a person in the custody of an agent of the other Contracting State, and surrendered to the latter by a third State, and who is not of the nationality of the country of transit, shall, subject to the provisions of the second paragraph of this Article, be permitted, independently of any judicial formalities, when requested through diplomatic channels and accompanied by the presentation in original or in authenticated copy of the document by which the State of refuge has granted the extradition. In the United States of America, the authority of the Secretary of State of the United States of America shall be first obtained.

The permission provided for in this Article may nevertheless be refused if the criminal act which has given rise to the extradition does not constitute a crime or offense enumerated in Article II of the present Treaty, or when grave reasons of public order are opposed to the transit.

TIAS 5691

### ARTICLE XX

Subject to the rights of third parties, which shall be duly respected:

1. All articles, valuables, or documents which relate to the crime or offense and, at the time of arrest, have been found in the possession of the person sought or otherwise found in the requested State shall be surrendered, with him, to the requesting State.

2. The articles and valuables which may be found in the possession of third parties and which likewise are related to the crime or offense shall also be seized, but may be surrendered only after the rights with regard thereto asserted by such third parties have been determined.

### ARTICLE XXI

A person extradited by virtue of the present Treaty may not be tried or punished by the requesting State for any crime or offense committed prior to the request for his extradition, other than that which gave rise to the request, nor may he be re-extradited by the requesting State to a third country which claims him, unless the surrendering State so agrees or unless the person extradited, having been set at liberty within the requesting State, remains voluntarily in the requesting State for more than 30 days from the date on which he was released.   Upon such release, he shall be informed of the consequences to which his stay in the territory of the requesting State would subject him.

### ARTICLE XXII

The present Treaty shall be ratified and the ratifications thereof shall be exchanged at Washington, as soon as possible.

The present Treaty shall enter into force one month after the date of exchange of ratifications.   It may be terminated at any time by either Contracting State giving notice of termination to the other Contracting State, and the termination shall be effective six months after the date of such notice.

IN WITNESS WHEREOF the respective Plenipotentiaries have signed the present Treaty and have affixed hereunto their seals.

DONE in duplicate, in the English and Portuguese languages, both equally authentic, at Rio de Janeiro, this thirteenth day of January, one thousand nine hundred sixty-one.

[SEAL]          JOHN M CABOT

[SEAL]          HORACIO LAFER

TIAS 5691

Case 9:20-mj-08171-BER   Document 3-1   Entered on FLSD Docket 04/29/2020   Page 11 of 201

## ADDITIONAL PROTOCOL TO THE TREATY OF EXTRADITION OF JANUARY 13, 1961, BETWEEN THE UNITED STATES OF AMERICA AND THE UNITED STATES OF BRAZIL

The United States of America and the United States of Brazil,

Having concluded at Rio de Janeiro, on January 13, 1961, a Treaty of Extradition for the purpose of making more effective the cooperation between the two countries in the repression of crime,

And desiring to make clear that their respective nationals will be subject to extradition only if the constitutional and legal provisions in force in their territories permit it,

Have resolved to sign an Additional Protocol to the aforementioned Treaty of Extradition and, to this end, have appointed the following Plenipotentiaries:

The President of the United States of America: His Excellency Lincoln Gordon, Ambassador Extraordinary and Plenipotentiary to Brazil, and

The President of the Republic of the United States of Brazil: His Excellency Francisco Clementino de San Tiango Dantas, Minister of State for External Relations,

Who, having communicated to each other their respective full powers, found to be in good and due form, agree as follows:

### ARTICLE I

Article VII of the Treaty of Extradition concluded between the two countries at Rio de Janeiro, on January 13, 1961, shall be interpreted as follows:

"The Contracting Parties are not obliged by this Treaty to grant extradition of their nationals. However, if the Constitution and laws of the requested State do not prohibit it, its executive authority shall have the power to surrender a national if, in its discretion, it be deemed proper to do so."

### ARTICLE II

The present Protocol shall enter into force on the same date as the Treaty of Extradition of January 13, 1961, and shall cease to be effective on the date of the termination of the Treaty.

IN WITNESS HEREOF, the respective Plenipotentiaries have signed the present Additional Protocol and have fixed hereunto their seals.

DONE in duplicate, in the English and Portuguese languages, both equally authentic, at Rio de Janeiro, on this eighteenth day of June, one thousand nine hundred sixty-two.

LINCOLN GORDON

F C DE SAN TIAGO DANTAS

[SEAL]

TIAS 5691

WHEREAS the Senate of the United States of America by their resolution of May 16, 1961, two-thirds of the Senators present concurring therein, did advise and consent to the ratification of the treaty and by their resolution of October 22, 1963, two-thirds of the Senators present concurring therein, did advise and consent to the ratification of the additional protocol;

WHEREAS the President of the United States of America ratified the treaty on May 29, 1961 and the additional protocol on October 29, 1963, in pursuance of the advice and consent of the Senate, and the Government of the United States of Brazil has duly ratified the treaty and the additional protocol;

WHEREAS the respective instruments of ratification of the treaty and the additional protocol were duly exchanged at Washington on November 17, 1964;

AND WHEREAS it is provided in Article XXII of the treaty that the treaty shall enter into force one month after the date of exchange of ratifications, and it is provided in Article II of the additional protocol that the additional protocol shall enter into force on the same date as the treaty;

NOW, THEREFORE, be it known that I, Lyndon B. Johnson, President of the United States of America, do hereby proclaim and make public the said treaty and additional protocol, to the end that the same and every article and clause thereof may be observed and fulfilled in good faith on and after December 17, 1964, one month after the day of exchange of instruments of ratification, by the United States of America and by the citizens of the United States of America and all other persons subject to the jurisdiction thereof.

IN TESTIMONY WHEREOF, I have hereunto set my hand and caused the Seal of the United States of America to be affixed.

DONE at the city of Washington this twentieth day of November in the year of our Lord one thousand nine hundred sixty-four and of the Independence of the United States of America the one hundred eighty-ninth.

[SEAL]

LYNDON B. JOHNSON

By the President:
   GEORGE W BALL
      Acting Secretary of State

TIAS 5691

L/LEI

2019 AUG 20 A 8 43

DEPARTMENT OF STATE

**BRAZILIAN EMBASSY**
WASHINGTON, D.C.

No. 61

The Embassy of the Federative Republic of Brazil presents its compliments to the Department of State and has the honor to present the request from the Brazilian Ministry of Justice and Public Safety for the extradition of the Brazilian national LUCAS CARVALHO ROLLO, whose last known address is ███████████ West Palm Beach, Florida and telephone ██████████.

2.          Mr ROLLO is wanted in an investigation into the rape of a minor, conduct described in Article II, item 2, of the Brazil-United States Extradition Treaty of January, 31, 1961, and its Additional Protocol of June 18, 1962.

3..          Therefore, the Embassy of Brazil hereby forwards a copy of supporting documents, translated into English and duly certified by the American Embassy in Brasilia, and requests the good offices of the Department of State towards making the necessary arrangements for the apprehension and extradition to Brazil of LUCAS CARVALHO ROLLO.

The Brazilian Embassy avails itself of this opportunity to renew to the Department of State the assurances of its highest consideration.

Washington D.C., August 08, 2019






U.S. Department of State

## CERTIFICATE TO BE ATTACHED TO DOCUMENTARY
## EVIDENCE ACCOMPANYING REQUISITIONS IN
## THE UNITED STATES FOR EXTRADITION
## AMERICAN FOREIGN SERVICE

Brasilia, DF, Brazil (07/25/2019)

Place and Date *(mm-dd-yyyy)*

I, _____ David D. Potter _____ , _____ A/Minister Counselor of Consular Affairs

Name                                                    Title

of the United States of America at _____ Brasilia, DF, Brazil _____

hereby certify that the annexed papers, being _____ supporting documents _____

proposed to be used upon an application for the extradition from the United States of America

Lucas Carvalho Rollo

charged with the crime of _____ rape of a minor _____

alleged to have been committed in _____ The Federal Republic of Brazil _____

are properly and legally authenticated so as to entitle them to be received in evidence for similar purposes by

the tribunals of _____ The United States of America _____

as required by Title 18, United States Code, Section 3190.

In witness whereof I hereunto sign my name and cause my seal of office to be affixed

this _____ 25th _____ day of _____ July 2019 _____

Month and Year

Signature

David D. Potter, A/MCCA

Type Name and Title of Certifying Officer
of the United States of America.

DS-0036
03-2015

PODER JUDICIÁRIO DO DISTRITO FEDERAL
CIRCUNSCRIÇÃO JUDICIÁRIA DE BRASÍLIA
VARA DE EXECUÇÕES PENAIS DO DISTRITO FEDERAL (VEP) - SEEU
FÓRUM PROFESSOR JÚLIO FABBRINI MIRABETE, SRTVS - QD. 701 - LOTE 8R , - BLOCO N, 2º ANDAR, SALA
205 - BRASÍLIA /DF - CEP: 70.340-000 - Fone: 6131031511 - E-mail: vep@tjdft.jus.br

### Autos nº. 0017372-86.2016.8.07.0015

Processo: 0017372-86.2016.8.07.0015
Classe Processual: Execução da Pena
Assunto Principal: Pena Privativa de Liberdade
Data da Infração: Data da infração não informada
   Polo Ativo(s): • Tribunal de Justiça do Distrito Federal e dos Territórios
   Polo Passivo(s): • LUCAS CARVALHO ROLLO

Para fins de instrução da Extradição do sentenciado LUCAS CARVALHO ROLLO, **segue FORMULÁRIO PARA PEDIDO DE EXTRADIÇÃO devidamente preenchido.**

**Oficie à Secretaria de Cooperação Internacional, do Ministério Público Federal, remetendo cópias da carta de guia, da denúncia, da Portaria de instauração do Inquérito Policial, da Sentença Absolutória, do Acórdão Condenatório, do mandado de prisão e trânsito em julgado do processo de execução, da Conta de Liquidação, bem como da presente decisão com o FORMULÁRIO PARA PEDIDO DE EXTRADIÇÃO devidamente preenchido e do texto dos artigos 33, 71, 217-A e Título VIII (DA EXTINÇÃO DA PUNIBILIDADE, Arts. 107/120), todos do Código Penal, solicitando a cooperação para a tradução, para o Inglês, e posterior remessa a este Juízo, para fins de instrução da Extradição do sentenciado LUCAS CARVALHO ROLLO.**

**Encaminhe-se cópia desta decisão com o FORMULÁRIO PARA PEDIDO DE EXTRADIÇÃO devidamente preenchido à Coordenação de Extradição e Transferência de Pessoas Condenadas do Ministério da Justiça, informando que este Juízo aguarda a tradução para o Inglês pela Secretaria de Cooperação Internacional, do Ministério Público Federal, para posterior encaminhamento.**

Após a chegada da tradução, **remetam todos os documentos informados, acompanhados da respectiva tradução, à Coordenação de Extradição e Transferência de Pessoas Condenadas do Ministério da Justiça.**

### FORMULÁRIO PARA PEDIDO DE EXTRADIÇÃO

**Tramitação em Sigilo?**

Sim. Este Juízo entende que há necessidade de tramitação sigilosa do pedido de extradição, em virtude da natureza do delito cometido, bem como da necessidade de resguardar os direitos fundamentais do sentenciado, tendo em vista que já houve exposição pública do presente caso, inclusive na imprensa.

**1) Destinatário:** GOVERNMENT EXHIBIT 1_20-MJ-8171-BER_015

Governo dos Estados Unidos da América

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em http://seeu.pje.jus.br/seeu/ - Identificador: PJXAP QL9GY H4P29 FGEYA

PROJUDI - Processo: 0017372-86.2016.8.07.0015 - Ref. mov. 17.1 - Assinado digitalmente por Leila Cury:310981
06/06/2019: OUTRAS DECISÕES. Arq: Decisão

**2) Autoridade Central Remetente:**

Departamento de Recuperação de Ativos e Cooperação Jurídica Internacional/ Secretaria Nacional de Justiça/Ministério da Justiça do Brasil.

**3) Autoridade Judiciária Requerente?**

VARA DE EXECUÇÕES PENAIS DO DISTRITO FEDERAL (VEP/DF)

ENDEREÇO: FÓRUM PROFESSOR JÚLIO FABBRINI MIRABETE, SRTVS - QD. 701 - LOTE 8 - BLOCO N, 2º ANDAR, SALA 205 - BRASÍLIA /DF - CEP: 70.340-000

Fone: 6131031511

E-mail: vep@tjdft.jus.br

**4) Descrição do pedido:**

Solicito a extradição de LUCAS CARVALHO ROLLO ao Brasil para:

Cumprir pena de 9 (nove) anos e 4 (quatro) meses de reclusão em regime fechado a que foi condenado pelo cometimento do crime capitulado no art. 217-A, caput, do Código Penal, por duas vezes, na forma do art. 71 do Código Penal (Crime continuado).

Segue anexa Conta de Liquidação com o cálculo da pena restante.

**5) Dados de identificação civil e de qualificação:**

Nome: LUCAS CARVALHO ROLLO

Alcunha: não informada

Nacionalidade: Brasileira, com informações que possui cidadania americana e passaporte

Data de nascimento ▇▇▇▇▇

Filiação: Tomas Owen Rolo e Angelina Carvalho Rollo

Natural de Florianópolis/SC

Carteira de Identidade ▇▇▇▇ - Órgão Expedidor: SSP/DF

CPF: ▇▇▇▇▇

Endereços Residenciais: ▇▇▇▇▇▇▇▇
▇▇▇▇▇▇ Pires/DF.

GOVERNMENT EXHIBIT 1_20-MJ-8171-BER_016

Documento assinado digitalmente, conforme MP nº 2.2.... 2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em http://seeu.pje.jus.br/seeu/ - Identificador: PJXAP QL9GY H4P29 FGEYA

Case 9:20-mj-08171-BER Document 3-1 Entered on FLSD Docket 04/29/2020 Page 17 of 201
JJUDI - Processo: 0017372-86.2016.8.07.0015 - Ref. mov. 17.1 - Assinado digitalmente por Leila Cury:310961
06/2019: OUTRAS DECISÕES. Arq: Decisão

Documento assinado digitalmente, conforme MP n° 2.200-2/2001, Lei n° 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em http://seeu.pje.jus.br/seeu/ - Identificador: PJXAP QL9GY H4P29 FGEYA

**6) Indicação do paradeiro do foragido:**

West Palm Beach, Flórida/USA, telefone +

Esclareço que a informação referente ao domicílio do sentenciado nos Estados Unidos da América chegou aos presentes autos de maneira informal, trazida pela mãe da vitima do crime pelo qual o apenado foi condenado, não havendo neste processo qualquer comprovação oficial do referido endereço.

**7) Referência:**

Execução Penal 0017372-86.2016.8.07.0015 - Número antigo 2016.01.1.097557-6 (Origem - Ação Penal 2014.07.1.009404-2 - 0009157-19.2014.8.07.0007 - Inquérito Policial n° 107/2014-38ª Delegacia de Polícia de Vicente Pires/DF).

**8) Resumo dos fatos atribuídos a LUCAS CARVALHO ROLLO e estágio atual do processo:**

De acordo com a Denúncia o réu LUCAS CARVALHO ROLLO:

*"I. De data indeterminada, até o dia 02 de fevereiro de 2014, por volta das 17h45min, no SHVP,                Pires/DF, o denunciado LUCAS CARVALHO ROLLO, de forma livre e consciente, por diversas vezes, praticou atos libidinosos com a criança                (nascida aos              , fls. 13), menor de 14 (catorze) anos de idade à época dos fatos.*

*II. Conforme incluso autos de inquérito, no dia 02 de fevereiro de 2014, o denunciado chamou a vítima no quarto dele e molestou-a sexualmente, mediante a prática de atos libidinosos consistentes em retirar suas roupas, tocar o corpo dela, inclusive nas partes intimas, esfregar-se nela, ficar em cima dela e encostar seu pênis nas partes intimas da vítima, dentre outros.*

*Entrevistada, a vítima-criança narrou os abusos sexuais sofridos (fls. 30/38), mencionando ainda que tais fatos já haviam ocorrido anteriormente, em várias outras oportunidades.*

*Conforme Laudo de Constatação de Material Biológico (fls. 57/65), "nas amostras de tecido recortadas da calcinha, do short e da camiseta foi constatada a presença de sangue humano e de sêmen". E, consoante Laudo de Exame de DNA (fls. 67/71), restou demonstrada a presença de material biológico do denunciado na calcinha, no short e no lençol.*

*III. Com suas condutas, o denunciado está incurso no art. 217-A, caput, do Código Penal (por diversas vezes). ..."*

Durante a instrução processual, o Juízo sentenciante relatou:

*"Recebida a denúncia à A. 83. O réu compareceu espontaneamente em Juízo e apresentou resposta à acusação, por meio de advogado constituído (fls. 131/135). Na oportunidade, tece comentários sobre o mérito, requer a absolvição e arrola testemunhas.*



GOVERNMENT EXHIBIT 1_20-MJ-8171-BER_017

*No dia 16 de abril de 2014 foi cumprido, mandado de prisão preventiva expedido*

PROJUDI - Processo: 0017372-86.2016.8.07.0015 - Ref. mov. 17.1 - Assinado digitalmente por Leila Cury:310981
06/06/2019: OUTRAS DECISÕES. Arq: Decisão

*em desfavor do acusado por força da decisão de fl. 88. Concedida liminar em Habeas Corpus e, no mérito, foi denegada a ordem (fls. 99/100 e 169/175). O réu foi novamente recolhido à prisão em 06 de junho de 2014 (fls. 176/177).*

*Instruído o feito com o Exame de Corpo de Delito realizado na vítima (II. 16), Auto de Apresentação e Apreensão (fl. 31), Exame de Constatação de Material Biológico (fls. 61/69); Laudo de Exame de DNA (fls. 70/73-A), Aditamento do Laudo de Exame de Corpo de Delito (fls. 282/283), Resposta a Quesito — Laudo de Exame de DNA ([Is. 316/317), Informação Pericial (fls. 319/322).*



*Ainda em fase instrutória, foram ouvidos os genitores da vítima, Luis Augusto Alves Nepomuceno e Raquel Pereira da Costa (fls. 271/274), as testemunhas Márcia Martins Morais Costa (fl. 275), Aline Fernandes Cardoso e Mauricio Moura de Souza (fls. 299/300) e os informantes Josineide Carvalho dos Anjos, Nayara de Carvalho Ferreira, Jorge' Alberto Carvalho de Souza e Suellen.*

*Na fase do artigo 402, do Código de Processo Penal, a Defesa requereu a realização de exame Ultrasson na vítima, bem como a remessa dos altos ao IPDNA/IC para resposta aos quesitos formulados nos itens 6.2 e 6.3 do laudo de fls. 244/247, além de requerer esclarecimento acerca do material recolhido da calcinha, short e lençol apreendidos (fl. 298). O Minisério Público nada requereu.*

*Alegações finais do Ministério Público as fls. 344/348, postulando pela condenação nos termos da denúncia.*

*A Defesa, também em razões derradeiras, suscita defesa indireta processual de cerceamento de defesa. No mérito, em extenso e bem fundamentado arrazoado, requer a absolvição.".*

Por sentença proferida em 03 de fevereiro de 2015, o denunciado foi absolvido da imputação que lhe foi feita, fundamentando e decidindo da seguinte forma:

" Inicialmente, cumpre registrar que o feito transcorreu sem qualquer eiva de nulidade, com estrita observância aos princípios do contraditório e ampla defesa e adoção do rito adequado à espécie, qual seja, o previsto nos artigos 396 e seguintes, do Código de Processo Penal, Ademais, a defesa indireta processual suscitada não merece acolhida. Olvida-Se a Defesa que o julgador é o destinatário da prova, a quem cabe valorá-la e conferir a credibilidade que entender devida. Assim, não se vislumbrando a sua real necessidade, mormente porque o fato que se pretende provar com o exame de ultrassom pode ser esclarecido pela prova oral, nãO se cogita em cerceamento de defesa, razão por que rejeito a defesa processual e adentro ao exame do mérito.

1 — DA MATERIALIDADE A peça vestibular imputa ao réu LUCAS CARVALHO ROLLO o crime tipificado no artigo 217-A, capta, do Código Penal, em razão de, supostamente e por diversas vezes, ter praticado atos libidinosos com a criança ▬▬▬▬▬▬▬▬, menor de 14 (catorze) anos de idade à época dos fatos. Pois bem. Tudo principiou com o Registro de Ocorrência Policial IP 1.424/2014-0, levado a efeito pelo policial militar Jorge Alberto Carvalho de Sousa, acostado às fl. 12/14. Na oportunidade, ficou consignado que "...SEGUNDO O PAI DA VÍTIMA ENCONTRA-SE NA CASA DE SUA 77A COM SUA FILHA E SEU PRIMO LUCAS, E QUE SUA FILHA FOI PARA O ANDAR DE CIMA, ONDE PICAM OS QUARTOS , E PERMANECEU POR ALGUNS MINUTOS ESTRANHANDO SUA DEMORA. RESOLVEU PROCURAI? PELA FILHA:CHAMANDO-A EM -VOZ ALTA ▬▬▬▬ DESCEU DIZENDO QUE IA TOMAI? UM BANHO. QUESTIONANDO A ATITUDE DA MENINA. FALOU QUE NÃO ERA HORA DE TOMAR BANHO E PERGUNTOU O POROQUE. A MENINA RESPONDEU QUE ESTAVA SANGRANDO. PERGUNTOU PORQUE ELA ESTARIA SANGRANDO, A MENINA RESPONDEU QUE O LUCAS ESTAVA EM CBOWERNMENT EXMIBITE NÇOMJEM7 QLER ËLCOU FORA DE 81. SUBIU E PEGOU O SUSPEITO TOMANDO BANHO, PEDIU QUE ELE ABRISSE A PORTA, LUCAS ABRIU PUXOU ELE I'ARA BAIXO E CONFIRMOU COM SUA FILHA SE LUCAS TINHA MEXIDO COM

Case 9:20-mj-08171-BER Document 3-1 Entered on FLSD Docket 04/29/2020 Page 19 of 201
(OJUDI - Processo: 0017372-86.2016.8.07.0015 - Ref. mov. 17.1 - Assinado digitalmente por Leila Cury:310981
6/06/2019: OUTRAS DECISÕES. Arq: Decisão

ELA E ▮ CONFIRMOU QUE SIM. PERGUNTOU A LUCAS O QUE ELE FEZ COM A MENINA, MAS LUCAS NEGAVA O TEMPO TODO DIZENDO QUE NÃO FEZ NADA REVOLTADO E IRADO, LIGOU PARA SUA 77A PEDINDO AJUDA SE NÃO IRIA PERDER A CABEÇA E MATAR LUCAS, MOMENTO EM QUE CHEGOU SEU PRIMO JORGE ALBERTO CARVALHO DE SOUSA. POLICIAL MILITAR E OS CONDUZIRAM ATÉ A 38" DP PARA REGISTRO DE OCORRÊNCIA, APRESENTANDO AS ROUPAS INTIMAS DA MENINA. APARENTEMENTE SUJAS DE SANGUE. NESTA DELEGACIA A MENOR ▮ FOI ENTREVISTADA. DEVIDO A SUA IDADE 06 ANOS. NÃO SOUBE EXPLICAR BEM O QUE ACONTECEU MAS EXPLICOU QUE LUCAS PASSOU UM PRODUTO NAS SUAS PARTES INTIMAS E QUE DEITOU EM CIMA DELA. PEDINDO-A QUE LEVANTASSE O I3UMBUM DIZENDO CHIE ELA ESTAVA SANGRANDO ...A MENOR 1701 ENCAMINHADA AO IML, NO EXAME DE CORPO DE DELITO. CONJUNÇÃO CARNAL, LAUDO Nº 04281/144ML/PCDF, DEU :NEGATIVO, NÃO ENCONTRANDO SINAIS DE bANCRAMENTO OU ATO LIBIDINOSO. UMA EQUIPE FOI ATÉ A RESIDÊNCIA DA VITIMA E EM BUSCA DE VESTiGIOS NO QUARTO DO SUSPEITO. NADA FOI ENCONIRADO.MAS NO QUARTO AO LADO, ONDE SEGUNDO INFORMAÇÃO DA VITIMA ESTEVE COM LUCAS FOI ENCONTRADO UM LENÇÕL COM MANCHAS DE SANGUE. PARA PO57E121012 EXAMES PERICIAIS ENTREVISTADO LUCAS NEGA AS AFIRMAÇÕES FEITAS PELA CRIANÇA ISABEL. AS ROUPAS DA CRIANÇA E O LENÇOL FORAM APREENDIDOS PARA PERÍCIA, PARA VERIFEÇAR SE TRATA-SE OU NÃO DE SANGUE HUMANO." II Assim, quando a suposta notícia do crime foi levada a conhecimento da autoridade policial, a menor Isabel Luisa da Costa Nepornuceno foi submetida a Exame de Corpo de Delito, resultando no Laudo '1 n0 04281/14 juntado à fl. 16. Na ocasião, os senhores experts já puderaín descrever, no item 4, que "...ausência de vestígios de violência fisica, genitália i externa co;,? as seguintes características ou alterações: ausência de lesões em valva, perineo e dn1 1.Ç: ril7US com Binas normal: ausência de sinais de sangramento, presença se .vecreção 'clara sobre a valva e ânus. 1-limem integro.". Mais adiante, concluíram: "Aguardar. Rimem integro e ónus sem sinais de penetrações." Ainda em fase inquisitória, o genitor da vitima, Luis Augusto Alves Nepomuceno foi ouvido e trouxe versão mais detalhada do sucedido naquele, dia, como se vê de fls. 21/23. Ele contou que "...no dia 02.02.2014 (domingo) estava passando o dia na residência de sua tia, de nome MARIA CECILIA DE CARVALHO...acompanhado de sua filha ▮ : QUE, no local também reside um primo' do declarante de nome LUCAS CARVALHO ROLLO...; QUE por volta das ) 161415min. sua filha fin para o andar de cima da residência,, onde se encontrava LUCAS, enquanto o declarante ficou no andar de baixo assistindo a uma partida de futebol pel ,la lele visão: QUE, após uns dez a quinze minutos o declarante`procurou ▮ chamando-a pelo nome, porém ela não respondeu: QUE, insistindo o l declarantej gritou o nome de ▮ em tom de vóz mais alto e somente assim ela desceu a escada, vestida com as mesmas roupas que já usava antes de subir para o outro andar da casa; QUE, logo que desceu ISABEL foi log dizendo que queria tomar banho, MOMelno em que o declaranie. falou que não era hora dela tomar banho: OUE. ▮ re.Tondeu que queria tomar banho porque estava sangrando. QUE, o declarante questionou porque ela estava SUIlgitMCIO e ao mesmo tempo o declarante ainda perguntou se o LUCAS havia mexido com ela; QUE. ISABEL respondeu: "MEXEU PAPAI! O LUCAS ESTAVA EM CIMA DE MIM! PASSOU UM PRODUTO NA MINHA BUNDINHA E NA MINHA PERERECA E PEDIU PARA EU LEVANTAR A BUNDINHA PARA ELE!": OUE, o declarante verificou as ' ,estes de ▮ e constatou (pie ela apresentava bastante sangram ento nas roupas, na altura dos • órgãos • genitais; QUE, o declarante ficou M11110 nervoso e subiu as escadas imediatamente para encontrar LUCAS: QUE, naquele momento LUCAS já eslava tomando banho; QUE, o declarante perguntou se ele havia Mexido com ▮ e respondeu que não; QUE. o declarante o puxou para o andar de baixo e o colocou de frente para ▮ , perguntando a ela se realmente ele havia . feito aquilo que ela falou; QUE, ▮ confirmou a história na ,frente dc LUCAS, repetindo que ele estava em cima dela...: QUE sua tia chegou alguns minutos depois acompanhada de outros membros da família e iodos questionaram a LUCAS o que tinha frito, porém sempre negava; OLIE, o declarante resolveu trazer LUCAS até esta Delegacia para registro da ocorrência, trazendo também sua filha ▮ para ser 01Wida e submetida a exames periciais...; QUE, naquela DP ▮ foi entrevistada por uma Policial feminina, tendo confirmado tudo que já havia falado para o declarante...; QUE, deseja ainda acrescentar quê ▮ chegou a comentar com o declarante que LUCAS já havia mexido com ela em outras oportunidades, porém ele sempre negava tudo e dava-lhe presentes para distraí-la e calá-la...". Declarações ratificadas em Juízo como se denota de fls. 271/272. A genitora da menor, RAQUEL PEREIRA DA COSTA, a despeito de não se encontrar no local no dia do acontecido, também foi ouvida pela autoridade policial e disse que

Documento assinado digitalmente. conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPROE
Validação deste em http://iseeu.pje.jus.br/seeu/ - Identificador: P.JXAP QL9GY H4P29 FGEYA

...a menina estava em companhia do pai LUIS AUGUSTO, vez que a declarante estava internada com problemas de depressão; QUE só ficou sabendo do fato na data de ontem; QUE. esclarece que antes do julo, ▮▮▮▮▮ costumava freqüentar a casa da tia MARIA CECILIA,. QUE, já estranhou o fato dela ficar IMMO tempo no quarto com LUCAS; QUE, sempre que ISABEL voltava da casa de MARIA CECILIA a declarante percebia vermelhidão e inchaço no órgão genital de sua filha e sempre perguntava a ela se alguém havia mexido" com ela, mas a criança nunca contou nada; QUE, certa vez ▮▮▮▮▮ apresentou corrimento na vagina e a declarante estranhou aquele fáto, mas como ▮▮▮▮▮ não relatou nenhum acontecimento estranho, acabou deixando -pra lá", QUE, certa vez ▮▮▮▮▮ falou que ficava brincando com LUC4S de "travesseiro" -...", fl. 25. De sua parte, a menor Isabel Luisa da Costa Nepomuceno foi submetida à entrevista especial na Seção de Atendimento Técnico da Delegacia de Proteção à Criança c ao Adolescente. Ela confirmou a versão apresentada pelo pai naquele dia, acrescentando que o sangue encontrado em seu corpo e vestes era do "pinto de Lucas", conforme fls. 34/42. Pois bem. Dois questionamentos se colocam até o momento. O primeiro guarda pertinência com a origem do sangue encontrado nas vestes da menor, já que, submetida a exame preliminar ainda no dia do acontecido, os, senhores peritos de antemão concluíram pela ausência de lesões na vulva, períneo e ânus da criança, ausência de sinais de sangrarriento, integridade do hímen e ânus, além da ausência de sinais de penetraçries, conforme fl. 12. Já, o segundo, que é crucial ao deslinde da controvérsia, pois a denúncia não imputa ao réu a prática de conjunção carnal, Mas de atos libidinosos em geral, diz respeito à credibilidade das declaracées da suposta vitima, pois, segundo a menina, "0 Lucas passou um produto eiu mim... Era um produto branco que ele passou na minha pererera e no meu bumbum..." (fl. 37), lembrando ainda que, segundo o pai, a menina disse que "...O LUCAS ESLAVA EM C:IMA DE MIM! PASSOU UM PRODUTO NA MINHA BUNDÍNHA E NA MINHA PERERECA E PEDIU PARA EU LEVANTAR? A BUNDINHA PARA ELE!" (fl. 21). Evidenciado o cerne da controvérsia, nesse momento é de todo oportuno reportar ao Exame de Constatação de Material Biológico (fls. 61/64) realizado na calcinha e short da criança, em uma camiseta utilizada pelo acusado c em um lençol localizado em um dos cômodos da residência (Amo de Apresentação e Apreensão n° 119/2014). Diante da importância das considerações traçadas pelos senhores peritos, vale transcrever na integra o subitens que tratam dos Exames de Laboratório realizados no material, as Considerações TécnicoPericiais e, por fim, a conclusão, nos termos a seguir: III — EXAMES (.•.) b) De Laboratório b.1) Pesquisa de sangue humano As amostras coletadas da calcinha, do short, da camiseta e do lençol foram submetidas à extração adequada e cm seguida ao Teste de Imunocromalogratia para Hemoglobina Hurna na obtendo-se o resultado positivo para as quatro amostras. 1).2) Pesquisa de espermatozoides As amostras recortadas da calcinha, short e da camiseta foram utilizadas para o preparo de (J3 lâminas de cada amostra, as quais foram submetidas à pesquisa de espematozóides, obtendo-se resultado negativo para espermatozoides. b.3) PSA Em seguida, procedeu-se ao teste de Imunoeromatografia isara presença de PSA (antígeno prostático específico), obtendo-se resultado positivo para as três amostras. IV — CONSIDERAÇÕES TÉCNICO-PERICIAIS O Antígeno Prostático Específico (PSA) é urna glicoproteína (34.000 daltons) presente no plasma seminal, é sintetizada pela glândula prostática e expressa em altos níveis no cpitélio da próstata hurnana. A presença de PSA no. esperma em concentrações milhões de vezes maiores que no soro de homens a caracterizou como um marcador valioso, já testado e validado pela comunidade forense, para a identificação de fluido seminal em evidências criminais deixadas por indivíduos vasectomisados, azoospérmicos ou oligozoospérmicos. V - CONCLUSÃO Assim, em face do exposto e analisado, concluem os Peritos que nas amostras de tecido recortadas da calcinha, do short e da camiseta foi constatada a presença de sangue humano e de sêmen, porém não foi constatada a presença de espermatozoides• e q tio na amostra de tecido recortada do lençol foi constatada a presença sangue humano conforme mencionado no item (...)" • Passo seguinte, foi realizado Exame de DNA para confronto do material biológico extraído da secreção perigenital, de recortes de tecido da calcinha e short de Isabel, da camiseta do acusado e do lençol, com aS amostras biológicas coletadas de ambos, resultando na elaboração do Latido de Exame de DNA juntado às fls. 70/73-A. Agora também se faz mister '1 transcrever parte das informações periciais, eis que essenciais à formação do convencimento deste Magistrado. Vejamos: V. RESULTADOS Após amplificação das amostras para os marcadores autossiimicos, observou-se que: • Na amostra de secreção perigenital foi identificado um perfil genético único, proveniente de uma pessoa do sexo feminino idêntico ao perfil identificado na amostra biológica coletada de Isabel Luisa da Costa Nepoinaceno. (.•.) • Nas amostras obtidas cio short e do lenço/ foi observada mistura de material genético de pelo menos duas pessoas, sendo uma do sexo masculino e uma do sexo feminino. O perfil observado em maior quantidade nesta mistura é proveniente de uma pessoa do sexo masculino e é idêntico ao perfil identificado na amostra biológica coletada de Lucas Carvalho RUIM. O. perfil observado em menor

GOVERNMENT EXHIBIT 1_20-MJ-8171-BER_020

Case 9:20-mj-08171-BER   Document 3-1   Entered on FLSD Docket 04/29/2020   Page 21 of 201
JUDI - Processo: 0017372-86.2016.8.07.0015 - Ref. mov. 17.1 - Assinado digitalmente por Leila Cury:310981
/06/2019: OUTRAS DECISÕES, Arq: Decisão

quantidade nesta mistura é idêntico ao perfil identificado na amostra biológica coletada de Isabel Luisa da Costa NepOIMICello. • Na amostra obtida da calcinha foi observada uma mistura de material genético de pelo menos duas pessoas. O perfil observado em maior quantidade nesta mistura é proveniente de uma pessoa do sexo feminino e idêntico ao perfil identificado na amostra biológica coletada de Isabel Luisa da Costa Neponiuceno. O perfil observado em menor quantidade nesta mistura é idêntico ao perfil identificado na amostra biológica coletada de Lucas Carvalho Rol/o. Após ampliação da amostra para os marcadores do cromossomo Y, observou-se que nas amostras de secreção perigenital, da calcinha, do short, da camiseta c do lençol, foi identificado um hapIptipo do cromossomo Y único que é idêntico ao haplotipo identificado na amostra biológica coletada de Lucas Carvalho Rollo. A probabilidade de se selecionar ao acaso na população masculina uma pessoa não relacionada apresentando o mesmo haplotipo é de aproximadamente 1 em 14.928 (um em quatorze mil novecentos c vinte e oito). VI CONCLUSÃO Considerando o objetivo pericial proposto, as signatárias concluem que: • O perfil genético observado na amostra catletada de Lucas Carvalho Rollo é idêntico ao perfil genético de origem masculina observado na rani iseta, amostra relacionada ao Inquérito Policial n" 107/14 — 38" DP. A probabilidade de se relacionar ao acaso na população masculina uma pessoa $n[10$ relacionada apresentando o mesmo perfil 1 de aproximadamente 1 cm 38.000.000.000.000.000.000.000.000 (uma em trinta e oito septilhões). • O perfil genético observado na amostra coletada de Lutas Carvalho Rollo é idêntico cm 1 cl os os marcadores ao perfil obtido em maior quantidade nas amostras obtidas do short e do lençol e ao perfil obtido em menor quantidade na tmostra obtida da calcinha, amostras relacionadas ao Inquérito Policial a' 107/24— 38a DP. • o haplálipo do cromossomo Y observado na amostra coletada de Lucas Carvalho Rolf° é idêntico em todos os marcadores analisados, ao perfil genético de origem masculina observado nas amostras de secreção PC cigen ital (relacnada ao Laudo de Exame de :Corpo dc Delito — Atos Libidinosos e Conjunção Carnal n" 4.281/14), na calcinha, no símil, na camiseta e no lençol, amostras relacionadas ao Inquérito Policial n" 107/14 — 38" DP. A probabilidade de se selecionar ao acaso na população masculina uma pessoa não relacionada apresentando • o mesmo perfil é de aproximadamente 1 em 14.928 (uma em quatorze mil novecentos e vinte c oito. A obtenção de perfis coincidentes nos ma veadores' do cromossomo Y indica mesma origem oti mesma linhagem patribinea entre os indivíduos que produziram as amostras. (--)" Do que restou expendido até então, exsurge questão crucial que não passou despercebida pela Defesa c à minuciosa análise da prova técnica realizada por este Magistrado. Em um primeiro momento, os senhores peritos apontam que na amostra de secreção perigenital foi identificado um perfil genético único proveniente de uma pessoa do sexo feminino idêntico ao perfil identificado na amostra .biológica coletada de ███ (fl. 72). Em seguida, ressaltam que após amplificação da amostra para os marcadores do cromossomo Y, observou-se que nas amostras de secreção perigenital, da calcinha, do short, da camiseta c do lençol, foi identificado um haplótico do cromossomo Y único que é idêntico ao haphitipo identificado na amostra biológica coletada de o acusado Lucas (fl. 73). A contradição é latente. Diante disso, indaga-se: na amostra de secreção perigenital da suposta vitima foi ou não encontrado material biológico do réu Lucas Carvalho Rollo? Até que se poderia cogitar que o contrassenso se mostra de somenos importância, pois também foi encontrado material biológico do réu no ishort e na calcinha da vitima. Todavia, é de todo oportuno lembrar que o acervo probatório revela que no dia dos fatos, e até mesmo antes disso, 'o réu e a suposta vitima coabitavam, pois o genitor da criança afirmou em Juizo que "...estava passando uns dias na casa de sua Tia Maria Cecília IC-0111 a vitima, em razão de sua esposa está internada...; que Lucas é filho adotivo de outra tia Maria Angelina: que Lucas reside na casa da lia Maria Cecilia: que quando ocorreu os fatos já estava hospedado na casa da tia Maria Cecilia 15 dias aproximadamente..." (fl. 271). Diante disso, flagrante a possibilidade da existêneia de contato físico anterior entre a vítima e o acusado que pode justificar a presença de material biológico do réu nas vestes da menina. Aliado a isso, insta lembrar que, à exceção da secreção perigenital, o material examinado foi apreendido no dia seguinte ao acontecido, ou seja, aos 03.02.14 (Auto de Apresentação e Apreensão de fl. 31), porr agente de policia que, certamente, não se cerca de cuidados técnicos próprios de uma equipe de profissionais peritos. Por isso, também não se descarta uma possível influência de interferentes como, por exemplo,, o contato de umas peças com as outras, o que pode justificar a presença 'de material biológico do réu nas vestimentas da menor. Por isso, repise-se, de crucial importância superar a contradição apontada alhures. Em reposta ao quesito formulado pela Defesa fl. 247, ás senhores peritos apresentaram informações nos seguintes termos (fls. 316/317): RESPOSTA AO QUESITO REFERENTE AO ITEM 6.2 Quesito único: O quesito indaga se o material identificado nas amostras de secreção perigenital referente ao Inquérito Policial foi ou não material genético. Resposta: Não. Na análise dos marcadores autossômicos da amostra da região perigenital foi detectado apenas um perfil de origem feminina, idêntico ao perfil identificado na amostra biológica coletada de Isabel Luisa da

Documento assinado digitalmente, conforme MP n° 2.200-2/2001, Lei n° 11.419/2006, resolução do Projudi, do TJ PROE
Validação deste em http://sseu.pje.us.br/sseu/ - Identificador: PJXAP QL9GY H4P29 FGEYA

PROJUDI - Processo: 0017372-86.2016.8.07.0015 - Ref. mov. 17.1 - Assinado digitalmente por Leila Cury:310981
06/06/2019: OUTRAS DECISÕES. Arq: Decisão

Costa Nepomuceno. kessalte-se que quando existe uma quantidade muito maior de DNA feminino (proporção do DNA majoritário igual ou superior a 50:1) a presença de DNA masculino abaixo de um limite mínimo não produz ampliação para marcadores autossômicos, impedindo a detecção do perfil genético masculino presente em menor quantidade. Por outro lado, quando da análise do cromossomo Y, como apenas o contribuinte do sexo masculino possui este cromossomo, mesmo na presença de urna quantidade desproporcionalmente maior de DNA feminino este pode ser evidenciado, fato que explica os achados da amostra coletada da região perigenital. Ocorre que, a informação técnica em realce não foi capaz de espancar a dúvida semeada na formação do convencimento deste julgador. Agora, os senhores peritos a'firmam que o. material identificado nas amostras de secreção perigenital não tem um único material genético e justificam que quando existe unia quantidade muito maior de DNA feminino, a presença de DNA masculino abaixo de um limite mínimo não produz ampliação para marcadores autossômicos, impedindo a detecção do perfil genético masculino presente em menor quantidade. Contudo, e por outro lado, afirmam que quando da análise do cromossomo Y, como apenas o contribuinte do sexo masculino possui este cromossomo, mesmo na presença de uma quantidade desproporcionalmente maior de DNA feminino este pode ser evidenciado, fato que explica os achados da amostra coletada da região perigenital. Ora, se quando existe uma quantidade muito maior de DNA feminino, a presença de DNA masculino abaixo de um límite mínimo não produz ampliação para marcadores autossomicos, impedindo a detecção do perfil 'genético masculino presente em menor quantidade, como pode ao mesmo tempo, concluir pela presença do perfil genético do acusado na secreção perigenital? A meu ver, a contradição não foi suplantada'. • Prosseguindo na análise da prova técnica, insta lembrar que, inicialMente, os experts concluíram pela presença de sangue humano e de sêmen nas amostras de tecido recortadas da calcinha e do short da vítima, como também da camiseta do acusado (fl. 63). Em seguida, e, de igual modo, 'em resposta ao quesito formulado pela Defesa, apresentaram informações no seguinte sentido (fls. 319/322): "C•.) I. Resposta ao quesito referente ao item 6.3 constante no Parecer Técnico Pericial (fls. 244-247) e anexos (lis 248-262) Quesito único: O quesito indaga sobre a identificação de sêmen somente pela presença de PSA e a ausência de descrição dos outros componentes desse fluido (espermatozóides, aminoácidos, prostaglandinas, fosfatas@ ácida, zinco, enzimas proteolíticas, c gal actose). Resposta: Com exceção da fosfatase ácida c espermatozóides, a Seção de Perícias e Análises Laboratoriais não dispõe de metodologia para identificação dos outros componentes do sêmen. Entretanto, é necessário esclarecer os seguintes pontos: As amostras forenses normalmente se encontram em condições adversas antes da coleta, sujeitas a intempéries e ação de microrganismos, diferente de urna amostra coletada e um laboratório de análises clínicas. Isso significa que as amostras analisadas em um laboratório forense geralmente apresentam quantidade reduzida, contaminações e muitas vezes perderam parte de sua composição por degradação ambiental ou biológica. Desse 'modo, a caracterização de fluidos biológicos, em âmbito forense, busca identificar componentes únicos de cada fluido, afim de evitar análises que possam gerar resultados inconclusivos. Ou seja, a identificação de galactose, enzimas proleoliticas e zinco, não permitiria conclusão alguma, pois uma mancha em uma veste contendo essas substâncias poderia possuir diversas origens diferentes, dentre as quais, outros fluidos corpóreos, restos de alimentos, etc. A ciência forense, no caso de identificação de sêmen, utiliza a constatação de espermatozoides para a identificação desse fluido. Inclusive porque sua identificação orienta o uso de técnica específica para extração de DNA. Porém há casos onde o sêmen pode não conter espermatozóides, por exemplo, em indivíduos vasectomizados. Uma solução para esses casos é. a utilização de outros marcadores de sêmen. A comunidade forense, geralmente, utiliza um entre dois: a fostalase ácida prostática (FAP) e o antígeno específico da próstata (PSA). A FAP foi bastante utilizada na investigação e caracterização do líquido seminal. Porém, foi considerado um marcador de sensibilidade e especificidade limitado, entrando em desuso após a descoberta do PASA (Cândido et (IP.). O PSA, por outro lado, pode ser identificado como uso de ensaios iinunocromatográficos, testes bastante específicos e sensíveis capazes de detectar concentrações de até 4 ng/mL. Esses testes são utilizados por diversos laboratórios forenses (khaldi et al. 20042, Hochmeister et al. 19993; Simich al. 1994). Entretanto, essa glieoproteina (PSA) não ocorre exclusivamente no sêmen, estudos demonstram a presença de PSA em níveis detectáveis pelo teste imunocromatográfico em soro de mulheres com câncer de mama (8,153 ng/MI), cru urina de mulheres ingerindo testosterona (12,00 ng/MI) e com síndrome de ovário policístico (10,29 ng/mL), em leite materno (350 ng/mL) (Sawaya & Rolim'), e em urina de homens após a ejaculação (260 ng/M1) (Gartside et al. 20036). Ressalte-se que a concentração média do PSA no seinen varia entre 0,4 x 106 ng/ml, c 1,29 x 106 ng/mL, cerca de um milhão de vezes mais concentrado do que observado nos outros fluidos (Sawaya & Rolims). Contudo, um estudo demonstrou

GOVERNMENT EXHIBIT 1, 20-MJ-8171-BER_022

Documento assinado digitalmente, conforme MP n° 2.2±±-2/2001, Lei n° 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em http://seeu.pje.jus.br/seeu/ - Identificador: PJXAP QL9GY H4P29 FGEYA

PDDF: Processo: 0011272.86.2016.8.07.0019 - Ref. mov. 17.1 - Assinado digitalmente por Leila Cury.310981
06/2019: OUTRAS DECISÕES. Arq: Decisão

Considerando os estudos acima citados, a extração de manchas leite materno e urina de homens após a ejaculação resultariam em urna concentração de 3,50 ng/mL e 2,60 ng/mL de PSA respectivamente, abaixo do limite de detecção do teste imunocromatográfico. Enquanto que uma extração de mancha de sêmen resultaria em uma concentração variando entre 0,4 x 104ng/mL. Outra referência bibliográfica (Paulino et. AI 20097 ), quantifica concentrações de PSA de até l,3ng/mL, porém utiliza outra metodologia. Esses valores não seriam detectados pelo método utilizado por este Laboratório, mesmo desconsiderando a taxa de recuperação de amostra de 1%. Considerando o acima exposto, percebe-se que a identificação de PSA como marcador de sêmen é uma ferramenta robusta e amplamente utilizada pela comunidade forense. Entretanto, sua identificação isolada não permite afirmar de forma inequívoca a presença de sêmen, visto que, apesar de os trabalhos da comunidade científica atualmente confirmarem a robustez do método empregado, no futuro podem ser descobertas condições clínicas que elevem a concentração de PSA em outros fluidos corpóreos a níveis comparáveis ao do sêmen. Cabe ressaltar que antes da quesitação este Laboratório já apresentava conclusão distinta da presente no Laudo de Perícia Criminal 3617/2014 — 1C, decorrente das considerações acima realizadas. Desse modo retifica-se a conclusão do Laudo de Perícia Criminal 3617/2014— IC para: "Assim, em face do exposto e analisado, concluem os Peritos que nas amostras de tecido recortadas da calcinha, do short e da camiseta foi constatada a presença de sangue humano e de PSA, sugestivo de presença de sêmen, porém não foi constatada a presença de espermatozóides;..." (destaques propositais) Percebe-se, portanto, que, nesse segundo momento, os senhores'iperitos apresentam informações mais detalhadas acerca do exame realizado para a constatação da presença de sêmen nas vestes. Esclarecem que, com exceção da fosfatase ácida e espermatozáides, não dispõem de metodologia para identificação dos outros componentes do sêmen; que a PSA não 'é encontrada exclusivamente no sêmen, mas também em soro de mulheres com câncer de mama, em urina de mulheres ingerindo testosterona e com síndrome de ovário policístico, em leite materno e em urina de homens após a ejaculação, sendo, em níveis maiores no sêmen, Reconhecem que, o PSA é uma Ferramenta robusta e amplamente utilizada pela comunidade forense como marcador da presença de sêmen, mas, por outro lado, sua identificação isolada não permite afirmar de forma inequívoca sua presença. Por derradeiro, retificam a conclusão, ressaltando que nas amostras de tecido recortadas da calcinha, do short e da camiseta foi constatada a presença de sangue humano e de PSA, sugestivo de presença de sêmen, lembrando que não foi constatada a presença de espermatozoides. Nesse sentir, ao contrário do sucedido na primeira oportunidade, agora os peritos não apresentam resultado conclusivo, mas apenas sugestivo da presença de sêmen. É sabido que o decreto condenatorio deve se amparar em 'provas robustas acerca da materialidade e autoria do crime. Vale dizer, para que haja condenação é necessário que se proceda à reconstituição histórica dos fatos, de molde a se perceber o que se passou na verdade e se a prática do ato ilícito pode ser atribuída ao denunciado. Ou seja, é necessário restabelecer, tanto quanto possível, a verdade dos fatos, para a solução justa do litígio, e sendo este o fim a que se destina o processo, é •através da instrução que se busca a mais perfeita possível representação dessa verdade. De igual modo, não se olvida que o processo penal contemporâneo contempla três modelos de avaliação ou valoração da prova, a saber: o sistema legal, o da íntima convicção e o da persuasão racional. Por esse último, adotado em nosso ordenamento jurídico, "O juiz jOrma rá sua convicção pela livre apreciação da prova produzida em contraditório , judicial, não podendo jiindamentar sua decisão exclusivamente nos elementos inthrmativos colhidos na investigação, ressalvadas as provas cautelares, não repetivcis e antecipadas.", mas deve fazê-lo de forma motivada. É o 'princípio do livre convencimento motivado expresso no artigo 155, do CPP. O que distingue o sistema da persuasão racional é a liberdade do magistrado na valoração dos elementos probatórios que, embora exista, é contida pela obrigatoriedade de justificação das escolhas adotadas, diante da prova legitimamente obtida, com a explicitação do caminho percorrido até a conclusão. Aliás, "Se é certo que o juiz fica adstrito às provas constantes dos autos, não é Menos certo que não fica subordinado a nenhum critério aprioristico no apurar, através 'delas, a verdade material, O juiz criminal é, assim restituído à sua própria consciência" (Exposição de Motivos do Código de Processo Penal, item VII). ' Disso resulta que-a convicção do Magistrado não está atrelada a nenhum meio de prova especifico ou isolado. Por isso, muito embora a prova pericial seja o meio de suprir a carência de conhecimentos técnicos de que se ressente o magistrado para apuração dos fatos, "O juiz não ficará adstrito ao laudo, podendo aceitê-lo ou rejeitá-lo, no todo ou em parle.", a teor do disposta no artigo 182, do CPP. Nesse diapasão, a despeito dos exames levados a efeito pelos experts, 'não concebo a possibilidade de amparar um decreto condenatório em conclusão sugestiva, mormente porque os próprios peritos destacam que GOVERNMENT EXHIBIT 1 20-MJ-8171-BER 023 a identificação isolada de PSA não permite afirmar de forma inequívoca a presença de sêmen. Ainda se poderia pensar que a prova oral produzida em Juizo seria sufibiente para confirmar a materialidade do crime. Aqui também não vislumbro robustez suficiente para lastrear o

Documento assinado digitalmente, conforme MP n° 2.200-2/2001, Lei n° 11.419/2006, resolução do Projudi, do TJPROE Validação deste em http://sseeu.pje.jus.br/seeu/ - Identificador: PJXAP QL9GY H4P29 FGEYA

PROJUDI - Processo: 0017372-86.2016.8.07.0015 - Ref. mov. 17.1 - Assinado digitalmente por Leila Cury:310981
06/06/2019: OUTRAS DECISÕES. Arq: Decisão

decreto condenatório. O réu Lucas Carvalho Rollo nega veementemente a materialidade do crime. Aliás, ouvido em duas oportunidades, apresenta versões semelhantes, como se vê de fls. 50/52 e 306/307. De sua parte, a vítima ▮▮▮▮▮▮▮▮▮▮▮ foi ouvida em Juízo por meio de entrevista realizada por vídeo conferência e, de certa forma, ratificou as declarações apresentadas em fase inquisitória. A mídia com a gravação da oitiva foi acostada à fl. 296. Bem é verdade que não se pode exigir reprodução ipis litteris da versão inicial, pois se trata de criança de tenra idade, portanto, imatura psiquicamente. Mas, em síntese, ela tornou a dizer que o denunciado tirou suas vestes, passou um creme em sua genitália e subiu em cima dela. Não se olvida do valor probatório da palavra da vítima, mormente em crimes desta natureza que, em sua maioria, são praticados às escondidas. Por outro lado, no caso vertente, outras circunstâncias também merecem ser valoradas, pois, no meu entender, podem mitigar sobremaneira a força probante das narrativas traçadas pela menor. Insta lembrar que, quando se trata de criança, há expectativa de uma fala fantasiosa, podendo até mesmo ser sugestionada por um adulto, ou influenciada pelo contexto em que vive, pois lhe falta maturidade para compreender o significado e as conseqüências da sua atitude, além de ser real o relato estar sujeito a divergências que podem advir da tentativa de proteger o agressor e sua família, já que nesse tipo delito, na maioria dos casos o agressor é membro da família ou alguém muito próximo afetivamente. Diante disso, a prova oral judicializada também revelou que o abuso sexual é terna que rodeia e aterroriza a família da vítima. E não é para menos, pois o genitor da menor, Luis Augusto Alves Nepomuceno, disse que "...sua esposa jhi abusada sexualmernce aos 16 anos e até hoje sofre por causa disso, sendo que o responsável nunca ft5i preso; que essa situação era de - eunheónnento da família: que tsabel dormia no mesmo quarto em que o depoente e sua esposall ein um colchão no chão: que embora a casa tivesse dois quartos Isabel tinha medo do escuro, razão pela qual dormia em seu quarto: que nunca comentaram com Isabel pelo abuso sexual sofrido por sua mãe...". Isso talvez possa justificar a forma ;corno o pai questionou a menina quando percebeu o sangramento, pois, disse que "...olhou para o shorte de ▮▮▮ e viu que eslavo ensopado de sangue; que neste momento perguntou a Isabel o que havia acontecido, se foi Lucas que fiz alguMa coisa com ela: que esclarece que perguntou se havia sido porque somente ele estinia no andar de cima; que perguntou o que Lucas havia félto e Isabel disse que ele estava em cima dela...", fls. 272/273. E também pode esclarecer o porquê da genitora, Raquel Pereira da Costa sempre questionar a menina sobre eventual abuso sofrido por ela quando voltava da casa da tia e, mesmo diante dü desconfiança, pois, segundo ela " por duas vezes Isabel ao voltar da casa da r?c, Maria Cecília reclamou de dor na genitália..." (fl. 273), ainda assim, permitia ,que a menina continuasse a freqüentar a casa. ; Como se Dão bastasse, a menor foi submetida a atendimento de emergência no Hospital Regional do Guará, no dia 03.02.2014, conformC guia acostada às fls. 290/291. Na oportunidade, a pediatra consignoU que a "...criança fiti avaliada por psicóloga que refere que a'mesma disse claramente', que houve penetração...". Ocorre que, em aditamento ao Laudo de Exame de Corpo de Delito n°04281/14, os senhores peritos destacaram que "Não há indícios objetivos de conjunção carnal ou ato libidinoso diverso da conjunção carnal.", ti'.. 282. 1 Por fim, e para fragilizar ainda mais a'narrativa [ática apresentada pela infante, familiares seus chegaram a informar em Juízo que se trata de 'criança habituada a mentir (fls. 302v e 305). Nesse sentir, e por tudo que restou expendido, latente a fragilidade do acervo probatório quanto à própria materialidade do crime, valendo lembrar que o dúvida deve militar em prol do acusado. 2 - DISPOSITIVO Ante o exposto; julgo IMPROCEDENTE a pretensão punitiva Estatal para ABSOLVER o acusado LUCAS CARVALHO ROLLO, já qualificado nos autos, da imputação que lhe foi feita, com fundamento no artigo 386, inciso II, do CPP. Por conseguinte, não mais subsistem os fundamentos que ensejaram o decreto da prisão cautelar, razão por que revogo a decisão de fls. 88/89 e determino a expedição de ALVARÁ DE SOLTURA em favor do denunciado, se por outro motivo não estiver preso. Sem custas. Publique-se. Registre-se. Intimem-se. Oportunamente, arquivem-se. Taguatinga-DF, 03 de fevereiro de 2015. t.y> WAG O ANTÔNIO DE SOUZA Juiz de Direito

Contudo, o Ministério Público recorreu da sentença absolutória, tendo sido provido, por unanimidade, o recurso ministerial para condenar o acusado LUCAS CARVALHO ROLLO como incurso nas penas do art. 217-A, *caput*, do Código Penal, por duas vezes, na forma no art. 71 do Código Penal.

No Acórdão Condenatório o Desembargador relator ressaltou que restava, ao colegiado, apreciar a prova coligida aos autos para embasar o decreto condenatório.

GOVERNMENT EXHIBIT 1_20-MJ-8171-BER_024

Nesta esteira, começou relatando:

Documento assinado digitalmente, conforme MP n° 2.200-2/2001, Lei n° 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em http://seeu.pje.jus.br/seeu/ - Identificador: PJXAP QL9GY H4P29 FGEYA

Documento assinado digitalmente, conforme MP n° 2.200-2/2001, Lei n° 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em http://seeu.pje.jus.br/seeu/ - Identificador: PJXAP QL9GV H4P29 FGEYA

*"Em juízo, o acusado negou a prática delitiva (fl. 275 e verso), narrando a dinâmica dos fatos da seguinte maneira: (...) o interrogando alega que os fatos ali descritos não são verdadeiros; que o interrogando alega que estava em um churrasco com sua família; que L. havia chegado do serviço com sua menina e foi para o churrasco; que L. ficou um tempo do churrasco bebendo e depois perguntou se o interrogando queria uma carona para onde morava; que morava com M.C.; que antes de chegar na casa, já em Vicente Pires, L perguntou ao interrogando se queria tomar uma bebida quente; que pararam em um boteco e consumiram uma bebida quente; que I. estava com eles; que no boteco L. comprou duas caixas de cerveja; que ao chegaram na casa de M.C., L sentou-se no sofá para ver futebol; que o interrogando disse a L. que iria sair para andar de skate com seus amigos; que após quarenta e cinco minutos retornou a fim de ir tomar banho; que quando retornou I. estava brincando como cachorro; que o interrogando só viu I. no andar de baixo; que o interrogando não viu I. no andar de cima; que antes de tomar banho entrou somente em seu quarto para pegar uma torça [sic] de roupa; que enquanto isso I. permanecia no andar debaixo; que pegou a roupa e entrou no banheiro para tomar banho; que depois de 15 minutos ouviu L. chamando o seu nome; que L. bateu na porta do banheiro; que o interrogando colocou uma toalha em volta do corpo e abriu a porta; que L. estava com o calcinha de I. na mão cheia de sangue; que L. perguntou se o interrogando havia mexido com ela ou deitado em cima dela; que o interrogando disse a L. que jamais faria isso com ele já que eram amigos e que costumavam beber juntos; que neste momento enquanto estava no banheiro L. não agrediu o interrogando; que L. disse ao interrogando que descesse com ele; que I. permaneceu no andar de baixo; que desceram a escada e foram até o banheiro do andar de baixo e lá estava I. nua; que I. havia acabado de tomar banho e lá estava seca; que L. voltou a perguntar para I. se interrogando havia deitado em cima dela ou mexido com ela; que I. olhou para o seu pai e depois olhou para o interrogando e balançou com a cabeça dizendo afirmativamente; que o interrogando implorou a L. dizendo que jamais faria isso com um amigo; que também disse para I. que jamais faria isso e perguntou se ela entendia o que estava falando; que neste momento L. começou a agredir o interrogando; que o interrogando foi agredido pela mão direita de L. enquanto que na mão esquerda ele segurava o shorts e a calcinha de I. com sangue; que o interrogando não agrediu L, apenas se defendeu dizendo que não havia feito nada; que quando foi até o banheiro e viu I. não viu nenhum sangue no banheiro e nem entre as pernas de I.; que não sabe dizer porque havia sangue na calcinha e no shorts de I.; que L. em seguida pegou o celular e disse que iria chamar a família; que o interrogando subiu e trocou de roupa; que o interrogando subiu para o seu próprio quarto; que o interrogando se recorda que o lado esquerdo do seu rosto estava inchado e que chegou a sangrar na nuca e atrás da orelha; que o primeiro a chegar em seu quarto foi J.; que J. disse ao interrogando que ele estava sendo acusado de estuprar I. e por isso teria que levá-lo até a delegacia; que não foi submetido a nenhum exame; que nos Estado Unidos o interrogando não sabia o que queria fazer da vida; que pensou que por saber falar inglês conseguiria um emprego melhor no Brasil; que no Brasil chegou a trabalhar no curso de inglês no Wizard, por um mês a título de experiência; que não deu certo e não foi contratado; que o interrogando queria dar aula para Turma avançada, mas não tinha vaga; que costumava brincar com as crianças mais novas, com J. de dez anos, H. com dez anos, e com outra menina de aproximadamente cinco anos; que não costumava brincar com I.; que ano [sic] gostava dela porque costumava arranjar encrenca com as outras crianças (...)."*



AUTENTICAÇÃO
Confere com o original

Por fim, o Desembargador, ressaltou:

GOVERNMENT EXHIBIT 1_20-MJ-8171-BER_025

"A meu sentir, o laudo pericial, nos termos em que lavrado, reforça o conjunto probatório no sentido da

PROJUDI - Processo: 0017372-86.2016.8.07.0015 - Ref. mov. 17.1 - Assinado digitalmente por Leila Cury:310981
06/06/2019: OUTRAS DECISÕES. Arq: Decisão

sofridos pela vítima criança.

As respostas aos quesitos (fls. 316/317 e 319/322) não contrariam os laudos anteriores, somente indicam a falibilidade da técnica usada, que, a propósito é muito baixa. Em um dos exames, a chance de se encontrar o mesmo perfil na população masculina é de uma em trinta e oito septilhões, em outro exame é de uma em catorze mil, aproximadamente, com o destaque de que a observação de perfis coincidentes nos marcadores do cromossomo Y indica mesma origem ou mesma linhagem patrilínea entre os indivíduos que produzem as amostras (fls. 73/73-A). Contudo, é improvável que a amostra colhida nos materiais (shots, calcinha, camiseta e lençol) seja de outra pessoa de mesma linhagem patrilínea, como o pai ou outro parente, pois o acusado é adotado e, com isso, não possui genética semelhante aos outros membros da família que frequentavam a casa.

Demais disso, os laudos, ainda que com uma margem pequena de desconfiança, aliados às demais provas dos autos, são suficientes para confirmar a versão apresentada pela vítima.

Cumpre consignar que o crime de estupro de vulnerável não exige a presença de violência ou grave ameaça contra vítima, e a ofensa à dignidade sexual é o quanto basta. Não há, pois, se faiar em absolvição.

Com efeito, à palavra da vítima há que se conferir especial credibilidade, máxime se em harmonia com os demais elementos de prova constantes dos autos.

Descrever a narrativa dos fatos de forma clara, objetiva e completa, identificando elementos essenciais, em que conste o lugar, a data e a maneira (circunstâncias de tempo, lugar e modo dos fatos criminosos) pela qual a infração foi cometida, apresentando o nexo de causalidade entre a investigação em curso com o foragido. Caso o pedido seja encaminhado aos Estados Unidos da América ou a outros países de common law, será necessário elaborar um relatório detalhado contendo o histórico do cometimento do crime, suas circunstâncias, data em que foi cometido, autores ou prováveis autores, descrição das diligências efetuadas desde o início das investigações, bem como toda a tramitação processual, constando as declarações e depoimentos tomados, as provas periciais elaboradas e, ao final, uma conclusão do magistrado que presidiu o processo, apontando os elementos de fato e de direito que o levam a supor que contra a pessoa procurada existem indícios suficientes de autoria.

## 9) Tipos penais:

Código Penal Brasileiro - Decreto-Lei n. 2.848/1940

Estupro de vulnerável          (Incluído pela Lei nº 12.015, de 2009)

Art. 217-A. Ter conjunção carnal ou praticar outro ato libidinoso com menor de 14 (catorze) anos:          (Incluído pela Lei nº 12.015, de 2009)

Pena - reclusão, de 8 (oito) a 15 (quinze) anos.          (Incluído pela Lei nº 12.015, de 2009)

Crime continuado

Art. 71 - Quando o agente, mediante mais de uma ação ou omissão, pratica dois ou mais crimes da mesma espécie e, pelas condições de tempo, lugar, maneira de execução e outras semelhantes, devem os subseqüentes ser havidos como continuação do primeiro, aplica-se-lhe a pena de um só dos crimes, se idênticas, ou a mais grave, se diversas, aumentada, em qualquer caso, de um sexto a dois terços. (Redação dada pela Lei nº 7.209, de 11.7.1984)

GOVERNMENT EXHIBIT 1_20-MJ-8171-BER_026

**Informo que o tipo penal se amolda ao rol taxativo do Tratado de Extradição firmado entre o Brasil e os Estados Unidos da América, assinado em 13 de janeiro de 1961 e promulgado**

AUTENTICAÇÃO
Confere com o original

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em http://seeu.pje.jus.br/seeu/ - Identificador: PJXAP QL9GY H4P29 FGEYA

JUDT - Processo: 0017372-86.2016.8.07.0015 - Ref. mov. 17.1 - Assinado digitalmente por Leila Cury.310981
06/2019: OUTRAS DECISÕES. Arq: Decisão

**Decreto n° 55.750, de 11 de fevereiro de 1965.**



AUTENTICAÇÃO
Confere com o original

**10) Prescrição:**

Declaro que, de acordo com a legislação brasileira, a pena relativa ao processo n° 0017372-86.2016.8.07.0015 - Número antigo 2016.01.1.097557-6 não está prescrita, nos termos do Art. 109, inciso III, do Código Penal, combinado com os Arts. 115 e 119 do Código Penal, com a aplicação da Súmula 497 do Superior Tribunal de Justiça, conforme transcrevo a seguir: ¡

Código Penal Brasileiro - Decreto-Lei n. 2.848/1940

Art. 109. A prescrição, antes de transitar em julgado a sentença final, salvo o disposto no § 1o do art. 110 deste Código, regula-se pelo máximo da pena privativa de liberdade cominada ao crime, verificando-se

I - em vinte anos, se o máximo da pena é superior a doze;

II - em dezesseis anos, se o máximo da pena é superior a oito anos e não excede a doze;

**III - em doze anos, se o máximo da pena é superior a quatro anos e não excede a oito;**

IV - em oito anos, se o máximo da pena é superior a dois anos e não excede a quatro; V - em quatro anos, se o máximo da pena é igual a um ano ou, sendo superior, não excede a dois;

VI - em dois anos, se o máximo da pena é inferior a um ano.

VI - em 3 (três) anos, se o máximo da pena é inferior a 1 (um) ano. (Redação dada pela Lei n° 12.234, de 2010).

Art. 110 - A prescrição depois de transitar em julgado a sentença condenatória regula-se pela pena aplicada e verifica-se nos prazos fixados no artigo anterior, os quais se aumentam de um terço, se o condenado é reincidente.

...

**Redução dos prazos de prescrição**

**Art. 115 - São reduzidos de metade os prazos de prescrição quando o criminoso era, ao tempo do crime, menor de 21 (vinte e um) anos, ou, na data da sentença, maior de 70 (setenta) anos.**

...

**Art. 119 - No caso de concurso de crimes, a extinção da punibilidade incidirá sobre a pena de cada um, isoladamente.**

...

**Súmula 497 do Superior Tribunal de Justiça: "Quando se tratar de crime continuado, a prescrição regula-se pela pena imposta na sentença, não se computando o acréscimo decorrente da continuação."**

Documento assinado digitalmente, conforme MP n° 2.200-2/2001, Lei n° 11.419/2006, resolução do Prejudi, do TJPR/OE
Validação deste em http://seeu.pje.jus.br/seeu/ - Identificador: PJXAP QL9GY H4P29 FGEYA

PROJUDI - Processo: 0017372-86.2016.8.07.0015 - Ref. mov. 17.1 - Assinado digitalmente por Leila Cury:31039611
06/06/2019: OUTRAS DECISÕES. Arq: Decisão

**11) Competência:**

Código Penal Brasileiro - Decreto-Lei n. 2.848/1940

Art. 5º - Aplica-se a lei brasileira, sem prejuízo de convenções, tratados e regras de direito internacional, ao crime cometido no território nacional.

**12) Garantias:**

Assumo as seguintes garantias a serem apresentadas pelo Estado brasileiro ao Estado requerido:

I - não submeter o extraditando a prisão ou processo por fato anterior ao pedido de extradição;

II - computar o tempo da prisão que, no Estado requerido, foi imposta por força da extradição;

III - comutar a pena corporal, perpétua ou de morte em pena privativa de liberdade, respeitado o limite máximo de cumprimento de 30 (trinta) anos;

IV - não entregar o extraditando, sem consentimento do Estado requerido, a outro Estado que o reclame;

V - não considerar qualquer motivo político para agravar a pena; e

VI - não submeter o extraditando a tortura ou a outros tratamentos ou penas cruéis, desumanos ou degradantes.

**13) Anexos:**

A. Mandado de Prisão;

B. Portaria de instauração do IP, Sentença Absolutória e Acórdãos;

C. Fotos, impressões datiloscópicas ou outros dados de identificação, se for o caso;

**D. Versão no idioma oficial do país requerido de toda a documentação, inclusive deste formulário.**



AUTENTICAÇÃO
Confere com o original

**BRASÍLIA , 03 de junho de 2019.**

*Leila Cury*

GOVERNMENT EXHIBIT 1_20-MJ-8171-BER_028

*Juíza de Direito*

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em http://seeu.pje.jus.br/seeu/ - Identificador: PJXAP QL9GY H4P29 FGEYA

Case 9:20-mj-08171-BER Document 3-1 Entered on FLSD Docket 04/29/2020 Page 29 of 201

JUDI - Processo: 0017372-86.2016.8.07.0015 - Ref. mov. 1.1 - Assinado digitalmente por Luiz Fernando Leite da Silva:319047

/2/2019: DIGITALIZAÇÃO DO PROCESSO. Arq: Guia de Execução/Recolhimento



**TJDFT**

Poder Judiciário da U
TRIBUNAL DE JUSTIÇ

Fórum Des. Antônio
Segunda Vara Crimir
AREA ESPECIAL N. 2;
3103-0560, CEP: 721
Horário de Funciona

**Comprovante do Protocolo de Distribuição - Serv. de Distribuição**

Nº Protocolo: 0017372-86 2016.807.0015  14:29:40 14/09/2016

Nº Proc: 0017372-86.2016.8.07.0015  Competência Exclusiva 15/09/2016 17:38:51
Juízo : VARA DE EXECUÇÕES PENAIS DO OF
Classe : Execução da Pena
Assunto : Pena Privativa de Liberdade
Exequente : MINISTÉRIO PÚBLICO DO DISTRITO FEDERAL E DOS
Executado : LUCAS CARVALHO ROLLO

**CARTA DE GUIA DEFINITIVA**

**O Dr. EDUARDO DA ROCHA LEE,**
Juiz de Direito Substituto da 2ª Vara Criminal de Taguatinga, Distrito Federal.

FAZ SABER ao Exmo. Juiz de Direito da VEP/VEPEMA/VEPERA que por este juízo tramitou a ação penal contra **LUCAS CARVALHO ROLLO**, o qual foi condenado nas sanções adiante especificadas, e estando o apenado **SOLTO**, passo-o à disposição de Vossa Excelência, a fim de que faça executar a condenação consoante os dados a seguir:

**Da Qualificação do Sentenciado**
Registro INI: Não cadastrado
Nome: **LUCAS CARVALHO ROLLO**
Filiação: THOMAS OWEN ROLLO
ANGELINA CARVALHO ROLLO
Outros nomes: não consta
Data de Nascimento: ▮▮▮▮  Estado Civil: SOLTEIRO  Gênero: Masculino
País de Origem: BRASIL  Naturalidade: Florianópolis/SC
Profissão: ESTUDANTE  Escolaridade: Ensino Médio Completo
Registro Geral: 3455371  Órgão expedidor: SSP/DF  Data emissão: não consta
Endereço: QUADRA 04 CONJUNTO K CASA 07
Bairro: SETOR SUL
Localidade: GAMA/DF  CEP: NÃO CONSTA
Telefone: ▮▮▮▮

**Do Processo Penal**
Processo nº: **2014.07.1.009404-2**
Traslado dos autos nº: NÃO  Juízo de origem:



**Procedimentos Investigatórios**
Tipo de procedimento criminal: INQUÉRITO POLICIAL  Número: 107/2014
Data da lavratura: 27/02/2014
Procedência: TRIGESIMA OITAVA DELEGACIA DE POLICIA - 38DPDF
Origem: PORTARIA  Nº Oc. Policial: 1424/2014 - 21ª DPDF  Data do fato: 02/02/2014

**AUTENTICAÇÃO**
Confere com o original

**Suspensão do Processo (Art. 366, do CPP)**
Data do decreto de suspensão: NÃO

**Citação**
Data da citação válida: 10/06/2014(FLS. 164)

GOVERNMENT EXHIBIT 1_20-MJ-8171-BER_029

Remetido em ___/___/___

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em http://seeu.pje.jus.br/seeu/ – Identificador: PJ5VX 3YQ48 7YDRE VWQBA

PROJUDI - Processo: 0017372-86.2016.8.07.0015 - Ref. mov. 1.1 - Assinado digitalmente por Luiz Fernando Leite da Silva:319047
01/02/2019: DIGITALIZAÇÃO DO PROCESSO. Arq: Guia de Execução/Recolhimento

**TJDFT**    Poder Judiciário da União      Folha nº
TRIBUNAL DE JUSTIÇA DO DISTRITO FEDERAL E DOS TERRITÓRIOS

**Fórum Des. Antônio Mello Martins**
Segunda Vara Criminal de Taguatinga
AREA ESPECIAL N. 23 SETOR C NORTE, NORTE, Telefone: 31038106/31038107, Fax:
3103-0560, CEP: 7211S9D1, TAGUATINGA-DF D2vcriminal.taguatinga@tjdft.jus.br,
Horário de Funcionamento: 12h00 às 19h00

Data da citação válida por edital:

**Suspensão Condicional do Processo (Art. 89, §3º, da Lei nº 9.099/95)**
Data da suspensão: NÃO     Prazo:
Data da revogação:

**Denúncia ou Queixa**
Data do recebimento da denúncia: 14/04/2014(FLS. 83)
Data do recebimento do aditamento:

**Sentença**
Tipo da Sentença: ABSOLUTÓRIA(FLS. 380/389)     Data da Sentença: 03/02/2015
Data da publicação: 03/02/2015

**Acórdão**
Tipo de acórdão: CONDENATÓRIO(FLS. 465/475)    Data do acórdão: 03/06/2015
Data da publicação: 03/06/2015
Reincidente: NÃO

**Recursos**
Recurso: APELAÇÃO CRIMINAL     Decisão: DEU-SE PROVIMENTO(FLS. 468/475)
Data do acórdão: 03/06/2015     Data da publicação: 03/06/2015
Recurso: EMBARGOS DECLARATÓRIOS     Decisão: NEGOU-SE PROVIMENTO(FLS. 490/493)
Data do acórdão: 25/06/2015     Data da publicação: 29/06/2015
Recurso: RECURSO ESPECIAL    Decisão: INDEFERIU-SE O PROCESSAMENTO(FLS. 511)
Data do acórdão: 27/08/2015     Data da publicação: 02/09/2015
Recurso: AGRAVO DE INSTRUMENTO     Decisão: NEGOU-SE PROVIMENTO(FLS. 535/537)
Data do acórdão: 01/08/2016     Data da publicação: 04/08/2016

**Trânsito em julgado**
Trânsito em julgado para a acusação: 21/07/2015(FLS. 506)
Trânsito em julgado definitivo: 19/08/2016(FLS. 540)

**Das Penas Impostas**
Incidência Penal: art. 217-A, caput, do Código Penal, por duas vezes; *na forma do art 71 do C?*
Pena Privativa de Liberdade
Pena: 09(NOVE) ANOS E 04(QUATRO) MESES     Natureza: RECLUSÃO     Regime: FECHADO
Hediondo: SIM
Pena Pecuniária: NÃO
Dias-Multa:    Razão: 1/30     Valor (R$):

**Suspensão Condicional da Pena**
Prazo da Suspensão: NÃO

Remetido em ___/___/___

Documento assinado digitalmente, conforme MP nº 2.2 .../2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/DE
Validação deste em http://seeu.pje.jus.br/seeu/ - Identificador: PJ5VX 3YQ48 7YDRE VWOBA

DI - Processo: 0017372-86.2016.8.07.0015 - Ref. mov. 1.1 - Assinado digitalmente por Luiz Fernando Leite da Silva:319047
2019: DIGITALIZAÇÃO DO PROCESSO. Arq: Guia de Execução/Recolhimento

**TJDFT**

Poder Judiciário da União
TRIBUNAL DE JUSTIÇA DO DISTRITO FEDERAL E DOS TERRITÓRIOS

Folha nº

**Fórum Des. Antônio Mello Martins**
Segunda Vara Criminal de Taguatinga
AREA ESPECIAL N. 23 SETOR C NORTE, NORTE, Telefone: 31038106/31038107, Fax:
3103-0S60, CEP: 72115901, TAGUATINGA-DF 02vcriminal.taguatinga@tjdft.jus.br,
Horário de Funcionamento: 12h00 às 19h00.

**Substituição da Pena**
Natureza: NÃO

**Medida de Segurança**
Natureza: NÃO     Prazo mínimo:

**Das Custas e da Fiança**
Custas: NÃO     Valor (R$):     Data do Cálculo:
Fiança:     Data do recolhimento:     Valor (R$):
Banco:     Agência:     Conta nº:

**Dos Recolhimentos**
Evento em: 16/04/2014(FLS. 89/91)     Motivo: PRISÃO PREVENTIVA(FLS. 88)
Evento em: 06/06/2014(FLS. 168 E 176/178)     Motivo: REVOGAÇÃO DE LIMINAR NOS AUTOS
DO PROCESSO DE HABEAS CORPUS(FLS. 168/175)

**Das Saídas**
Evento em: 16/04/2014(FLS. 542/545)
Motivo: LIMINAR CONCEDIDA EM HABEAS CORPUS(FLS. 99/100)
Evento em: 03/02/2015(FLS. 400)
Motivo: REVOGAÇÃO DE PRISÃO EM SENTENÇA ABSOLUTÓRIA.

**Observações**

Taguatinga-DF, 31 de agosto de 2016 às 15h03

**DIANA NOGUEIRA DE QUEIROZ**
**Diretora de Secretaria**

AUTENTICAÇÃO
Confere com o original

**EDUARDO DA ROCHA LEE**
**Juiz de Direito Substituto**

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em http://seeu.pje.jus.br/seeu/ - Identificador: PJ5VX 3YQ48 7YDRE VWQBA

Remetido em ____/____/____

Case 9:20-mj-08171-BER Document 3-1 Entered on FLSD Docket 04/29/2020 Page 32 of 201
PROJUDI - Processo: 0017372-86.2016.8.07.0015 - Ref. mov. 1.1 - Assinado digitalmente por Luiz Fernando Leite da Silva:319047
01/02/2019: DIGITALIZAÇÃO DO PROCESSO. Arq: Guia de Execução/Recolhimento



**MINISTÉRIO PÚBLICO DA UNIÃO**
**MINISTÉRIO PÚBLICO DO DISTRITO FEDERAL E TERRITÓRIOS**

**EXCELENTÍSSIMO(A) SENHOR(A) JUIZ(A) DE DIREITO DA 2ª VARA CRIMINAL DA CIRCUNSCRIÇÃO JUDICIÁRIA DE TAGUATINGA/DF**

ref. autos nº. 2014.07.1.009404-2
(IP nº. 107/2014 - 38ª DP)

*O MINISTÉRIO PÚBLICO DO DISTRITO FEDERAL E TERRITÓRIOS*, com base nas provas dos autos em epígrafe, vem, à presença de Vossa Excelência, promover

**AÇÃO PENAL**

mediante denúncia, contra **LUCAS CARVALHO ROLLO**, brasileiro, solteiro, natural de Florianópolis/SC, nascido aos ▮▮▮▮▮, filho de Thomas Owen Rollo e de Angelina Carvalho Rollo, profissão de desempregado, portador da CIRG nº ▮▮▮▮▮-SSP/DF e do CPF nº ▮▮▮▮▮, endereço na ▮▮▮▮▮ ▮▮▮▮▮/DF, tel. ▮▮▮▮▮ (demais dados às fls. 46), pelos fatos que passa a expor:

**I.**

De data indeterminada, até o dia 02 de fevereiro



AUTENTICAÇÃO
Confere com o original



de 2014, por volta das 15min, no GUVP,

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em http://seeu.pje.jus.br/seeu/ - Identificador: PJ5VX 3YQ48 7YDRE VWQBA

JUDI - Processo: 00137372-86.2016.8.07.0015 - Ref. mov. 1.1 - Assinado digitalmente por Luiz Fernando Leite da Silva.319047
2/2019: DIGITALIZAÇÃO DO PROCESSO. Arq: Guia de Execução/Recolhimento

Ministério Público da União
Ministério Público do Distrito Federal e Territórios

-2-

██ Vicente Pires/DF, **o denunciado LUCAS CARVALHO ROLLO**, de forma livre e consciente, por diversas vezes, praticou atos libidinosos com a criança ████ ████████████████ (nascida aos ████████, fls. 13), menor de 14 (catorze) anos de idade à época dos fatos.

### II.

Conforme incluso autos de inquérito, no dia 02 de fevereiro de 2014, o denunciado chamou a vítima no quarto dele e molestou-a sexualmente, mediante a prática de atos libidinosos consistentes em retirar suas roupas, tocar o corpo dela, inclusive nas partes íntimas, esfregar-se nela, ficar em cima dela e encostar seu pênis nas partes íntimas da vítima, dentre outros.

Entrevistada, a vítima-criança narrou os abusos sexuais sofridos (fls. 30/38), mencionando ainda que tais fatos já haviam ocorrido anteriormente, em várias outras oportunidades.

Conforme Laudo de Constatação de Material Biológico (fls. 57/65), "nas amostras de tecido recortadas da calcinha, do short e da camiseta foi constatada a presença de sangue humano e de sêmen". E, consoante Laudo de Exame de DNA (fls. 67/71), restou demonstrada a presença de material biológico do denunciado na calcinha, no short e no lençol.

### III.

Com suas condutas, o denunciado está incurso no **art. 217-A, caput, do Código Penal (por diversas vezes)**. Diante do exposto, o Ministério Público requer seja recebida a presente denúncia e, uma vez autuada esta, seja ordenada a citação do acusado para responder à acusação, por escrito, no prazo de 10 dias, e acompanhar os demais termos da ação penal, procedendo-se de acordo com o rito previsto no CPP, até a final condenação, com fixação de valor mínimo

GOVERNMENT EXHIBIT 1_20-MJ-8171-BER_033

Documento assinado digitalmente, conforme MP n° 2.200-2/2001, Lei n° 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em http://seeu.pje.jus.br/seeu - Identificador: PJ5VX 3YQ48 7YDRE VWQBA

AUTENTICAÇÃO

Case 9:20-mj-08171-BER Document 3-1 Entered on FLSD Docket 04/29/2020 Page 34 of 201
PROJUDI - Processo: 0017372-86.2016.8.07.0015 - Ref. mov. 1.1 - Assinado digitalmente por Luiz Fernando Leite da Silva:319047
01/02/2019: DIGITALIZAÇÃO DO PROCESSO. Arq: Guia de Execução/Recolhimento

MINISTÉRIO PÚBLICO DA UNIÃO
MINISTÉRIO PÚBLICO DO DISTRITO FEDERAL E TERRITÓRIOS

- 3 -

para reparação dos danos causados pela infração, o que se esclarecerá quando da realização da audiência de instrução, nos termos do art. 387, inc. IV, do CPP, sem prejuízo da(s) própria(s) vítima(s) demandá-lo, com a oitiva das testemunhas abaixo arroladas.

Taguatinga/DF, 10 de abril de 2014.

Alberto Tadashi Honda
Promotor de Justiça

**ROL**:

▆▆▆▆▆▆▆ vít, 6 anos;
- Jorge Alberto Carvalho de Sousa, genitor vít, fls. 17;
- Raquel Pereira da Costa, genitora vít, fls. 21;
- Márcia Martins M. Costa, agente, fls. 04/07.



AUTENTICAÇÃO
Confere com o original

Documento assinado digitalmente, conforme MP n° 2.200-2/2001, Lei n° 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em http://seeu.pje.jus.br/seeu/ - Identificador: PJ5VX 3YGA8 7YDRE VWGBA

UDI - Processo: 0017372-86.2016.8.07.0015 - Ref. mov. 1.1 - Assinado digitalmente por Luiz Fernando Leite da Silva:319047
/2019: DIGITALIZAÇÃO DO PROCESSO. Arq: Guia de Execução/Recolhimento



## GDF – POLÍCIA CIVIL DO DISTRITO FEDERAL
### DEPARTAMENTO DE POLÍCIA CIRCUNSCRICIONAL
### 38ª DELEGACIA POLICIAL – VICENTE PIRES

## PORTARIA

A Delegada de Polícia, Chefe da 38ª Delegacia Policial de Vicente Pires/DF, no uso das atribuições que lhe confere o artigo 144, § 4º, da Constituição Federal, o artigo 4º e seguintes do CPP, tendo em vista do que consta da ocorrência 1424/14-21ª DP, Complementado pelo relatório 082/14-38ª DP,

RESOLVE,

instaurar inquérito policial, visando melhor apurar os fatos chegado ao nosso conhecimento de que a vulnerável ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, **com 6 anos de idade,** teria sido abusado sexualmente por seu primo LUCAS CARVALHO ROLLO, de 20 anos, CPF nº ▮▮▮▮▮▮▮▮, demais dados qualificativos nos autos, ao praticar atos libidinosos diversos da conjunção carnal.

Posto isto, determina, preliminarmente as seguintes providências:

I. autuamento da presente portaria com as peças instruendas, desde já homologadas;

GOVERNMENT EXHIBIT 1_20-MJ-8171-BER_035



AUTENTICAÇÃO
Confere com o original

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em http://seeu.pje.jus.br/seeu/ - Identificador: PJ5VX 3YQ48 7YDRE VWQBA

Case 9:20-mj-08171-BER Document 3-1 Entered on FLSD Docket 04/29/2020 Page 36 of 201

PROJUDI - Processo: 0017372-86.2016.8.07.0015 - Ref. mov. 1.1 - Assinado digitalmente por Luiz Fernando Leite da Silva:31904

01/02/2019: DIGITALIZAÇÃO DO PROCESSO. Arq: Guia de Execução/Recolhimento



## GDF – POLÍCIA CIVIL DO DISTRITO FEDERAL
## DEPARTAMENTO DE POLÍCIA CIRCUNSCRICIONAL
## 38ª DELEGACIA POLICIAL – VICENTE PIRES

II. Oitiva em cartório de RAQUEL PEREIRA DA COSTA e LUCAS CARVALHO ROLLO, para que esclareçam as circunstâncias em que se deu o fato em apuração;

III. juntada do relatório da entrevista com a menor, realizada pela DPCA;

IV. juntada dos laudos de pesquisa de espermatozoide, constatação de sangue humano, bem como o laudo de confronto de DNA.

Após, tornem-se os autos conclusos.

Vicente Pires/DF, 27 de fevereiro de 2014.

**TÂNIA MARIA DE OLIVEIRA DIAS SOARES**
Delegada de Polícia
Chefe da 38ª DP



AUTENTICAÇÃO
Confere com o original

Documento assinado digitalmente, conforme MP n° 2.200-2/2001, Lei n° 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em http://seeu.pje.jus.br/seeu/ - Identificador: PJ5VX 3YQ48 7YDRE VWQBA

_UDI - Processo: 0017372-86.2016.8.07.0015 - Ref. mov. 1.1 - Assinado digitalmente por Luiz Fernando Leite da Silva:919047
_/2019: DIGITALIZAÇÃO DO PROCESSO. Arq: Guia de Execução/Recolhimento

TJDFT  Poder Judiciário da União
Tribunal de Justiça do Distrito Federal e Territórios
Segunda Vara Criminal de Taguatinga

Folha Nº

8½

**Processo**      : **2014.07.1.009404-2**
**Classe**        : **Inquérito Policial**
**Assunto**       : **Estupro de Vulnerável**
**Nº do Inquérito** : **1072014**
                  : **NAO HA**
                  : **LUCAS CARVALHO ROLLO**

## DECISÃO

A peça acusatória preenche os requisitos do art. 41 do CPP e, por não verificar nenhuma das hipóteses previstas no art. 395 do mesmo diploma legal, recebo a denúncia em desfavor de LUCAS CARVALHO ROLLO.

Junte-se aos autos a folha de antecedentes penais do acusado, reautuando-se o feito como Ação Penal, constando o nome do réu e o tipo penal pelo qual foi denunciado, juntando-se a denúncia ao início destes autos.

Conforme dispõe os artigos 394 e seguintes do CPP, o procedimento processual aplicável será o ordinário.

Cite-se o denunciado para responder à acusação, por escrito e por meio de advogado, no prazo de 10 (dez) dias, a teor do disposto no art. 396 do Código de Processo Penal. Intime-se, ainda, para declinar ao oficial de justiça, no ato da citação, o nome de seu advogado, para que seja intimado a apresentar a resposta.

Sem prejuízo, cientifique-se o réu de que, caso não possua advogado, nem condições de constituir um, terá o privilégio de ter sua defesa patrocinada pelo NPJ/UCB, para onde os autos deverão ser encaminhados se assim se manifestar o denunciado, ou se transcorrido "in albis" o prazo legal para a resposta à acusação.

Observe-se o disposto no art. 352 do CPP, bem como o item 3.3.1.1 do Plano de Gestão das Varas Criminais e de Execução Penal do CNJ.

Expeçam-se as requisições e comunicações processuais pertinentes.

Atenda-se à cota ministerial (fl. 79).

Intimem-se.

Taguatinga - DF, segunda-feira, 14 de abril de 2014 às 17h44.

WAGNO ANTONIO DE SOUZA
Juiz de Direito



Registrado
Último andamento: 14/04/2014 - DECISAO PROFERIDA - 313796
Incluído na Pauta: ____/____/____
GOVERNMENT EXHIBIT 1 20-MJ-8171-BER_037

AUTENTICAÇÃO
Confere com o original

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em http://seeu.pje.jus.br/seeu/ - Identificador: PJ5VX 3YQ48 7YDRE VWQBA

PROJUDI - Processo: 0017372-86.2016.8.07.0015 - Ref. mov. 1.1 - Assinado digitalmente por Luiz Fernando Leite da Silva:319047
01/02/2019: DIGITALIZAÇÃO DO PROCESSO. Arq: Guia de Execução/Recolhimento


**TJDFT**

Poder Judiciário da União
Tribunal de Justiça do Distrito Federal e Territórios
Segunda Vara Criminal de Taguatinga

Folha Nº

| | |
|---|---|
| **Processo** | : 2014.07.1.011263-0 |
| **Classe** | : Pedido de Prisão Preventiva |
| **Assunto** | : Prisão Preventiva |
| **Requerente** | : MPDFT MINISTERIO PUBLICO DO DISTRITO FEDERAL E TERRITORIOS |
| **Indiciado** | : LUCAS CARVALHO ROLLO |

## DECISÃO

Ref. Processo 2014.07.1.009404-2
IP 107/2014 - 38ª DP

Cuida-se de requerimento de prisão preventiva formulado pelo Ministério Público em desfavor de LUCAS CARVALHO ROLLO, com o fim de garantir a ordem pública, assegurar a aplicação da lei penal e por conveniência da instrução criminal. Pugnou ainda pelo deferimento de busca e apreensão do passaporte, do computador e de outros objetos do representado.

Breve relato. DECIDO.

Como cediço, a prisão preventiva será decretada quando não for cabível a imposição de outra medida cautelar (artigo 282, § 6º, CPP) e, ainda, quando presentes os pressupostos e quaisquer dos fundamentos do artigo 312 do CPP, conjugado com uma das condições de admissibilidade estabelecidas pelo artigo 313 do mesmo diploma legal.

Pois bem. No que toca à existência do crime e de indícios de autoria, pressupostos necessários à segregação cautelar, tem-se que o contido no Laudo de Exame de DNA de fls. 70/74 é mais que suficiente para a sua configuração.

De igual modo, está preenchida a condição de admissibilidade da custódia cautelar, posto que o crime imputado ao réu comina abstratamente pena privativa de liberdade superior à exigida pelo inciso I, do artigo 313, do CPP.

Quanto ao fundamento para a prisão cautelar, este se consubstancia tanto na garantia da ordem pública quanto na efetiva aplicação da lei penal. De fato, extrai-se dos autos que o réu teria propensão à prática reiterada da conduta ilícita, além de acesso facilitado a potenciais vítimas, devendo o Estado agir de modo a aumentar a confiança da população nos mecanismos oficiais de repressão às diversas formas de delinquência.

Acrescente-se a isso a forma audaciosa com que agiu o acusado, que se valeu da confiança e da proximidade com a família da vítima para facilitar a prática do crime.

Além disso, o réu possui cidadania americana e passaporte, o que demonstra a vulnerabilidade da aplicação da lei penal, pois pode o réu se refugiar

Documento assinado digitalmente, conforme MP nº 2.226/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em http://seeu.pje.jus.br/seeu/ - Identificador: PJ5VX 3YQ48 7YDRE VWOBA

GOVERNMENT EXHIBIT

Case 9:20-mi-08171-BER Document 3-1 Entered on FLSD Docket 04/29/2020 Page 39 of 201
JUDI - Processo: 0011372-86.2016.8.07.0000 - Ref. mov. 1.1 - Assinado digitalmente por Luiz Fernando Leite da Silva:31904...
02/2019: DIGITALIZAÇÃO DO PROCESSO. Arq: Guia de Execução/Recolhimento

 **TJDFT** Poder Judiciário da União
Tribunal de Justiça do Distrito Federal e Territórios
Segunda Vara Criminal de Taguatinga

Folha Nº

Processo Nº 2014.07.1.011263-0

em outro país a qualquer tempo.

Destarte, a segregação cautelar do requerido se mostra indispensável para assegurar a tranquilidade social e evitar que ele retorne à prática delitiva.

Por fim, registro que a segregação provisória se impõe, no caso concreto, sobre outras medidas cautelares diversas da prisão (art. 319 do CPP), tendo em vista que nenhuma delas se revela suficiente para garantir a ordem pública e assegurar a aplicação da lei penal.

No que atine ao pedido de busca e apreensão, não houve, nesse particular, alteração fática suficiente para o seu deferimento, pois a apreensão do computador, como já dito na Decisão de fl. 40 dos autos do IP, em nada contribuirá para a elucidação do crime em apuração. Também não há que se falar em apreensão de outros objetos, pois a Polícia Civil, quando da visita ao local dos fatos, já apreendeu os objetos que entendeu necessários à elucidação dos fatos.

ANTE O EXPOSTO, **DECRETO** a **PRISÃO PREVENTIVA de LUCAS CARVALHO ROLLO**, brasileiro, natural de Florianópolis-SC, nascido aos ██████████, filho de Thomas Owen Rollo e de Angelina Carvalho Rollo, titular do RG 3.455.371-SSP/DF, CPF ██████ constando como endereços a ██████ ██████ Setor Sul do Gama-DF ou ██████ Pires-DF, o que faço com fundamento nos artigos 282, § 6º, 312 e 313, todos do CPP.

Confiro à presente decisão força de mandado de prisão.

Cientifique-se o Ministério Público.

Taguatinga - DF, segunda-feira, 14 de abril de 2014 às 17h46.

WAGNO ANTÔNIO DE SOUZA
Juiz de Direito



AUTENTICAÇÃO.
Confere com o original

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em http://seeu.pje.jus.br/seeu/ - Identificador: PJ5VX 3YQ48 7YDRE VWQBA

PROJUDI - Processo: 0017372-86.2016.8.07.0015 - Ref. mov. 1.1 - Assinado digitalmente por Luiz Fernando Leite da Silva:319047

01/02/2019: DIGITALIZAÇÃO DO PROCESSO. Arq: Guia de Execução/Recolhimento



## POLÍCIA CIVIL DO DISTRITO FEDERAL
## RELATÓRIO DE ENTREGA DE EXPEDIENTE
## TRIGESIMA OITAVA DELEGACIA DE POLICIA



OFÍCIO N° 669/2014 - 38ª DP
Protocolo N° 126687/2014 - 21ª DP

Vicente Pires - DF, 16 de abril de 2014.

Ref..: MANDADO DE PRISÃO N° 18438/2014 - 38ª DP
Ref..: PROCESSO N° 20140710112630/2014 - 2VCTAG

Senhor Juiz,

Cumprimentando-o(a), dirijo-me a Vossa Excelência para comunicar a prisão da(s) pessoa(s) abaixo qualificada(s) em razão do cumprimento do Mandado de Prisão em epígrafe expedido pelo(a) SEGUNDA VARA CRIMINAL DE TAGUATINGA, nos autos do Processo n° 20140710112630/2014 - SEGUNDA VARA CRIMINAL DE TAGUATINGA, a(s) qual(is) se encontra(m) recolhida(s) no estabelecimento prisional informado em campo próprio, à disposição da Justiça.

Nome: LUCAS CARVALHO ROLLO
Filiação: THOMAS OWEN ROLLO e ANGELINA CARVALHO ROLLO
Data Nascimento: ▮▮▮▮
Data da Prisão: 16/04/2014
Local de recolhimento: DIVISÃO DE CONTROLE E CUSTÓDIA DE PRESOS

Respeitosamente,

JOÃO MACIEL CLARO
DELEGADO CHEFE ADJUNTO
075.950-3

AUTENTICAÇÃO
Confere com o original

A Sua Excelência o(a) Senhor(a)
WAGNO ANTONIO DE SOUZA
SEGUNDA VARA CRIMINAL DE TAGUATINGA
Cidade: TAGUATINGA-DF

Documento assinado digitalmente, conforme MP n° 2.2 /2001, Lei n° 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em http://sseeu.pje.jus.br/sseeu/ - Identificador: PJ5VX 3YQ48 7YDRE VWQBA

JJUDI - Processo: 0017372-86.2016.8.07.0015 - Ref. mov. 1.1 - Assinado digitalmente por Luiz Fernando Leite da Silva:319047

/02/2019: DIGITALIZAÇÃO DO PROCESSO. Arq: Guia de Execução/Recolhimento



Poder Judiciário da União
Tribunal de Justiça do Distrito Federal e dos Territórios



**Plantão Judicial do Segundo Grau, às 19h15min, de 16/04/2014.**

Espécie      : HABEAS CORPUS - HBC
Impetrante : Claudiana Porto de Sousa Rocha
Paciente    : LCR
Relator      : GEORGE LOPES LEITE



AUTENTICAÇÃO
Confere com o original

### DECISÃO

A advogada Claudiana Porto de Sousa Rocha impetra *habeas corpus* em favor de LCR contra ato do Juízo da Segunda Vara Criminal de Taguatinga que lhe decretou prisão preventiva no dia 14/04/2014. alegando que o paciente foi preso em flagrante no dia 02/02/2014 acusado de praticar estupro de vulnerável, mas, sem denotar periculosidade, foi liberado pela "autoridade policial". Diz que ele sempre compareceu à delegacia quando convocado, é primário, tem residência fixa, não se recusou em fornecer material para exame de DNA, mas, contudo, acabou preso no dia 16/04/2014. Sustenta que não há os requisitos nem fundamento legal para a segregação cautelar, que é sempre uma medida excepcional. Não estando a decisão motivada em fatos concretos, afrontando o princípio da inocência presumida. Por isso, requer a expedição de salvo conduto para comparecer aos atos do processo e o relaxamento da prisão.

Embora afirme a impetrante que o paciente fora preso em flagrante, juntou apenas uma cópia de ocorrência policial, onde consta que ele compareceu à Delegacia no dia 02/02/2014, junto com a suposta vítima, sua prima, com seis anos de idade, e o pai dela. Lavrada a ocorrência policial, todos foram liberados, não havendo flagrante algum, nem tampouco a "liberação" do suposto autor do fato pela "autoridade policial". Posteriormente, no dia 21/03/2014, retornou à mesma Delegacia para qualificação e interrogatório. A inicial não foi instruída com cópia da decisão impugnada, nem da que recebeu a denúncia. O feito corre em segredo de justiça, mas em consulta ao sistema informatizado se obteve a transcrição da decisão que recebeu a denúncia, datada de 14/04/2014. sendo na mesma ocasião decretada a prisão preventiva como garantia da ordem pública e efetiva aplicação da lei penal. A decisão destaca que o paciente seria propenso à prática reiterada da conduta ilícita, tendo acesso facilitado a potenciais vítimas e se valeu da confiança e da proximidade com os familiares da vítima para cometer o crime, tendo também cidadania e passaporte americano, denotando vulnerabilidade.

O paciente conta vinte anos de idade, é primário, tem residência fixa e não foi preso em flagrante pelo fato, que teria ocorrido em fevereiro deste anos de 2014. Desde então sempre atendeu ao chamado da autoridade policial, o que permite inferir que até o momento atual não prejudicou a instrução e nem demonstrou interesse em atrapalhar o andamento processual. O fato de possuir cidadania americana e passaporte expedido pelos Estados Unidos não constitui óbice à sua liberação para responder a ação penal em liberdade, considerando que ofereceu esse documento com a inicial, para submetê-lo à guarda da Justiça, denotando que não tem intenção de deixar o País.

Documento assinado digitalmente, conforme MP n° 2.200-2/2001, Lei n° 11.419/2006, resolução do Projudi, do TJPR/OE

Validação deste em http://seeu.pje.jus.br/seeu/ - Identificador: PJ5VX 3YQ48 7YDRE VWQBA

PROJUDI - Processo: 0017372-86.2016.8.07.0015 - Ref. mov. 1.1 - Assinado digitalmente por Luiz Fernando Leite da Silva:319047
01/02/2019: DIGITALIZAÇÃO DO PROCESSO. Arq: Guia de Execução/Recolhimento



Poder Judiciário da União *
Tribunal de Justiça do Distrito Federal e dos Territórios



Assim, num juízo sumário de cognição, entendo estarem presentes os pressupostos do *fumus bonis juris et periculum in mora* devido ao fato de o paciente não ter sido preso em flagrante e não ter havido, desde a instauração do inquérito policial, nenhum fato novo que pudesse justificar a segregação cautelar, que é sempre uma medida excepcional, só admitida em casos restritos. Assim, concedo a liminar para que seja imediato liberado, salvo se por outro motivo não estiver preso, devendo assim permanecer até o julgamento final do *writ*, quando a matéria será reapreciada pelo colegiado. Dou a esta decisão força de mandado para todos os efeitos legais. Recolham-se provisoriamente os passaportes, que deverão ser oportunamente remetidos, com ofício do Juízo processante, à Polícia Federal, onde ficarão recolhidos até nova deliberação judicial.

Distribua-se oportunamente.

Brasília, 16 de abril de 2014.

GEORGE LOPES LEITE
Relator

*George Lopes Leite*
Desembargador





AUTENTICAÇÃO
Confere com o original

Documento assinado digitalmente, conforme MP nº 2.2007/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em http://seeu.pje.jus.br/seeu/ - Identificador: PJ5VX 3YQ48 7YDRE VWOBA

Case 9:20-mj-08171-BER Document 3-1 Entered on FLSD Docket 04/29/2020 Page 43 of 201
PROJUDI - Processo: 0017372-86.2016.8.07.0015 - Ref. mov.: 57 - Assinado digitalmente por: ... - ...
01/02/2019: DIGITALIZAÇÃO DO PROCESSO. Arq: Guia de Execução/Recolhimento

**TJDFT** Poder Judiciário da União
Tribunal de Justiça do Distrito Federal e Territórios
Segunda Vara Criminal de Taguatinga

Folha Nº

Processo          : 2014.07.1.009404-2
Classe            : Ação Penal - Procedimento Ordinário
Assunto           : Estupro de Vulnerável
Nº do Inquérito   : 1072014
Autor             : MINISTERIO PUBLICO
Réu               : LUCAS CARVALHO ROLLO

## DESPACHO

A denúncia foi recebida na forma do art. 396 do Código de Processo Penal.

Embora não se tenha tido êxito na diligência de fls. 159/160, o certo é que o réu tomou ciência da imputação, tanto que constituí advogado. Nesse sentido é o entendimento da Suprema Corte, externado no HC 96465/MG, Rel. Min. Dias Toffoli. Sendo assim, reputo o réu citado.

Resposta à acusação às fls. 131/151. Pugnou pela absolvição sumária e pela revogação da prisão preventiva. Arrolou testemunhas.

Não há motivos a ensejar sua absolvição sumária, a teor do art. 397 do Código de Processo Penal. Ademais, matéria de mérito será oportunamente analisada.

Nada a prover quanto ao pedido de revogação da preventiva. Uma porque tal pleito deve ser regularmente distribuído, conforme dispõem os arts. 139 e seguintes do PGC. Outra porque a d. causídica ingressou com HC na Superior Instância para tal fim, tendo sido concedida liminarmente a ordem, e eventual reanálise deste juízo acarretaria supressão de instância, até porque, não há nos autos a decisão final do writ.

Defiro a oitiva das testemunhas arroladas pela Defesa.

Designe-se data para audiência de instrução e julgamento.

Intimem-se as testemunhas e as partes, procedendo-se a requisições e demais diligências que se fizerem necessárias.

Taguatinga - DF, terça-feira, 10 de junho de 2014 às 13h27.

WAGNO ANTÔNIO DE SOUZA
Juiz de Direito

AUTENTICAÇÃO
Confere com o original

Registrado
Último andamento: 10/06/2014 - DESPACHO PROFERIDO
Incluído na Pauta: ___/___/___          1/1

ENVIADO À PUBLICAÇÃO
EM 11.06.14

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJ-PR/OE
Validação deste em http://seeu.pje.jus.br/seeu/ - Identificador: PJSVX 3YG48 7YDRE VWQBA



Poder Judiciário da União
Tribunal de Justiça do Distrito Federal e dos Territórios

## SECRETARIA DA PRIMEIRA TURMA CRIMINAL

Praça Municipal, Lote 1, Fórum de Brasília, Bloco A, 3º Andar, Ala A, Salas 305 e 307
Fone 3103-7196/3103-7197, fax 3103-0772, CEP 70094-900, Brasília-DF

### MANDADO DE PRISÃO Nº 8/2014

**AUTENTICAÇÃO**
Confere com o original

A Desembargadora SANDRA DE SANTIS, Presidente da Primeira Turma Criminal do Tribunal de Justiça do Distrito Federal e Territórios

**MANDA**

ao Senhor DELEGADO-CHEFE DA DELEGACIA DE CAPTURA POLICIAL INTERESTADUAL - DCPI, que visto este por ele assinado e subscrito pelo Diretor de Secretaria da Primeira Turma Criminal, em seu cumprimento, **PRENDA E RECOLHA ao cárcere, devendo os denunciados permanecerem custodiados em celas separadas não podendo comunicar-se entre si,** à sua ordem e conseqüente disposição do juízo da 2ª Vara Criminal de Taguatinga/DF, o réu **LUCAS CARVALHO ROLLO**, brasileiro, nascido aos 15/10/1993, em Florianópolis/SC, filho de ANGELINA CARVALHO ROLLO e de THOMAS OWEN ROLLO, portador da RG nº 3.455.371-SSP/DF, em virtude de decisão proferida pela Egrégia 1ª Turma Criminal, que em sua 18ª Sessão Ordinária, realizada em 22 de maio de 2014, ao julgar o *Habeas Corpus* n.º 2014.00.2.008304-6, decidiu, por maioria, denegar a ordem nos seguintes termos: **"(...) Ante o exposto, denega-se a ordem, revogando-se a liminar concedida às fls. 50/51, a fim de restabelecer a prisão preventiva de Lucas Carvalho Rollo, como garantia da ordem pública. Expeça-se o mandado de prisão".** Ref. **Proc. 2014.07.1.009404-2** originário do **IP 107/2014**, da **2ª Vara Criminal de Taguatinga/DF**. Dado e passado nesta cidade de Brasília, capital da República, aos vinte e dois dias do mês de maio do ano de dois mil e quatorze. Eu, p/ João Alves Costa Filho, Diretor da Secretaria da Primeira Turma Criminal, o subscrevo.

Desembargadora SANDRA DE SANTIS
Presidente da Primeira Turma Criminal



TJDFT

Poder Judiciário da União
TRIBUNAL DE JUSTIÇA DO DISTRITO FEDERAL E DOS TERRITÓRIOS
GDRCO
Gabinete do Desembargador Romão C. Oliveira

## TJDFT / SEJU / SEREST    794.169

DATA: 02/06/2014    REGISTRO Nº.:
RUBRICA:.....

**Órgão:** PRIMEIRA TURMA CRIMINAL
**Classe:** HBC - HABEAS CORPUS
**Processo:** 2014 00 2 008304-6
**Impetrante:** CLAUDIANA PORTO DE SOUSA ROCHA
**Paciente:** LUCAS CARVALHO ROLLO
**Relator:** DESEMBARGADOR ROMÃO C. OLIVEIRA

**Segredo de Justiça**

**EMENTA.**
*HABEAS CORPUS.* PROCESSUAL PENAL. PRISÃO.
PREVENTIVA COMO GARANTIA DA ORDEM PÚBLICA E
PARA ASSEGURAR A APLICAÇÃO DA LEI PENAL –
ESTUPRO DE VULNERÁVEL – PRESENÇA DE MATERIAL
GENÉTICO DO ACUSADO NAS AMOSTRAS OBTIDAS.
NECESSIDADE DA SEGREGAÇÃO PARA EVITAR A
REITERAÇÃO DA CONDUTA. ORDEM DENEGADA.
MAIORIA.
A decretação da prisão preventiva de indivíduo acusado de
praticar estupro de vulnerável, valendo-se da confiança e
proximidade com a família da vítima, não configura
constrangimento ilegal, eis que, em hipóteses que tais, a
regra é segregação como garantia da ordem pública, para
evitar que o acusado venha a cometer crimes sexuais contra
outras crianças, porquanto os vulneráveis merecem maior
proteção do Estado.
Ordem denegada, revogando-se a liminar e determinando-se
a expedição de mandado de prisão. Maioria.

## ACÓRDÃO

Acordam os Desembargadores da Primeira Turma

AUTENTICAÇÃO
Confere com o original

Documento assinado digitalmente, conforme MP n° 2.200-2/2001, Lei n° 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em http://seeu.pje.jus.br/seeu/ - Identificador: PJ5VX 3YQ48 7YDRE VWQBA

GOVERNMENT EXHIBIT 1_20-MJ-8171-BER_045

PROJUDI - Processo: 0017372-86.2016.8.07.0015 - Ref. mov. 1.1 - Assinado digitalmente por Luiz Fernando Leite da Silva:319047
01/02/2019: DIGITALIZAÇÃO DO PROCESSO. Arq: Guia de Execução/Recolhimento

**TJDFT** Poder Judiciário da União
TRIBUNAL DE JUSTIÇA DO DISTRITO FEDERAL E DOS TERRITÓRIOS
GDRCO
Gabinete do Desembargador Romão C. Oliveira

HBC 2014 00 2 008304-6

Criminal do Tribunal de Justiça do Distrito Federal e Territórios ROMÃO C.
OLIVEIRA – Relator, GILBERTO PEREIRA DE OLIVEIRA e GEORGE LOPES
LEITE – Vogais, sob a presidência da Desembargadora SANDRA DE SANTIS,
em ADMITIR E DENEGAR A ORDEM, POR MAIORIA, de acordo com a ata do
julgamento e notas taquigráficas.

Brasília (DF), 22 de maio de 2014.

Desembargador ROMÃO C. OLIVEIRA
Relator



AUTENTICAÇÃO
Confere com o original

Documento assinado digitalmente, conforme MP n° 2.2.2001, Lei n° 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em http://seeu.pje.jus.br/seeu/ – Identificador: PJSVX 3YQ48 7YDRE WVQBA

2

**TJDFT** Poder Judiciário da União
Tribunal de Justiça do Distrito Federal e Territórios ·
Segunda Vara Criminal de Taguatinga

Folha Nº

178

| | |
|---|---|
| **Processo** | : 2014.07.1.009404-2 |
| **Classe** | : Ação Penal - Procedimento Ordinário |
| **Assunto** | : Estupro de Vulnerável |
| **Nº do Inquérito** | : 1072014 |
| **Autor** | : MINISTERIO PUBLICO |
| **Réu** | : LUCAS CARVALHO ROLLO |

## CERTIDÃO

Certifico e dou fé que, nesta data, juntei o ofício nº 20.351/2014 -1ª
TCrim às fls. 165/175, e o prontuário do acusado, o qual consigna que este foi
preso no dia 06/06/2014.

Taguatinga - DF, terça-feira, 10 de junho de 2014 às 18h32.

Diana Nogueira de Queiroz
Diretora de Secretaria



AUTENTICAÇÃO
Confere com o original

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em http://sseu.pje.jus.br/seeu/ - Identificador: PJ5VX 3YQ48 7YDRE VWQBA

Registrado
Último andamento: 10/06/2014 - CERTIDAO EMITID.
Incluído na Pauta: ___/___/_____    1/1

PROJUDI - Processo: 0017372-86.2016.8.07.0015 - Ref. mov. 1.1 - Assinado digitalmente por Luiz Fernando Leite da Silva:319047
01/02/2019: DIGITALIZAÇÃO DO PROCESSO. Arq: Guia de Execução/Recolhimento

**TJDFT**

Poder Judiciário da União
Tribunal de Justiça do Distrito Federal e dos Territórios
2ª Vara Criminal de Taguatinga

Folha Nº
3

**Processo:** 2014.07.1.009404-2
**Feito:** Ação Penal
**Autor:** Ministério Público
**Réu:** LUCAS CARVALHO ROLLO

# SENTENÇA

O Ministério Público ofereceu denúncia em desfavor de **LUCAS CARVALHO ROLLO**, já qualificado nos autos, atribuindo-lhe a prática do crime previsto no artigo 217-A, *caput*, do Código Penal (por diversas vezes), nos seguintes termos:

### I.

*De data indeterminada, até o dia 02 de fevereiro de 2014, por volta das 17h45min, no SHVP, Rua 06, Chácara 279, Casa 32, Vicente Pires/DF, **o denunciado LUCAS CARVALHO ROLLO**, de forma livre e consciente, por diversas vezes, praticou atos libidinosos com a criança* ▮▮▮▮ *(nascida aos* ▮▮▮ *fls. 13), menos de 14 (catorze) anos de idade à época dos fatos.*

### II.

*Conforme incluso autos de inquérito, no dia 02 de fevereiro de 2014, o denunciado chamou a vítima no quarto dele e molestou-a sexualmente, mediante a prática de atos libidinosos consistentes em retirar suas roupas, tocar o corpo dela, inclusive nas partes íntimas, esfregar-se nela, fica em cima dela e encostar seu pênis nas partes íntimas da vítima, dentre outros.*

AUTENTICAÇÃO
Confere com o original

Incluído na Pauta: ___/___/_____                    1/20

Documento assinado digitalmente, conforme MP nº 2.2 2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em http://seeu.pje.jus.br/seeu/ - Identificador: PJ5VX 3YQ48 7YDRE VWQBA

PROJUDI - Processo: 0017372-86.2016.8.07.0015 - Ref. mov. 1.1 - Assinado digitalmente por Luiz Fernando Leite da Silva.
01/02/2019: DIGITALIZAÇÃO DO PROCESSO. Arq: Guia de Execução/Recolhimento



**TJDFT** Poder Judiciário da União
Tribunal de Justiça do Distrito Federal e dos Territórios
2ª Vara Criminal de Taguatinga

Folha Nº

**AUTENTICAÇÃO**
**Confere com o original**

*Entrevistada, a vítima-criança narrou os abusos sexuais sofridos (fls. 30/38), mencionando ainda que tais fatos já haviam ocorrido anteriormente, em várias outras oportunidades.*

*Conforme Laudo de Constatação de Material Biológico (fls. 57/65), "nas amostras de tecido recortadas da calcinha, do short e da camiseta foi constatada a presença de sangue humano e de sémen". E, consoante Laudo de Exame de DNA (fls. 67/71), restou demonstrada a presença de material biológico do denunciado na calcinha, no short e no lençol."*

Recebida a denúncia à fl. 83. O réu compareceu espontaneamente em Juízo e apresentou resposta à acusação, por meio de advogado constituído (fls. 131/135). Na oportunidade, tece comentários sobre o mérito, requer a absolvição e arrola testemunhas.

No dia 16 de abril de 2014 foi cumprido mandado de prisão preventiva expedido em desfavor do acusado por força da decisão de fl. 88. Concedida liminar em Habeas Corpus e, no mérito, foi denegada a ordem (fls. 99/100 e 169/175). O réu foi novamente recolhido à prisão em 06 de junho de 2014 (fls. 176/177).

Instruído o feito com o Exame de Corpo de Delito realizado na vítima (fl. 16), Auto de Apresentação e Apreensão (fl. 31), Exame de Constatação de Material Biológico (fls. 61/69); Laudo de Exame de DNA (fls. 70/73-A), Aditamento do Laudo de Exame de Corpo de Delito (fls. 282/283), Resposta a Quesito – Laudo de Exame de DNA (fls. 316/317), Informação Pericial (fls. 319/322).

Ainda em fase instrutória, foram ouvidos os genitores da vítima, Luis Augusto Alves Nepomuceno e Raquel Pereira da Costa (fls. 271/274), as testemunhas Márcia Martins Morais Costa (fl. 275), Aline

Incluído na Pauta: ___/___/_____ 2/20

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em http://seeu.pje.jus.br/seeu/ – Identificador: PJ5VX 3YQ48 7YDRE VWQBA

PROJUDI - Processo: 0017372-86.2016.8.07.0015 - Ref. mov. 1.1 - Assinado digitalmente por Luiz Fernando Leite da Silva:319047
01/02/2018: DIGITALIZAÇÃO DO PROCESSO. Arq: Guia de Execução/Recolhimento

**AUTENTICAÇÃO** TJDFT
Confere com o original

Poder Judiciário da União
Tribunal de Justiça do Distrito Federal e dos Territórios
2ª Vara Criminal de Taguatinga

Folha Nº

Fernandes Cardoso e Maurício Moura de Souza (fls. 299/300) e os informantes Josineide Carvalho dos Anjos, Nayara de Carvalho Ferreira, Jorge Alberto Carvalho de Souza e Suellen

Na fase do artigo 402, do Código de Processo Penal, a Defesa requereu a realização de exame Ultrasson na vítima, bem como a remessa dos autos ao IPDNA/IC para resposta aos quesitos formulados nos itens 6.2 e 6.3 do laudo de fls. 244/247, além de requerer esclarecimento acerca do material recolhido da calcinha, short e lençol apreendidos (fl. 298). O Ministério Público nada requereu.

Alegações finais do Ministério Público às fls. 344/348, postulando pela condenação nos termos da denúncia.

A Defesa, também em razões derradeiras, suscita defesa indireta processual de cerceamento de defesa. No mérito, em extenso e bem fundamentado arrazoado, requer a absolvição.

É o relatório. **DECIDO.**

Inicialmente, cumpre registrar que o feito transcorreu sem qualquer eiva de nulidade, com estrita observância aos princípios do contraditório e ampla defesa e adoção do rito adequado à espécie, qual seja, o previsto nos artigos 396 e seguintes, do Código de Processo Penal. Ademais, a defesa indireta processual suscitada não merece acolhida. Olvida-se a Defesa que o julgador é o destinatário da prova, a quem cabe valorá-la e conferir a credibilidade que entender devida. Assim, não se vislumbrando sua real necessidade, mormente porque o fato que se pretende provar com o exame de ultrassom pode ser esclarecido pela prova oral, não se cogita em cerceamento de defesa, razão por que rejeito a defesa processual e adentro ao exame do mérito.

Incluído na Pauta: ___/___/_____          3/20

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em http://seeu.pje.jus.br/seeu/ - Identificador: PJ5VX 3YQ48 7YDRE VWOBA

PROJUDI - Processo: 0017372-86.2016.8.07.0015 - Ref. mov. 3 - Assinado digitalmente por ...
01/02/2019 DIGITALIZAÇÃO DO PROCESSO. Arq: Guia de Execução/Recolhimento



**AUTENTICAÇÃO**
**Confere com o original**

**TJDFT** Poder Judiciário da União
Tribunal de Justiça do Distrito Federal e dos Territórios
2ª Vara Criminal de Taguatinga

Folha Nº

## I - DA MATERIALIDADE

A peça vestibular imputa ao réu LUCAS CARVALHO ROLLO o crime tipificado no artigo 217-A, *caput*, do Código Penal, em razão de, supostamente e por diversas vezes, ter praticado atos libidinosos com a criança Isabel Luísa da Costa Nepomuceno, menor de 14 (catorze) anos de idade à época dos fatos.

Pois bem. Tudo principiou com o Registro de Ocorrência Policial nº 1.424/2014-0, levado a efeito pelo policial militar Jorge Alberto Carvalho de Sousa, acostado às fl. 12/14. Na oportunidade, ficou consignado que "...*SEGUNDO O PAI DA VÍTIMA ENCONTRAVA-SE NA CASA DE SUA TIA COM SUA FILHA E SEU PRIMO LUCAS, E QUE SUA FILHA FOI PARA O ANDAR DE CIMA, ONDE FICAM OS QUARTOS, E PERMANECEU POR ALGUNS MINUTOS. ESTRANHANDO SUA DEMORA, RESOLVEU PROCURAR PELA FILHA, CHAMANDO-A EM VOZ ALTA. ISABEL DESCEU, DIZENDO QUE IA TOMAR UM BANHO. QUESTIONANDO A ATITUDE DA MENINA, FALOU QUE NÃO ERA HORA DE TOMAR BANHO E PERGUNTOU O PORQUE. A MENINA RESPONDEU QUE ESTAVA SANGRANDO. PERGUNTOU PORQUE ELA ESTARIA SANGRANDO. A MENINA RESPONDEU QUE O LUCAS ESTAVA EM CIMA DELA. MOMENTO EM QUE FICOU FORA DE SI. SUBIU E PEGOU O SUSPEITO TOMANDO BANHO. PEDIU QUE ELE ABRISSE A PORTA. LUCAS ABRIU. PUXOU ELE PARA BAIXO E CONFIRMOU COM SUA FILHA SE LUCAS TINHA MEXIDO COM ELA E ISABEL CONFIRMOU QUE SIM. PERGUNTOU A LUCAS O QUE ELE FEZ COM A MENINA, MAS LUCAS NEGAVA O TEMPO TODO DIZENDO QUE NÃO FEZ NADA. REVOLTADO E IRADO, LIGOU PARA SUA TIA PEDINDO AJUDA SE NÃO IRIA PERDER A CABEÇA E MATAR LUCAS. MOMENTO EM QUE CHEGOU SEU PRIMO JORGE ALBERTO CARVALHO DE SOUSA, POLICIAL MILITAR E OS CONDUZIRAM ATÉ A 38ª DP PARA REGISTRO DE OCORRÊNCIA. APRESENTANDO AS ROUPAS ÍNTIMAS DA MENINA. APARENTEMENTE SUJAS DE SANGUE. NESTA DELEGACIA A MENOR ISABEL FOI ENTREVISTADA. DEVIDO A SUA IDADE 06 ANOS. NÃO SOUBE EXPLICAR BEM O QUE ACONTECEU, MAS EXPLICOU QUE LUCAS PASSOU UM PRODUTO NAS SUAS PARTES ÍNTIMAS E QUE DEITOU EM CIMA DELA, PEDINDO-A QUE LEVANTASSE O BUMBUM, DIZENDO QUE ELA ESTAVA SANGRANDO...A MENOR FOI ENCAMINHADA AO IML. NO EXAME*

Incluído na Pauta: ___/___/_____          4/20

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em http://seeu.pje.jus.br/seeu/ – Identificador: PJ5VX 3YQ48 7YDRE VWQBA

PROJUDI - Processo: 0017372-86.2016.8.07.0015 - Ref. mov. 1.1 - Assinado digitalmente por Luiz Fernando Leite da Silva:319047
01/02/2019: DIGITALIZAÇÃO DO PROCESSO. Arq: Guia de Execução/Recolhimento

AUTENTICAÇÃO
Confere com o original

**TJDFT**

Poder Judiciário da União
Tribunal de Justiça do Distrito Federal e dos Territórios
2ª Vara Criminal de Taguatinga

Folha Nº

*DE CORPO DE DELITO, CONJUNÇÃO CARNAL, LAUDO Nº 04281/14-IML/PCDF, DEU NEGATIVO, NÃO ENCONTRANDO SINAIS DE SANGRAMENTO OU ATO LIBIDINOSO. UMA EQUIPE FOI ATÉ A RESIDÊNCIA DA VÍTIMA E EM BUSCA DE VESTÍGIOS NO QUARTO DO SUSPEITO. NADA FOI ENCONTRADO. MAS NO QUARTO AO LADO, ONDE SEGUNDO INFORMAÇÃO DA VÍTIMA ESTEVE COM LUCAS FOI ENCONTRADO UM LENÇOL COM MANCHAS DE SANGUE, PARA POSTERIOR EXAMES PERICIAIS. ENTREVISTADO LUCAS NEGA AS AFIRMAÇÕES FEITAS PELA CRIANÇA ISABEL. AS ROUPAS DA CRIANÇA E O LENÇOL FORAM APREENDIDOS PARA PERÍCIA, PARA VERIFICAR SE TRATA-SE OU NÃO DE SANGUE HUMANO."*

Assim, quando a suposta notícia do crime foi levada a conhecimento da autoridade policial, a menor foi submetida a Exame de Corpo de Delito, resultando no Laudo nº 04281/14 juntado à fl. 16. Na ocasião, os senhores *experts* já puderam descrever, no item 4, que *"...ausência de vestígios de violência física, genitália externa com as seguintes características ou alterações: ausência de lesões em vulva, períneo e ânus; ânus com tônus normal; ausência de sinais de sangramento, presença se secreção clara sobre a vulva e ânus. Hímem íntegro".* Mais adiante, concluíram: *"Aguardar. Hímem íntegro e ânus sem sinais de penetrações."*

Ainda em fase inquisitória, o genitor da vítima, Luis Augusto Alves Nepomuceno foi ouvido e trouxe versão mais detalhada do sucedido naquele dia, como se vê de fls. 21/23. Ele contou que *"...no dia 02.02.2014 (domingo) estava passando o dia na residência de sua tia, de nome MARIA CECÍLIA DE CARVALHO...acompanhado de sua filha____; QUE, no local também reside um primo do declarante de nome LUCAS CARVALHO ROLLO...; QUE, por volta das 16h45min, sua filha foi para o andar de cima da residência, onde se encontrava LUCAS, enquanto o declarante ficou no andar de baixo assistindo a uma partida de futebol pela televisão; QUE, após uns dez a quinze minutos o declarante procurou____, chamando-a pelo nome, porém ela não respondeu; QUE, insistindo o declarante gritou o nome de ISABEL em tom de voz mais alto e somente assim ela desceu a escada, vestida com as mesmas roupas que já usava antes de subir para o outro andar da casa; QUE, logo que desceu____ foi log dizendo que queria tomar*

Incluído na Pauta: ___/___/___     5/20)

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em http://seeu.pje.jus.br/seeu/ - Identificador: PJ5VX 3YQ48 7YDRE VWQBA

PROJUDI - Processo: 0017372-86.2016.8.07.0015 - Ref. mov. 1.1 - Assinado digitalmente por Desembargador ...
01/02/2019: DIGITALIZAÇÃO DO PROCESSO. Arq: Guia de Execução/Recolhimento

AUTENTICAÇÃO
confere com o original

**TJDFT**

Poder Judiciário da União
Tribunal de Justiça do Distrito Federal e dos Territórios
2ª Vara Criminal de Taguatinga

Folha Nº

*banho, momento em que o declarante falou que não era hora dela tomar banho; QUE.* ▮ *respondeu que queria tomar banho porque estava sangrando. QUE. o declarante questionou porque ela estava sangrando e ao mesmo tempo o declarante ainda perguntou se o LUCAS havia mexido com ela; QUE. ISABEL respondeu: "MEXEU PAPAI! O LUCAS ESTAVA EM CIMA DE MIM! PASSOU UM PRODUTO NA MINHA BUNDINHA E NA MINHA PERERECA E PEDIU PARA EU LEVANTAR A BUNDINHA PARA ELE!"; QUE. o declarante verificou as vestes de ISABEL e constatou que ela apresentava bastante sangramento nas roupas, na altura dos órgãos genitais; QUE. o declarante ficou muito nervoso e subiu as escadas imediatamente para encontrar LUCAS; QUE. naquele momento LUCAS já estava tomando banho; QUE. o declarante perguntou se ele havia mexido com ISABEL e respondeu que não; QUE. o declarante o puxou para o andar de baixo e o colocou de frente para* ▮ *perguntando a ela se realmente ele havia feito aquilo que ela falou; QUE.* ▮ *confirmou a história na frente de LUCAS, repetindo que ele estava em cima dela...; QUE, sua tia chegou alguns minutos depois acompanhada de outros membros da família e todos questionaram a LUCAS o que tinha feito, porém sempre negava; QUE. o declarante resolveu trazer LUCAS até esta Delegacia para registro da ocorrência, trazendo também sua filha* ▮ *para ser ouvida e submetida a exames periciais...; QUE. naquela DP* ▮ *foi entrevistada por uma Policial feminina, tendo confirmado tudo que já havia falado para o declarante...; QUE, deseja ainda acrescentar que* ▮ *chegou a comentar com o declarante que LUCAS já havia mexido com ela em outras oportunidades, porém ele sempre pedia para ela não contar nada a ninguém...".* Declarações ratificadas em Juízo como se denota de fls. 271/272.

A genitora da menor, RAQUEL PEREIRA DA COSTA, a despeito de não se encontrar no local no dia do acontecido, também foi ouvida pela autoridade policial e disse que *"...a menina estava em companhia do pai LUIS AUGUSTO, vez que a declarante estava internada com problemas de depressão; QUE só ficou sabendo do fato na data de ontem; QUE. esclarece que antes do fato,* ▮ *costumava freqüentar a casa da tia MARIA CECÍLIA; QUE. já estranhou o fato dela ficar muito tempo no quarto com LUCAS; QUE. sempre que* ▮ *voltava da casa de MARIA CECÍLIA a declarante percebia vermelhidão e*

Incluído na Pauta: ___/___/___          6/20

Case 9:20-mj-08171-BER  Document 3-1  Entered on FLSD Docket 04/29/2020  Page 54 of 201

PROJUDI - Processo: 0017372-86.2016.8.07.0015 - Ref. mov. 1.1 - Assinado digitalmente por Luiz Fernando Leite da Silva:319047

01/02/2019: DIGITALIZAÇÃO DO PROCESSO. Arq: Guia de Execução/Recolhimento

AUTENTICAÇÃO
Confere com o original

**TJDFT**

Poder Judiciário da União
Tribunal de Justiça do Distrito Federal e dos Territórios
2ª Vara Criminal de Taguatinga

Folha Nº
383

*inchaço no órgão genital de sua filha e sempre perguntava a ela se alguém havia "mexido" com ela, mas a criança nunca contou nada; QUE, certa vez* ▆▆▆▆ *apresentou corrimento na vagina e a declarante estranhou aquele fato, mas como* ▆▆▆▆ *não relatou nenhum acontecimento estranho, acabou deixando "pra lá"; QUE, certa vez* ▆▆▆▆ *falou que ficava brincando com LUCAS de "travesseiro"...",* fl. 25.'

De sua parte, a menor ▆▆▆▆▆▆▆ foi submetida à entrevista especial na Seção de Atendimento Técnico da Delegacia de Proteção à Criança e ao Adolescente. Ela confirmou a versão apresentada pelo pai naquele dia, acrescentando que o sangue encontrado em seu corpo e vestes era do "pinto do Lucas", conforme fls. 34/42.

Pois bem. Dois questionamentos se colocam até o momento. O primeiro guarda pertinência com a origem do sangue encontrado nas vestes da menor, já que, submetida a exame preliminar ainda no dia do acontecido, os senhores peritos de antemão concluíram pela ausência de lesões na vulva, períneo e ânus da criança, ausência de sinais de sangramento, integridade do hímen e ânus, além da ausência de sinais de penetrações, conforme fl. 12. Já, o segundo, que é crucial ao deslinde da controvérsia, pois a denúncia não imputa ao réu a prática de conjunção carnal, mas de atos libidinosos em geral, diz respeito à credibilidade das declarações da suposta vítima, pois, segundo a menina, "*O Lucas passou um produto em mim...Era um produto branco que ele passou na minha perereca e no meu bumbum...*" (fl. 37), lembrando ainda que, segundo o pai, a menina disse que "*...O LUCAS ESTAVA EM CIMA DE MIM! PASSOU UM PRODUTO NA MINHA BUNDINHA E NA MINHA PERERECA E PEDIU PARA EU LEVANTAR A BUNDINHA PARA ELE!*" (fl. 21).

Evidenciado o cerne da controvérsia, nesse momento é de todo oportuno reportar ao Exame de Constatação de Material Biológico

Incluído na Pauta: ___/___/_____          7/20

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em http://seeu.pje.jus.br/seeu/ - Identificador: PJ5VX 3YQ48 7YDRE VWQBA

Case 9:20-mj-08171-BER Document 3-1 Entered on FLSD Docket 04/29/2020 Page 55 of 201
PROJUDI - Processo: 0017372-86.2016.8.07.0015 - Ref. mov. 1.1 - Assinado digitalmente por SD - Docket 04/29/2020
01/02/2019: DIGITALIZAÇÃO DO PROCESSO. Arq: Guia de Execução/Recolhimento



Poder Judiciário da União
Tribunal de Justiça do Distrito Federal e dos Territórios
2ª Vara Criminal de Taguatinga

Folha Nº

(fls. 61/64) realizado na calcinha e short da criança, em uma camiseta utilizada pelo acusado e em um lençol localizado em um dos cômodos da residência (Auto de Apresentação e Apreensão nº 119/2014).

Diante da importância das considerações traçadas pelos senhores peritos, vale transcrever na íntegra o subitens que tratam dos Exames de Laboratório realizados no material, as Considerações Técnico-Periciais e, por fim, a conclusão, nos termos a seguir:

"(...)

### III – EXAMES

(...)

**b) De Laboratório**

**b.1) Pesquisa de sangue humano**

As amostras coletadas da calcinha, do short, da camiseta e do lençol foram submetidas à extração adequada e em seguida ao Teste de Imunocromatografia para Hemoglobina Humana obtendo-se o **resultado positivo para as quatro amostras.**

**b.2) Pesquisa de espermatozóides**

As amostras recortadas da calcinha, short e da camiseta foram utilizadas para o preparo de 03 lâminas de cada amostra, as quais foram submetidas à pesquisa de espermatozóides, obtendo-se **resultado negativo para espermatozóides.**

**b.3) PSA**

Em seguida, procedeu-se ao teste de Imunocromatografia para presença de PSA (antígeno prostático específico), obtendo-se **resultado positivo para as três amostras.**

### IV – CONSIDERAÇÕES TÉCNICO-PERICIAIS

O Antígeno Prostático Específico (PSA) é uma glicoproteína (34.000 daltons) presente no plasma seminal, é sintetizada pela glândula prostática e expressa em altos níveis no epitélio da próstata humana.

A presença de PSA no esperma em concentrações milhões de vezes maiores que no soro de homens a caracterizou como um marcador valioso, já testado e validado pela comunidade forense, para a identificação de fluido seminal em evidências criminais deixadas por indivíduos vasectomisados, azoospérmicos ou oligozoospérmicos.

### V – CONCLUSÃO

Assim, em face do exposto e analisado, concluem os Peritos que **nas amostras de tecido recortadas da calcinha, do short e da camiseta foi constatada a presença de sangue humano e de sêmen, porém não foi constatada a presença de espermatozóides; e que na amostra de tecido**

Incluído na Pauta: ___/___/___  8/20

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em http://seeu.pje.jus.br/seeu/ - Identificador: PJ5VX 3YQ48 7YDRE VWOBA

MINISTÉRIO DA JUSTIÇA
Cooperação de Recuperação Internacional
AUTENTICAÇÃO
Confere com o original





**TJDFT** Poder Judiciário da União
Tribunal de Justiça do Distrito Federal e dos Territórios
2ª Vara Criminal de Taguatinga

Folha Nº

> **recortada do lençol foi constatada a presença sangue humano**, conforme
> mencionado no item III-b.
>
> (...)"

Passo seguinte, foi realizado Exame de DNA para confronto
do material biológico extraído da secreção perigenital, de recortes de
tecido da calcinha e short de Isabel, da camiseta do acusado e do lençol,
com as amostras biológicas coletadas de ambos, resultando na elaboração
do Laudo de Exame de DNA juntado às fls. 70/73-A. Agora também se faz
mister transcrever parte das informações periciais, eis que essenciais à
formação do convencimento deste Magistrado. Vejamos:

"(...)

## V. RESULTADOS

Após amplificação das amostras para os **marcadores autossômicos**,
observou-se que:

* Na amostra de **secreção perigenital** foi identificado um perfil genético
único, proveniente de uma pessoa do sexo feminino idêntico ao perfil
identificado na amostra biológica coletada de *Isabel Luisa da Costa
Nepomucena.*

(...)

* Nas amostras obtidas do *short* e do *lençol* foi observada ma mistura de
material genético de pelo menos duas pessoas, sendo uma do sexo masculino
e uma do sexo feminino. O perfil observado em maior quantidade nesta
mistura é proveniente de uma pessoa do sexo masculino e é **idêntico** ao
perfil identificado na amostra biológica coletada de *Lucas Carvalho Rollo*.
O perfil observado em menor quantidade nesta mistura é idêntico ao perfil
identificado na amostra biológica coletada de

* Na amostra obtida da **calcinha** foi observada uma mistura de material
genético de pelo menos duas pessoas. O perfil observado em maior
quantidade nesta mistura é proveniente de uma pessoa do sexo feminino e é
**idêntico** ao perfil identificado na amostra biológica coletada de
                              O perfil observado em menor quantidade nesta
mistura é idêntico ao perfil identificado na amostra biológica coletada de
*Lucas Carvalho Rollo*.

Após ampliação da amostra para os **marcadores do cromossomo Y**,
observou-se que nas amostras de **secreção perigenital**, da **calcinha**, do
*short*, da **camiseta** e do **lençol**, foi identificado um haplótipo do cromossomo
Y único que é **idêntico** ao haplótipo identificado na amostra biológica
coletada de *Lucas Carvalho Rollo*. A probabilidade de se selecionar ao acaso
na população masculina uma pessoa não relacionada apresentando o mesmo



**AUTENTICAÇÃO**
Confere com o original

Incluído na Pauta: ___/___/___          9/20

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em http://sseu.pje.jus.br/sseu/ - Identificador: PJ5VX 3YQ48 7YDRE VWQBA

Case 9:20-mj-08171-BER Document 3-1 Entered on FLSD Docket 04/29/2020 Page 57 of 201
PROJUDI - Processo: 0017372-86.2016.8.07.0015 - Ref. mov. 1.1 - Assinado digitalmente por Luiz Fernando Rodrigues Borges
01/02/2019: DIGITALIZAÇÃO DO PROCESSO. Arq: Guia de Execução/Recolhimento

**TJDFT**  Poder Judiciário da União
Tribunal de Justiça do Distrito Federal e dos Territórios
2ª Vara Criminal de Taguatinga

Folha Nº

haplótipo é de aproximadamente 1 em **14.928** (um em quatorze mil novecentos e vinte e oito).

## VI    CONCLUSÃO

Considerando o objetivo pericial proposto, as signatárias concluem que:

- O perfil genético observado na amostra coletada de **Lucas Carvalho Rolla** é **idêntico** ao perfil genético de origem masculina observado na **camiseta**, amostra relacionada ao Inquérito Policial nº 107/14 – 38ª DP. A probabilidade de se relacionar ao acaso na população masculina uma pessoa não relacionada apresentando o mesmo perfil é de aproximadamente 1 em 38.000.000.000.000.000.000.000.000.000 (uma em trinta e oito septilhões).

- O perfil genético observado na amostra coletada de **Lucas Carvalho Rolla** é **idêntico**, em todos os marcadores ao perfil obtido em maior quantidade nas amostras obtidas do **short** e do **lençol** e ao perfil obtido em menor quantidade na amostra obtida da **calcinha**, amostras relacionadas ao Inquérito Policial nº 107/14 – 38ª DP.

- o haplótipo do cromossomo Y observado na amostra coletada de **Lucas Carvalho Rolla** é **idêntico**, em todos os marcadores analisados, ao perfil genético de origem masculina observado nas amostras de **secreção perigenital** (relacionada ao Laudo de Exame de Corpo de Delito – Atos Libidinosos e Conjunção Carnal nº 4.281/14), na **calcinha**, no **short**, na **camiseta** e no **lençol**, amostras relacionadas ao Inquérito Policial nº 107/14 – 38ª DP. A probabilidade de se selecionar ao acaso na população masculina uma pessoa não relacionada apresentando o mesmo perfil é de aproximadamente 1 em **14.928** (uma em quatorze mil novecentos e vinte e oito). A obtenção de perfis coincidentes nos marcadores do cromossomo Y indica mesma origem ou mesma linhagem patrilínea entre os indivíduos que produziram as amostras.

(...)"



AUTENTICAÇÃO
**Confere com o original**

Do que restou expendido até então, exsurge questão crucial que não passou despercebida pela Defesa e à minuciosa análise da prova técnica realizada por este Magistrado. Em um primeiro momento, os senhores peritos apontam que na amostra de secreção perigenital foi identificado **um perfil genético único proveniente de uma pessoa do sexo feminino idêntico ao perfil identificado na amostra biológica coletada de** ▮▮▮▮ (fl. 72). Em seguida, ressaltam que após amplificação da amostra para os marcadores do cromossomo Y, observou-se que nas amostras de secreção perigenital, da calcinha, do short, da camiseta e do lençol, foi identificado um haplótico do cromossomo Y único que é

Incluído na Pauta: ___/___/___          10/20

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em http://seeu.pje.jus.br/seeu/ - Identificador: PJ5VX 3YQ48 7YDRE VWGBA

PROJUDI - Processo: 0017372-86.2016.8.07.0015 - Ref. mov. 1.1 - Assinado digitalmente por Luiz Fernando Leite da Silva:319047
01/02/2019: DIGITALIZAÇÃO DO PROCESSO. Arq: Guia de Execução/Recolhimento

AUTENTICAÇÃO
Confere com o original

**TJDFT** Poder Judiciário da União
Tribunal de Justiça do Distrito Federal e dos Territórios
2ª Vara Criminal de Taguatinga

Folha Nº

idêntico ao haplótipo identificado na amostra biológica coletada de o acusado Lucas (fl. 73). A contradição é latente. Diante disso, indaga-se: na amostra de secreção perigenital da suposta vítima foi ou não encontrado material biológico do réu Lucas Carvalho Rollo?

Até que se poderia cogitar que o contrassenso se mostra de somenos importância, pois também foi encontrado material biológico do réu no short e na calcinha da vítima. Todavia, é de todo oportuno lembrar que o acervo probatório revela que no dia dos fatos, e até mesmo antes disso, o réu e a suposta vítima coabitavam, pois o genitor da criança afirmou em Juízo que "...estava passando uns dias na casa de sua Tia Maria Cecília, com a vítima, em razão de sua esposa está internada...; que Lucas é filho adotivo de outra tia Maria Angelina; que Lucas reside na casa da tia Maria Cecília; que quando ocorreu os fatos já estava hospedado na casa da tia Maria Cecília 15 dias aproximadamente...". (fl. 271). Diante disso, flagrante a possibilidade da existência de contato físico anterior entre a vítima e o acusado que pode justificar a presença de material biológico do réu nas vestes da menina.

Aliado a isso, insta lembrar que, à exceção da secreção perigenital, o material examinado foi apreendido no dia seguinte ao acontecido, ou seja, aos 03.02.14 (Auto de Apresentação e Apreensão de fl. 31), por agente de polícia que, certamente, não se cerca de cuidados técnicos próprios de uma equipe de profissionais peritos. Por isso, também não se descarta uma possível influência de interferentes como, por exemplo, o contato de umas peças com as outras, o que pode justificar a presença de material biológico do réu nas vestimentas da menor.

Por isso, repise-se, de crucial importância superar a contradição apontada alhures. Em reposta ao quesito formulado pela Defesa à fl. 247, os senhores peritos apresentaram informações nos seguintes termos (fls. 316/317):

Incluído na Pauta: ___/___/___          11/20

Documento assinado digitalmente, conforme MP nº 2.2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em http://sseu.pje.jus.br/sseu/ - Identificador: PJ5VX 3YQ48 7YDRE VWGBA

Case 9:20-mj-08171-BER Document 3-1 Entered on FLSD Docket 04/29/2020 Page 59 of 201

PROJUDI - Processo: 0017372-86.2016.8.07.0015 - Ref. mov. 1.1 - Assinado digitalmente por...
01/02/2019: DIGITALIZAÇÃO DO PROCESSO. Arq: Guia de Execução/Recolhimento

■ ■ 1.

**TJDFT**
Poder Judiciário da União
Tribunal de Justiça do Distrito Federal e dos Territórios
2ª Vara Criminal de Taguatinga

Folha Nº

"(...)

## RESPOSTA AO QUESITO REFERENTE AO ITEM 6.2

**Quesito único:**

O quesito indaga se o material identificado nas amostras de secreção perigenital referente ao Inquérito Policial nº 107/14 – 38ª DP teria apenas um único material genético.

**Resposta:**

Não.

(...)



Na análise dos **marcadores autossômicos** da amostra da região **perigenital** foi detectado apenas um perfil de origem feminina, **idêntico** ao perfil identificado na amostra biológica coletada de ▓▓▓▓▓▓▓▓▓▓. Ressalte-se que quando existe uma quantidade muito maior de DNA feminino (proporção do DNA majoritário igual ou superior a 50:1) a presença de DNA masculino abaixo de um limite mínimo não produz ampliação para **marcadores autossômicos**, impedindo a detecção do perfil genético masculino presente em menor quantidade. Por outro lado, quando da análise do **cromossomo Y**, como apenas o contribuinte do sexo masculino possui este cromossomo, mesmo na presença de uma quantidade desproporcionalmente maior de DNA feminino este pode ser evidenciado, fato que explica os achados da amostra coletada da região **perigenital**.

(...)"

Ocorre que, a informação técnica em realce não foi capaz de espancar a dúvida semeada na formação do convencimento deste julgador. Agora, os senhores peritos afirmam que o material identificado nas amostras de secreção perigenital **não** tem um único material genético e justificam que quando existe uma quantidade muito maior de DNA feminino, a presença de DNA masculino abaixo de um limite mínimo não produz ampliação para marcadores autossômicos, impedindo a detecção do perfil genético masculino presente em menor quantidade. Contudo, e por outro lado, afirmam que quando da análise do cromossomo Y, como apenas o contribuinte do sexo masculino possui este cromossomo, mesmo na presença de uma quantidade desproporcionalmente maior de DNA

**AUTENTICAÇÃO**
**Confere com o original**

Incluído na Pauta: ___/___/_____          12/20

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE

Validação deste em http://sseu.pje.jus.br/sseu/ - Identificador: PJ5VX 3YQ48 7YDRE VWQBA

PROCESSO... 0011914-86.2018.8.07.0015 - Ref. mov. 1.1 - Assinado digitalmente por Luiz Fernando Leite da Silva:319047
01/02/2019: DIGITALIZAÇÃO DO PROCESSO. Arq: Guia de Execução/Recolhimento



Poder Judiciário da União
Tribunal de Justiça do Distrito Federal e dos Territórios
2ª Vara Criminal de Taguatinga

Folha Nº

feminino este pode ser evidenciado, fato que explica os achados da amostra coletada da região perigenital.

Ora, se quando existe uma quantidade muito maior de DNA feminino, a presença de DNA masculino abaixo de um limite mínimo não produz ampliação para marcadores autossômicos, impedindo a detecção do perfil genético masculino presente em menor quantidade, como pode ao mesmo tempo, concluir pela presença do perfil genético do acusado na secreção perigenital? A meu ver, a contradição não foi suplantada.

Prosseguindo na análise da prova técnica, insta lembrar que, inicialmente, os *experts* concluíram pela presença de sangue humano e de sêmen nas amostras de tecido recortadas da calcinha e do short da vítima, como também da camiseta do acusado (fl. 63). Em seguida, e, de igual modo, em resposta ao quesito formulado pela Defesa, apresentaram informações no seguinte sentido (fls. 319/322):

"(...)

**1. Resposta ao quesito referente ao item 6.3 constante no Parecer Técnico Pericial (fls. 244-247) e anexos (fls 248-262)**

**Quesito único:**

O quesito indaga sobre a identificação de sêmen somente pela presença de PSA e a ausência de descrição dos outros componentes desse fluido (espermatozóides, aminoácidos, prostaglandinas, fosfatase ácida, zinco, enzimas proteolíticas, e galactose).

**Resposta:**

Com exceção da fosfatase ácida e espermatozóides, a Seção de Perícias e Análises Laboratoriais não dispõe de metodologia para identificação dos outros componentes do sêmen.

Entretanto, é necessário esclarecer os seguintes pontos:

As amostras forenses normalmente se encontram em condições adversas antes da coleta, sujeitas a intempéries e ação de microrganismos, diferente de uma amostra coletada e um laboratório de análises clínicas. Isso significa que as amostras analisadas em um laboratório forense geralmente

**AUTENTICAÇÃO**
Confere com o original

Incluído na Pauta: ___/___/___          13/20

Documento assinado digitalmente, conforme MP nº 2.2...00/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em http://seeu.pje.jus.br/seeu/ - Identificador: PJSVX 3YQ48 7YDRE VWQBA

Case 9:20-mj-08171-BER Document 3-1 Entered on FLSD Docket 04/29/2020 Page 61 of 201
PROJUDI - Processo: 0017372-86.2016.8.07.0015 - Ref. mov. 1.1 - Assinado digitalmente por Luiz Fernando Gonçalves

01/02/2019: DIGITALIZAÇÃO DO PROCESSO. Arq: Guia de Execução/Recolhimento

TJDFT

Poder Judiciário da União
Tribunal de Justiça do Distrito Federal e dos Territórios
2ª Vara Criminal de Taguatinga

Folha Nº

apresentam quantidade reduzida, contaminações e muitas vezes perderam parte de sua composição por degradação ambiental ou biológica.

Desse modo, a caracterização de fluidos biológicos, em âmbito forense, busca identificar componentes únicos de cada fluido, afim de evitar análises que possam gerar resultados inconclusivos. Ou seja, a identificação de galactose, pH alcalino, enzimas proteolíticas e zinco, não permitiria conclusão alguma, pois uma mancha em uma veste contendo essas substâncias poderia possuir diversas origens diferentes, dentre as quais, outros fluidos corpóreos, restos de alimentos, etc.

A ciência forense, no caso de identificação de sêmen, utiliza a constatação de espermatozóides para a identificação desse fluido. Inclusive porque sua identificação orienta o uso de técnicas específicas para extração de DNA. Porém há casos onde o sêmen pode não conter espermatozóides, por exemplo, em indivíduos vasectomizados. Uma solução para esses casos é a utilização de outros marcadores de sêmen. A comunidade forense, geralmente, utiliza um entre dois: a fosfatase ácida prostática (FAP) e o antígeno específico da próstata (PSA).

A FAP foi bastante utilizada na investigação e caracterização do líquido seminal. Porém, foi considerado um marcador de sensibilidade e especificidade limitado, entrando em desuso após a descoberta do PASA (Cândido *et al¹*.).

O PSA, por outro lado, pode ser identificado como uso de ensaios imunocromatográficos, testes bastante específicos e sensíveis capazes de detectar concentrações de até 4 ng/mL. Esses testes são utilizados por diversos laboratórios forenses (khaldi et al. 2004[2], Hochmeister *et al.* 1999[3]; Simich *et al.* 1994[4] ).

Entretanto, essa glicoproteína (PSA) não ocorre exclusivamente no sêmen, estudos demonstram a presença de PSA em níveis detectáveis pelo teste imunocromatográfico em soro de mulheres com câncer de mama (8,153 ng/Ml), em urina de mulheres ingerindo testosterona (12,00 ng/Ml) e com síndrome de ovário policístico (10,29 ng/mL), em leite materno (350 ng/mL) (Sawaya & Rolim[5]), e em urina de homens após a ejaculação (260 ng/Ml) (Gartside *et al.* 2003[6]). Ressalte-se que a concentração média do PSA no sêmen varia entre 0,4 x 10⁶ ng/mL e 1,29 x 106 ng/mL, cerca de um milhão de vezes mais concentrado do que observado nos outros fluidos (Sawaya & Rolim[5]).

Contudo, um estudo demonstrou que a eficiência de extração de PSA de manchas de algodão é menor do que 1% (Gartside et al. 2003[6]). Considerando os estudos acima citados,



MINISTÉRIO DA JUSTIÇA
Departamento de Recuperação de Ativos
Cooperação Jurídica Internacional

AUTENTICAÇÃO
Confere com o original

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em http://seeu.pje.jus.br/seeu/ - Identificador: PJ5VX 3YQ48 7YDRE VWQBA

Case 9:20-mj-08171-BER Document 3-1 Entered on FLSD Docket 04/29/2020 Page 62 of 201

PROJUDI - Processo: 0017372-86.2016.8.07.0015 - Ref. mov. 1.1 - Assinado digitalmente por Luiz Fernando Leifte da Silva:319047

01/02/2019: DIGITALIZAÇÃO DO PROCESSO. Arq: Guia de Execução/Recolhimento

**TJDFT**

Poder Judiciário da União
Tribunal de Justiça do Distrito Federal e dos Territórios
2ª Vara Criminal de Taguatinga

Folha Nº

a extração de manchas leite materno e urina de homens após a ejaculação resultariam em uma concentração de 3,50 ng/mL e 2,60 ng/mL de PSA , respectivamente, abaixo do limite de detecção do teste imunocromatográfico. **Enquanto que uma extração de mancha de sêmen resultaria em uma concentração variando entre $0,4 \times 10^4$ ng/mL.**

Outra referência bibliográfica (Paulino et. Al 2009[7]), quantifica concentrações de PSA de até 1,3ng/mL, porém utiliza outra metodologia. Esses valores não seriam detectados pelo método utilizado por este Laboratório, mesmo desconsiderando a taxa de recuperação de amostra de 1%.

Considerando o acima exposto, percebe-se que a identificação de PSA como marcador de sêmen é uma ferramenta robusta e amplamente utilizada pela comunidade forense. Entretanto, sua identificação isolada não permite afirmar de forma inequívoca a presença de sêmen, visto que, apesar de os trabalhos da comunidade científica atualmente confirmarem a robustez do método empregado, no futuro podem ser descobertas condições clínicas que elevem a concentração de PSA em outros fluidos corpóreos a níveis comparáveis ao do sêmen.

Cabe ressaltar que antes da quesitação este Laboratório já apresentava conclusão distinta da presente no Laudo de Perícia Criminal 3617/2014 – IC, decorrente das considerações acima realizadas.

Desse modo retifica-se a conclusão do Laudo de Perícia Criminal 3617/2014 – IC para:

"Assim, em face do exposto e analisado, concluem os Peritos que <u>nas amostras de tecido recortadas da calcinha, do short e da camiseta foi constatada a presença de sangue humano e de PSA,</u> sugestivo de presença de sêmen, **porém não foi constatada a presença de espermatozóides;...**" (destaques propositais)

Percebe-se, portanto, que, nesse segundo momento, os senhores peritos apresentam informações mais detalhadas acerca do exame realizado para a constatação da presença de sêmen nas vestes. Esclarecem que, com exceção da fosfatase ácida e espermatozóides, não dispõem de metodologia para identificação dos outros componentes do sêmen; que a PSA não é encontrada exclusivamente no sêmen, mas também em soro de

Incluído na Pauta: ____/____/____          15/20

MINISTÉRIO DA JUSTIÇA
Departamento de Rec... ...ção Jurídica Int...
AUTENTICAÇÃO
Confere com o ori...

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em http://seeu.pje.jus.br/seeu - Identificador: PJ5VX 3YQ48 7YDRE VWQBA

Case 9:20-mj-08171-BER Document 3-1 Entered on FLSD Docket 04/29/2020 Page 63 of 201
PROJUDI - Processo: 0017372-86.2016.8.07.0015 - Ref. mov. 1.1 - Assinado digitalmente por... 04/29/2020
01/02/2019: DIGITALIZAÇÃO DO PROCESSO. Arq: Guia de Execução/Recolhimento

Poder Judiciário da União
Tribunal de Justiça do Distrito Federal e dos Territórios
2ª Vara Criminal de Taguatinga

mulheres com câncer de mama, em urina de mulheres ingerindo testosterona e com síndrome de ovário policístico, em leite materno e em urina de homens após a ejaculação, sendo, em níveis maiores no sêmen. Reconhecem que o PSA é uma ferramenta robusta e amplamente utilizada pela comunidade forense como marcador da presença de sêmen, mas, por outro lado, sua identificação isolada não permite afirmar de forma inequívoca sua presença. Por derradeiro, retificam a conclusão, ressaltando que nas amostras de tecido recortadas da calcinha, do short e da camiseta foi constatada a presença de sangue humano e de PSA, sugestivo de presença de sêmen, lembrando que não foi constatada a presença de espermatozóides.

Nesse sentir, ao contrário do sucedido na primeira oportunidade, agora os peritos não apresentam resultado conclusivo, mas apenas sugestivo da presença de sêmen.

É sabido que o decreto condenatório deve se amparar em provas robustas acerca da materialidade e autoria do crime. Vale dizer, para que haja condenação é necessário que se proceda à reconstituição histórica dos fatos, de molde a se perceber o que se passou na verdade e se a prática do ato ilícito pode ser atribuída ao denunciado. Ou seja, é necessário restabelecer, tanto quanto possível, a verdade dos fatos, para a solução justa do litígio, e sendo este o fim a que se destina o processo, é através da instrução que se busca a mais perfeita possível representação dessa verdade.

De igual modo, não se olvida que o processo penal contemporâneo contempla três modelos de avaliação ou valoração da prova, a saber: o sistema legal, o da íntima convicção e o da persuasão racional. Por esse último, adotado em nosso ordenamento jurídico, "*O juiz*

Incluído na Pauta: ___/___/_____          16/20

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJDFT/PJe. Validação deste em http://seeu.pje.jus.br/seeu/ - Identificador: PJ5VX 3YQ48 7YDRE VWQBA

PROJUDI - Processo: 0017372-86.2016.8.07.0015 - Ref. mov. 1.1 - Assinado digitalmente por Luiz Fernando Leite da Silva:319047
11/02/2019: DIGITALIZAÇÃO DO PROCESSO. Arq: Guia de Execução/Recolhimento

**AUTENTICAÇÃO** TJDFT
Confere com o original

- Poder Judiciário da União
Tribunal de Justiça do Distrito Federal e dos Territórios
2ª Vara Criminal de Taguatinga

Folha Nº

*formará sua convicção pela livre apreciação da prova produzida em contraditório judicial, não podendo fundamentar sua decisão exclusivamente nos elementos informativos colhidos na investigação, ressalvadas as provas cautelares, não repetíveis e antecipadas.*", mas deve fazê-lo de forma motivada. É o princípio do livre convencimento motivado expresso no artigo 155, do CPP. O que distingue o sistema da persuasão racional é a liberdade do magistrado na valoração dos elementos probatórios que, embora exista, é contida pela obrigatoriedade de justificação das escolhas adotadas, diante da prova legitimamente obtida, com a explicitação do caminho percorrido até a conclusão. Aliás, "*Se é certo que o juiz fica adstrito às provas constantes dos autos, não é menos certo que não fica subordinado a nenhum critério apriorístico na apurar, através delas, a verdade material. O juiz criminal é, assim restituído à sua própria consciência*" (Exposição de Motivos do Código de Processo Penal, item VII).

Disso resulta que a convicção do Magistrado não está atrelada a nenhum meio de prova específico ou isolado. Por isso, muito embora a prova pericial seja o meio de suprir a carência de conhecimentos técnicos de que se ressente o magistrado para apuração dos fatos, "*O juiz não ficará adstrito ao laudo, podendo aceitá-lo ou rejeitá-lo, no todo ou em parte.*", a teor do disposto no artigo 182, do CPP.

Nesse diapasão, a despeito dos exames levados a efeito pelos *experts*, não concebo a possibilidade de amparar um decreto condenatório em conclusão sugestiva, mormente porque os próprios peritos destacam que a identificação isolada de PSA não permite afirmar de forma inequívoca a presença de sêmen.

Ainda se poderia pensar que a prova oral produzida em Juízo seria suficiente para confirmar a materialidade do crime. Aqui também não vislumbro robustez suficiente para lastrear o decreto condenatório.

Incluído na Pauta: ___/___/___              17/20

GOVERNMENT EXHIBIT 1_20-MJ-8171-BER_064

MINISTÉRIO DA JUSTIÇA
Departamento de Recuperação de Ativos e Cooperação Jurídica Internacional
Folha Nº
AUTENTICAÇÃO
Confere com o original

O réu Lucas Carvalho Rollo nega veementemente a materialidade do crime. Aliás, ouvido em duas oportunidades, apresenta versões semelhantes, como se vê de fls. 50/52 e 306/307.

De sua parte, a vítima [redacted] foi ouvida em Juízo por meio de entrevista realizada por vídeo conferência e, de certa forma, ratificou as declarações apresentadas em fase inquisitória. A mídia com a gravação da oitiva foi acostada à fl. 296. Bem é verdade que não se pode exigir reprodução *ipis litteris* da versão inicial, pois se trata de criança de tenra idade, portanto, imatura psiquicamente. Mas, em síntese, ela tornou a dizer que o denunciado tirou suas vestes, passou um creme em sua genitália e subiu em cima dela.

Não se olvida do valor probatório da palavra da vítima, mormente em crimes desta natureza que, em sua maioria, são praticados às escondidas. Por outro lado, no caso vertente, outras circunstâncias também merecem ser valoradas, pois, no meu entender, podem mitigar sobremaneira a força probante das narrativas traçadas pela menor. Insta lembrar que, quando se trata de criança, há expectativa de uma fala fantasiosa, podendo até mesmo ser sugestionada por um adulto, ou influenciada pelo contexto em que vive, pois lhe falta maturidade para compreender o significado e as conseqüências da sua atitude, além de seu relato estar sujeito a divergências que podem advir da tentativa de proteger o agressor e sua família, já que nesse tipo delito, na maioria dos casos o agressor é membro da família ou alguém muito próximo afetivamente.

Diante disso, a prova oral judicializada também revelou que o abuso sexual é tema que rodeia e aterroriza a família da vítima. E não é para menos, pois o genitor da menor, Luis Augusto Alves Nepomuceno, disse que "...*sua esposa foi abusada sexualmente aos 16 anos e até hoje sofre por*

GOVERNMENT EXHIBIT 1_20-MJ-8171-BER_065

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em http://seeu.pje.jus.br/seeu/ - Identificador: PJ5VX 3YQ48 7YDRE VWQBA

PROJUDI - Processo: 0017372-86.2016.8.07.0015 - Ref. mov. 1.1 - Assinado digitalmente por Luiz Fernando Leite da Silva:319047
01/02/2019 DIGITALIZAÇÃO DO PROCESSO. Arq: Guia de Execução/Recolhimento

AUTENTICAÇÃO
Confere com o original

**TJDFT**

Poder Judiciário da União
Tribunal de Justiça do Distrito Federal e dos Territórios
2ª Vara Criminal de Taguatinga

Folha Nº

*causa disso, sendo que o responsável nunca foi preso; que essa situação era de conhecimento da família; que Isabel dormia no mesmo quarto em que o depoente e sua esposa em um colchão no chão; que embora a casa tivesse dois quartos Isabel tinha medo do escuro, razão pela qual dormia em seu quarto; que nunca comentaram com Isabel pelo abuso sexual sofrido por sua mãe...*". Isso talvez possa justificar a forma como o pai questionou a menina quando percebeu o sangramento, pois, disse que "*...olhou para o shorte de Isabel e viu que estava ensopado de sangue; que neste momento perguntou a Isabel o que havia acontecido, se foi Lucas que fez alguma coisa com ela; que esclarece que perguntou se havia sido porque somente ele estava no andar de cima; que perguntou o que Lucas havia feito e Isabel disse que ele estava em cima dela...*", fls. 272/273. E também pode esclarecer o porquê da genitora, Raquel Pereira da Costa sempre questionar a menina sobre eventual abuso sofrido por ela quando voltava da casa da tia e, mesmo diante da desconfiança, pois, segundo ela "*...por duas vezes Isabel ao voltar da casa da tia Maria Cecília reclamou de dor na genitália...*" (fl. 273), ainda assim, permitia que a menina continuasse a freqüentar a casa.

Como se não bastasse, a menor foi submetida a atendimento de emergência no Hospital Regional do Guará, no dia 03.02.2014, conforme guia acostada às fls. 290/291. Na oportunidade, a pediatra consignou que a "*...criança foi avaliada por psicóloga que refere que a mesma disse claramente que houve penetração...*". Ocorre que, em aditamento ao Laudo de Exame de Corpo de Delito nº 04281/14, os senhores peritos destacaram que "*Não há indícios objetivos de conjunção carnal ou ato libidinoso diverso da conjunção carnal.*", fl. 282.

Por fim, e para fragilizar ainda mais a narrativa fática apresentada pela infante, familiares seus chegaram a informar em Juízo que se trata de criança habituada a mentir (fls. 302v e 305).

Incluído na Pauta: ___/___/___          19/20

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em http://aseeu.oje.jus.br/seeu/ - Identificador: PJ5VX 3YQ48 7YDRE VWQBA

PROJUDI - Processo: 0017372-86.2016.8.07.0015 - Ref. mov. 1.1 - Assinado digitalmente por Luiz Fernando Leite da Silva Neto
01/02/2019: DIGITALIZAÇÃO DO PROCESSO. Arq: Guia de Execução/Recolhimento

**TJDFT**

Poder Judiciário da União
Tribunal de Justiça do Distrito Federal e dos Territórios
2ª Vara Criminal de Taguatinga

Folha Nº

Nesse sentir, e por tudo que restou expendido, latente a fragilidade do acervo probatório quanto à própria materialidade do crime, valendo lembrar que a dúvida deve militar em prol do acusado.

### 2 - DISPOSITIVO

Ante o exposto, julgo **IMPROCEDENTE** a pretensão punitiva Estatal para **ABSOLVER** o acusado **LUCAS CARVALHO ROLLO**, já qualificado nos autos, da imputação que lhe foi feita, com fundamento no artigo 386, inciso II, do CPP.

Por conseguinte, não mais subsistem os fundamentos que ensejaram o decreto da prisão cautelar, razão por que revogo a decisão de fls. 88/89 e determino a expedição de **ALVARÁ DE SOLTURA** em favor do denunciado, se por outro motivo não estiver preso.

Sem custas.

Publique-se. Registre-se. Intimem-se.

Oportunamente, arquivem-se.

Taguatinga-DF, 03 de fevereiro de 2015.

**WAGNO ANTÔNIO DE SOUZA**
**Juiz de Direito**



AUTENTICAÇÃO
Confere com o original

Incluído na Pauta: ___/___/_____        20/20

PROJUDI - Processo: 0017372-86.2016.8.07.0015 - Ref. mov. 1.1 - Assinado digitalmente por Luiz Fernando Leite da Silva:319047
01/02/2019: DIGITALIZAÇÃO DO PROCESSO. Arq: Guia de Execução/Recolhimento

**TJDFT** Poder Judiciário da União
**TRIBUNAL DE JUSTIÇA DO DISTRITO FEDERAL E DOS TERRITÓRIOS**

CIRCUNSCRIÇÃO JUDICIÁRIA DE BRASÍLIA - OFICIAIS DE JUSTIÇA

**Processo nº (formato CNJ): 00091571920148070007**
*Processo nº (formato SISTJ): 20140710094042*
*Classe: Ação Penal - Procedimento Ordinário*
*Polo Ativo: MINISTERIO PUBLICO*
*Polo Passivo: L.C.R.*

## Certidão

Certifico e dou fé que dirigi-me ao CDP no dia 03/02/15, às 23h59min, e procedi à ENTREGA do alvará de soltura expedido em favor do LUCAS CARVALHO ROLLO, ao(à) plantonista, Sr(a). Andre-192239-4, que o recebeu e exarou o seu ciente.

Informo, ainda, que o(a) plantonista informou que o **senhor LUCAS CARVALHO ROLLO, seria posto em liberdade.**

Em continuidade, certifico, ainda, que intimei de todo o teor do mandado o senhor LUCAS CARVALHO ROLLO (lendo-lhe) da decisão que concedeu sua liberdade.

- intimei-o(a) da sentença prolatada, oportunidade em que manifestou sua intenção de não apelar, mas bem ciente ficou do prazo para recurso.

Distrito Federal, 9 de Fevereiro de 2015.

**HERMIONE SILVA**
*Oficial(a) de Justiça*



**AUTENTICAÇÃO**
Confere com o original

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em http://seeu.pje.jus.br/seeu/ - Identificador: PJSVX 3YQ48 7YDRE VWQBA

*Documento assinado digitalmente. A autenticidade do documento poderá ser conferida no sítio do TJDFT - http://www.tjdft.jus.br

| 2411028 | - | 001.0000.11200000000/2015.0008.028491-14 | - | 09/02/2015 09:30 | - | 1 / | 1 |

 **Poder Judiciário da União**
**Tribunal de Justiça do Distrito Federal e dos Territórios** 

| | | |
|---|---|---|
| Órgão | : | 1ª TURMA CRIMINAL |
| Classe | : | APELAÇÃO |
| N. Processo | : | 20140710094042APR |
| | | (0009157-19.2014.8.07.0007) |
| Apelante(s) | : | M.P.D.D.F.E.T. |
| Apelado(s) | : | L.C.R. |
| Relator | : | Desembargador ROMÃO C. OLIVEIRA |
| Revisor | : | Desembargador ESDRAS NEVES |
| Acórdão N. | : | 872600 |

## EMENTA

DIREITO PENAL. ARTS. 217-A, *CAPUT*, (DUAS VEZES) NA
FORMA DO ART. 71, TODOS DO CÓDIGO PENAL.
CONDENAÇÃO. RECURSO MINISTERIAL PROVIDO.
Se do depoimento da vítima, em harmonia com as demais
provas carreadas para os autos, em especial Exame de
Constatação de Material Biológico e Exame de DNA, resta
comprovado que o réu praticou atos libidinosos diversos da
conjunção carnal com a vítima de 6 anos de idade por mais de
uma vez, reforma-se a sentença absolutória para condená-lo
pela prática do delito tipificado no art. 217-A, *caput*, do Código
Penal por duas vezes em continuidade delitiva.



AUTENTICAÇÃO
Confere com o origin...

Código de Verificação :2015ACO9391MRWB2HGSM06CZ6Q8

GABINETE DO DESEMBARGADOR **RDMÃO C. DLIVEIRA**                    1

PROJUDI - Processo: 0017372-86.2016.8.07.0015 - Ref. mov. 1.1 - Assinado digitalmente por Luiz Fernando Leite da Silva:319047
01/02/2019: DIGITALIZAÇÃO DO PROCESSO. Arq: Guia de Execução/Recolhimento

Fls. _____

Apelação 20140710094042APR

## ACÓRDÃO

Acordam os Senhores Desembargadores da **1ª TURMA CRIMINAL** do Tribunal de Justiça do Distrito Federal e Territórios, **ROMÃO C. OLIVEIRA** - Relator, **ESDRAS NEVES** - Revisor, **MARIO MACHADO** - 1º Vogal, sob a presidência do Senhor Desembargador **ROMÃO C. OLIVEIRA,** em proferir a seguinte decisão: **PROVER. UNÂNIME**, de acordo com a ata do julgamento e notas taquigráficas.

Brasilia(DF), 3 de Junho de 2015.

Documento Assinado Eletronicamente
**ROMÃO C. OLIVEIRA**
Relator



**AUTENTICAÇÃO**
Confere com o original

Código de Verificação :2015ACO9391MRWB2HGSM06CZ6Q8

GABINETE DO DESEMBARGADOR **ROMÃO C. OLIVEIRA**

2

Documento assinado digitalmente, conforme MP nº 2.../2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em http://seeu.pje.jus.br/seeu/ - Identificador: PJ5VX 3YQ48 7YDRE VWQBA

Fls.
Apelação 20140710094042APR

# RELATÓRIO

Cuida-se de apelação interposta pelo Ministério Público do Distrito Federal e Territórios em face da r. sentença de fls. 380/389-v que absolveu L.C.R. da prática do delito previsto no art. 217-A, *caput*, (por diversas vezes) do Código Penal, com fundamento no art. 386, inc. II, do CPP.

Com as razões de fls. 406/412, pleiteia o órgão acusador a condenação do apelado, nos moldes da inicial, alegando, em síntese, que as provas constantes dos autos são suficientes para embasar o decreto condenatório.

As contrarrazões são vistas às fls. 424/448.

A douta Procuradoria de Justiça se manifesta pelo conhecimento e provimento do recurso (fl. 461/462-v).

É o relatório.



AUTENTICAÇÃO
Confere com o original

Documento assinado digitalmente, conforme MP n° 2.200-2/2001, Lei n° 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em http://seeu.pje.jus.br/seeu/ - Identificador: PJ5VX 3YQ48 7YDRE VWQBA

Código de Verificação :2015ACQ9391MRWB2HGSM06CZ6Q8

GABINETE DO DESEMBARGADOR **ROMÃO C. OLIVEIRA**

3

PROJUDI - Processo: 0017372-86.2016.8.07.0015 - Ref. mov. 1.1 - Assinado digitalmente por Luiz Fernando Leite da Silva:319047
Case 9:20-mj-08171-BER Document 3-1 Entered on FLSD Docket 04/29/2020 Page 72 of 201
01/02/2019: DIGITALIZAÇÃO DO PROCESSO. Arq: Guia de Execução/Recolhimento



Fls. _____

Apelação 20140710094042APR

# VOTOS

## O Senhor Desembargador ROMÃO C. OLIVEIRA - Relator

O recurso interposto preenche os pressupostos de admissibilidade, razão por que dele se conhece.

Colhe-se da peça acusatória (fls. 2/4):

> De data indeterminada, até o dia 02 de fevereiro de 2014, por volta das 17h45min, no SHVP, Rua 06, Chácara 279, Casa32, Vicente Pires/DF, o denunciado L.C.R., de forma livre e consciente, por diversas vezes, praticou atos libidinosos com a criança I.L.C.N. (nascida aos 21/09/2007, fls. 13), menor de 14 (catorze) anos de idade à época dos fatos.
>
> Conforme incluso autos de inquérito, no dia 02 de fevereiro de 2014, o denunciado chamou a vítima no quarto dele e molestou-a sexualmente, mediante a prática de atos libidinosos consistentes em retirar suas roupas, tocar o corpo dela, inclusive nas partes íntimas, esfregar-se nela, ficar em cima dela e encostar seu pênis nas partes íntimas da vítima, dentre outros. Entrevistada, a vítima-criança narrou os abusos sexuais sofridos (fls. 30/38), mencionando ainda que tais fatos já haviam ocorrido anteriormente, em várias outras oportunidades.
>
> Conforme Laudo de Constatação de Material Biológico (fls. 57/65), "nas amostras de tecido recortadas da calcinha, do short e da camiseta foi constatada a presença de sangue humano e de sêmen". E, consoante Laudo de Exame de DNA (fls. 67/71), restou demonstrada a presença de material biológico do denunciado na calcinha, no short e no lençol.



**AUTENTICAÇÃO**
Confere com o original

Conforme relatado, o Ministério Público requer a condenação do apelado, nos moldes da inicial, alegando, em síntese, que as provas constantes dos autos são suficientes para embasar o decreto condenatório.

Resta, pois, ao colegiado, apreciar a prova colhida.

Em juízo, o acusado negou a prática delitiva (fl. 275 e verso), narrando a dinâmica dos fatos da seguinte maneira:

Código de Verificação :2015ACQ9391MRWB2HGSM06CZ6Q8

GABINETE DO DESEMBARGADOR ROMÃO C. OLIVEIRA                4

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em http://seeu.pje.jus.br/seeu/ - Identificador: PJ5VX 3YQ48 7YDRE VWOBA



Fls.

Apelação 20140710094042APR

(...) o interrogando alega que os fatos ali descritos não são verdadeiros; que
o interrogando alega que estava em um churrasco com sua família; que L.
havia chegado do serviço com sua menina e foi para o churrasco; que L.
ficou um tempo do churrasco bebendo e depois perguntou se o interrogando
queria uma carona para onde morava; que morava com M.C.; que antes de
chegar na casa, já em Vicente Pires, L. perguntou ao interrogando se queria
tomar uma bebida quente; que pararam em um boteco e consumiram uma
bebida quente; que I. estava com eles; que no boteco L. comprou duas
caixas de cerveja; que ao chegaram na casa de M.C., L. sentou-se no sofá
para ver futebol; que o interrogando disse a L. que iria sair para andar de
skate com seus amigos; que após quarenta e cinco minutos retornou a fim
de ir tomar banho; que quando retornou I. estava brincando com o cachorro;
que o interrogando só viu I. no andar de baixo; que o interrogando não viu I.
no andar de cima; que antes de tomar banho entrou somente em seu quarto
para pegar uma torça [sic] de roupa; que enquanto isso I. permanecia no
andar debaixo; que pegou a roupa e entrou no banheiro para tomar banho;
que depois de 15 minutos ouviu L. chamando o seu nome; que L. bateu na
porta do banheiro; que o interrogando colocou uma toalha em volta do corpo
e abriu a porta; que L. estava com o calcinha de I. na mão cheia de sangue;
que L. perguntou se o interrogando havia mexido com ela ou deitado em
cima dela; que o interrogando disse a L. que jamais faria isso com ele já que
eram amigos e que costumavam beber juntos; que neste momento
enquanto estava no banheiro L. não agrediu o interrogando; que L. disse ao
interrogando que descesse com ele; que I. permaneceu no andar de baixo;
que desceram a escada e foram até o banheiro do andar de baixo e lá
estava I. nua; que I. havia acabado de tomar banho e já estava seca; que L.
voltou a perguntar para I. se interrogando havia deitado em cima dela ou
mexido com ela; que I. olhou para o seu pai e depois olhou para o
interrogando e balançou com a cabeça dizendo afirmativamente; que o
interrogando implorou a L. dizendo que jamais faria isso com um amigo; que
também disse para I. que jamais faria isso e perguntou se ela entendia o
que estava falando; que neste momento L. começou a agredir o
interrogando; que o interrogando foi agredido pela mão direita de L.,
enquanto que na mão esquerda ele segurava o shorts e a calcinha de I. com
sangue; que o interrogando não agrediu L., apenas se defendeu dizendo



AUTENTICAÇÃO
Confere com o original

Código de Verificação :2015ACO9391MRWB2HGSM06CZ6Q6

GABINETE DO DESEMBARGADOR **ROMÃO C. OLIVEIRA**

5

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em http://seeu.pje.jus.br/seeu/ – Identificador: PJ5VX 3YQ48 7YDRE VWQBA

Case 9:20-mj-08171-BER   Document 3-1   Entered on FLSD Docket 04/29/2020   Page 74 of 201
PROJUDI - Processo: 0017372-86.2016.8.07.0015 - Ref. mov. 1.1 - Assinado digitalmente por Luiz Fernando Leite da Silva:319047
01/02/2019: DIGITALIZAÇÃO DO PROCESSO. Arq: Guia de Execução/Recolhimento

Fls. _____

Apelação 20140710094042APR

*que não havia feito nada; que quando foi até o banheiro e viu I.. não viu nenhum sangue no banheiro e nem entre as pernas de I.; que não sabe dizer porque havia sangue na calcinha e no shorts de I.; que L. em seguida pegou o celular e disse que iria chamar a família; que o interrogando subiu e trocou de roupa; que o interrogando subiu para o seu próprio quarto; que o interrogando se recorda que o lado esquerdo do seu rosto estava inchado e que chegou a sangrar na nuca e atrás da orelha; que o primeiro a chegar em seu quarto foi J.; que J. disse ao interrogando que ele estava sendo acusado de estuprar I. e por isso teria que levá-lo até a delegacia; que não foi submetido a nenhum exame; que nos Estado Unidos o interrogando não sabia o que queria fazer da vida; que pensou que por saber falar inglês conseguiria um emprego melhor no Brasil; que no Brasil chegou a trabalhar no curso de inglês no Wizard, por um mês a título de experiência; que não deu certo e não foi contratado; que o interrogando queria dar aula para Turma avançada, mas não tinha vaga; que costumava brincar com as crianças mais novas, com J. de dez anos, H. com dez anos, e com outra menina de aproximadamente cinco anos; que não costumava brincar com I.; que ano [sic] gostava dela porque costumava arranjar encrenca com as outras crianças (...).*

Por outro lado, a vítima I.L.C.N., ouvida pela Seção de Atendimento Técnico, da Delegacia Especial de Proteção à Criança e ao Adolescente, às fls. 34/42, contou a seguinte versão:



AUTENTICAÇÃO
Confere com o original

*Entrevistadora: - E então, aconteceu alguma coisa que não foi legal, ou que sua família ficou preocupada com você que você gostaria de me falar?*
*Criança - O L. passou um produto em mim e ai eu fui tomar banho e o papai perguntou porque eu ia tomar banho se a gente ainda caminhar, que aquela não era hora de tomar banho. Ai meu pai deu uma surra no L. que quase matou ele. Ai meu pai ligou pra minha avó e falou vem pra cá todo mundo senão eu vou matar o L. Ai meu pai falou pra minha mãe: "seja forte e não chore mais!"*
*Entrevistadora: - Quem é L.?*
*Criança - L. é meu amigo. Ele é parente da vovó M.*

Código de Verificação :2015ACO9391MRWB2HGSM06CZ8Q8

GABINETE DO DESEMBARGADOR ROMÃO C. OLIVEIRA                                    5

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em http://seeu.pje.jus.br/seeu/ - Identificador: PJ5VX 3YQ48 7YDRE VWQBA

PROCESSO: Processo n. 0072-96.2016.8.07.00.16 - Núm. mov. 9.1 - Assinado digitalmente por Luiz Fernando Leite da Silva 3190047 - Page 75 of 201

01/02/2019: DIGITALIZAÇÃO DO PROCESSO. Arq: Guia de Execução/Recolhimento

Fls.
Apelação 20140710094042APR

Documento assinado digitalmente, conforme MP n° 2.200-2/2001, Lei n° 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em http://seeu.pje.jus.br/seeu/ - Identificador: PJ5VX 3YQ48 7YDRE VWQBA

*Entrevistadora:* - Você sabe que produto é este que ele passou em você?

*Criança:* - Era um produto branco que ele passou na minha pererera e no meu bumbum.

*Entrevistadora:* - Você poderia me mostrar onde ficam a pererera e o bumbum (foi mostrada à criança uma boneca anatomicamente semelhante às garotas)

*Criança:* (Apontou para as partes referentes aos órgãos genitais na boneca)

*Entrevistadora:* - Onde ele pegou este produto?

*Criança:* - Tava no banheiro o produto

*Entrevistadora:* - Para onde vocês iam quando ele te passava este produto?

*Criança:* - Foi no quarto dele, na casa da minha vó (vovó M.). (..) Mãe do meu pai.

*Entrevistadora:* - tinha algum horário que ele fazia isso mais com você? Tipo: era de dia, de tarde ou de noite...?

*Criança:* - De manhã. (...) mais perto do almoço.

*Entrevistadora:* - Você me disse que tinha ido ao banheiro tomar banho, né? (criança assentiu com a cabeça). Por que você decidiu tomar banho nesta hora?

*Criança:* - Porque eu estava cheia de sangue.

*Entrevistadora:* - Onde tinha sangue?

*Criança:* - Tinha sangue no meu bumbum, no meu short e na minha pererera.

*Entrevistadora:* - Você sabe da onde vinha este sangue?

*Criança:* - Do pinto do L.

*Entrevistadora:* - poderia me mostrar o que é o pinto?

*Criança:* (Mostrou a parte referente aos órgãos genitais masculinos no boneco, despindo-o).

*Entrevistadora:* - L. já mexeu outras vezes antes com você antes deste dia que seu pai ficou sabendo?

*Criança:* - Já. A primeira vez que começou foi quando eu saí da festa do meu amigo. Esqueci o nome.

*Entrevistadora:* - quantos anos você tinha?

*Criança:* - Eu tinha seis anos. (ainda possui 6 anos).

*Entrevistadora:* - Quais os lugares que ele fazia isso com você?

*Criança:* - Todos os dias. Foi sempre no quarto dele.

*Entrevistadora:* - Onde estava sua família quando isso acontecia?

*Criança:* - Meu pai ia trabalhar e me deixava na casa da minha avó. No dia



MINISTÉRIO DA JUSTIÇA

AUTENTICAÇÃO
Confere com o original

Código de Verificação :2015ACO9391MRWB2HGSM06CZ6Q8

Case 9:20-mj-08171-BER Document 3-1 Entered on FLSD Docket 04/29/2020 Page 76 of 201

PROJUDI - Processo: 0017372-86.2016.8.07.0015 - Ref. mov. 1.1 - Assinado digitalmente por Luiz Fernando Leite da Silva:319047
01/02/2019: DIGITALIZAÇÃO DO PROCESSO. Arq: Guia de Execução/Recolhimento



Fls. _____

Apelação 20140710094042APR

AUTENTICAÇÃO
Confere com o original

*que meu pai descobriu. esconderam o L. na casa do tio J., mas lá não tem creme daquele que o L. usava em mim.*

*Entrevistadora: - Sei. Alguma vez sangrou sua perereca quando ele fazia isso?*

*Criança: – Não.*

*Entrevistadora: - E o bumbum?*

*Criança: - Não.*

*Entrevistadora: - Das vezes que você ia à casa da sua avó M., o L. sempre mexia com você ou tinha vez que ele não fazia?*

*Criança: - Todo dia ele fazia!*

*Entrevistadora: - Ele já te deu algum presente ou doces?*

*Criança: - Não. Meu pai dava dinheiro pra ele e ele comprava maconha. Ele também bebe cerveja e pinga.*

*Entrevistadora: - Quando ele mexia com você, você sentia cheiro de pinga ou percebia se ele tinha usado·maconha?*

*Criança: - Não. Não tinha usado.*

*Entrevistadora: - Ele já pediu segredo?*

*Criança: - Pra não contar pro meu pai.*

*Entrevistadora: - Ele disse que iria acontecer algo se você contasse o que ele fazia com você?*

*Criança: - Não.*

Em juízo (vídeo de fl. 256), a criança contou a mesma versão, mostrando-se encabulada ao falar dos fatos e dizendo a todo tempo que não se recordava. No entanto, quando insistia se lembrava de mais alguma coisa, relatava detalhes, demonstrando que os fatos ainda estão claros em sua mente.

Também são valiosas as palavras do pai da vítima, colhidas às fls. 271/272:

*(...) que estava passando uns dias na casa de sua Tia M.C., com a vítima, em razão de sua esposa está internada; que nesta casa mora J., N., J., J. e sua filha M.E. e L.; que L. é filho adotivo de outra tia M.A.; que L. reside na casa da tia M.C.; que quando ocorreu os fatos já estava hospedado na casa da tia M.C. 15 dias aproximadamente; que dormia com a filha I. na*

Código de Verificação :2015ACO9391MRWB2HGSM06CZ6Q8

GABINETE DO DESEMBARGADOR **ROMÃO C. OLIVEIRA**                    8



Documento assinado digitalmente, conforme MP n° 2.200-2/2001, Lei n° 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em http://seeu.pje.jus.br/seeu - Identificador: PJ5VX 3YQ48 7YDRE VWQBA

Fls. ___

Apelação 201407:0094042APR

*sala, apenas os dois; que enquanto assistia o jogo de futebol na televisão, I. brincava com a cachorrinha; que a cachorrinha subiu para a parte de cima da casa; que I. subiu atrás da cachorrinha e ficou lá em cima; que após 15 minutos começou chamar a I. mandando-a descer e esta não respondia; após gritar mais alto I. desceu e disse que queria tomar banho; que o depoente disse que ainda estava cedo e que iriam tomar banho após caminharem; que I. insistiu em tomar banho e disse que estava sangrando, que neste momento olhou para o shorts de I. e viu que estava ensopado de sangue; que neste momento perguntou a I. o que havia acontecido, se foi L. que fez alguma coisa com ela; que esclarece que perguntou se havia sido L. porque somente ele estava no andar de cima; que perguntou o que L. havia feito e I. disse que ele estava em cima dela; que neste momento se descontrolou e subiu atrás de L. e viu que este estava tomando banho; que bateu na porta até que L. abriu, momento em que o agrediu; que não chegou a entrar no quarto onde estava L.; que L. negava e dizia que não havia feito nada; que ligou par a sua tia e pediu que viesse para casa e ligou ainda para o seu chefe que é advogado e pediu orientação; que chegou sua tia acompanhado de outros parentes, J., N., J., J., C., Tia N., S.; que disse a sua tia senão Iria matar L., que todas essa pessoas viram o shorts de I. sujo de sangue que esta ainda estava vestida neste momento; que I. sempre morou com o depoente e que nunca tinha tido sangramento anterior a este dia; que foram para a delegacia o depoente, e mais quatro parentes (J., J., o depoente, I. e L.); que foram encaminhados para a 21$^a$ DP; que neste dia sua filha foi ouvida e contou tudo; que o depoente também foi ouvido; que em seguida foram para o IML; que a calcinha e o shorts de I. ficaram no IML; que nunca teve nenhum desentendimento com L.; que tinham uma convivência tranqüila com ele; que chegou a levar L. para entregar currículum juntamente com a sua esposa; que o relacionamento de L. com I. era normal e ele brincava com ela, normalmente; que L. é usuário de drogas, inclusive foi achado vestígios de drogas no seu quarto pela polícia; que antes do fato L. disse ao depoente que ia sair para fumar um baseado e saiu com amigos (...).*



AUTENTICAÇÃO
Confere com o original

A mãe da vítima também relatou que por duas vezes a criança chegou da casa da tia M.C. (local dos fatos) com dor na genitália e tratava com pomada de assadura (fls. 273/274):

Código de Verificação :2015ACO9391MRWB2HGSM06CZ6Q8

GABINETE DO DESEMBARGADOR **ROMÃO C. OLIVEIRA**

9

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em http://seeu.pje.jus.br/seeu/ – Identificador: PJ5VX 3YQ48 7YDRE VWQBA

PROJUDI - Processo: 0017372-86.2016.8.07.0015 - Réf. mov. 1.1 - Assinado digitalmente por Luiz Fernando Leite da Silva:319047
01/02/2019: DIGITALIZAÇÃO DO PROCESSO. Arq: Guia de Execução/Recolhimento

Fls. ____

Apelação 20140710094042APR

*(...) que no dia dos fatos estava internada em um clinica de atendimento psicossocial e não presenciou os fatos; que já estava internada a dois meses quando ocorreram os fatos, pois havia tentado o suicidio; que antes de ser internada a depoente trabalhava e enquanto trabalhava deixava I. aos cuidados da tia M.C., na casa onde ocorreu os fatos; que I. passava o dia lá e a pegava a noite; que I. estava sendo maltratada na escola, razão pela qual a tirou da escola e a deixou aos cuidados da Tia M.C., durante o dia; que I. ficava com M.C. dois meses antes de ser internada; que em janeiro de 2013 L. veio residir com a tia M.C., antes morava com a mãe dele nos Estados Unidos; que neste periodo em que I. ficava aos cuidados de M.C., L. já morava na casa; que a convivência com L. era boa e que a familia era unida, e chegou a levar curriculum com este; que conversava com L. normalmente; que L. entende bem o português e fala bem; que apenas tem dificuldade com a escrita em português; que L. é filho adotivo; que L. contou a depoente que brigava com seu pai adotivo em razão de ser usuário de drogas e que em uma dessas brigas foram parar na delegacia nos Estados Unidos; que I. nunca reclamou do comportamento de L. antes da ocorrência dos fatos; que por duas vezes I. ao voltar de casa da tia M.C. reclamou de dor na genitália; que a depoente tratava com pomada ante assadura e não desconfiou que se trataria de abuso; que a depoente após a ocorrência dos fatos perguntou a I. se quando a mamãe havia passado a pomadinha havia sido o L. que tinha feito alguma coisa, e a vitima respondeu que L. havia deitado em cima dela e mexido em sua vagina com os dedos; que I. disse que não contou para mãe porque L. disse para não contar para ninguém; (...) que antes desse fato I. nunca tinha tido nenhum sangramento e nem teve depois; (...) que depois do fato piorou o seu estado de saúde e decidiu com seu esposo que a depoente e I. iriam para o Piauí onde mora a mãe da depoente; que atualmente a depoente encontra-se estável (...).*



AUTENTICAÇÃO
Confere com o original

Destaca-se, ainda, o depoimento de N.C.F. (fls. 301/303), que é parente do acusado e da vítima e acompanhou a menina ao hospital:

*(...) que antes dos fatos estavam todos na casa de J. em um churrasco; que*

Código de Verificação :2015ACO9391MRWB2HGSM06CZ6Q8

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em http://aseeu.pje.jus.br/seeu/ – Identificador: PJ5VX 3YQ48 7YDRE VWQBA

Fls.

Apelação 20140710094042APR

de lá L., I. e L. foram juntos para casa de M.C.; que mais tarde L. ligou para
o telefone de sua mãe M C., que ainda estava na casa de J.; que L. pediu
que sua mãe fosse imediatamente para casa senão mataria L.; que
imediatamente seu irmão J., o esposo da depoente e a esposa de J., N.,
foram até a casa de M.C.; que depois foram J. e sua mãe M.C.; que depois
foram a depoente e N. sua prima; que quando chegou presenciou L. muito
nervoso com a roupa de I. nas mãos, enquanto que L. estava no quarto de
M.C., mãe da depoente acompanhado de J., seu irmão e seu marido
segurava a porta; que seu marido disse que ainda não sabia o que havia de
fato ocorrido, mas que estava na porta para impedir que L. entrasse já que
estava muito nervoso; que pode ver que no shorts e na calcinha de I. grande
quantidade de sangue e que parecia também um pouco úmido; que todos
pediram para que L. se acalmasse; que entrou em seu quarto acompanhada
de I. e lá estava N., sua cunhada; que também entraram outras mulheres da
família; que a depoente perguntou para I. o que havia acontecido; que I.
aparentando tranqüilidade respondeu que L. havia passado creme em sua
perereca e em seu bumbum; que inicialmente I. não queria contar; que I.
aceitou a idéia da depoente de fazer um desenho e ao explicar o desenho
disse que L. havia passado creme em seu bumbum e em sua perereca; que
a depoente perguntou a I. se L. havia feito mais alguma coisa, ou se ela
havia visto mais alguma coisa, ao que I. respondeu que não; que em
seguida L. telefonou para o seu chefe, que J. na condição de policial deu
voz de prisão a L.; que L., J., o esposo da depoente, L. e I. foram para a
delegacia; que quando chegaram na casa de M.C., I. já havia tomado
banho; que no dia seguinte pela manha, por volta de 10h30, telefonou para
L. e este disse que estava no Hospital do Guará com I.; que L. disse que
não havia levado I. para ser consultada e sim que havia ido consultar-se,
uma vez que estava com o braço e o tornozelo machucados: que foi para o
hospital com a intenção de que I. também fosse consultada; que foi a
depoente que entrou com I. na consulta; que primeiro ela passou por uma
pediatra e depois por uma assistente social e psicóloga que ouviram a
narrativa de I.; que a pediatra encaminhou I. para uma ginecologista
experiente; que a ginecologista examinou I. e nada constatou anormal; que
I. respondeu negativamente as perguntas que a ginecologista fez dizendo
que L. não havia mexido aqui e que não doía quando fazia xixi ou coco; que
depois disso I. foi encaminhada para psicóloga, isso no mesmo dia; que
primeiro entrou somente I. e depois entrou a depoente; que a depoente se



MINISTÉRIO DA JUSTIÇA

Departamento de Recuperação de Ativos ... Jurídica Internacional

AUTENTICAÇÃO
Confere com o original

Código de Verificação :2015ACO9391MRWB2HGSM06CZ6Q8

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em http://seeu.pje.jus.br/seeu/ – Identificador: PJ5VX 3YQ48 7YDRE VWQBA

Case 9:20-mj-08171-BER   Document 3-1   Entered on FLSD Docket 04/29/2020   Page 80 of 201
PROJUDI - Processo: 0017372-86.2016.8.07.0015 - Ref. mov. 1.1 - Assinado digitalmente por Luiz Fernando Leite da Silva:319047
01/02/2019: DIGITALIZAÇÃO DO PROCESSO. Arq: Guia de Execução/Recolhimento

Fls. _____
Apelação 20140710094042APR



**AUTENTICAÇÃO**
Confere com o original

*recorda de ter dito a psicóloga que não acreditava cem por cento nem em L. e nem em I.; que explicou que não acreditava cem por cento em I., pois esta já havia ficado muito tempo na companhia da depoente e a depoente constatou que se tratava de uma criança mentirosa; que R. uma vez comentou com a depoente que D., então com aproximadamente 09 anos havia tirado a fralda de I. com aproximadamente 03 anos e a abraçado por trás, mas que R. não tomou qualquer atitude; que D. é filho de J., irmã da depoente; que tem conhecimento que R. já foi estuprada, tendo ouvido dela própria; que enquanto R. esteve internada I. ficava na casa de sua mãe; que L. sempre foi muito cuidadoso com I.; que o lençol apreendido foi retirado de um quarto que fica ao lado do de L. no andar de cima; que esse quarto era de J., I. e M.E. (...).*

Soma-se a isso os exames periciais realizados. No Laudo de Exame de Corpo de Delito (fls. 279/280), ficou evidente que não houve conjunção carnal ou violência. No prontuário médico também ficou registrado que os exames defectaram região anal sem alterações (fl. 290).

No entanto, o shorts e a calcinha da criança estavam com manchas de sangue e foram levados para exame técnico. No Exame de Constatação de Material Biológico (fls. 61/64), concluiu-se que:

> *(...) nas amostras de tecido recortadas da calcinha, do shorts e da camiseta foi constatada a presença de sangue humano e de sêmen, porém não foi constatada a presença de espermatozóides; e que na amostra de tecido recortada do lençol foi constatada a presença de sangue humano (...).*

No Laudo de Exame de DNA (fls. 70/73-A), chegou-se à seguinte conclusão:

> *- Na amostra de secreção perigenital foi identificado um perfil genético único, proveniente de uma pessoa do sexo feminino idêntico ao perfil identificado na amostra biológica coletada de I.L. C.N.*

Código de Verificação :2015ACO9391MRWB2HGSM06CZ6Q8

GABINETE DO DESEMBARGADOR **ROMÃO C. OLIVEIRA**                                    12

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em http://seeu.pje.jus.br/seeu/ - Identificador: PJ5VX 3YQ48 7YDRE VWQBA

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em http://seeu.pje.jus.br/seeu/ - Identificador: PJSVX 3YQ48 7YDRE VWOBA

Fls.

Apelação 20140710094042APR

– Na amostra obtida da camiseta foi identificado um perfil genético único, proveniente de uma pessoa do sexo masculino, idêntico ao perfil identificado na amostra biológica coletada de L.C.R. A probabilidade de se selecionar ao acaso na população masculina uma pessoa não relacionada apresentando o mesmo perfil é de aproximadamente 1 em 38.000.000.000.000.000.000.000.000 (um em trinta e oito septilhões).

– Nas amostras obtidas do short e do lençol foi observada uma mistura de material genético de pelo menos duas pessoas, sendo uma do sexo masculino e uma do sexo feminino. O perfil observado em maior quantidade nesta mistura é proveniente de uma pessoa do sexo masculino e é idêntico ao perfil identificado na amostra biológica coletada de L.C.R. O perfil observado em menor quantidade nesta mistura é idêntico ao perfil identificado na amostra biológica coletada de I.L.C.N.

– Na amostra obtida da calcinha foi observada uma mistura de material genético de pelo menos duas pessoas. O perfil observado em maior quantidade nesta mistura é proveniente de uma pessoa do sexo feminino e é idêntico ao perfil identificado na amostra biológica coletada de I.L.C.N. O perfil observado em menor quantidade nesta mistura é idêntico ao perfil identificado na amostra biológica coletada de L.C.R. Após amplificação da amostra para os marcadores do cromossomo Y, observou-se que nas amostras de secreção periginital, da calcinha, do short, da camiseta e do lençol foi identificado um haplótipo do cromossomo Y único que é idêntico ao haplótipo identificado na amostra biológica coletada de L.C.R. A probabilidade de se selecionar ao acaso na população masculina uma pessoa não relacionada apresentando o mesmo haplótipo é de aproximadamente 1 em 14.928 (uma em quatorze mil novecentos e vinte e oito).



AUTENTICAÇÃO
Confere com o original

A meu sentir, o laudo pericial, nos termos em que lavrado, reforça o conjunto probatório no sentido da autoria da conduta reprimida eis que, em cotejo com as demais provas carreadas, evidencia os abusos sofridos pela vítima criança.

As respostas aos quesitos (fls. 316/317 e 319/322) não contrariam os laudos anteriores, somente indicam a falibilidade da técnica usada, que, a propósito é muito baixa. Em um dos exames, a chance de se encontrar o mesmo perfil na população masculina é de uma em trinta e oito septilhões, em outro exame é de uma em catorze mil, aproximadamente, com o destaque de que a observação

Código de Verificação :2015AC O9391MRWB2HGSM06CZ6Q8

GABINETE DO DESEMBARGADOR ROMÃO C. OLIVEIRA

13

Case 9:20-mj-08171-BER Document 3-1 Entered on FLSD Docket 04/29/2020 Page 82 of 201
PROJUDI - Processo: 0017372-86.2016.8.07.0015 - Ref. mov. 1.1 - Assinado digitalmente por Luiz Fernando Leite da Silva:319047
01/02/2019: DIGITALIZAÇÃO DO PROCESSO. Arq: Guia de Execução/Recolhimento

Fls.___
Apelação 20140710094042APR

de perfis coincidentes nos marcadores do cromossomo Y indica mesma origem ou mesma linhagem patrilínea entre os indivíduos que produzem as amostras (fls. 73/73-A). Contudo, é improvável que a amostra colhida nos materiais (shots, calcinha, camiseta e lençol) seja de outra pessoa de mesma linhagem patrilínea, como o pai ou outro parente, pois o acusado é adotado e, com isso, não possui genética semelhante aos outros membros da família que frequentavam a casa.

Demais disso, os laudos, ainda que com uma margem pequena de desconfiança, aliados às demais provas dos autos, são suficientes para confirmar a versão apresentada pela vítima.

Cumpre consignar que o crime de estupro de vulnerável não exige a presença de violência ou grave ameaça contra vítima, e a ofensa à dignidade sexual é o quanto basta. Não há, pois, se falar em absolvição.

Com efeito, à palavra da vítima há que se conferir especial credibilidade, máxime se em harmonia com os demais elementos de prova constantes dos autos.

A jurisprudência que promana do colendo Superior Tribunal de Justiça é no sentido de que, praticadas sem a presença de testemunhas, a palavra da vítima tem grande validade como prova. Confira-se:

> *CRIMINAL. RESP. ATENTADO VIOLENTO AO PUDOR. ABSOLVIÇÃO EM SEGUNDO GRAU. REVALORAÇÃO DAS PROVAS. PALAVRA DA VÍTIMA. ESPECIAL RELEVO. AUSÊNCIA DE VESTÍGIOS. RECURSO PROVIDO. I. Hipótese em que o Juízo sentenciante se valeu, primordialmente, da palavra da vítima - menina de apenas 8 anos de idade, à época do fato -, e do laudo psicológico, considerados coerentes em seu conjunto, para embasar o decreto condenatório. II. Nos crimes de estupro e atentado violento ao pudor, a palavra da vítima tem grande validade como prova, especialmente porque, na maior parte dos casos, esses delitos, por sua própria natureza, não contam com testemunhas e sequer deixam vestígios. Precedentes. III. Recurso provido, nos termos do voto do Relator. (REsp 700.800/RS, Rel. Ministro GILSON DIPP, QUINTA TURMA, julgado em 22/03/2005, DJ 18/04/2005 p. 384)*
>
> *PENAL E PROCESSUAL PENAL - ESTUPRO E ATENTADO VIOLENTO AO PUDOR - NULIDADES - INOCORRÊNCIA - CRIMES CONSIDERADOS HEDIONDOS - REGIME INTEGRALMENTE FECHADO - CONDENAÇÃO COM BASE EM DIVERSAS PROVAS COLHIDAS DURANTE A*



AUTENTICAÇÃO
Confere com o original

Código de Verificação :2015ACO9391MRWB2HGSM06CZ6Q8

GABINETE DO DESEMBARGADOR **ROMÃO C. OLIVEIRA** 14

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em http://seeu.pje.jus.br/seeu/ – Identificador: PJ5VX 3YQ48 7YDRE VWQBA

Fls
Apelação 20140710094042APA



**AUTENTICAÇÃO**
Confere com o original

*INSTRUÇÃO CRIMINAL. (...) De outro lado, no que concerne à alegação de ocorrência de nulidade em condenação com base exclusiva na palavra da vítima, o writ improcede. Pela leitura do v acórdão, verifica-se que a condenação se deu com base em diversas outras provas, dentre as quais, a palavra da vítima que, nesses casos, assume especial relevo, já que geralmente tais crimes são cometidos às escondidas (...) - Ordem denegada. (HC 29.412/RJ, Rel. Ministro JORGE SCARTEZZINI, QUINTA TURMA, julgado em 14/10/2003, DJ 19/12/2003 p 531)*

A jurisprudência desta egrégia Corte de Justiça firmou entendimento de que, nos crimes contra os costumes, a palavra da vítima, quando em harmonia com o conjunto probatório, é suficiente para autorizar a condenação.

Destarte, não resta dúvida de que a conduta praticada pelo apelante amolda-se aos parâmetros normativos insertos no artigo 217-A, *caput*, do Código Penal.

O Ministério Público requer a condenação pelo art. 217-A, *caput*, do CP por diversas vezes. A vítima afirmou que os abusos ocorriam todos os dias, no quarto do acusado, no horário que seu pai ia trabalhar e a deixava na casa da avó (fl. 39). Em juízo, a vítima afirmou que os fatos aconteceram outras vezes, mas não soube indicar quantas ou quando foi a primeira vez (vídeo de fl. 296).

A mãe da vítima também informou que a menina, em duas oportunidades, apresentou vermelhidão na região da vagina quando voltava da casa da avó, mas acreditava que era só assadura.

A vergonha demonstrada pela vítima em seu depoimento em juízo não permitem indicar com precisão quantas vezes os abusos sexuais ocorreram, mas ficou claro que houve outras ocorrências além do dia 2 de fevereiro de 2014.

Portanto, condena-se o acusado como incurso nas penas do art. 217-A, *caput*, do CP, por duas vezes, na forma no art. 71 do CP.

Passo à dosimetria da pena.

Analisando as condições previstas no art. 59, do Código Penal, verifica-se que a culpabilidade, motivos, circunstâncias e consequências do delito são as normais do tipo. O réu é primário (fl. 85). As testemunhas que conheciam o acusado (fls. 299, 300, 301 e 305) não indicaram qualquer comportamento que pudesse macular sua conduta social ou valorar negativamente sua personalidade. O comportamento da vítima não contribuiu para a prática do delito.

Sendo as condições favoráveis ao réu, fixa-se a pena-base em 8

Código de Verificação :2015ACO9391MRWB2HGSM06CZ6Q8

GABINETE DO DESEMBARGADOR **ROMÃO C. OLIVEIRA**

15

Documento assinado digitalmente, conforme MP n° 2.200-2/2001, Lei n° 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em http://seeu.pje.jus.br/seeu - Identificador: PJ5VX 3YQ48 7YDRE VWGBA

Case 9:20-mj-08171-BER   Document 3-1   Entered on FLSD Docket 04/29/2020   Page 84 of 201
PROJUDI - Processo: 0017372-86.2016.8.07.0015 - Ref. mov. 1.1 - Assinado digitalmente por Luiz Fernando Leite da Silva:319047
01/02/2019: DIGITALIZAÇÃO DO PROCESSO. Arq: Guia de Execução/Recolhimento

Fls. ____
Apelação 20140710084042APR

(oito) anos de reclusão, patamar mínimo para a espécie delitiva, que se concretiza ante a inexistência de agravantes ou atenuantes ou causas de aumento ou diminuição de pena.

Para o segundo delito, perpetrado em continuidade, aplica-se a mesma reprimenda no patamar de 8 (oito) anos de reclusão, porquanto inalteradas as condições fáticas do crime e os balizadores pessoais do acusado.

Destarte, comprovadas duas condutas ofensivas, e com fulcro no art. 71, do Código Penal, a sanção deve ser majorada em 1/6 (um sexto), concretizando-se a pena final em 9 (nove) anos e 4 (quatro) meses de reclusão.

O regime de cumprimento da pena é o fechado, face ao disposto no artigo 33, § 2º, "a", do Estatuto Repressivo.

Após o trânsito em julgado, procedam-se as anotações e comunicações de praxe.

Isto posto, dá-se provimento ao recurso ministerial.

E é o voto.


**O Senhor Desembargador ESDRAS NEVES - Revisor**

Com o relator.


**O Senhor Desembargador MARIO MACHADO - Vogal**

Com o relator.



AUTENTICAÇÃO
Confere com o original

**D E C I S Ã O**

PROVER. UNÂNIME

Código de Verificação :2015ACQ9391MRWB2HGSM06CZ6Q8

GABINETE DO DESEMBARGADOR **ROMÃO C. OLIVEIRA**                    16

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em http://seeu.pje.jus.br/seeu/ – Identificador: PJ5VX 3YQ48 7YDRE VWQBA

Case 9:20-mj-08171-BER Document 3-1 Entered on FLSD Docket 04/29/2020 Page 85 of 201
PROJUDI - Processo: 0017372-86.2016.8.07.0015 - Ref. mov. 7.1 - Assinado digitalmente por Juiz de Direito em 04/29/2020
01/02/2019: DIGITALIZAÇÃO DO PROCESSO. Arq: Guia de Execução/Recolhimento

  



Poder Judiciário    Tribunal de Justiça do Distrito Federal e Territórios

**SECRETARIA DA PRIMEIRA TURMA CRIMINAL**

---

## CERTIDÃO
## TRÂNSITO EM JULGADO

## APR: 2014 07 1 009404-2

Certifico e dou fé que os v. acórdãos de fls. 468-475 e
490-493 transitaram em julgado para o **MINISTÉRIO PÚBLICO DO
DISTRITO FEDERAL E TERRITORIOS** em 21 de julho de 2015.

Brasília-DF, 22 de julho de 2015.

Camila de Sena Silvério
Servidora da Primeira Turma Criminal
Mat. 317403

---

### REMESSA

Nesta data faço remessa desses autos à SURER.

Brasília-DF, 22 de julho de 2015.

**Camila de Sena Silvério**
**Servidora da Primeira Turma Criminal**
**Matrícula 317403**



**AUTENTICAÇÃO**
Confere com o original

Documento assinado digitalmente, conforme MP n° 2.200-2/2001, Lei n° 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em http://seeu.pje.jus.br/seeu/ - Identificador: PJ5VX 3YQ48 7YDRE VWQBA

PROJUDI - Processo: 0017372-86.2016.8.07.0015 - Ref. mov. 1.1 - Assinado digitalmente por Luiz Fernando Leite da Silva:319047
01/02/2019: DIGITALIZAÇÃO DO PROCESSO. Arq: Guia de Execução/Recolhimento



**Poder Judiciário da União**
**Tribunal de Justiça do Distrito Federal e dos Territórios**  Fls. 450

| | | |
|---|---|---|
| Órgão | : | 1ª TURMA CRIMINAL |
| Classe | : | EMBARGOS DE DECLARAÇÃO NO(A) APELAÇÃO |
| N. Processo | : | 20140710094042APR (0009157-19.2014.8.07.0007) |
| Embargante(s) | : | L.C.R. |
| Embargado(s) | : | M.P.D.D.F.E.T. |
| Relator | : | Desembargador ROMÃO C. OLIVEIRA |
| Acórdão N. | : | 877600 |

**E M E N T A**

PROCESSUAL PENAL. EMBARGOS DE DECLARAÇÃO. INEXISTÊNCIA DE VÍCIOS. EMBARGOS NÃO PROVIDOS. É de se negar provimento aos embargos de declaração quando não for constatado erro material, obscuridade, contradição ou omissão no acórdão recorrido, máxime quando a parte embargante visa rediscutir a matéria de mérito, almejando efeitos processuais para fins de prequestionamento.



**AUTENTICAÇÃO**
Confere com o original

Código de Verificação :2015ACO2TF2DZMULQ4X8L4VNR36

GABINETE DO DESEMBARGADOR **ROMÃO C. OLIVEIRA**

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em http://seeu.pje.jus.br/seeu/ - Identificador: PJSVX 3YO48 7YDRE VWQBA

1

GOVERNMENT EXHIBIT 1_20-MJ-8171-BER_086

Fls _____

Embargos de Declaração no(a) Apelação 20140710094042APR

## ACÓRDÃO

Acordam os Senhores Desembargadores da **1ª TURMA CRIMINAL** do Tribunal de Justiça do Distrito Federal e Territórios, **ROMÃO C. OLIVEIRA** - Relator, **MARIO MACHADO** - 1º Vogal, **SANDRA DE SANTIS** - 2º Vogal, sob a presidência do Senhor Desembargador **ROMÃO C. OLIVEIRA,** em proferir a seguinte decisão: **DESPROVER. UNÂNIME**, de acordo com a ata do julgamento e notas taquigráficas.

Brasília(DF), 25 de Junho de 2015.

Documento Assinado Eletronicamente
**ROMÃO C. OLIVEIRA**
Relator



AUTENTICAÇÃO
Confere com o original

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em http://seeu.pje.jus.br/seeu/ - Identificador: PJ5VX 3YQ48 7YDRE VWQBA

Código de Verificação :2015ACO2TF2DZMULQ4X6L4VNR36

GABINETE DO DESEMBARGADOR **ROMÃO C. OLIVEIRA**

2



PROJUDI - Processo: 0017372-86.2016.8.07.0015 - Ref. mov. 1.1 - Assinado digitalmente por Luiz Fernando Leite da Silva:319047
01/02/2019: DIGITALIZAÇÃO DO PROCESSO. Arq: Guia de Execução/Recolhimento

> TJDFT
> Fls. nº _____



**PODER JUDICIÁRIO**
**Tribunal de Justiça do Distrito Federal e dos Territórios**
**Gabinete da Presidência**

| | |
|---|---|
| **Órgão:** | PRESIDÊNCIA |
| **Classe:** | RECURSO ESPECIAL NA APELAÇÃO CRIMINAL |
| **Processo:** | 2014 07 1 009404-2 |
| **Recorrente:** | L. C. R. |
| **Advogado:** | CLÁUDIA TEREZA SALES DUARTE |
| **Recorrido:** | M. P. D. F. T. |

## DECISÃO

I – Trata-se de recurso especial interposto com fundamento no artigo 105, inciso III, alínea "a", da Constituição Federal, contra acórdão proferido pela Primeira Turma Criminal deste Tribunal de Justiça, cuja ementa encontra-se redigida nos seguintes termos:



*DIREITO PENAL. ARTS. 217-A, CAPUT, (DUAS VEZES) NA FORMA DO ART. 71, TODOS DO CÓDIGO PENAL. CONDENAÇÃO. RECURSO MINISTERIAL PROVIDO.*
*Se do depoimento da vítima, em harmonia com as demais provas carreadas para os autos, em especial Exame de Constatação de Material Biológico e Exame de DNA, resta comprovado que o réu praticou atos libidinosos diversos da conjunção carnal com a vítima de 6 anos de idade por mais de uma vez, reforma-se a sentença absolutória para condená-lo pela prática do delito tipificado no art. 217-A, caput, do Código Penal por duas vezes em continuidade delitiva.*

**AUTENTICAÇÃO**
Confere com o original

O recorrente alega violação aos artigos 156, 158, 167, e 386, inciso II, todos do Código de Processo Penal, pugnando por sua absolvição, ante a ausência de provas aptas a condená-lo.

II – O recurso é tempestivo, as partes são legítimas e está presente o interesse em recorrer.



Código de Verificação: QRZL.2015.SRDG.DYL7.HY3D.OGE2
Documento assinado digitalmente conforme MP nº 2.200-2/2001.
O documento pode ser acessado no endereço eletrônico http://www.tjdft.jus.br/servicos/autenticacao-de-documentos-eletronicos informando o código de verificação.

1

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em http://seeu.pje.jus.br/seeu/ - Identificador: PJ5VX 3YQ48 7YDRE VWQBA

**P. J. – Tribunal de Justiça do Distrito Federal e dos Territórios**
**Gabinete da Presidência**

Passo ao exame dos pressupostos constitucionais de admissibilidade.

O recurso especial não merece ser admitido. Isso porque a turma Julgadora concluiu pela existência de provas de autoria e materialidade do delito, de forma que a análise da tese do recorrente exigiria o reexame do conjunto fático-probatório carreado aos autos, o que se mostra inviável nessa sede recursal, a teor do disposto no enunciado 7 da Súmula do STJ.

**III** – Ante o exposto, **INDEFIRO o processamento do recurso especial**.

Publique-se.

Documento assinado digitalmente em 27/08/2015 15:44:12
Desembargador **GETÚLIO DE MORAES OLIVEIRA**
Presidente do Tribunal de Justiça do
Distrito Federal e dos Territórios

A010

SUREC- SUBSECRETARIA DE RECURSOS CONSTITUCIONAIS
PUBLICAÇÃO
PAUTA DE JUÍZO DE ADMISSIBILIDADE - 472/2015
Disponibilização : DJ-e 01/09/2015 – fls. 59/62
Publicação : Primeiro dia útil seguinte - Lei nº 11.419/2006
Num Processo : 2014 07 1 009404-2
Brasília, 1 de setembro de 2015.
Ryan de Chantal Zanchet e Santos – Subsecretário



AUTENTICAÇÃO
Confere com o original

Código de Verificação: QRZL.2015.SRDG.DYL7.HY3D.OGE2
*Recurso Especial na Apelação Criminal 2014 07 1 009404-2*
Documento assinado digitalmente conforme MP n° 2.200-2/2001.
O documento pode ser acessado no endereço eletrônico
http://www.tjdft.jus.br/servicos/autenticacao-de-documentos-eletronicos
informando o código de verificação.

2

Documento assinado digitalmente, conforme MP n° 2.200-2/2001, Lei n° 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em http://seeu.pje.jus.br/seeu/ - Identificador: PJ5VX 3YQ48 7YDRE VWQBA

GOVERNMENT EXHIBIT 1_20-MJ-8171-BER_089

Case 9:20-mj-08171-BER   Document 3-1   Entered on FLSD Docket 04/29/2020   Page 90 of 201
PROJUDI - Processo: 0017372-86.2016.8.07.0015 - Ref. mov. 1.1 - Assinado digitalmente por Luiz Fernando Leite da Silva:319047
01/02/2019: DIGITALIZAÇÃO DO PROCESSO. Arq: Guia de Execução/Recolhimento

**(e-STJ Fl.626)**

# Superior Tribunal de Justiça

**AREsp 785.771/DF**

## CONCLUSÃO

Faço estes autos  conclusos para julgamento ao Exmo.
Senhor Ministro **NEFI CORDEIRO** (Relator).
Brasília, 16 de novembro de 2015.

STJ - COORDENADORIA DA SEXTA TURMA
*Assinado por LUANA CASECA RUFFO, Técnico Judiciário,
em 16 de novembro de 2015

(em 3 vol. e 0 apenso(s))



**AUTENTICAÇÃO**
Confere com o original

* Assinado eletronicamente nos termos do Art. 1º § 2º inciso III alínea "b" da Lei 11.419/2006

Documento eletrônico VDA13214825 assinado eletronicamente nos termos do Art.1º §2º inciso III da Lei 11.419/2006
Signatário(a): LUANA CASECA RUFFO, COORDENADORIA DA SEXTA TURMA   Assinado em: 11-16-2015 08:47:30
Código de Controle do Documento: B13B22C3-88F0-4029-94D7-A8B78D6FFB9E

Case 9:20-mj-08171-BER Document 3-1 Entered on FLSD Docket 04/29/2020 Page 91 of 201

PROJUDI - Processo: 0817372-86.2016.8.07.0015 - Ref. mov. 11.1 - Assinado digitalmente por Nefi Cordeiro
01/02/2019: DIGITALIZAÇÃO DO PROCESSO. Arq: Guia de Execução/Recolhimento

**AGRAVO EM RECURSO ESPECIAL Nº 785.771 - DF (2015/0241297-4)**

**RELATOR** : MINISTRO NEFI CORDEIRO
AGRAVANTE : L C R
ADVOGADO : CLÁUDIA TEREZA SALES DUARTE
AGRAVADO : MINISTÉRIO PÚBLICO DO DISTRITO FEDERAL E TERRITÓRIOS

**DECISÃO**

Trata-se de agravo interposto em face de decisão do Presidente do Tribunal de Justiça do Distrito Federal e dos Territórios, que inadmitiu o processamento do recurso especial ajuizado com fulcro no art. 105, III, "a", da Constituição Federal, em face do óbice contido na Súmula 7/STJ (fls. 593/594).

No presente agravo, sustenta que a análise das razões do recurso especial não demanda reexame dos fatos, mas revaloração jurídica de provas consistente em se aferir, diante da legislação pertinente, se determinado meio probatório é apto ou não a provar uma situação jurídica (fls. 595/602).

Apresentada a contraminuta, manifestou-se o Ministério Público Federal pelo desprovimento do agravo (fls. 616/625).

É o relatório.

Decido.

O ora agravante, condenado como incurso nas sanções do art. 217-A, *caput* (duas vezes), e com fulcro no art. 71 do CP, à pena de 9 anos e 4 meses de reclusão, nas suas razões de recurso especial, aponta violação ao art. 158 e 386, inc. II, V e VII, ambos do CPP. Em síntese, *questiona precisamente a validade da única prova em que se baseou a condenação, que é a prova pericial sugestiva e não conclusiva da materialidade do delito, aliando-a ela a palavra de uma vítima de 6 anos, a qual não se pode dar credibilidade diante das demais provas colacionadas* (fl. 577). Sustenta, ainda, que não há nas amostras colhidas material genético de L C R, *ou seja, as respostas aos quesitos formulados conduziram à retificação do primeiro laudo que apontava material genético do acusado e à ratificação da tese da defesa, por meio de seus assistentes técnicos, de que não há materialidade do crime. Se aliando a esses resultados, os laudos do IML são conclusivos pela ausência de conjunção carnal ou outro ato libidinoso. Sendo assim, não há materialidade do crime de estupro de vulnerável ou, no mínimo, ela é duvidosa* (fl. 579).

Requer, assim, o provimento do recurso especial, para que seja absolvido do crime disposto no art. 217-A do CP.

O Tribunal de Origem entendeu presentes suficientes indícios de autoria e materialidade para condenar o ora agravante, em acórdão cuja ementa tem o seguinte teor (fl. 531):



AUTENTICAÇÃO
Confere com o original

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em http://seeu.pje.jus.br/seeu/ – Identificador: PJ5VX 3YQ48 7YDRE VWOBA

PROJUDI - Processo: 0017372-86.2016.8.07.0015 - Ref. mov. 1.1 - Assinado digitalmente por Luiz Fernando Leite da Silva:319047
01/02/2019: DIGITALIZAÇÃO DO PROCESSO. Arq: Guia de Execução/Recolhimento

Case 9:20-mj-08171-BER   Document 3-1   Entered on FLSD Docket 04/29/2020   Page 92 of 201

*DIREITO PENAL. ARTS. 217-A, CAPUT, (DUAS VEZES) NA FORMA DO ART. 71, TODOS DO CÓDIGO PENAL. CONDENAÇÃO. RECURSO MINISTERIAL PROVIDO.*

*Se do depoimento da vítima, em harmonia com as demais provas carreadas para os autos, em especial Exame de Constatação de Material Biológico e Exame de DNA, resta comprovado que o réu praticou atos libidinosos diversos da conjunção carnal com a vítima de 6 anos de idade por mais de uma vez, reforma-se a sentença absolutória para condená-lo pela prática do delito tipificado no art. 217-A, caput, do Código Penal por duas vezes em continuidade delitiva.*

Ao examinar a apelação, na parte que interessa ao deslinde do feito, referiu o Tribunal *"a quo"* que (fl. 543/545):

(...)

*A meu sentir, o laudo pericial, nos termos em que lavrado, reforça o conjunto probatório no sentido da autoria da conduta reprimida eis que, em cotejo com as demais provas carreadas, evidencia os abusos sofridos pela vítima criança.*

*As respostas aos quesitos (fls. 316/317 e 319/322) não contrariam os laudos anteriores, somente indicam a falibilidade da técnica usada, que, a propósito é muito baixa. Em um dos exames, a chance de se encontrar o mesmo perfil na população masculina é de uma em trinta e oito septilhões, em outro exame é de uma em catorze mil, aproximadamente, com o destaque de que a observação de perfis coincidentes nos marcadores do cromossomo Y indica mesma origem ou mesma linhagem patrilínea entre os indivíduos que produzem as amostras (fls. 73/73-A). Contudo, é improvável que a amostra colhida nos materiais (shorts, calcinha, camiseta e lençol) seja de outra pessoa de mesma linhagem patrilínea, como o pai ou outro parente, pois o acusado é adotado e, com isso, não possui genética semelhante aos outros membros da família que freqüentavam a casa.*

*Demais disso, os laudos, ainda que com uma margem pequena de desconfiança, aliados às demais provas dos autos, são suficientes para confirmar a versão apresentada pela vítima.*

*Cumpre consignar que o crime de estupro de vulnerável não exige a presença de violência ou grave ameaça contra vítima, e a ofensa à dignidade sexual é o quanto basta. Não há, pois, se falar em absolvição.*

*Com efeito, à palavra da vítima há que se conferir especial credibilidade, máxime se em harmonia com os demais elementos de prova constantes dos autos.*

*A jurisprudência que promana do colendo Superior Tribunal de Justiça é no sentido de que, praticadas sem a presença de testemunhas, a palavra da vítima tem grande validade como prova. Confira-se:*

(...)

*A jurisprudência desta egrégia Corte de Justiça firmou entendimento de que, nos crimes contra os costumes, a palavra da vítima, quando em harmonia com o conjunto probatório, é suficiente para autorizar a condenação.*



AUTENTICAÇÃO
Confere com o original

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em http://saeu.pje.jus.br/saeu/ - Identificador: PJ5VX 3YQ48 7YDRE VWQBA

Case 9:20-mj-08171-BER Document 3-1 Entered on FLSD Docket 04/29/2020 Page 93 of 201

PROJUDI - Processo: 0017372-86.2016.8.07.0015 - Ref. mov. 1.1 - Assinado digitalmente por Fernando de Almeida Castro...
01/02/2019: DIGITALIZAÇÃO DO PROCESSO. Arq: Guia de Execução/Recolhimento

Documento assinado digitalmente, conforme MP n° 2.200-2/2001, Lei n° 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em http://seeu.pje.jus.br/seeu/ - Identificador: PJ5VX 3YQ48 7YDRE VWQBA

*Destarte, não resta dúvida de que a conduta praticada pelo apelante amolda-se aos parâmetros normativos insertos no art. 217-A caput, do Código Penal.*

Nesse contexto, tendo a Corte de origem, soberana na apreciação da matéria fático-probatória, concluído pela existência de provas suficientes para a condenação, refutando a alegação de ausência de materialidade, tanto que em embargos de declaração destacou que eventuais inconsistências havidas entre as provas técnicas não chegam a importar em contradições (fl. 565), afastar tal entendimento encontra óbice na Súmula 7/STJ, pois seria necessário o confronto com os fatos e provas dos autos.

Refira-se, ainda, que, nos crimes sexuais, a palavra da vítima, desde que coerente com as demais provas dos autos, tem grande validade como elemento de convicção, sobretudo porque em grande parte dos casos, tais delitos são perpetrados às escondidas e podem não deixar vestígios. A propósito:

> *PENAL E PROCESSO PENAL. AGRAVO REGIMENTAL. RECURSO ESPECIAL. ATENTADO VIOLENTO AO PUDOR. ABSOLVIÇÃO. SÚMULA 7/STJ. PALAVRA DA VÍTIMA. VALOR PROBANTE. LAUDO PERICIAL OFICIAL NÃO OBRIGATORIEDADE. VÍTIMA MENOR DE 14 ANOS. PRESUNÇÃO ABSOLUTA. RESSALVA DO POSICIONAMENTO DA RELATORA. NATUREZA HEDIONDA DO DELITO.*
>
> *1. O acolhimento da pretensão recursal, a fim de reformar o acórdão que concluiu pela suficiência de provas da autoria e materialidade do delito de atentado violento ao pudor, demandaria a alteração das premissas fático-probatórias estabelecidas na instância ordinária, o que é vedado em sede de recurso especial, nos termos do enunciado da Súmula 7/STJ.*
>
> *2. Consolidou-se neste Superior Tribunal de Justiça a tese de que a palavra da vítima tem alto valor probatório, considerando que crimes dessa natureza geralmente não deixam vestígios e, em regra, tampouco contam com testemunhas.*
>
> *3. Não há falar em nulidade na hipótese de condenação, por atentado violento ao pudor, em razão da ausência de laudo pericial oficial, se demonstrada a materialidade e autoria do crime por outros elementos contidos nos autos.*
>
> *4. Predomina nesta Corte o raciocínio segundo o qual é absoluta, e não relativa, a presunção de violência nos casos de estupro ou atentado violento ao pudor contra menor de catorze anos nos crimes cometidos antes da vigência da Lei 12.015/09. Ressalva do entendimento da Relatora.*
>
> *5. O estupro e o atentado violento ao pudor praticados antes da Lei n° 12.015/2009, ainda que mediante violência presumida, isto é, das quais não haja resultado lesão corporal ou morte, constituem crimes hediondos. Entendimento da Terceira Seção.*



**AUTENTICAÇÃO**
Confere com o original

PROUDI - Processo: 0017372-86.2016.8.07.0015 - Ref. mov. 1.1 - Assinado digitalmente por Luiz Fernando Leite da Silva:319047
01/02/2019: DIGITALIZAÇÃO DO PROCESSO. Arq: Guia de Execução/Recolhimento

31/08/2016

SIAPEN-WEB

## Detalhe do interno

Prontuário   98504

Nome   LUCA5 CARVALHO ROLLO

| Data histórico | Descrição | Funcionário | Status | Procedência | Motivo saída | Unidade penal | Setor | Tipo histórico |
|---|---|---|---|---|---|---|---|---|
| 04/02/2015 | Saída da Unidade Penal: CDP – CENTRO DE DET. PROVISÓRIA, Destino: ABSOLVIDO, Motivo: , Conforme Alvará 107/2014. | | S | | | CDP | | |
| | Mudança de Cela: CDP – CENTRO DE DET. PROVISÓRIA, Motivo: | | | | | | | |
| 12/12/2014 | SOLICITAÇÃO, | | M | | Mudança de | CDP | | |

Cham

http://siapen.seg.ipe.df.gov.br/interno/Detalhe.faces?id=312747

1/4

PROJUDI - Processo: 0017372-86.2016.8.07.0015 - Ref. mov. 1.1 - Assinado digitalmente por Luiz Fernando Leite da Silva:319047
01/02/2016: DIGITALIZAÇÃO DO PROCESSO. Arq: Guia de Execução/Recolhimento

31/08/2016                                                    SIAPEN-WEB

Alvará
107/2014.

Consultas Processuais nos Tribunais Regionais e Superiores

# SIAPEN**WEB**

GOVERNMENT EXHIBIT 1 20-MJ-8171-BER 095
Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em http://seeu.pje.jus.br/seeu/ - Identificador: PJ5VX 3YQ48 7YDRE VWQBA

Case 9:20-mj-08171-BER   Document 3-1   Entered on FLSD Docket 04/29/2020   Page 96 of 201
PROJUDI - Processo: 0017372-86.2016.8.07.0015 - Ref. mov. 1.1 - Assinado digitalmente por Luiz Fernando Leite da Silva:319047
01/02/2019: DIGITALIZAÇÃO DO PROCESSO. Arq: Guia de Execução/Recolhimento



# Superior Tribunal de Justiça

## AREsp 785771/DF

## CERTIDÃO DE TRÂNSITO E TERMO DE BAIXA

Certifico que a r. decisão retro transitou em julgado no dia 19 de agosto de 2016.

Registro a baixa destes autos ao Tribunal de Justiça do Distrito Federal e Territórios.

Brasília - DF, 23 de agosto de 2016

COORDENADORIA DA SEXTA TURMA

*Assinado por MARCIA VELLOSO DOS SANTOS
em 23 de agosto de 2016 às 14:41:51

3 Volume(s)
0 Apenso(s)



**AUTENTICAÇÃO**
Confere com o original

* Assinado eletronicamente nos termos do Art. 1º § 2º inciso III alínea "b" da Lei 11.419/2006

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em http://seeu.pje.jus.br/seeu/ - Identificador: PJ5VX 3YQ48 7YDRE VWQBA



## PODER JUDICIÁRIO
TRIBUNAL DE JUSTIÇA DO DISTRITO FEDERAL E TERRITÓRIOS

**TJDFT** 44

VEP/Fl.:

Rubrica:

# RECEBIMENTO

Certifico e dou fé que, nesta data, recebi os autos.
Para constar, lavrei este.

Brasília/DF, 21 / 09 / 2016 .

M
Márcia de Souza Vieira
Técnico Judiciário
Mat. 319263



AUTENTICAÇÃO
Confere com o original

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em http://seeu.pje.jus.br/seeu/ - Identificador: PJ5VX 3YQ48 7YDRE VWQBA

Case 9:20-mj-08171-BER   Document 3-1   Entered on FLSD Docket 04/29/2020   Page 98 of 201

PROJUDI - Processo: 0017372-86.2016.8.07.0015 - Ref. mov. 1.1 - Assinado digitalmente por Luiz Fernando Leite da Silva:319047

01/02/2019: DIGITALIZAÇÃO DO PROCESSO. Arq: Guia de Execução/Recolhimento

SIAPEN-WEB ... http://siapen.sesipe.df.gov.br/internoDetalhe.faces?id=312747



## SIAPENWEB

| Cidade | NÃO INFORMADO |
| Histórico | |

Cadastrar Fuga

Consultas Processuais nos Tribunais Regionais e Superiores

TJDFT 1ª    TJDFT 2ª    STJ    STF



AUTENTICAÇÃO
Confere com o original

Documento assinado digitalmente, conforme MP n° 2.200-2/2001, Lei n° 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em http://seeu.pje.jus.br/seeu/ - Identificador: PJ5VX 3YQ48 7YDRE VWQBA

SIAPEN-WEB

http://siapen.sesipe.df.gov.br/internoDetalhe.faces?id=312747

46

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJ/PR/OE
Validação deste em http://seeu.pje.jus.br/seeu/ - Identificador: PJ5VX 3YQ48 7YDRE VWQBA

# Detalhe do interno

| Detalhes | Disciplina | Visitantes | Histórico de visitas | Histórico |
| Movimentações | Mudanças de cela | Transferências | Processos | GEAIT |
| Setores | | | | |

| Prontuário | 98504 |
| Nome | LUCAS CARVALHD ROLLO |

| Número: 112630/2014 | |
| --- | --- |
| Situação jurídica | INQUÉRITO POLICIAL |
| Situação da condenação | |
| Delegacia | 38ª Delegacia de Polícia - Vicente Pires |
| Número do inquérito | 107/2014/38ªDP |
| Data do processo | 02/06/2014 |
| Motivo da prisão | MANDADO DE PRISÃO PREVENTIVA |
| Dispositivo legal | Art 217-A, caput do CP |
| Data do inquérito | |
| Total pena ano | 0 |
| Total pena mês | 0 |
| Total pena dias | 0 |
| Data da prisão | 16/04/2014 |
| Data da soltura | 03/02/2015 |

Consultas Processuais nos Tribunais Regionais e Superiores

| TJDFT 1ª | TJDFT 2ª | STJ | STF |

AUTENTICAÇÃO
Confere com o original

1 de 2

03/10/2016 11:10

Case 9:20-mj-08171-BER   Document 3-1   Entered on FLSD Docket 04/29/2020   Page 100 of 201

PROJUDI - Processo: 0017372-86.2016.8.07.0015 - Ref. mov. 1.1 - Assinado digitalmente por Luiz Fernando Leite da Silva:319047
01/02/2019: DIGITALIZAÇÃO DO PROCESSO. Arq: Guia de Execução/Recolhimento

SIAPEN-WEB                                          http://siapen.sesipe.df.gov.br/internoDetalhe.faces?id=312747

## *SIAPENWEB*                                                                              ⚊









**AUTENTICAÇÃO**
Confere com o original

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em http://seeu.pje.jus.br/seeu/ - Identificador: PJ5VX 3YQ48 7YDRE VWQBA

Case 9:20-mj-08171-BER Document 3-1 Entered on FLSD Docket 04/29/2020 Page 101 of 201
PROJUD Processo 0017372862018070015 PROJUD ... Assinado digitalmente por ... em ... PODER JUDICIÁRIO DA UNIÃO
01/02/2019: DIGITALIZAÇÃO DO PROCESSO. Arq: Guia de Execução/Recolhimento



## PODER JUDICIÁRIO DA UNIÃO
### Tribunal de Justiça do Distrito Federal e dos
VARA DE EXECUÇÕES PENAIS DO DF - BRASÍLIA/DF



47

### Conta de Liquidação

**Registro Criminal:** 2016062380
**Requerido:** LUCAS CARVALHO ROLLO
**Filiação:** ANGELINA CARVALHO ROLLO
THOMAS OWEN ROLLO

**Data de Nascimento:** 15/10/1993
**Outros Nomes:**

**Preferência na Tramitação:** Não

#### 1ª Execução

| | | | |
|---|---|---|---|
| Processo n°: | 0017372862018070015 | | |
| Incidência Penal: | art. 217-A, caput do Código Penal | | |
| Pena: | 9 anos e 4 meses | | |
| Regime: | Fechado (H) | Reincidente: | NÃO |
| Data do Fato: | 02/02/2014 | | |
| Suspensão (art. 366, CPP): | | Data da Citação Válida: | |
| Recebimento de Denúncia: | 14/04/2014 | Recebimento do Aditamento: | |
| Suspensão (Lei n° 9.099/95): | | Data da Revogação: | |
| Data da Pronúncia: | | Confirmação da Pronúncia: | |
| Data da Sentença: | 03/02/2015 | Publicação da Sentença: | 03/02/2015 |
| Data do Acórdão: | 27/08/2015 | Publicação do Acórdão: | 27/08/2015 |
| Trânsito Julg. Acusação: | 21/07/2015 | Trânsito Julg. Definitivo: | 19/08/2016 |
| Juízo de Origem: | 2A VCR | Processo de Origem: | 20140710094042 |
| Inquérito Policial: | 107/2014 | Procedência: | 38ª Delegacia de Polícia (Vicente Pires) |
| Pena Restritiva Cumprida: | | | |
| Pena Privativa Cumprida: | 8 meses | | |
| Prazo Prescricional: | 6 anos | Provável Prescrição: | 20/07/2021 |

#### Recolhimentos e Saídas

| Recolhimento | Saída | Motivo | Prazo |
|---|---|---|---|
| 16/04/2014 | 17/04/2014 | Relaxamento de Prisão | 2 dias |
| 06/06/2014 | 03/02/2015 | Relaxamento de Prisão | 7 meses e 28 dias |
| | | **Cumprimento:** | **8 meses** |

#### Liquidação

| | | | |
|---|---|---|---|
| Regime Atual: | Fechado | Remição: | |
| Pena Cumprida: | 8 meses | Pena Remanescente: | 8 anos e 8 meses |
| Pena Total: | 9 anos e 4 meses | Data Efetiva para o Cálculo: | |
| **CUMPRIMENTO MAIOR OU IGUAL A PENA TOTAL? NÃO** | | | |
| Provável Término da Pena: | | Art. 75, do CP: | |
| Provável Término do Benefício: | | | |



**AUTENTICAÇÃO**
**Confere com o original**



Conta de liquidação atualizada na forma dos artigos 10 e 76, ambos do Código Penal, bem como para exibição do tempo remido em dias.

T312197      03/10/2016 12:19      1/1

Documento assinado digitalmente, conforme MP n° 2.200-2/2001, Lei n° 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em http://seeu.pje.jus.br/seeu/ - Identificador: PJ5VX 3YQ48 7YDRE VWQBA

PROJUDI - Processo: 0017372-86.2016.8.07.0015 - Ref. mov. 1.1 - Assinado digitalmente por Luiz Fernando Leite da Silva:319047
01/02/2019: DIGITALIZAÇÃO DO PROCESSO. Arq: Guia de Execução/Recolhimento



**TJDFT** Poder Judiciário da União
**TRIBUNAL DE JUSTIÇA DO DISTRITO FEDERAL E DOS TERRITÓRIOS**

VARA DE EXECUÇÕES PENAIS DD DF

**Autos nº 00173728620168070015**
*(Processo antigo nº 20160110975576)*

## DECISÃO

Considerando a sentença condenatória **transitada em julgado em definitivo**, elaborem e providenciem a atualização da Conta de Liquidação, bem como procedam à expedição de Mandado de Prisão.

Não havendo advogado constituído, fica, desde já, nomeada a Defensoria Pública para atuar em favor do executado.

Vista às partes, devendo a Defesa manifestar ciência da nomeação.

Distrito Federal, 3 de Outubro de 2016.

Valtz. André de Luna Bueno Araújo
Juiz de Direito Substituto
Matrícula 30.281

**VINICIUS SANTOS SILVA**
*JUIZ(A) DE DIREITO SUBSTITUTO(A) DO DF*

AUTENTICAÇÃO
Confere com o original

312197 — Documento não assinado digitalmente — 03/10/2016 11:46 — 1/ — 1

Documento assinado digitalmente, conforme MP nº 2.2../2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em http://seeu.pje.jus.br/seeu - Identificador: PJ5VX 3YQ48 7YDRE VWQBA

PROJUDI – Case records 0017372-86.2016.8.07.0015 – Ref. Mov. 17.1 – digitally signed by Leila Cury: 310981 Jun/06/2019: OTHER DECISIONS. Arq. Decision

JUDICIARY BRANCH OF THE FEDERAL DISTRICT
JUDICIAL DISTRICT OF BRASÍLIA
SENTENCE EXECUTION COURT OF THE FEDERAL DISTRICT (VEP) – SEEU
COURT PROFESSOR JÚLIO FABBRINI MIRABETE, SRTVS – QD. 701, LOTE 8R, - BLOCO N, 2° ANDAR, SALA 205 –
BRASÍLIA/DF – CEP: 70.340-000 – Phone: 6131031511 – Email: vep@tjdf.jus.br

### Case Records n. 0017372-86.2016.8.07.0015

| | |
|---|---|
| Case records: | 0017372-86.2016.8.07.0015 |
| Case type: | Sentence Execution |
| Main subject: | Imprisonment |
| Date of offense: | Date of offense not informed |
| Plaintiff: | Tribunal de Justiça do Distrito Federal e Territórios (District Court of the Federal District and Territories |
| Defendant: | LUCAS CARVALHO ROLLO |

For the purposes of production of evidence of Extradition of the convicted LUCAS CARVALHO ROLLO, **the EXTRADITION REQUEST FORM, duly filled out, follows as an attachment.**

**Notify the International Cooperation Unit, of the Federal Prosecution Service, sending copies of the mittimus, the complaint, the Ordinance, the arrest warrant and final judgment of the execution process, the Liquidation Account, as well as the present decision along with the EXTRADITION REQUEST FORM duly filled out and the text of articles 33, 71, 217-A and Title VIII (of the ANULMENT OF LIABILITY TO PROSECUTION, Articles 107/120), all from the Penal Code, requesting the cooperation for the translation, to English, and later remittance to this Court, for the purpose of production of evidence of the Extradition of the convicted LUCAS CARVALHO ROLLO.**

**Forward a copy of this decision along with the EXTRADITION REQUEST FORM, duly filled out, to the Coordination of Extradition and Transfer of Convicted Persons of the Ministry of Justice, informing that this Court awaits for the translation to English by the International Cooperation Unit, of the Federal Prosecution Service, for later forwarding.**

After the translation has arrived, **send all documents informed, along with the translation, to the Coordination of Extradition and Transfer of Convicted Persons of the Ministry of Justice.**

### EXTRADITION REQUEST FORM

### Confidential procedure?

Document digitally signed, according to MP n° 2.200-2 / 2001, Law n° 11.419 / 2006. Resolution of Projudi, of the TJPR / OE Validation of this in http://seeu.pje.jus.br/seeu/ - Identifier: PJXAP QL9GY H4P29 FGEYA

Yes. This Court understands that there is a need for confidentiality concerning the extradition request, due to the nature of the crime committed, as well as the need to safeguard the fundamental rights of the convicted, considering that there has already been public exposure of the present case, including in the press.

**1) Recipient:**

The Government of the United States of America

**2) Sender Central Authority:**

Department of Assets Recovery and International Legal Cooperation / National Secretariat of Justice / Ministry of Justice of Brazil.

**3) Requesting Central Authority:**

SETENCE EXECUTION COURT FOR THE FEDERAL DISTRICT (VEP/DF)

ADRESS: FÓRUM PROFESSOR JÚLIO FABBRINI MIRABETE, SRTVS – QD. 701 – LOTE 8 – BLOCO N, 2º ANDAR, SALA 205 – BRASÍLIA/DF – CEP 70.340-000.

Phone: 6131031511

Email: vep@tjdf.jus.br

**4) Description of the request:**

I request the extradition of LUCAS CARVALHO ROLLO to Brazil in order to:

Serve the sentence of nine (9) years and four (4) months of imprisonment, to which he was convicted for committing the crime set forth in article 217-A, *caput*, of the Penal Code, two times, as described in article 71 of the Penal Code (continuing offense).

The Liquidation Account is attached with the remaining sentence calculation.

**5) Civil identification and qualification data:**

Name: LUCAS CARVALHO ROLLO

Alias: not informed

Nationality: Brazilian, with information that has US citizenship and passport

Date of birth: OCT/15/1993



AUTENTICAÇÃO
Confere com o original

Document digitally signed, according to MP nº 2.200-2 / 2001, Law nº 11.419 / 2006, Resolution of Projudi, of the TJPR / OE Validation of this in http://seeu.pje.jus.br/seeu/ - Identifier: PJXAP QL9GY H4P29 FGEYA

Parentage: Tomas Owen Rollo and Angelina Carvalho Rollo

Born in Florianópolis/SC

Identity card: 3455371 – Issuing Institution: SSP/DF
CPF: 702.767.181-60

Residence address: ███████████████████████████
███████████████ Pires/DF.

**6) Suggestion of whereabouts of the fugitive:**

████████████████ Palm Beach, Florida/USA, telephone +█████████

I hereby declare that the information concerning the residence of the convicted in the United States of America arrived in the present case informally, brought by the mother of the victim of the crime for which the offender was convicted, and in this case there is no official proof of that address.

**7) Reference:**

Sentence execution 0017372-86.2016.8.07.1.009404-2 – Old number 2016.01.1.097557-6 (Origin – Criminal action 2014.07.1.009404-2 – 0009157-19.2014.8.07.0007 – Police Inquiry n. 107/2014-38ª Police Station of Vicente Pires/DF).

**8) Summary of the facts attributed to LUCAS CARVALHO ROLLO and the current stage of the case:**

According to the complaint the defendant LUCAS CARVALHO ROLLO:

"*I. From an undetermined date, until February 2, 2014, at around 5:45 pm, at the SHVP, ███████████████ Pires / DF, the defendant LUCAS CARVALHO ROLLO, freely and conscientiously, on several occasions, committed libidinous acts with the child ██████████████████ (born ██████████, p. 13), under 14 (fourteen) years old at the time of the events.*

*II. According to investigation reports, on February 2, 2014, the convicted invited the victim to his room and molested her sexually, by committing libidinous acts consisting of removing her clothes, touch her body, including the intimate parts, rub himself onto her, stay on top of her and rub his penis in the intimate parts of the victim, among others.*

*Interviewed, the victim-child narrated the sexual abuse she suffered (pp. 30/38), mentioning that such events had taken place occurred before, on several other occasions.*

Document digitally signed, according to MP nº 2.200-2 / 2001, Law nº 11.419 / 2006, Resolution of Projudi, of the TJPR / OE
Validation of this in http://seeu.pje.jus.br/seeu/ - Identifier: PJXAP QL9GY H4P29 FGEYA

*According to the Biological Material Finding Report (pp. 57/65), "human blood and semen were present on the samples of the cutoff fabric from the underwear, shorts and t-shirt." And according to the DNA Examination Report (pp. 67/71), the presence of biological material of the convicted in her underwear, the shorts and the bed sheet was confirmed.*

*III. With his conduct, the defendant is incurred to art. 217-A, caput, of the Penal Code (several times)... "*

During the production of evidence, the Court which renders the sentence reported:

*"The complaint was accepted in page 83. The defendant spontaneously appeared before the Court and presented his defense to the prosecution, through an appointed attorney (pp. 131/135). In the report, he makes comments concerning the merit, pleas for acquittal and lists witnesses.*

*On April 16th, 2014, the preventive detention warrant issuance was fulfilled against the defendant through decision in page 88. Injunction granted in Habeas Corpus and, in the merit, the order was denied (pp.99/100 and 169/175). The defendant was once again taken to prison on June 6th, 2014 (pp.176/177).*

*After the case was duly supported by evidence with the Medical Examination of the victim (II.16), Seizure and Forfeiture Notice (p.31), Biological Material Finding Exam (pp.61/69); DNA Examination Report (pp. 70/73-A), Amendment of the Medical Examination Answer (pp. 282/283), Answer to the Questionnaire – DNA Exam Report (pp. 316/317), Expert Information (pp. 319/322).*

*During the production of evidence stage, the parents of the victim were heard, Luis Augusto Alves Nepomuceno and Raquel Pereira da Costa (pp. 271/274), the witnesses Márcia Martins Morais costa (p. 275), Aline Fernandes Cardoso and Maurício Moura de Souza (pp. 299/300) and the informants Josineide Carvalho dos Anjos, Mayara de Carvalho Ferreira, Jorge Alberto Carvalho de Souza and Suellen.*

*At the stage of article 402, of the Code of Criminal Procedure, the Defense required the Ultrasound exam on the victim, as well as the remittance of the case to IPDNA/IC as a response to the questionnaire elaborated in items 6.2 and 6.3 of the report of pages 244/247, besides requiring clarification concerning the collected material from the underwear, shorts and seized bed sheets (p. 298). The Federal Prosecution Service did not require anything.*

*Final allegations of the Federal Prosecution Service in pages 344/348, filing for the conviction under the terms of the complaint.*

*The Defense, also for ultimate reasons, raises an indirect procedural defense for a fair opportunity to be heard. In the merit, in extensive and well grounded reasoning, requests acquittal. "*



AUTENTICAÇÃO
Confere com o original

Document digitally signed, according to MP n° 2.200-2 / 2001, Law n° 11.419 / 2006, Resolution of Projudi, of the TJPR / OE Validation of this in http://seeu.pje.jus.br/seeu/ - Identifier: PJXAP QL9GY H4P29 FGEYA

For the sentence rendered on February 3rd, 2015, the defendant was acquitted of the imputation against him, reasoning and deciding as follows:

"Initially, it is important to note that the case took place without any grounds for nullity, with strict observance of the adversary system doctrine and the opportunity to be heard and the adoption of the appropriate rite to the case, set forth in articles 396 and following, of the Code of Criminal Procedure. Moreover, the defense is not accepted. The Defense has to consider that the court is where the evidence goes to, which is the one to judge and grant credibility it finds fit. Thus, their real need is not seen, especially since the fact that is intended to be proven by the ultrasound examination can be clarified by the parol evidence, a fair opportunity to be heard is not considered, reason why I deny the defense and in the examination of the merit.

1 – PROBABLE CAUSE The complaint imputes to the defendant LUCAS CARVALHO ROLLO the crime typified in article 217-A, *caput*, of the Penal Code, because of supposedly and on several occasions, having practiced libidinous acts with the ████████████████ I started with the Registration Police Report IP 1.424 / 2014-0, carried out by the military police officer Jorge Alberto Carvalho de Sousa, found in pages 12/14. At the opportunity, it was stated that "... ACCORDING TO THE FATHER OF THE VICTIM, HE WAS IN THE HOUSE WITH HIS DAUGHTER AND HIS COUSIN LUCAS, AND THAT HIS DAUGHTER WENT UPSTAIRS, AND SHE REMAINED THERE FOR QUITE SOMETIME AND HE THOUGHT IT WAS WEIRD SHE WAS TAKING SO LONG. HE DECIDED TO GO AFTER HER: CALLING HER NAME OUTLOUD ███████ CAME DOWN THE STAIRS SAYING SHE WAS GOING TO TAKE A SHOWER. ███ QUESTIONED HIS DAUGHTER'S ATTITUDE. HE SAID IT WAS NOT THE TIME TO TAKE A SHOWER AND ASKED HER WHY. THE GIRL SAID SHE WAS BLEEDING. HE ASKED HER WHY SHE WAS BLEEDING. THE GIRL SAID THAT LUCAS WAS ON TOP OF HER. AT THAT MOMENT HE GOT FURIOUS. HE WENT UPSTAIRS AND CAUGHT THE SUSPECT TAKING A SHOWER, HE ASKED HIM TO OPEN THE DOOR, LUCAS OPENED THE DOOR, HE GRABBED HIM AND BROUGHT HIM DOWNSTAIRS AND CHECKED WITH HIS DAUGHTER IF LUCAS HAD TOUCHED HER AND ISABEL CONFIRMED. HE ASKED LUCAS WHAT HE HAD DONE TO HER, BUT LUCAS ███████ THE WHOLE TIME SAYING HE DID NOT DO ANYTHING. HE WAS OUTRAGED AND ANGRY, HE CALLED HIS AUNT ASKING FOR HELP, OTHERWISE HE WOULD LOSE HIS MIND AND KILL LUCAS, AT THAT MOMENT, HIS COUSIN JORGE ALBERTO CARVALHO DE SOUSA ARRIVED. THE MILITARY POLICEMAN TOOK THEM TO THE 38TH POLICE STATION FOR THE REGISTRATION OF A POLICE REPORT, PRESENTING THE GIRL'S UNDERWEAR. APPARENTLY WITH BLOOD STAINS. AT THAT POLICE STATION, THE MINOR ███████ WAS INTERVIEWED. BECAUSE SHE WAS ONLY 6 YEARS OLD, SHE DID NOT KNOW HOW TO EXPLAIN WELL WHAT HAPPENED BUT SHE SAID THAT LUCAS APPLIED A PRODUCT TO HER PRIVATE PARTS AND LAID ON TOP OF HER, ASKING HER TO RAISE HER BUTTOCKS SAYING SHE WAS BLEEDING... THE MINOR WAS TAKEN TO IML (INSTITUTE OF FORENSIC MEDICINE), FOR A MEDICAL EXAMINATION. SEXUAL INTERCOURSE, REPORT N. 04281/144ML/PCDF, CONCLUSION: NEGATIVE, NO SIGNS OF BLEEDING WERE FOUND OR LIBIDINOUS ACTS. A TEAM OF EXPERTS WENT TO THE VICTIM'S HOUSE TO SEARCH FOR TRACE ELEMENTS IN THE SUSPECT'S BEDROOM. NOTHING WAS FOUND. BUT, IN THE NEXT BEDROOM OVER WHERE ACCORDING TO THE VICTIM'S STATEMENT SHE WAS WITH LUCAS AND A BED SHEET WAS FOUND WITH

Document digitally signed, according to MP n° 2.200-2 / 2001, Law n° 11.419 / 2006, Resolution of Projudi, of the TJPR / OE
Validation of this in http://seeu.pje.jus.br/seeu/ - Identifier: PJXAP QL9GY H4P29 FGEYA

AUTENTICAÇÃO
Confere com o original

BLOOD STAINS. LUCAS DENIES THE VISTIM'S STATEMENT. THE GIRL'S CLOTHES AND THE BED SHEET WERE SEIZED BY THE FORENSIC TEAM, TO VERIFY IF IT WAS HUMAN BLOOD O████████████████████ d new about the crime was known by the police authority, the minor ███████████████████ was submitted to Medical Examination. Resulting in the Report n. n████████████████ t that time, the expert team could describe, in item 4, that "... lack of traces of physical violence, genitalia, with the following characteristics or alterations: lack of lesions in the vulva, perineum. Lack of signs of bleeding, presence of clear discharge on the vulva and anus. 1 – hymen was intact.". Later on, they concluded: "Hymen still intact and no signs of penetration of the anus." Still in inquisitorial stage, the father of the victim, Luis Augusto Alves Nepomuceno was heard and provided a more detailed version of what happened that day, as we can see in pages 21/23. He said that "... on FEB/02/2014 (Sunday)████ e spending the day at his aunt's house, MARIA CECILIA DE CARVALHO...with his daughter ████ : THAT, a cousin also lives there, by the name of LUCAS CARVALHO ROLLO...; THAT at 2:15pm, his daughter went upstairs, where LUCAS was, whilst the declarant stayed downstairs watching a soccer game on TV: THAT, after about fifteen minutes the declarant searched for ISABEL calling her name, however she did not respond: THAT, the declarant insisted and yelled out her name and only then she same down the stairs, wearing the same clothes she was wearing when when went upstairs; THAT, as soon as she came downstairs, ISABEL said she was going t████ a shower, and at that moment, the declarant said it was not the time to take a shower: THAT, I████ L said she wanted to take a shower because she was bleeding. THAT, the declarant questioned ███████ was bleeding ans at the same time the declarant also asked if LUCAS had touched her; THAT, ████ L replied: "YES, HE DID DAD! LUCAS WAS ON TOP OF ME! HE APPLIED A PRODUCT  MY BUTTOCKS AND MY V████ND ASKED ME TO RAISE MY BUTTOCKS FRO HIM!": THAT, the declarant checked ████ clothes and saw that her clothes had a lot of blood, in the genital areas: THAT, the declar████ lly mad and immediately went up the stairs to find LUCAS: THAT, at that moment LUCAS was already in the shower; THAT, the declarant asked if he had touched ISABEL and he said no; THAT, the declarant grabbed him and brought him downstairs and put him in front of ISABEL, asking her if he had really done what she said he did; THAT, ISABEL confirmed the story in front of LUCAS, repeating that he was on top of her...; THAT, his aunt arrived a few minutes later accompanied by other family members and everyone questioned LUCAS about what happened, however he denied; THAT, the declarant decided to bring LUCAS to the police station to register a police report, also bringing ISABEL along with them, in order to be heard and go through medical examination..; THAT, at that Police Station ISABEL was interviewed by a female police officer, having confirmed everything she said previously...; THAT, the policewoman wishes to add that ISABEL also mentioned that she had told her father about other times in which LUCAS had touched her before, although he always asked her not to say anything to anyone...". Statement ratified in Court as we can see in pages 271/272. The minor's mother, RAQUEL PEREIRA DA COSTA, in spite of not being present at the place and time when it happened, she was also heard by the police authority and said that "... the girl was with her father LUIS AUGUSTO, and she also said she was hospitalized for depression; THAT she was only aware of it the day before: THAT, she clarifies that before what happened, when ISABEL used to go to her aunt's house MARIA CECILIA; THAT, she always thought it was weird the girl was always inside LUCAS' bedroom with him: THAT, whenever ISABEL came back from MARIA CECILIA'S house, she noticed redness and swelling in the vaginal area of her daughter, and always asked her if anyone had touched her in her private areas, but the girl never said anything; THAT, at o██████SABEL had vaginal discharge and the declarant found it████e, but since ISABEL never ██████ anything out of the ordinary, she did not mind". THAT, ████L mentioned that one time sh████ laying "pillow" with

Document digitally signed, according to MP n° 2.200-2 / 2001, Law n° 11.419 / 2006, Resolution of Projudi, of the TJPR / OE Validation of this in http://seeu.pje.jus.br/seeu/ - Identifier: PJXAP'QL9GY H4P29 FGEYA

MINISTÉRIO DA ... AUTENTICAÇÃO

LUCAS)- ... ", page 25. On her part, the minor ███████████████████ was submitted to the special interview in the Technical Assistance Se████████████████ n of Children and Adolescents. She confirmed the version presented by her father that day, adding that the blood found in her body and robes was of "Lucas´s dick," according to pp. 34/42. Two questions have arisen so far. The first one is pertinent to the origin of the blood found on the child's clothing, since, prior to the preliminary examination, the experts concluded that there were no injuries to the vulva, perineum and anus of the child, absence of signs of bleeding, integrity of the hymen and anus, and absence of signs of penetration, page 12. The second, which is crucial to the clarification of the controversy, since the accusation does not impute to the defendant the practice of sexual intercourse, instead libidinous acts in general, concerns the credibility of the declarations of the alleged victim, since, according to the girl, "Lucas applied a product on me... It was a white product that he applied on my vagina and my butt..." (37), also remembering that, according to the father, the girl said that "... LUCAS WAS ON TOP OF ME! HE APPLIED A PRODUCT ON MY BUTT AND MY VAGINA AND ASKED ME TO RAISE MY BUTT FOR HIM!" (page 21). Evidenced the core of the controversy, at this point it is entirely appropriate to report to the Biological Material Examination Exam (pages 61/64) on the child's underwear and shorts, a t-shirt worn by the defendant, and a bed sheet located in one of the rooms In the face of the importance of the considerations drawn by the experts, it is worth transcribing in its entirety the sub-items that deal with the Laboratory Examinations carried out in the material, the Technical and Practical Considerations and, finally, the b) From Laboratory b.1) Examination of human blood of the samples collected from the underwear, shorts, T-shirt and bed sheet were subjected to appropriate extraction and then to the Immune chromalography Test for Hemoglobin Hurna obtaining a positive result for the four samples. 1). 2) Sperm search. The samples were cut from the panties, shorts and t-shirts, and were used to prepare (3 slides from each. sample; which were submitted to the spermatozoa test, obtaining a negative result for spermatozoa b.3). the presence of PSA (prostatic specific antigen) was tested and the results were positive for the three samples. The prostate specific antigen (PSA) is a glycoprotein (34,000 daltons) present in seminal plasma, is synthesized by the prostate gland and expressed at high levels in the prostate gut. The presence of PSA in the sperm in concentrations millions of times greater than in serum of men has characterized it as a valuable marker, already tested and validated by the forensic community, for the identification of seminal fluid in the criminal evidence. left by vasectomized, azoospermic or oligozoospermic individuals. V .— CONCLUSION Thus, in view of the above and analyzed, experts conclude that in the samples of tissue cut from the underwear, shorts and t-shirt was found the presence of human blood and semen, but the presence of spermatozoa eq uncle in the sample of tissue cut from the sheet was found the presence of human blood as mentioned in item (...). "Next step was performed DNA test to compare the biol████l material extracted from the perigenital secretion, from the tissue cuts of the panties and shorts of ████, of the defendant's shirt and of the sheet, with the biological samples collected from both, resul n the elaboration of the DNA Exam Beat attached to pages 70/73-A. Now it is also necessary to transcribe part of the expert information, are essential to the formation of the conviction of this Court. In the sample of perigenital secretion, a unique genetic profile was identified, coming ████████████ ████████████the profile identified in the biological sample collected from Isabel ███████████ ██████████████. (. •.) In the samples obtained from the shorts and the sheet was o████████████ material of at least two people, one being male and one female. The profile observed in most of this mixture comes from a male person and is identical to the profile identified in the biological sample collected from Lucas Carvalho Rollo. The profile observed in a sma██ ████████████tical to the profile identified in the biological sample collected from ███████████ ███████████. In the sample obtained from the panties a mixture of genetic mat

Document digitally signed, according to MP n° 2.200-2 / 2001, Law n° 11.419 / 2006, Resolution of Projudi, of the TJPR / OE
Validation of this in http://seeu.pje.jus.br/seeu/ - Identifier: PJXAP QL9GY H4P29 FGEYA

two people was observed. The profile observed in most of this mixture comes fro ████████████

████████████████████████████████████████████████████

chromosome markers, it was observed that in the samples of perigenital secretion, underwear, shorts, T-shirt and sheet, a single Y chromosome haplotype was identified that is identical to the haplotype identified in the biological sample collected from Lucas Carvalho Rollo. The probability of selecting at random in the male population an unrelated person having the same haphitip is approximately 1 in 14,928 (one in fourteen thousand nine hundred and twenty eight). VI CONCLUSION Considering the proposed expert objective, the signatories conclude that:  The genetic profile observed in Lucas Carvalho Rollo's sample is identical to the genetic profile of male origin observed on the t-shirt, a sample related to Police Inquiry 107/14 – 38 " DP. The probability of relating to the male population a related person presenting the same profile 1 of approximately 1 cm 38,000,000,000,000,000,000,000,000,000 (one in thirty-eight sextillion). The genetic profile observed in the collected sample of Lucas Carvalho Rollo is identical in 1 of the markers to the profile obtained in greater quantity in the samples obtained from the shorts and the sheet and to the profile obtained in less quantity in the sample obtained from the panties, samples related to the Police Inquiry 107 / 24-38a DP. the haplotype of the Y chromosome observed in the collected sample of Lucas Carvalho Rollo is identical in all the analyzed markers, to the genetic profile of masculine origin observed in the samples of congenital secretion PC  (related to the Report of Medical Examination – Libidinous Acts and Conjunction Carnal No 4.281 / 14), panties, shorts, T-shirts and sheet, samples related to Police Inquiry No 107/14 – 38 "DP. The likelihood of selecting at random in the male population an unrelated person with the same profile is approximately 1 in 14,928 (one in fourteen thousand, eight hundred and twenty eight.) The matching profiles on the markers of the Y chromosome indicate the same origin (--)" From what remained until then, there is a crucial question that has not gone unnoticed by the Defense and to the detailed analysis of the technical test carried out by this Court. experts point out that in the perigenital secretion sample a unique genetic profile was identified from a female person identical to the profile identified in the biological sample collected from Isabel (p. 72). Afterward, they point out that after amplification of the sample for the markers of the Y chromosome, it was observed that in the samples of perigenital secretion, the panties, the shorts, the shirt and the sheet, a haplotype of the unique Y chromosome was identified that is identical to the haplotype identified in the biological sample collected from the defendant Lucas (page 73). The contradiction is latent. In view of this, it is questioned: in the sample of perigenital secretion of the supposed victim was or not found biological material of the defendant Lucas Carvalho Rollo. Until one could think that the contradiction is of minor importance, because biological material of the defendant was also found in the short and in the underwear of the victim. However, it is worth mentioning that the body of evidence reveals that on the day of the events, and even before that, 'the defendant and the alleged victim cohabited, since the child's parent said in Court that "... he was spending a few days at his Aunt Maria Cecilia's house. that Lucas is the adoptive son of another aunt Maria Angelina: that Lucas lives in the house of Aunt Maria Cecilia: that when the events occurred she was already staying at Aunt Maria Cecilia's house for about 15 days... "(271). In view of this, the possibility of the existence of previous physical contact between the victim and the defendant can justify the presence of biological material of the defendant in the girl's dress. In addition to this, he recalls that, with the exception of perigenital secretion, the material examined was seized on the day after that, that is, at FEB/02/14 (Order of Presentation and Seizure of page 31), by a police officer who, certainly, do not surround themselves with technical care of a team of professional experts. Therefore, a possible influence of interfering substances, such as the contact of

Document digitally signed, according to MP n° 2.200-2 / 2001, Law n° 11.419 / 2006, Resolution of Projudi, of the TJPR / OE Validation of this in http://seeu.pje.jus.br/seeu/ - Identifier: PJXAP QL9GY H4P29 FGEYA

AUTENTICAÇÃO

some pieces with others, can not be ruled out, which may justify the presence of biological material of the defendant in the clothes of the minor. For this reason, it is crucially important to overcome the contradiction pointed out elsewhere. In response to the question formulated by the Defense fl. 247, the experts presented information in the following terms (pages 316/317): ANSWER TO THE QUESTION ON THE ITEM 6.2 Single question: The question inquires whether the material identified in the samples of perigenital secretion referring to the Police Inquiry 107/14 − 38 In the analysis of the autosomal markers of the perigenital sample, only a profile of female origin was detected, identical to the profile identified in the biological sample collected from ▆▆▆▆▆▆▆▆▆▆▆▆ It should be noted that when there is a much larger amount of fema▆▆▆▆▆▆▆▆▆▆▆▆▆▆ NA equal to or greater than 50: 1) the presence of male DNA below a minimum threshold does not produce amplification for autosomal markers, preventing the detection of the male genetic profile present in less quantity. On the other hand, when the V chromosome is analyzed, as only the male contributor possesses this chromosome, even in the presence of a disproportionately greater amount of female DNA, this fact can be evidenced, a fact that explains the findings of the sample collected from the perigenital region. It should be noted that when there is a much larger amount of female DNA (proportion of the major DNA equal to or greater than 50: 1) the presence of male DNA below a minimum threshold does not produce amplification for autosomal markers, preventing the detection of the male genetic profile present in less quantity. On the other hand, when the V chromosome is analyzed, as only the male contributor possesses this chromosome, even in the presence of a disproportionately greater amount of female DNA, this fact can be evidenced, a fact that explains the findings of the sample collected from the perigenital region. It occurs that, the technical information in highlight was not able to beat the doubt sown in the formation of the conviction of this judge. Now, experts have confirmed that the material identified in the perigenital secretion samples does not have a single genetic material and justify that when there is a much larger amount of female DNA, the presence of male DNA below a minimum threshold does not produce amplification for autosomal markers, preventing the detection of the male genetic profile present in less quantity. However, on the other hand, they affirm that when the Y chromosome is analyzed, as only the male contributor possesses this chromosome, even in the presence of a disproportionately larger amount of female DNA, this fact can be evidenced, a fact that explains the findings of the sample collected from the perigenital region. If, when there is a much larger amount of female DNA, the presence of male DNA below a minimum threshold does not produce amplification for autosomal markers, preventing the detection of the male genetic profile present in less quantity, as it may at the same time conclude presence of the genetic profile of the defendant in the perigenital secretion? In my view, the contradiction has not been superseded. Proceeding in the analysis of the technical test, he recalls that, initially, experts concluded that human blood and semen were present in the tissue samples cut from the victim's panties and shorts, as well as from the defendant's T-shirt. Then, in response to the question raised by the Defense, they presented information in the following sense (pages 319/322): "C) 1. Response to the item referring to item 6.3 in the Technical Expert Opinion (pp. 244-247) and annexes (lis 248-262) Single question: The question inquires about the identification of semen only by the presence of PSA and the absence of description of the other components of this fluid (Spermatozoa, amino acids, prostaglandins, acid phosphates, zinc, phosphate, spermatozoa, spermatozoa, spermatozoa, spermatozoa and spermatozoa) proteolytic enzymes, galactose) Answer: With the exception of acid phosphatase and spermatozoa, the Laboratory Experiments and Analysis Section does not have a methodology for identifying the other components of the semen. However, it is necessary to clarify the following points: Forensic samples are normally in adverse conditions before collection, subject to weather and action of microorganisms, different from a sample collected and a laboratory of clinical analyzes. This means that samples

Document digitally signed, according to MP n° 2.200-2 / 2001, Law n° 11.419 / 2006, Resolution of Prejudi, of the TJPR / OE
Validation of this in http://seeu.pje.jus.br/seeu/ - Identifier: PJXAP QL9GY H4P29 FGEYA

AUTENTICAÇÃO
Confere com o original

analyzed in a forensic laboratory usually have reduced amounts, contamination and often lost part of their composition by environmental or biological degradation. Thus, the characterization of biological fluids, in the forensic scope, seeks to identify unique components of each fluid, in order to avoid analyzes that can generate inconclusive results. That is, the identification of galactose, proleolytic enzymes and zinc, would not allow any conclusion, because a stain on a garment containing these substances could have several different origins, among which other body fluids, food remains, etc. Forensic science, in the case of semen identification, uses spermatozoa to identify this fluid. Even because its identification guides the use of specific techniques for DNA extraction. However, there are cases where semen may not contain spermatozoa, for example, in vasectomized individuals. One solution to such cases is the use of other semen markers. The forensic community usually uses one of two: prostatic acid phosphatidase (FAP) and prostate specific antigen (PSA). FAP was widely used in the investigation and characterization of seminal fluid. However, it was considered a marker of sensitivity and limited specificity, falling into disuse after the discovery of PASA (Candido et al.). PSA, on the other hand, can be identified as the use of immune chromatographic assays, very specific and sensitive tests (PSA) is not only present in semen, but also in the presence of a single nucleotide sequence, studies demonstrate the presence of PSA at levels detectable by the immune chromatographic test in serum of women with cancer (12.00 ng / ml) and polycystic ovarian syndrome (10.29 ng / mL), in breast milk (350 ng / ml) (Sawaya & Rolim '), and in urine of men after ejaculation (260 ng / M1) (Gartside et al., 20036). It should be noted that the mean concentration of PSA in the semen ranges from $0.4\times106$ ng / ml to $1.29\times106$ ng / ml, about one million times more concentrated than observed in the other fluids (Sawaya & Rolims). However, one study has shown that the efficiency of PSA extraction from cotton spots is less than 1% (Gartside et al., 20036). Considering the above studies, the extraction of breast milk and urine from men after ejaculation would result in a concentration of 3.50 ng/ml and 2.60 ng/ml PSA, respectively, below the detection limit of the immune chromatographic test. While a semen spot extraction would result in a concentration ranging from $0.4\times104$ng / ml. Another bibliographic reference (Paulino et al., 2009) quantifies PSA concentrations up to 1.3ng / ml, but uses another methodology. These values would not be detected by the method used by this Laboratory, even disregarding the sample recovery rate of 1%. Considering the above, it is noticed that the identification of PSA as semen marker is a robust tool and widely used by the forensic community. However, its isolated identification does not allow unequivocal affirmation of the presence of semen, since, although the scientific community currently works to confirm the robustness of the method employed, in the future clinical conditions may be discovered that increase the concentration of PSA in other fluids to levels comparable to semen. It should be noted that prior to the questioning this Laboratory already presented a different conclusion from the present in the 3617/2014 – 1C Criminal Investigation Report, resulting from the above considerations. In this way, the conclusion of the Criminal Investigation Report 3617/2014-IC is hereby rectified: "Thus, in view of the foregoing and analyzed, the Experts conclude that in the samples of cut out fabrics of panties, shorts and t-shirts, of human blood and PSA, suggestive of the presence of semen, but the presence of spermatozoa was not detected;..."(intentional highlights) It is therefore apparent that, in this second moment, the experts present more detailed information about of the examination carried out to verify the presence of semen in the garments. They clarify that, with the exception of acid phosphatase and spermatozoa, they do not have a methodology to identify the other components of the semen; that PSA is not found exclusively in semen, but also in the serum of women with breast cancer, in urine of women taking testosterone and with polycystic ovary syndrome, in breast milk and in men's urine after ejaculation, and at levels They recognize that PSA is a robust tool widely used by the forensic community as a marker of the presence of semen, but, on the other hand, its isolated identification does not allow to state unequivocally its presence. Lastly,

Document digitally signed, according to MP n° 2.200-2 / 2001, Law n° 11.419 / 2006, Resolution of Projudi, of the TJPR / OE Validation of this in http://seeu.pje.jus.br/seeu/ - Identifier: PJXAP QL9GY H4P29 FGEYA

they rectify the conclusion, emphasizing that in the samples of cut fabrics of the panties, the shorts and the t-shirt was verified the presence of human blood and PSA, suggestive of the presence of semen, remembering that the presence of spermatozoa was not detected. In this sense, unlike what happened at the first opportunity, the experts now do not present conclusive results, but only suggestive of the presence of semen. It is well known that the condemnatory decree must rely on 'robust evidence of the materiality and authorship of the crime. That is to say, for there to be condemnation it is necessary to proceed to the historical reconstitution of the facts, in order to perceive what happened in the truth and if the practice of the illicit act can be attributed to the denounced. That is, it is necessary to reestablish, as far as possible, the truth of the facts, for the just solution of the litigation, and this being the end for which the process is intended, it is through the instruction that the most perfect representation of this truth is sought. Similarly, it is not forgotten that contemporary criminal proceedings contemplate three models of evaluation or evaluation of evidence, namely: the legal system, that of intimate conviction and that of rational persuasion. By the latter, adopted in our legal system, "The judge will take his conviction for the assessment of the evidence produced in a contradictory manner, and can not base his decision exclusively on the information elements collected in the investigation, except for the precautionary, non-repetitive and anticipated evidence", but must do so in a motivated way. It is the principle of free convincing expressed in article 155 of the CPP. What distinguishes the system from rational persuasion is the freedom of the judge in valuing the evidence that, although it exists, is contained in the obligatory justification of the choices made, in the face of the legitimately obtained proof, with the explanation of the road traveled to completion. Moreover, "If it is true that the judge is bound by the evidence contained in the case, it is no less certain that he is not subordinated to any abstract criterion in ascertaining, through them, material truth. The criminal judge is thus returned to his own conscience "(Statement of Motives of the Code of Criminal Procedure, item VII). 'It follows that the conviction of the Judge is not tied to any specific or isolated means of proof. Therefore, although the expert evidence is the means of supplying the lack of technical knowledge that rests with the Judge to ascertain the facts, "The judge will not be attached to the award, being able to accept or reject it, in whole or in part.", according to the provisions of article 182 of the CPP. In spite of the examinations carried out by the experts, 'I do not conceive of the possibility of supporting a condemnatory decree in suggestive conclusion, mainly because the experts themselves point out that the isolated identification of PSA does not allow to affirm unequivocally the presence of semen. One could still think that the oral test produced in Court would suffice to confirm the materiality of the crime. Here, too, I do not see enough robustness to back the condemnatory decree. The defendant Lucas Carvalho Rollo vehemently denies the materiality of the crime. Moreover, heard twice, he presents similar versions, as can be seen from Fr. 50/52 and 306/307. For his part, the victim Isabel Luisa da Costa Nepomuceno was heard in court through an interview conducted by video conference and, to a certain extent, ratified the statements presented in the inquisitorial phase. The media with the hearing recording was placed on the fl. 296. It is true that it is not possible to require reproduction of the initial version because it is a child of a young age, therefore, immature psychically. But in short, she said again that the defendant took off her robes, passed a cream on her genitals and climbed on top of her. Do not forget the probative value of the victim's word, especially in crimes of this nature that, for the most part, are practiced in secret. On the other hand, in the present case, other circumstances also deserve to be valued, since, in my view, they can greatly mitigate the evidentiary force of the narratives drawn by the minor. It urges to remember that when it comes to children, there is an expectation of a fanciful speech, and it may even be suggested by an adult, or influenced by the context in which it lives, because it lacks maturity to understand the meaning and consequences of its attitude, besides of his report to be subject to divergences that can come from the attempt to protect the aggressor and his

Document digitally signed, according to MP n° 2.200-2 / 2001, Law n° 11.419./ 2006, Resolution of Projudi, of the TJPR /. OE
Validation of this in http://seeu.pje.jus.br/seeu/ -. Identifier: PJXAP QL9GY H4P29 FGEYA

family, since in this type of crime, in most cases the aggressor is a member of the family or someone very close effectively. Given this, the judicial trial also revealed that the sexual abuse is tender that surrounds and terrorizes the family of the victim. And not for less, because the minor's father, Luis Augusto Alves Nepomuceno, said that "... his wife was sexually abused at the age of 16 and to this day she suffers because of this, and the person in charge has never been arrested; was known to the family: that Isabel slept in the same room as the deponent and his wife on a mattress on the floor: that although the house had two bedrooms Isabel was afraid of the dark, which is why she slept in her room: they never commented with Isabel for the sexual abuse suffered by her mother... ". This may perhaps justify the form, as the father questioned the girl when he noticed the bleeding, for she said that "... he looked at Isabel's shorts and saw that it blood-soaked, that at this moment he asked Isabel what had happened, if it was Lucas who did something to her: that he clarified that he asked it was because he was alone upstairs, that he asked what Lucas had done and Isabel said that he was on top of her... ", p. 272/273. And she can also clarify why Raquel Pereira da Costa always questioned the girl about possible abuse she suffered when she returned from her aunt's house and, even in the face of suspicion, because, according to her, "Isabel twice when she returned from the house Maria Cecilia complained of pain in her genitals... "(p. 273), however, she allowed the girl to continue to attend the house.; As if that were not enough, the minor was submitted to emergency care at the Regional Hospital of Guará, on FEB.03.2014; according to the guide in the pp. 290/291. At the opportunity, the pediatrician reported that the "... child was evaluated by a psychologist who states that she said clearly," that there was penetration... ". In addition to the Appellate Body Examination Report No. 04281/14, experts note that "There is no objective evidence of carnal conjunction or libidinous act other than carnal conjunction." 282. 1 By and in order to further weaken the factual narrative presented by the infant, his relatives came to inform in Judgment that it is a child accustomed to lie (pages 302v and 305). In this sense, and for all that remained expended, latent the fragility of the collection of evidence as to the very materiality of the crime, it being worth remembering that the doubt must military for the benefit of the defendant. 2 – PROVISION Before the above; I DENY the punitive claim of the State (*ius puniendi*) to ACQUIT the defendant LUCAS CARVALHO ROLLO, already qualified in the records, of the imputation made to him, based on Article 386, item II, of the CPP. Consequently, the grounds that gave rise to the decree of pre-trial detention no longer exist, which is why I am revoking the decision of pp. 88/89 and determine the dispatch of RELEASE ORDER in favor of the defendant, if otherwise you are not stuck. No cost. Publish yourself. Please, let it be registered. Let it be summoned. In due time, let it be filed. Taguatinga-DF, February 03, 2015. 't.y> WAG THE ANTÔNIO DE SOUZA Judge.

However, the Federal Prosecution Service appealed against the acquittal, and the appeal was granted unanimously to convict the defendant LUCAS CARVALHO ROLLO as an offense in the penalties of art. 217-A, *caput*, of the Penal Code, twice, in the form in art. 71 of the Penal Code.

In the Appellate Decision, the Judge-Rapporteur pointed out that it was still up to the collective body of judges to assess the evidence collected in support of the decision.

In view of the foregoing, he began by reporting:



*"In court, the defendant denied the commission of the crime (page 275 and verse), narrating the dynamics of the facts in the following manner: (...) the questioner alleges that the facts described therein are not true; that the defendant claims that he was at a barbecue party with his family; that L. had arrived from the service with his girl and went to the barbecue; that L. spent some time in the barbeque drinking and then asked if*

AUTENTICAÇÃO
Confere com o original

Document digitally signed, according to MP n° 2.200-2 / 2001, Law n° 11.419 / 2006, Resolution of Projudi, of the TJPR / OE
Validation of this in http://seeu.pje.jus.br/seeu/ - Identifier: PJXAP QL9GY H4P29 FGEYA



AUTENTICAÇÃO
Confere com o original

*the defendant wanted a ride to where he lived; who lived with M.C.; that before arriving at the house, at Vicente Pires, L asked when he asked if he wanted to have a hot drink; who stopped at a bar and drank a hot drink; that I was with them; that in the bar L. bought two cases of beer; who when they arrived at M.C.'s house, L sat down on the sofa to watch soccer; that the defendant told L. that he would go out to skate with his friends; that after forty-five minutes he returned to take a bath; that when he returned L. was playing as a dog; that the defendant only saw L. downstairs; that the interrogating did not see L. upstairs; that before bathing he entered only in his room to take a twist [sic] of clothes; who in the meantime remained on the floor below; who took her clothes and went into the bathroom to take a shower; who after 15 minutes heard L. calling his name; that L. knocked on the bathroom door; that the defendant put a towel around his body and opened the door; that L. was in her underpants in her hand full of blood; that L. asked whether the defendant had moved with her or lying on top of her; who interrogating him said. L. that he would never do that to him since they were friends and that they used to drink together; who at this point while in the bathroom L. did not attack him by interrogating; which L. said while interrogating him to come down with him; that L. remained on the lower floor; who went down the stairs and went to the bathroom downstairs and there was I. naked; that I had finished showered and there it was dry; that L. again asked L. for questioning had he laid on her or tampered with her; that L. looked at his father and then looked at the defendant and nodded affirmatively; that the defendant begged L. saying he would never do this to a friend; who also told L. that he would never do that and asked if she understood what he was talking about; that at this moment L. began to attack him by questioning; that the defendant was assaulted by the right hand of L, while in his left hand he held the shorts and the panties of L. with blood; that the defendant did not assault L, only defended himself by saying that he had done nothing; which when I went to the bathroom and saw L. saw no blood in the bathroom and neither between I's legs. who can not tell because there was blood in my panties and shorts; that L. then took the cell phone and said he would call the family; that the defendant went up and changed his clothes; that the defendant went up to his own room; that the defendant remembers that the left side of his face was swollen and that it came to bleed at the nape and behind the ear; that the first to arrive in his room was J.; which J. said while interrogating that he was being defendant of raping L. and so would have to take him to the police station; which has not undergone any examination; that in the United States questioning him he did not know what he wanted to do with life; who thought that knowing how to speak English would get a better job in Brazil; who in Brazil got to work in the English course at Wizard, for one month as an experiment; which did not work and was not hired;. that the defendant wanted to teach advanced class, but he had no place; who used to play with the younger children, with ten-year-old J., and another girl about five; who did not play with I.; that year [sic] liked her because she used to get into trouble with the other children (...). "*

Finally, the Judge emphasized:

"In my opinion, the expert's report, in the terms in which it was drafted, reinforces the set of evidence in the sense of the authorship of the repressed conduct, which, in comparison with the other evidence, shows the abuses suffered by the child victim.

Document digitally signed, according to MP nº 2.200-2 / 2001, Law nº 11.419 / 2006, Resolution of Projudi, of the TJPR / OE
Validation of this in http://seeu.pje.jus.br/seeu/ - Identifier: PJXAP QL9GY H4P29 FGEYA

The answers to the questions (pages 316/317 and 319/322) do not contradict the previous reports, only indicate the fallibility of the technique used, which by the way is very low. In one of the examinations, the chance of finding the same profile in the male population is one in thirty-eight septillions, in another exam is one in fourteen thousand approximately, with the highlight that the observation of coincident profiles in the markers of the Y chromosome indicates the same origin or same patrilineal lineage between the individuals producing the samples (pages 73/73-A). However, it is unlikely that the sample collected in the materials (shorts, panties, T-shirt and sheet) is from another person of the same patrilineal lineage, such as the father or other relative, since the defendant is adopted and, other family members who attended the house.

In addition, the reports, albeit with a small margin of suspicion, allied to the other evidence in the case records, are sufficient to confirm the version presented by the victim.

It should be noted that the crime of rape of vulnerable does not require the presence of violence or serious threat against the victim, and the offense of sexual dignity is enough. There is therefore no question of acquittal.

In fact, the word of the victim must be given special credibility, especially in harmony with the other evidence in the file.

Describe the narrative of the facts in a clear, objective and complete manner, identifying essential elements, stating the place, date and manner (circumstances of time, place and mode of criminal events) for which the offense was committed, showing the causal connection between the ongoing investigation and the fugitive. If the request is forwarded to the United States of America or other common law countries, it will be necessary to prepare a detailed report containing the history of the commission of the crime, its circumstances, the date on which it was committed, authors or probable perpetrators, a description of the steps taken from the beginning of the investigation, as well as the entire process, including the statements and testimony taken, the expert evidence drawn up and, in the end, a conclusion of the judge who presided over the case, pointing out the elements of fact and law that lead to suppose that there is sufficient evidence of authorship against the wanted person.

**9) Types of offense:**

Brazilian Penal Code – Decree-Law n. 2.848 / 1940

Rape of vulnerable                           (Included by Law n. 12.015, of 2009)

Art. 217-A. Having intercourse or practicing another libidinous act with a minor of fourteen (14) years: (Included by Law n. 12.015, of 2009).

Sentence – imprisonment, from 8 (eight) to 15 (fifteen) years. (Included by Law No. 12,015, of 2009).

Continuing offense

Document digitally signed, according to MP n° 2.200-2 / 2001, Law n° 11.419 / 2006, Resolution of Projudi, of the TJPR / OE
Validation of this in http://seeu.pje.jus.br/seeu/ - Identifier: PJXAP QL9GY H4P29 FGEYA

Article 71 – When the perpetrator, by means of more than one action or omission, commits two or more crimes of the same kind and, by the conditions of time, place, manner of execution and other similar ones, the subsequent ones must be regarded as a continuation of the first, it shall be punished by one of the crimes, if any, or the most serious, if different, in any case increased by six to two-thirds. (Wording provided by Law N. 7.209, dated 11.7.1984).

**I hereby inform that the type of offense is in accordance with the Extradition Treaty signed between Brazil and the United States of America signed on January 13, 1961 and enacted Decree n. 55,750 of February 11, 1965.**

**10) Statute of limitations:**

I state that, according to the Brazilian legislation, the sentence related to case records n. 0017372-86.2016.8.07.0015 – Old number 2016.01.1.0957557-6 has not reached the statute of limitations, under the terms of article 109, item III, of the Penal Code, coupled with Articles 115 and 119 of the Penal Code, with application of Precedent 497 of the Superior Court of Justice, according to I transcribe as follows:

Brazilian Penal Code 0 Decree-law n. 2.848/1940

Article 109. the statute of limitations, before the final judgment, except as set forth in article 110 of this Code, it is regulated by the maximum imprisonment sentence imposed by the crime committed, verifying that:

I – in twenty years, if the maximum penalty is more than twelve;

II – in sixteen years, if the maximum penalty is more than eight years and does not exceed twelve;

**III – in twelve years, if the maximum penalty is more than four years and does not exceed eight;**

IV – in four years, if the maximum penalty is equal to one year or, if higher, does not exceed two;

VI – in two years, if the maximum penalty is less than one year.

VI – in 3 (three) years, if the maximum sentence is less than 1 (one) year. (Wording provided by Law n.. 12.234, of 2010).

Article 110 – The statute of limitations after the final judgment is regulated by the sentence rendered and it is verified in the specific terms described in the previous article, which are increased by one third if the convicted has committed repeated offenses.



AUTENTICAÇÃO
Confere com o original

Document digitally signed, according to MP n° 2.200-2 / 2001, Law n° 11.419 / 2006, Resolution of Projudi, of the TJPR / OE Validation of this in http://seeu.pje.jus.br/seeu/ - Identifier: PJXAP QL9GY H4P29 FGEYA



AUTENTICAÇÃO
confere com o original

**Reduction of statute of limitations terms**

Article 115 – Statute of limitation periods are reduced by half when the perpetrator was, at the time of the crime, or, at the time of the sentence, a minor <u>under 21 (twenty-one) years, 70 (seventy) years</u>.

...

Article 119 – In the case of joinder of offenses, the annulment liability to prosecution will cover the sentence of each one of them, individually.

...

Precedent 497 of the Superior Court of Justice: "When it is a continuing offense, the statute of limitations is regulated by the penalty imposed by the sentence, not calculating the increase resulted from the continuing offense.

**11) Jurisdiction:**

Brazilian Penal Code – Decree-law n. 2.848/1940

Article 5 – The Brazilian Law shall be applied to crimes committed in the Brazilian territory, without the exclusion of conventions, treaties, and international law provisions.

**12) Guarantees:**

I commit to the following guarantees to be submitted by the Brazilian State to the requested State:

I – do not submit the extradite to the arrest or proceeding for fact prior to the extradition request;

II – compute the time of the arrest which, in the requested State, was imposed by virtue of the extradition;

III – commute corporal punishment, perpetual or death penalty in imprisonment, respecting the maximum execution limit of thirty (30) years;

IV – fails to surrender the person to be extradited, without the consent of the requested State, to another State that claims them;

**13) Annexes:**

A. Arrest warrant;

B. Ordinance that instituted the police inquiry, Judgment of Acquittal and Appellate Decisions;

Document digitally signed, according to MP n° 2.200-2 / 2001, Law n° 11.419 / 2006, Resolution of Projudi, of the TJPR / OE
Validation of this in http://seeu.pje.jus.br/seeu/ - Identifier: PJXAP QL9GY H4P29 FGEYA

GOVERNMENT EXHIBIT 1_20-MJ-8171-BER_118

C. Photos, fingerprint impressions or other identification data, is that is the case;

**D. Version in the official language of the requested country of all documentation, including this form.**



AUTENTICAÇÃO
Confere com o original

**BRASÍLIA, JUNE 3rd, 2019.**

*Leila Cury*
*Judge*



Document digitally signed, according to MP nº 2.200-2 / 2001, Law nº 11.419 / 2006, Resolution of Projudi, of the TJPR / OE
Validation of this in http://seeu.pje.jus.br/seeu/ - Identifier: PJXAP QL9GY H4P29 FGEYA

GOVERNMENT EXHIBIT 1_20-MJ-8171-BER_119

PROJUDI – Proceeding 0017372-86.2016.8.07.0015. – Ref. mov.1.1- Signed digitally by Luiz Fernando Leite da Silva:
319047 - 02/01/2019 (Feb. 1): PROCEEDING DIGITALIZATION: Arq. : Execution/Commitment

# TJDFT   Brazilian Judiciary Power
## COURT OF JUSTICE OF THE FEDERAL DISTRICT AND THE TERRITORIES

Proof of Bar Docket – Serv. Of Filing
Docket NO : 0017372-86.2016.807.0015   02:29:40 PM   09/14/16

Forum Des. Antônio proc. NO :0017372-86.2016.8.07.0015         Exclusive Jurisdiction 09/15/2016 17:39:51
Second Criminal Court          Court  : SENTENCE EXECUTING COURT OF DF
SPECIAL AREA NO. 2:          Class  : Execution of the Sentence
3103-0560, CEP: 721          Matter: Deprivation of Liberty
Office Hours          Executor:    FEDERAL PROSECUTION SERVICE OF FEDERAL DISTRICT  AND OF
                  : Executed: LUCAS CARVALHO ROLLO
                  ||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||

**DEFINITIVE COMMITMENT**
||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||

### DR. EDUARDO DA ROCHA LEE,
Acting Judge of the Second Criminal Court of Taguatinga, Federal District.

MAKES IT KNOWN to the Hon Judge of VEP/VEPEMA/VEPERA that by this Court the
criminal action against **LUCAS CARVALHO ROLLO** proceeded, who was convicted in the
sanctions hereunder specified, and the convict being **RELEASED**, I place him on court  probation
before  Your, in order that the sentence be executed pursuant to the details below:

**Of the Identification of the Convict**
Register IN: Not registered
Name**: LUCAS CARVALHO ROLLO**
Filiation: THOMAS OWEN ROLLO
          ANGELINA CARVALHO ROLLO
Other names: NA
Date of Birth: 10/15/1993     Marital Status: SINGLE     Sex: Male
Country of Birth: BRAZIL     Nationality: Florianopolis/SC
Profession: STUDENT     Education: Secondary Course Concluded
ID: 3455371  Issuing Agency: SSP/DF     Date of Issue: NA
Address: QUADRA 04 CONJUNTO K CASA 07
District: SETOR SUL
Place: GAMA/DF     CEP: NA
Telephone



AUTENTICAÇÃO
Confere com o original

**Of the Criminal Proceeding**
Proceeding: **2014.07.1.009404-2**
Transcript of Records NO: NO          Lower Court:



**Investigative Proceedings**
Type of criminal proceeding: POLICE INVESTIGATION        Number 107/2014
Date of Transcription: 02/27/2014
Source: THIRTY- EIGHT POLICE STATION – 38DPDF
Source: Administrative Rule NO. Oc. Policies: 1424/2014-21a DPDF        Date of fact: 02/02/2014

**Stay (Art. 366, of CPP –Code of Criminal Procedure)**

Date of the decree of suspension: **NO.**

**Notification**
Date of valid notification: 06/10/2014 (June 10) (Pg. 164)
||||||||||||||||||||||||||||||||||||||||||||||        Sent on: ----/----/----





PROJUDI – Proceeding 0017372-86.2016.8.07.0015. – Ref. mov.1.1- Signed digitally by Luiz Fernando Leite da Silva: 319047 - 02/01/2019 (Feb. 1): PROCEEDING DIGITALIZATION: Arq. : Execution/Commitment

# TJDFT  Brazil's Judiciary Power

Page NO

Court of Justice of the  Federal District and the Territories
Second Court of Taguatinga

Fórum Des. Antônio Mello Martins
SPECIAL AREA NO. 23: SETOR C. NORTE, NORTE, Telephone: 31038106/031038107,  Fax: 3103-0560,CEP: 72115901, TAGUATINGA-DF D2vcriminal.taguatinga@tjdft.jus.br
Office Hours      12h00 am / 7h00 pm

Date of valid notification per publication:

**Petrial Diversion (Art. 89, pa 3, of the Law NO. 9.099/95)**
Date of Suspension: NO.      Period:
Date of Revocation:

**Accusation or Complaint**
Date of acknowledgment of the information: 04/14/2014 (Pg. 83)
Date of acknowledgment of amendment:

**Sentence**
Type of the Sentence: ACQUITTAL (PG. 380/389)   Date of the Sentence: 02/03/2015 (Feb. 3)
Date of publication: 02/03/2015 (February 3)

**Judgment**
Type of Judgment: CONVICTION (PLS 465/475) . Date of judgment: 06/03/2015 (June 3)
Date of publication: 06/03/2015 (June 3)
Recidivist: NO

**Appeals**
Appeal: CRIMINAL APPEAL       Decision: JUDGMENT REVERSED (PG. 468/475)
Date of Judgment: 06/03/2015 (June 3)       Date of publication: 06/03/2015 (June 3)

Appeal: MOTION FOR MORE DEFINITE STATEMENT
Decision: AFFIRMANCE OF JUDGMENT (PG. 490/493)
Date of judgment: 06/25/2015       Date of publication: 06/29/2015
Appeal: APPEAL TO FEDERAL SUPERIOR COURT



AUTENTICAÇÃO
Confere com o original



Decision: PROCEEDING DENIED (PG. 511)
Date of judgment: 08/27/2015     Date of publication: 09/02/2015 (Sep 2)

Appeal: INTERLOCUTORY APPEAL     Decision: JUDMENT REVERSED (PG. 535/537)
Date of judgment: 08/01/2016 (Aug 1)     Date of publication: 08/04/2016 (Aug 4)

**Transited in rem judicatam**
Res judicata for the accusation: 07/21/2015 (PG. 506)

Definitive res judicata: 08/19/2016 (PG. 540)

**Punishments Imposed**
Criminal incidence: art. 217-A, caput, of Criminal Code, for two  times, according to ar. 71 of CP
Deprivation of Liberty
Sentence: 09 (NINE) YEARS AND 04 (FOUR) MONTHS          Nature: CONFINMENT
System: Imprisonment
Major (crime): YES
Fine: NO
Days Fine:     Rate: 1/30     Value (R$):

**Sursis**
Period of suspension: NO

||||||||||||||||||||||||||||||||||||||||||||

**Punishment Substitution**
Nature: NO

**Commitment Proceedings**
**Nature: NO   Minimal Period:**

**Costs and Guaranties**
Costs: NO     Value (R$)     Date of Calculation:
Bank:     Branch:     Account NO.:

**Of the Incarcerations**
Event on: 04/16/2014 (PG. 89/91)    Reason: PREVENTIVE DETENTION (PG. 88)
Event on: 06/06/2014 (PG 168 E. 176/178)     Reason: REVOCATION OF INJUNCTION IN THE
RECORDS OF HABEAS CORUPUS PROCEE3DING (PG. 168/175)

**Of the Releases**
Event on: 04/16/2014 (PG. 542/545)
Reason: INJUNCTION GRANTED IN HABEAS CORPUS (PAG. 99/100)
Event on: 02/03/2015 (Feb 3) (PG. 400)
Reason: REVOCATION OF IMPRISONMENT IN IN JUDGMENT OF ACQUITTAL



AUTENTICAÇÃO
Confere com o original



**Remarks:**

Taguatinga-DF, August 31, 2016, at 03:03 PM

(Signed on stamp): DIANA NOGUEIRA DE QUEIROZ
Clerk´s Office Director

EDUARDO DA ROCHA LEE
Acting Judge

Sent on----/----/-----





PROJUDI – Proceeding 0017372-86.2016.8.07.0015. – Ref. mov.1.1- Signed digitally by Luiz Fernando Leite da Silva: 319047 - 02/01/2019 (Feb 1)): PROCEEDING DIGITALIZATION: Arq.: Execution/Commitment

### Federal Prosecution Service
### Prosecution Service of the Federal District and the Territories

## HON MR JUDGE OF THE 2ND CRIMINAL COURT OF THE JUDICIAL DISTRICT OF TAGUATINGA/DF

REF. RECORDS no. 2014.07.1.009404-2
(IP NO. 107/2014 – 38a DP)                           **(Carimbo nesta parte)**

**PROSECUTIOM SERVICE OF THE FEDERAL DISTRICT AND THE TERRITORIES**, based on the evidence in the records above mentioned, comes up to You, to move

**Criminal Action**

**By means of information, against LUCAS CARVALHO ROLLO,** Brazilian, single, from Florianopolis/SC, born on 10/15/1993, Thomas Owen Rollo and Angelina Carvalho Rollo's son, professionally unemployed, Id Card NO. ▮▮▮▮-SSP/DF and CPF NO. ▮▮▮▮▮▮▮▮ holder, with address at ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ (other details on pg. 46), for the facts submitted below:

**I.**

From unknown date, until February 2, 2014, about 5:45 pm, in SHVP, ▮▮▮▮▮▮▮▮, Casa 32, Vicente Pires/DF, the defendant **LUCAS CARVALHO ROLLO,** knowingly and willfully, by several times, committed libidinous acts with the child Isabel Luisa da Costa Nepumuceno (born on 09/21/2007, pg. 13), under (fourteen) years old on the occasion of the facts.

**II.**

According to enclosed records of the investigation, on February 2, 2014, the defendant called the victim into his bedroom and harassed her sexually, through the practice of repeated libidinous acts by putting off her clothes , touching her body, inclusively her privates, groping her, lying on her and scrubbing his penis against her private pates of the vagina, among others.

Questioned, the child victim states the sexual abuses suffered (pg. 30/38), saying also that such facts have already occurred before, in several opportunities.

In accordance with Report of Confirmation of Biological Material, (pg. 57/65), "on the samples of tissue trimmed from the underpants, from the shorts and from the undershirt the presence of human blood and semen was confirmed". And, pursuant to Report of DNA Examination



AUTENTICAÇÃO
Confere com o original



(pg. 67/71), the presence of biological material from the defendant turned evidenced on the underpants, shorts and sheet.

### III

With his conducts, the defendant is chargeable under the **art. 217-A, caput, of the Criminal Code (for several times)**. By the foregoing, Federal Prosecution Service requires that the present information be recognized and, once this is recorded, the summons be ordered to answer the accusation, in writing, in the period of 10 days, and follow the other terms of the criminal action, it being conducted according to the procedural form provided in the CPP (Code of Criminal Procedure), up to the end of the conviction, with fixation of a minimal value for compensation for the damages caused by the infraction, what will be clarified on occasion of the held of the presentence hearing, under the terms of the art. 387, Item IV, of the CPP, without prejudice of the very victim(s) to demand it, with the testimony of the witnesses listed below.

Taguatinga/DF, April 10. 2014.


(Signed on stamp)
Alberto Tadashi. Honda
Public Prosecutor

ROL;

███████████████████████, vic. 6 years;
-Jorge Alberto Carvalho de Souza, father, vic., pg. 17;
-Raquel Pereira da Costa, mother, vic., pg. 21;
-Márcia Martins M. Costa, agent, pg. 04/07



AUTENTICAÇÃO
Confere com o original



PROJUDI – Proceeding 0017372-86.2016.8.07.0015. – Ref. mov.1.1- Signed digitally by Luiz Fernando Leite da Silva: 319047 - 02/01/2019 (Feb. 1): PROCEEDING DIGITALIZATION: Arq. : Execution/Commitment

**(Stamp of Civil Police)**

## GDF –CIVIL POLICE OF THE FEDERAL DISTRICT
## DEPARTMENT OF DISTRICT POLICE
## 38TH POLICE STATION – VICENTE PIRES

### ADMINISTRTIVE RULE

The Chief Police Officer, Chief of 38th the Police Station of Vicente Pires/DF, in the exercise of the attributions incumbent on her by the article 144, pa 4, of the Federal Constitution, the article 4 and seq. of the CPP (Code of Criminal Procedure), considering what is in the police report 1424/14-21st DP, Complemented by the report 082/14-38th DP,

DECIDES:

to file a police investigation, aiming to better find the facts we are acquainted with, that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, **at the age of 6 years old**, would have been sexually abused by her cousin LUCAS CARVALHO ROLLO, of 20 years of age, CPF NO. ▮▮▮▮▮▮ other qualifying details in the records, to practice libidinous acts diverse from the carnal knowledge.

By the foregoing, she determines, preliminarily the following measures:

I.  Filing of the present ordinance with the preparing parts, already approved;

II. Testimony in court of records of RAQUEL PEREIRA DA COSTA and LUCAS CARVALHO ROLLO, in order to explain the circumstances where the fact under investigation occurred;

III. Entry of the report of conference with the minor, held by DPCA;

IV. Entry of the reports of spermatozoid test, confirmation of human blood and the DNA confronting report as well.




Further, the record be taken under advisement.

Vicente Pires/DF, February 27, 2014.

TÂNIA MARIA DE OLIVEIRA DIAS SOARES
    Chief Police Officer
    Chief 38th DP



AUTENTICAÇÃO
Confere com o original



PROJUDI – Proceeding 0017372-86.2016.8.07.0015. – Ref. mov.1.1- Signed digitally by Luiz Fernando Leite da Silva: 319047 - 02/01/2019 (Feb. 1): PROCEEDING DIGITALIZATION: Arq. : Execution/Commitment

# TJDFT

Brazil´s Judiciary Power
Court of Justice of the Federal District and the Territories
Second Criminal Court of Taguatinga

**Proceeding:** **2014.07.1.009404-2**
**Class:** **Police Investigation**
**Subject:** **Vulnerable Rape**
**NO. of Police Investigation:1072014**
  :   **NONE**
  :   **LUCAS CARVALHO ROLLO**

---

## D E C I S I O N

---

The accusatory instrument meets the requirements of the art. 41 of CPP and, for not identifying any of the hypotheses provided in the art.395 of the very statute, I recognize the information against LUCAS CARVALHO ROLLO,

Make the sheet of criminal records of the accused be attached to the records, refilling the proceeding as Criminal Action, having the defendant´s name and the type of offense for which he was charged, and including the information to the commencement of the records.

According to what is provided in articles 394 et seq. of CPP, the applicable procedural form will be the ordinary proceeding.

Let the defendant be notified to answer the accusation, in writing and by an attorney, within the period of 10 (ten) days, according to articles 396 of the Code of Criminal Procedure. Let him also be summoned to tell the process server, on occasion of the notification, his attorney´s name, that same be notified to answer.

Without prejudice, let the defendant be aware of, in case he does not have a lawyer, nor conditions to retain one, having the benefit to have his defense sponsored by NPJ/UCB, where the records will be sent to if the defendant declares so, or if the legal period for answering the accusation is elapsed "in albis".

The provision in the art. 352 of CPP be abided by, and the item 3.3.1.1 of the Criminal and Sentence Executing Courts of CNJ as well.

The opinion be complied with (pf. 79)

Summons be done





Taguatinga – DF, Monday, April 14, 2014, at 5:44 pm.

## WAGNO ANTÔNIO DE SOUZA
Judge.

Registered
Last prosecution: 04/14/2014 – DECISION RENDERED – 313796
Included in the Trial Docket: ------/----/---- 1/1
|||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||



AUTENTICAÇÃO
Confere com o original



PROJUDI – Proceeding 0017372-86.2016.8.07.0015. – Ref. mov.1.1- Signed digitally by Luiz Fernando Leite da Silva: 319047 - 02/01/2019 (Feb. 1): PROCEEDING DIGITALIZATION: Arq. : Execution/Commitment

# TJDFT

Brazil's Judiciary Power
Court of Justice of the Federal District And the Territories
Second Criminal Court of Taguatinga

**Proceeding:** **2014.07.1.011263-0**
**Class:** **Preventive Detention Writ**
**Subject:** **Preventive Detention**
**Petitioners:** **MPDFT PROSECUTION SERVICE OF THE FEDERAL DISTRICT AND THE TERRITORIES**
**Defendant:** **LUCAS CARVALHO ROLLO**

## DECISION

Ref.: Proceeding 2014.07.1.009404-2
IP 107/2014 – 38th DP

This refers to writ of preventive detention filed by Prosecution Service against LUCAS CARVALHO ROLLO, in order to guarantee the public order assure the enforcement of the criminal law and by convenience of the criminal finding of facts. It also moved for the grant of search and seizure of the passport of the corruptor and other objects of the represented.

Brief. I DECIDE.

As it is clear. the preventive detention must be ruled when the imposition of another provision remedy (art. 282 pa 6, CPP) is not appropriate and, yet, when there are the presumptions and any of the causes of the article 312 of CPP, conjugated with one of the conditions of admissibility established by article 313 of the same legal statute.

All right. As regards the existence of the crime and circumstantial evidence of commission, presumptions necessary to the provisional detention, it is taken into account that the content of the DNA Report of Examination pg. 70/74 is more than sufficient for its constitution.

Likewise, the condition of admissibility of custody is met, since the crime imputed top the defendant carries abstractly deprivation of liberty over the one required by the item I, of the article 313, of CPP.

As to the ground for the provisional detention, this is circumstantiated either in the guarantee of the public order or in enforcement of the criminal law. In fact, it is deduced from the records that



AUTENTICAÇÃO
Confere com o original



the defendant would have propensity for the repeated practice of wrongful conduct, besides access facilitated to the main victims, the State being supposed to act in order to increase the population's confidence in the official mechanisms of repression against the several ways of delinquency.

Let be added to this audacious manner the defendant acted, who availed himself of the confidence and approach with the victim's family to ease the practice of the crime.

Besides, the defendant has American citizenship and passport, what shows the vulnerability of enforcement of the criminal law, since the defendant can find refuge in another country any time.
|||||||||||||||||||||||||||||||||||||||||||||||||

In this way, the provisional detention of the defendant is shown to be necessary to assure the social peace and avoid that he turns to the wrongful practice.

Finally, I register that the provisional detention is necessary, in the real case, over other injunctions diverse to the imprisonment (art. 319 of CPP), considering that none of them prove sufficient to guarantee the public order and assure the enforcement of the criminal law.

As to the search and seizure warrant, there was not, in this particular, factual alteration sufficient for its grant, since the seizure of the computer, as already said in the Decision of pg. 40 of the IP (Police Investigation), will not contribute to the elucidation of the crime under finding. Nor is reasonable to talk about the seizure of other things, since the Civil Police, in its visit to the place of the facts, already seized the objects found necessary for elucidation of the facts.

BY THE FOREGOING, **I DECREE the PREVENTIVE DETENTION of LUCAS CARVALHO ROLLO,** Brazilian, from Florianopolis-SC, born on ▇▇▇▇▇ son of Thomas Owen Rollo and Angelina Carvalho Rollo, RG (ID)▇▇▇▇-SSP/DF, CPF ▇▇▇▇ holder, having as address the ▇▇▇▇▇ ▇▇▇▇ Vicente Pires-DF, what I do based on the articles 282, pa 6, 312 and 313, all of CPP.

I confirm this decision force of arrest writ.

Let it be known to Prosecution Service.

Taguatinga – DF, Monday, April 14, at 5:46 pm.

(Signed) WAGNO ANTÔNIO DE SOUZA
Judge



AUTENTICAÇÃO
Confere com o original

Register
Last prosecution: 04/14/2014 – DECISION RENDERED – 313796
Included in the Trial Docket: ------/----/---- 21/2
|||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||



PROJUDI – Proceeding 0017372-86.2016.8.07.0015. – Ref. mov.1.1- Signed digitally by Luiz Fernando Leite da Silva: 319047 - 02/01/2019 (Feb. 1): PROCEEDING DIGITALIZATION: Arq. : Execution/Commitment

## CIVIL POLICE OF FEDERAL DISTRICT
## REPORT OF DELIVERY OF EXPEDIEDNT
## THIRTY-EITH POLICE STATION

Stamp GDF

**OFFICIAL LETTER NO. 669/2014 – 38TH DP**
**Docket NO. 126687/2014-21th DP**

WARRANT OF ARREST NO 18438/2014 - 38ºDP

REF: PROCEEDING NO 20140710112630/2014 - 2VCTAG

Mr. Judge

Kindly, I come to You to communicate the detention of the person(s) qualified below for reason of the execution of the Arrest Warrant issued by the SECOND CRIMINAL COURT OF TAGUATINGA, in the records of the Proceeding NO.. 20140710112630/2014 – SECOND CRIMINAL COURT OF TAGUATINGA, who is (are) found incarcerated in the prison informed in specific box, on probation of the Courts.

Name: LUCAS CARVALHO ROLLO
Filiation: THOMAS OWEN ROLLO and ANGELINA CARVALHO ROLLO
Date of birth: 10/15/1993
Date of imprisonment: 04/16/2014
Place of commitment:  DIVISION OF CONTROL  AND CUSTODY OF PRISONERS

Faithfully yours,

(Signed)  JOÃO MACIEL CLARO
ACTING CHIEF POLICE OFFICER
075.950-3

To Hon. Mr.
WAGNO ANTÔNIO DE SOUZA
SECOND CRIMINAL COURT OF TAGUATINGA
City: TAGUATINGA-DF

Rua 04-A-CHÁCARA 92 – VICENTE PIRES-DF – VICENTE PIRES/DF – CEP 72110-800
Phones: 3383-8100 –FAX 3383-8106 – E-mail: dp.38-saa@scdf gov.br
Brasília Patrimônio Cultura da Humanidade



AUTENTICAÇÃO
Confere com o original



PROJUDI – Proceeding 0017372-86.2016.8.07.0015. – Ref. mov.1.1- Signed digitally by Luiz Fernando Leite da Silva: 319047-02/01/2019 (Feb. 1)): PROCEEDING DIGITALIZATION: Arq.: Execution/Commitment

Stamp TJDFT

Brazil´s Judiciary Power
Court of Justice of the Federal District and the Territories

**On Duty Judge of the Second Degree, at 7:15 pm, of 04/16/214**

Type:          HABEAS CORPUS – HBC
Petitioner:    Claudiana Porto de Sousa Rocha
Patient:       LCR
Assignee:      GEORGE LOPES LEITE

## DECISION

The lawyer Claudiana Porto de Sousa Rocha submits habeas corpus in favor of LCR against the Court of the Second Criminal Circuit of Taguatinga that decreed preventive detention against her on 04/14/2014, alleging that the patient was arrested in flagrant on 02/02/2014 accused of having practiced vulnerable rape, but, without showing risk, he was released by the "police authority". She says that he always appeared in the police station when called, is first-time offender, has fixed residence, did not refuse to furnish material for the DNA test, but, however, he took to be arrested on 04/16/2014.She argues that there are not the requirements nor the legal ground for the provisional detention, which is always an exceptional measure .The decision not being based on concrete facts, affronting the principle of the presumed innocence .Therefore, she requests for the issue of save- conduct to appear in the acts of the proceeding and discharge of the punishment.

Although the petitioner alleges that the patient had been arrested in flagrant, she attached only a copy of police report that registers that he appeared in the precinct on 02/02/2014, together with the presumed victim, his cousin, at the age of six years, and her father. The police report written all were discharged, there not being any flagrant neither the "liberation" of the presumed feasor by "the police authority". Later on, on 03/21/2014, he returned to the same Police Station for qualification and interrogatory. The declaration was not prepared with copy of the challenged decision, nor of the one that acknowledged the accusation. The suit proceeds in camera proceedings, but search of the computerized system there was the obtainment of transcription of the decisions that acknowledged the accusation, dated from 04/14/2014, occasion when the preventive detention was decreed for guarantee of the public order and effective application of the criminal law. The decision highlights that the patient would be inclined to repeated practice of wrongful conduct, having access facilitated to potential victims and availed of the confidence and proximity with the victim´s relatives to commit the crime, having American citizenship and passport as well, denoting vulnerability.

The patient is twenty years old, is first-time offender, has fixed residence and was not arrested in





AUTENTICAÇÃO
Confere com o original

flagrant for the fact, which would have occurred in February of this year and of 2014. Ever since he obeyed the call of the police authority, what leads to deduce that so far he did not prejudice the finding of facts and nor demonstrated interest in obstructing the procedural prosecution. The fact of same having American citizenship and passport issued by the United States does not constitute impediment to his liberation to respond the criminal action on release, considering that he offered such a document with the declaration, to submit it to custody of the Justice, denoting that he does have intention of leaving the Country.

Thus, in a summary court of cognition, I understand the presence of the presumptions of *fumus bonis juns et periculum in mora* due to the fact of the patient not having been arrested in flagrant nor there having been, since filing of the police investigation, any new fact that could justify the provisional detention, which is always an exceptional, admitted only in restrict cases. Therefore, I grant the injunction for immediate release, save if by another reason he is not imprisoned, having to remain so until the final judgment of the writ, when the matter will reexamined by the Panel. I give this decision force of writ for all the legal purposes. Let the passports be seized provisionally, which must be sent in due course, at discretion of the Court of process, to Federal Police, where they shall remain collected until new judicial deliberation.

Let it be assigned opportunely.

Brasília, April 16, 2014.

(Signed) GEORGE LOPES LEITE
Assignee

George Lopes Leite
Justice Associate

*Stamp EDUARDO ROTSTEIN*
*...04/17 00:45 PM*



AUTENTICAÇÃO
Confere com o original



PROJUDI – Proceeding 0017372-86.2016.8.07.0015. – Ref. mov.1.1- Signed digitally by Luiz Fernando Leite da Silva: 319047 - 02/01/2019 (Feb. 1): PROCEEDING DIGITALIZATION: Arq. : Execution/Commitment

# TJDFT

Brazil's Judiciary Power
Court of Justice of the Federal District And the Territories
Second Criminal Court of Taguatinga

**Proceeding:** 2014.07.1.009404-2
**Class:** **Criminal Action - Ordinary Proceeding**
**Subject:** **Rape of Vulnerable Person**
**NO. of PI:** **1072014**
**Bailiff:** **PROSECUTION SERVICE**
**Defendant:** **LUCAS CARVALHO ROLLO**

| ORDER |
|---|

The information was recognized according to the art.396 of Code of Criminal Procedure.

Although there has not been success in the search of pg. 159/160, the truth is that the defendant was aware of the imputation, so much so that he retained an attorney. To this end it is the Supreme Court's opinion, externalized in the HC 96465/MG, Assignee Min. Dias Toffoli. So, I consider the defendant serviced.

Answer to the accusation on pg. 131/151, decided on the summary acquittal and revocation of the preventive detention. Witnesses were listed.

There is no reasons to wait for his summary acquittal, according to the article 397 of Code of Criminal Procedure. Besides, matter of merits will be examined in due course.

Nothing to be granted as to the request for revocation of the preventive. Firstly because this case must be assigned regularly, as provided in articles 139 e seq. of PGC. Secondly, the d. lawyer filed HC in the Superior Instance on this account, the order having been granted preliminarily, and eventual examination of this court would cause suppression of the instance, even because there is not in the records the final decision of the writ

I grant the testimony of the witnesses listed by the Defense.

Le the witnesses be subpoenaed, carrying out the requests and other searches that become necessary.

Taguatinga-DF, Tuesday, June 10, 2014, at 1:27 pm.

(Signed) WAGNO ANTÔNIO DE SOUZA
Judge

**>Stamp: ENVIADA A PUBLICAÇÃO**





**11.06.14**

Register
Last Prosecution: 06/10/2014 (June 10) – ORDER RENDERED
 Included in the Trial Docket: ----/----/----1/1
||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||



AUTENTICAÇÃO
Confere com o original



PROJUDI – Proceeding 0017372-86.2016.8.07.0015. – Ref. mov.1.1- Signed digitally by Luiz Fernando Leite da Silva: 319047 - 02/01/2019 (Feb. 1): PROCEEDING DIGITALIZATION: Arq. : Execution/Commitment

Brazilian Judiciary Power
Court of Justice of the Federal District and the Territories

## CLERK´S OFFICE OF THE FIRST CRIMINAL DIVISION

Praça Municipal, Lote 1, Fórum de Brasília, Bloco A, 3° Andar, Ala A, Salas 305 e 307
Phone: 3103-7196/3103-7197, fax 3103-0772, CEP 70094-900, Brasília-DF

# WRIT OF ARREST NO. 8/2014

The Associate Justice SANDRA DE SANTIS, Presiding Justice of the First Criminal Division of the Court of Justice of the Federal District and the Territories

### ORDERS

Mr. CHIEF POLICE OFFICER OF THE  INTERSTATE POLICE STATION OF ARREST – DCPI, that aware of this signed by him and subscribed by the Director of  Clerk´s Office  of the First Criminal Division, in  execution of same, ARREST AND INCACERATE, the  defendants  having to remain in separate jails and prohibited from communicating   between each other, to order and consequent  availability of the  Court of the Second Criminal   Circuit of Taguatinga/DF, the defendant **LUCAS CARVALHO ROLLO**, Brazilian, born on 1‍           in Florianopolis/SC, son of ANGELINA  CARVALHO ROLLO  and THOMAS OWEN ROLLO, RG NO.3‍ SSP/DF, by virtue of decision rendered by  the High 1st Criminal Division, that in its 18th  Regular Session, held on May 22, 2014, when judging *the Habeas Corpus*  NO. 2014.00.2.008304-6, decided by majority, to deny the  order  in the following terms: "(…) **By the foregoing, the order is denied, with revocation of the injunction granted on pg. 50/51, in order to reinstate  the detention of Lucas Carvalho Rollo, as guarantee of the public order**. Let writ of arrest be issued. ". Proc. 2014.07.1.009404-2 originated from the IP 107/2014, of the 2nd Criminal Court of Taguatinga/DF.** Made and executed in this city of Brasília, capital of the Republic, on twenty-two days of the month May of the year two thousand fourteen.  I, ----by/ João Alves Costa Filho, Director of the Clerk´s Office of the First Criminal Court, subscribe.

Justice Associate SANDRA DE SANTIS
Presiding Justice of the First Criminal Division) (signed)

>Stamps





PROJUDI – Proceeding 0017372-86.2016.8.07.0015. – Ref. mov.1.1- Signed digitally by Luiz Fernando Leite da Silva : 319047 - 02/01/2019 (Feb. 1):PROCEEDING DIGITALIZATION : Arq.: Execution/Commitment

# TJDFT Brazilian Judiciary Power

Court of Justice of the Federal District and the Territories
GDRCO
Chamber of the Associate Justice Romão C. Oliveira

## TJDFT / SEJU/SEREST
## DATE: 06/02/2014 REGISTER NO. 794.169
## INICITIALS-------

|||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||

| | |
|---|---|
| Organ : | FIRST CRIMINAL DIVISION |
| Class: | HBC – HABEAS CORPUS |
| Proceeding: | 2014 00 2 008304-6 |
| Petitioner: | CLAUDIANA PORTO DE SOUSA ROCHA |
| Patient: | LUCAS CARVALHO ROLLO |
| Assignee: | ASSOCIATE JUSTICE ROMÃO C. OLIVEIRA |

**In camera proceedings**

*AMENDMENT*
*HABEAS CORPUS*.CRIMINAL PROCEEDING. PREVFENTIVE DETENTION AS GUARANTEE OF THE PUBLIC ORDER AND TO ASSURE THE APPLICAATION OF THE CRIMINAL LAW – VULNERABLE RAPE – PRESENCE OF GENETIC MATERIAL OF THE DEFENDANT IN THE SAMPLES OBTAINED NEED OF THE SEGREGATION TO EVOID REPEAT OF THE CONDUCT. ORDER DENIED BY MAJORITY.

The ruling of the preventive detention of the individual accused of committing the rape of a vulnerable person, availing of close relationship with the victim´s relatives, does not constitute illegal harassment, since, in hypotheses like these, the rule is the provisional detention as guarantee of the public order, to avoid that the accused returns to commits crimes with other children, since the vulnerable deserve more protection from the State.

Order denied, the injunction being revoked and the issue of writ of arrest being here by determined Majority.



AUTENTICAÇÃO
Confere com o original



**TJDFT** Brazilian Judiciary Power
Court of Justice of the Federal District and the Territories
GDRCO
Chamber of the Associate Justice Romão C. Oliveira

## DECISION

The Associate Justices of the First Criminal Division of the Court of Justice of the Federal District and the Territories ROMÃO C. OLIVEIRA – Assignee, GILBERTO PEREIRA DE OLIVEIRA and GEORGE LOPES LEITE – Voting members, under the presiding justice of the Associate Justice SANDRA DE SANTIS, held in ADMITTINT AND DENYING THE ORDER, BY MAJORITY, according to the minutes of the judgment and tachygraphic notes.

Brasília (DF), May 22, 2014.


(Signed)  Associate Justice ROMÃO C. OLIVEIRA
Assignee



AUTENTICAÇÃO
Confere com o original



PROJUDI – Proceeding 0017372-86.2016.8.07.0015. – Ref. mov.1.1- Signed digitally by Luiz Fernando Leite da Silva: 319047 - 02/01/2019 (Feb. 1)): PROCEEDING DIGITALIZATION: Arq.: Execution/Commitment

**TJDFT** Brazil's Judiciary Power
Court of Justice of the Federal District and the Territories
Second Criminal Court of Taguatinga

**Proceeding:** 2014.07.1.009404-2
**Class:** **Criminal Action – Ordinary Proceeding**
**Subject:** **Rape of Vulnerable Person**
**NO. PI:** **1072014**
**Bailiff:** **PROSECUTION SERVICE**
**Defendant:** **LUCAS CARVALHO ROLLO**

### CERTICATE

I certify on faith that, this date, I attached the official letter NO. 20351/2014 – 1st Criminal Division pg. 165/175, and the defendant's record, which registers that same was imprisoned 06/06/2014.

Taguatinga – DF, Tuesday, June10, 2014, at 6:32 pm.

(Signed) Diana Nogueira de Queiroz
Director of Clerk's Office

Registered
Last prosecution: 04/14/2014 – CERTIFICATE ISSUED
Included in the Trial Docket:——/——/—— 1/1
|||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||



AUTENTICAÇÃO
Confere com o original



PROJUDI – Proceeding 0017372-86.2016.8.07.0015. – Ref. mov.1.1- Signed digitally by Luiz Fernando Leite da Silva: 319047 - 02/01/2019 (Feb. 1)): PROCEEDING DIGITALIZATION: Arq. Execution/Commitment

**TJDFT**  Brazil's Judiciary Power
Court of Justice of the  Federal District and the Territories
Second Criminal Court of Taguatinga

Record:       2014.07.1.009404-2
Proceeding:   Criminal Action
Bailiff:      Prosecution Service
Defendant:    LUCAS CARVALHO ROLLO

---

### SENTENCE

Prosecution Service has filed an information against **LUCAS CARVALHO ROLLO** , already qualified in the records, attributing him the practice of the crime provided in the article 217-A, *caput,* of the Criminal Code (for several times), under the following terms:

I.

*From indeterminate date until February 02, 2014, about 5:45 pm, in the SHVP, Rua* ▓▓▓▓ */DF, the defendant LUCAS CARLO ROLLO, knowingly and willy, made sex in a libidinous manner with the child* ▓▓▓▓ *(born on* ▓▓▓▓ *, pg. 13), under 14 (fourteen) years of age on occasion of the facts.*

……... II.

*According to enclosed records o police investigation on February 02, 2014, the defendant invited the victim into his room and harassed her sexually, through the practice of libidinous acts consisting I putting clothes off, touching her body, inclusively in her privates, groping her, lying on her and approaching his penis  the victim privates, among others.*

Questioned the child-victim states the sexual abuses suffered (pg. 30/38), alleging also that such facts had already occurred before, in several opportunities.

In accordance with the Report of Verification of Biological Material (pg. 57/65), "in the samples of tissue cut from the panties, shorts and under shirt there was confirmation of the presence of human blood and semen". And, pursuant to Report of DNA test (pg. 67/71), the presence of biological material of the defendant was found in the panties, shorts and in the sheet"



AUTENTICAÇÃO
Confere com o original



Information acknowledged on pg. 83. The defendant did not appeared spontaneously in the Court and delivered an answer, by an attorney of record (pg. 131/135). On the occasion, he commented on the merits, asked for the acquittal and listed witnesses.

On April 16 2014, a warrant of preventive detention was executes against the defendant by force of the decision of pg. 88. Injunction in Habeas Corpus was granted and, on the merits, the order was denied (pg. 99/100 and 169/175). The defendant was imprisoned again on June 06, 2014 (pg. 176/177).

The proceeding was prepared with the Body of the Offense Examination in the victim (pg. 16), Notice of Appearance and Apprehension (pg. 31): Examination of Verification of Biological Material (pg. 61/69): Report of DNA Examination (pg. 73/73-A, Amendment to the Notice of the Examination of the Body of the Offense (pg. 282/283); Answer to Question – Report of DNA Examination (pg. 316/317); Expert Information (pg.319/322).

Still on the preparatory stage, the victim's parents, Luis Augusto Alves Nepomuceno and Raquel Pereira da Costa were heard (pg. 271/274), and the witnesses Márcia Martins Morais Costa (pg. 275), Aline Fernandes Cardoso and Maurício Moura de Souza (pg. 299/300) and the informants Josineide Carvalho dos Anjos, Nayara de Carvalho Ferreira, Jorge Alberto Carvalho de Souza and Suellen.

Based on the article 402, of the Code of Criminal Procedure, the Defense required performance of examination of Ultrasound in the victim, and sending of the records to IPDNA/IC as well for answer to the questions made in items 6.2 and 6.3 of the report of pg. 244/247, beside requiring explanation about the material collected from the panties, shorts and panties apprehended (pg. 298). Prosecution Service did not required anything.

Closing argument of the Prosecution Service on pg.344/348, pleading the conviction under the terms of the accusation.

The Defense, too, in final allegations, challenge indirect procedural defense of denial or due process. On the merits, by extensive and well-grounded recital, requires the acquittal.

It is the report. **I DECIDE.**

To begin with, it behooves to register that the proceeding followed its course without any flaw of nullity, with strict observance of the entire adversary system and due process and use of the procedural form suitable in the identical form, that to say, the provision in the articles 396 et. Seq., of the Code of Criminal Procedure. Besides, the indirect procedural defense challenged does not deserve recognition. The Defense forgets that the judge is the addressee of the evidence, who is to evaluate it and give the credibility that he holds due. Thus, it real necessity is no surmised, especially because the fact intended to be proved by the ultrasound examination can be clarified by



AUTENTICAÇÃO
Confere com o original



the oral evidence, the denial of due process  not being cogitated, reason why I reject the  procedural defense and go into the examination of the merits.

### 1. OF THE MATERIALITY

The accusation imputes to the defendant LUCAS CARVALHO ROLLO the crime specified in the article 217-A, *caput*, of the Criminal Code, for reason, presumably and for several times, to have practiced libidinous acts with the child ███████████████, under 14 (fourteen) years of age on the occasion of the facts.

All right. Everything began with the Register of Police Report NO. 1.424/2014-0) carried out by the military policeman Alberto Carvalho de Sousa, attached to pg. 12/14. On the occasion it was registered that "...*IN ACCCORDANCE WITH THE VICTIM'S FATHER HE WAS AT HIS ANT'S HOUSE WITH HIS DAUGHTER AND HIS COUSIN LÇUCAS. AND THAT HIS DAUGHTER WENT TO THE UPPER FLOOR WHERE THERE ARE THE ROOMS, AND REMAINED THERE FOR A FEW MINUTES. FINDING HER DELAY STRANGE HE DECIDED TO LOOK FOR HIS DAUGHTER CALLING HER LOUDLY. ██████ CAME DOWNSTAIRS SAYING THAT SHE WAS GOING TO TAKE A SHOWER. QUESTIONING THE GIRL'S ATTITUDE, HE SAID IT WAS NOT TIME TO TAKE A SHOWER AND ASKED WHY. THE GIRL ANSWERED SHE WAS BLEEDING. HE ASKED HER WHY SHE WOULD BE BLEEDING. THE GIRL ANSWERED THAT LUCAS WAS LYING ON HER WHEN SHE FELT BESIDE HER SELF. HE WENT UP AND CAUGHT THE SUSPECT TAKING A SHOWER. HE ASKED HIM TO OPEN THE DOOR. LUCAS OPENED THE DOOR. HE PULLED HIM DOWNSTAIRS AND CONFIRMED WITH HIS DAUGTGHER IF LUCAS HAD MOLESTED HER AND ██████ SAID YES. HE ASKED WHAT LUCAS HAD DONE DO THE GIRL BUT THIS DENIED ALL THE TIME SAYIND HE HAD DONE NOTHING. RFEVOLTED AND ANGRY, HE PHONED TO HIS ANT ASKING FOR HELP LEST HE WOULD LOSE HIS HEAD AND KILL LUCAS, WHEN HIS COUSIN JORGE ALBERTO CARVALHO DE SOUSA ARRIVED. MILITARY POLICEMAN TOOK THEM TO THE 38TH DP FOR REGISTER OF THE CASE, EXHIBITING THE PRIVATE CLOTHES OF THE GIRL APPARENTLY DIRY WITH BLOOD. IN THIS POLICE STATION THE MINOR ISABEL WAS QUESTIONED DUE TO HER AGE (06 YEARS) SHE DID NOT KNOW HOW TO EXPLAIN CLEARLY WHAT HAD HAPPNED BUT SHE SAID LUCAS HAD SPREAD SOME PRODUCT ON HER PRIVATES AND HAD LIED ON HER ASKING HER TO LIFT HER BEHIND SAYING SHE WAS BLEEDING...THE MINOR WAS SENT TO IML (INSTITUTE OF MEDICAL JURISPRUDENCE). ON THE EXAMINATION OF THE BODY OF THE OFFENSE, CARNALKNOWLEDGE, REPORT NO.0-4281/14 RESULTED NEGATIVE, THERE HAVINGNOT BEEN FOUND SIGNS OF BLEEDING OR LIBIDINOUS ACT. A TEAM WENT TO GHE VICTIM'S RESIDENCE SEARCHING FOR CIRCUMSTANTIAL EVIDENCE IN THE SUSPECT'S ROOM. NOTHING WAS FOUND, BUT IN THE NEXT ROOM, WHERE, ACCCORING TO THE VITIM'S INFORMATION, SHE HAD BEEN WITH LUCAS, A SHEET WITH SPOTS OF BLOOD WAS FOUND, FOR FURTHERMORE EXPERT EXAMINATION. QUESTIONED LUCAS DENIES THE ALLEGATIONS MADE BY THE CHILD ██████ THE SHEET AND THE CHILD'S CLOTHES WERE APREHENDED FOR EXAMINATION, IN ORDER TO BE VERIFIED WHETHER IT IS ABOUT HUMAN BLOOD OR NOT*".





AUTENTICAÇÃO
Confere com o original

Thus, as the presumed notice of the crime was made known the police authority, the minor ███████████████████████ underwent Examination of the Body of the Offense, resulting in the Report NO. 04281/14 attached to pg. 16. On the occasion, the experts could already describe, in the item 4, that "...*lack of circumstantial evidence of physical violence, external genitalia with the following characteristics or alterations: lesions in the vulva, perineum and anus: anus with normal tonus; lack of signs of bleeding, presence of clear secretion on the vulva and anus. Hymen complete.*" Next, they concluded: "*Await: Hymen complete and anus without signs of penetrations*".

Still on trier of facts, the victim´s father, Luis Augusto Alves Nepomuceno was heard and brought a version with more details about what happened that day, as seen on pg. 21/23, that "...*on 02.02.2014 (Sunday) he was spending the day in his ant´s residence, named MARIA CECÍLIA DE CARVALO, in company of his daughter* ████████ *THAT there also lives a cousin of his (the declarant) name LUCAS CARVALHO ROLLO...: THAT, about 4:15 pm his daughter went to upper floor of the residence, where LUCAS was, while the declarant stayed in lower floor watching a football game on television; THAT, after some ten or fifteen minutes the declarant looked for* ████████*, calling by name, but she did not respond; THAT, insisting, the declarant shouted out to her and only this way she came downstairs dressed in the same clothes she was wearing before going to the other floor of the house.; THAT, as soon as she came downstairs* ████████ *immediately said she to take a shower, when the declarant said it was not time for her to take a shower.; THAT,* ████████ *answered she wanted to take a shower because she was bleeding; THAT, the declarant asked why she was bleeding and at same time the declarant asked where LUCAS had molested her; THAT, Isabel answered: "HE DID DAD! LUCAS WAS ON ME! HE SPREAD SOME PRODUCT ON MY BEHIND AND MY PUSSY AND ASKED ME TO LIFT MY BEHIND FOR HIM". THAT, the declarant examined the clothes of* ████████ *and she showed much bleeding in her clothes, around the genitals; THAT, the declarant got very nervous and suddenly went upstairs to find LUCAS; THAT, at that moment LUCAS was already taking a shower; THAT, the declarant asked where he had molested* ████████ *and he said not; THAT, the declarant rushed him to the lower floor and placed in front of* ████████*, asking her if he actually had done what she said. THAT, ISABEL confirmed the history in front of LUCAS repeating that he was on her...THAT his ant arrived a few minutes later accompanied by other members of the family and all of them asked LUCAS what he had done but he always denied; THAT the declarant decided to take LUCAS to this police station for register of the case, bringing also his daughter ISABEL to be heard and submitted to expert examination...: THAT in that police station* ████████ *was questioned by a policewoman, having confirmed all she had said to the declarant...; THAT he also wants to add that* ████████ *got to comment that LUCAS had already molested her in other opportunities; however he always asked her to keep it in secret...*" Statements ratified in court as denoted on pg. 271/272.

The minor´s mother, RAQUEL PEREIRA DA COSTA, despite the fact of she not being in the place the day of the occurrence, was, too, heard by the police authority and said that"...*the girl in company of her father LUIS AUGUSTO, since the declarant was hospitalized with problems of depression: THAT she only was aware of the fact yesterday; THAT before the fact* ████████ *used to attending the house of the ant MARIA CECÍLIA; THAT, she already found it strange the fact of the girl so long with LUCAS in the room; THAT; whenever ISABEL returned from MARIA CECILIA'S house the declarant perceived redness and swelling in the sex organ of her*



AUTENTICAÇÃO
Confere com o original



*daughter  and always asked if anybody had "molested" but the child has  told anything.; THAT certain time* ▮▮▮ *shoed discharge in the vagina and the declarant  thought it strange, but as ISABEL did not stated any strange occurrence, she  ended to "leave it that". THAT, once* ▮▮▮ *said played with LUCAS of pillow". Pg.  25.*

On her part, the minor Isabel Luisa da Costa Nepomuceno was submitted to a special interview in the Session of Technical Attendance of the Police Station for Protection of Children and Adolescents. She confirmed the version presented by her father that day, confirming that the blood found in her body and clothes was from "LUCAS´s cock", according to pg. 34/42.

All right. Two questions are raised so far. The first keeps relationship with the source of the blood found in the clothes of the minor, since, undergoing preliminary examination the day of the occurrence, the experts concluded beforehand for lack of lesions in the vulva, perineum and anus of the child, lack of sigs of bleeding, the integrity of the hymen, besides lack of signs of penetration, in accordance with pg. 12. On the other hand, the second, which is crucial for the outcome of the controversy, since the accusation does no impute to the defendant the practice intercourse, but of libidinous acts in general, relate to the credibility of the declarations of the presumed victim, since, according to the girl," *Lucas spread some product on me...It was a white product that he spread on my pussy and behind"."* (Fl. 37), remembering also that, according to the father, the girl said that "LUCAS WAS ON ME! SPREAD SOME PROUCT ON MY BEHIND AND ON MY PUSSY AND ASKED TO LIFT MY BEHIND FOR HIM" (Pg 21).

The core of the converse evidenced, now it is thoroughly appropriate to report to the Examination of Test of Biological Material (pg. 61/64) made of the panties and shorts of the child, in an undershirt worn by the defendant and of the sheet found in one of the rooms of the residence (Notice of Appearance and Apprehension) NO 119/2014.

By the relevance of the considerations described by the experts, it is worth transcribing in full the items about the Examinations of Laboratory made of the material, the Technical-Expert Considerations and finally, the conclusion, under the following terms:

"(…)
**III-EXAMINATIONS**
(…)
b) Of Laboratory
b.1) Research of human blood

The samples collected from the panties, shorts, undershirt and sheet  were submitted to  adequate   extraction  and  further  to  test  of  immunochromatography  for  Human Hemoglobin the **positive result** being obtained  for the four samples.

**b.2) Research of spermatozoid**

The samples cut out from the panties; shorts and undershirt were used for the





AUTENTICAÇÃO
Confere com o original

preparation of 03 laminas of each sample, which were submitted to research of spermatozoid, **the negative result being obtained for spermatozoids.**

### b.3) PSA

Next, the test of immune-chromatography was carried out for the presence or PSA (specific prostate antigen), **positive result being obtained for the three samples**

## IV-TECHNICAL-EXPERT CONSIDERATIONS

The Specific Prostate Antigen (PSA) is a glycoprotein (34,000 Daltons present in the seminal plasmas by prostate glandule and expressed in high level in the human epithelia.

The present of PSA in the sperm in concentrations millions times greater than in the serum of men characterized it as a valuable marker, already tested and validated by the forensic community, for identification of fluid in criminal evidence left by vasectomized individuals, zoosperm tic or oligozoospermatic

## V – CONCLUSION

Thus, and by the foregoing and examination, the Experts conclude **that in the samples of the tissue cut from the panties, shorts e undershirt there was the presence of human blood with semen, but there was not the present of spermatozoid;** and that **in the sample of tissue cut from the sheet there was the presence of human blood,** as mentioned in item III-b.

(…)"

Next step, the DNA Test was made for confrontation with the biological material extracted from the per genital secretion, of clips from the panties and shorts of Isabel, from the undershirt of the defendant and from the sheet, with biological samples collected from both, resulting in the elaboration of the Report of DNA Test on pg. 70/73-A. Now it is also necessary to transcribe part of the expert information, behold essential to the formation of the breast of this Court. Let us see:

"(…

## V. RESULTS

After the ampliation of the samples for the auto-sonic markers, it was noted that:

· In the sample of per genital secretion a unique genetic profile was identified, proceeding from a female person. identical to the profile identified in the biological sample collected from ████████████████.



AUTENTICAÇÃO
Confere com o original



(…)

· In the samples obtained from the **shorts and from the sheet** it a mixture of genetic material from at least two persons was found, a male individual and a female one. The profile observed in more quantity in this mixture comes from a male person and is identical to the biological sample collected from **LUCAS CARVALHO ROLLO,**. The profile observed in less quantity in this mixture is identical to the profile identified in the biological sample collected from █████ █████.

· Ion the sample obtained from the panties a mixture of genetic material from at least two persons was found. The mixture observed in more quantity comes from a female person and is **identical** to the profile identified in the biological sample
· collected from ███████████████. The profile observed in less quantity   in this mixture is identical to the profile identified in the biological sample collected from **Lucas Carvalho Rollo**.

After t the ampliation of sample for the  markers of chromosomes Y, it was observed that in the samples of **perigenital  secretion**, from **the panties**, from the **short**, from the **undershirt** and from the sheet, a haplotype  type of  the unique  chromosome Y that is **identical**  to the  haplotype  identified in  the biological sample  collected **from Lucas Carvalho Rollo**.  The probability of selecting to the case in the male population a person not selected showing the same haplotype is of approximately 1 in **14,928 (in** fourteen thousand nine hundred twenty-eight).

**IV – CONCLUSION**

Considering the proposed objectives, the signatories conclude that:

· The genetic profile observed in the sample collected from **Lucas Carvalho is identical** to the genetic profile from male origin observed in **the undershirt,** sample related to the Police Investigation NO. $107/14 - 38^{th}$ DP.  The probability of relating to the same case in the male population a person not related showing the same profile is approximately **1 in 38,000.000.000.000.000.000.000.000.000** (1 in thirty-eight septillions).

· The genetic profile observed in the sample collected from **Lucas Carvalho Rollo is identical** , in all  the markers,  to the profile  in more quantity in the samples obtained from  the **shorts** and from the **sheet** and to the profile obtained in less quantity in the sample obtained from **panties,** samples related to the Police Investigation NO. $107/14 - 38^{th}$ DP.

· The haplotype of the chromosome Y observed in the sample collected from **Lucas Carvalho Rollo is identical** to, in all the marker examined, the genetic profile from male origin observed in samples of **perigenital secretion** (related to the Report of Examination of the Body of the Offense – Libidinous and Sex Intercourse Acts NO. 4.281/14), in the **panties**, shorts, **undershir**t and **sheet,**





samples related do the Police Investigation NO. 107/14 – 38th DP. The probability of selecting to the case in the male population a person not selected showing the same profile is approximately **1** in **14,928** (one in fourteen thousand nine hundred twenty-eight). The obtainment of profiles coincident with the markers of chromosome Y indicates the same origin or same patrilineal ancestry among the individual who produced the samples.

(...)"

By the foregoing so far, the crucial question comes forth that was not unperceived by the Defense and to the examination of the technical evidence performed by this Court. In first moment, the experts point out that in the sample of per genital secretion **a unique genetic profile proceeding from a female person identical to profile identified in the biological sample Collected from Isabel** was identified (pf. 72). Next, the highlight that after amplification of the sample for the markers of the chromosome Y, it was noted that in the samples of perigenital secretion of the panties, shorts, undershirt and sheet, a haplotype of the chromosome Y was identified and that is identical to the haplotype identified in the biological sample of the defendant Lucas (pg. 73). The contradiction is latent. Therefore, a question is here raised: in the sample of per genital secretion of the presumed victim biological material from the defendant Lucas Carvalho Rollo was found or not?

One could cogitate that the nonsense has common importance, since biological material was also found in the shorts and panties of the victim. Nonetheless, it is totally opportune to remember that the probative assets reveals that o the occasion of the facts, and even before, the defendant and the presumed victim cohabitated, since the child's father confirmed in Court "...*was spending some days in his Tia Maria Cecília's house , with the victim due the fact that his wife was hospitalized; that Lucas is adoptive son of another ant Maria Angelina; that Lucas lives in the house of the ant Maria Cecília; that when the facts happened he had been hosted in the ant Maria Cecília for 15 days or so...*" (pg.271). By the foregoing the possibility of antecedent physical contact between the victim and the defendant is flagrant that can justify the presence of biological material from the defendant in the clothes of the girl.

Besides, it must remembered that, except for the perigenital secretion, the examined material was apprehended immediately after the day of the occurrence, that is, on 02.03.14 (Feb. 3) (Notice of Appearance and Apprehension of pg. 31), by an agent of the police who, certainly, does not have the technical precautions inherent to a team of expert professionals. Therefore, nor is the influence of interferers discharged like, for instance, the contact of some pieces with the others, what can justify the presence of biological material from the defendant in the clothes of the minor.

Therefore, it is worth reprising, to surpass the contradiction pointed out is of crucial relevance anywhere. In answer made for the Defense on. Pg. 247, the experts exhibit the information under the following terms (pg. 316/317):

"(...)

**ANSWER TO THE QUESTION RELATED TO ITEM 6.2**



AUTENTICAÇÃO
Confere com o original



**Sole Question:**

The count questions if the material identified in the samples of per genital secretion referent to the Police Investigation NO. 107/14 – 38th DP would only one genetic material.

**Answer:**

No.

(...)

On examination of the **autosomic markers** of the sample of the pe**rigenital** region only one profile of female origin was found, **identical** to the profile identified in the biological sample collected from ▮▮▮▮ ▮▮▮▮ Importantly, when there is higher quantity of female DNA (rate of majority DNA equal or more that (50:1) the presence of male **DNA** less than minimum limit does not produce ampliation for **autosomic markers,** impeding a detection of the male genetic profile present in less quantity. On the other hand, **as the chromosome Y is examined,** as only the male contributor has this chromosome, even in the presence of a quantity disproportionally elevated of female **DNA**, this can be evidenced, fact that explains the findings of sample collected in the **perigenital** region.

(...)"

However, the highlighted technical information was not cable of beating the doubt seeded on the formation of this judge´s breast. Now, the experts state that the material identified in the samples of per genital secretion **does not** have an only genetic material and they justify that when there is a more elevated quantity of female **DNA,** the presence of male **DNA** in quantity less than a minimal limit does not produce ampliation for autosomic markers, impeding the detection of the male genetic profile in less quantity. Nevertheless, and on the other hand, they say that on examination of the chromosome Y, as only the male contributor has this chromosome, even in the presence of a quantity disproportionally higher of female **DNA** this can be evidenced, fact that explains the findings of the sample collected from the per genital region.

Then, if when there is much more quantity of female **DNA** the presence of male **DNA** less than a minimal limit does not produce ampliation for autosomic markers, impeding the presence of the detection of the male genetic profile in less quantity, how is it possible at the same to conclude with the presence of the defendant´s genetic profile in the per genital secretion? In my opinion, the contradiction was not supplanted.

Proceeding with the examination of the technical evidence, it is opportune to remember that, in the beginning, the experts concluded with the presence of human blood and of semen in the samples of tissue cut from the panties and from the shorts of the victim, and from the defendant´s undershirt as well (pg. 63). Next, and, likely, in answer to the question made by the Defense, they



AUTENTICAÇÃO
Confere com o original



present information to this end (pg. 319/322):

"(...)

### 1. Answer to the question concerning the item 6.3 in the Expert Technical Opinion ( pg. 244-247) and annexes Pg. 248-262)

**Sole question:**

The count questions about the identification of semen by the presence of PSA and absence of description of the other components of this fluid (spermatozoids, amino acids, prostate glandules, acid phosphate, zinc, proteolysis enzyme, and GA lactose.).

Answer:

Except to the acid phosphatase and spermatozoids, the Section of Expert Examination and Laboratorial Analyses dos not have methodology for identification of other components of the semen.

Nevertheless, it is necessary to explain the following points:

The forensic samples usually are found in adverse conditions before the collection, subject to bad weather and actions of microorganisms, different from a sample collected in laboratory of clinic examinations. That means that the samples examined in forensic laboratory usually show reduce quantity, contaminations and many a time lose part of their composition environmental or biological degradation.

The characterization of biological fluids, in ambit forensic, seeks to identify sole components of each fluid, in order to avoid analyses that cam produce inconclusive results. That is, the identification of GA lactose, alkaline pH, protolithic enzymes and zinc, would allow no conclusion, since a spot on a apiece of clothes containing these substances could have several different sources, among them other corporeal fluids, rests of food, etc.

The forensic science, in the of identification of semen, uses the confirmation of spermatozoid for the identification of this fluid. Inclusively because its identification directs the use of specific techniques for the extraction from **DNA**. Nevertheless there cases where the semen may not contain spermatozoids, for instance, in vasectomized individuals. A solution for these cases is the use of other markers of semen. The forensic community, generally, uses one between the two. A prostate acid phosphatase (FAP) and the prostate specific antigen (PSA).

The FAP has largely used in the investigation and characterization of





the seminal liquid. Notwithstanding, it was considered a limited marker of sensitivity and specificity, being   out of use after the discovery of the PASA (Cândido et al[1].

The **PSA**, on the other hand, can be identified with the use of immunochromatographic experiments, test very specific and sensitive able of detecting concentration up to 4 g/ml. These tests are used by several forensic laboratories (Khaldi et al. 2004[2], Hochmeister et al. 1999[3], Simich et al. 1994[4].

**Nonetheless, this glycoprotein (PSA) does not appear exclusively in the semen, studies have demonstrated the presence of PSA in levels detectable  by the immunochromatographic  in serum of women with cancer of the breast (8.153 ng/MI), in the urine of women ingesting testosterones (12.00 ng/MI) and with syndrome of polycystic ovary  10.29 ng/MI), in maternal   milk(350 ng/ml) (Sawaya & Rolim[5], and in the urine of men after the ejaculation (260 ng/MI (Gatside et al. 2005[6]). Importantly, the average concentration of the PSA in the semen varies between $0.4 \times 10^6$ and $1.29 \times 106$ng/ml, about one million times more concentrated than observed in the other fluid (Sawaya & Rolim[5]).**

However, a study has demonstrated that the efficiency of extraction of PSA from spots of cotton is less than 1% (Gartside e al, 2003[6]). Considering the studies above mentioned. The extraction from maternal milk spots and men's urine after ejaculation would result in a concentration of 3.50ng/mL and 2.60 ng/mL of PSA, respectively, bellow the limit of detection of the immunochromatographic test. **While a the extraction from semen spot would result in a concentration varying between $0.4 \times 10^4$ ng/ml.**

**Another bibliographic reference (Paulino et Al  2009[7]), qualifies concentration of PSA up to 1.3 ng/ml, but it uses another methodology. These values would be detected by the method used by this Laboratory, even by considering the rate of recovery de sample of 1%.**

**Taking into account the foregoing, it is noted that the identification of PSA as a marker of semen a huge tool and largely used by the forensic community. Notwithstanding, its  isolated identification does allows it to state unequivocally the presence of semen, since, despite the fact  that the work of the scientific community currently confirms the strength of the method employed, in there may be the discovery  of clinic conditions that elevate  the concentration of  PSA in other corporeal fluids to levels comparable  the level of the semen.**

**It behooves to highlight that before the query this Laboratory already reached conclusion different  from the one in the Report of**





AUTENTICAÇÃO
Confere com o original

Criminal Expert Examination 3617/2014 – IC, derived from the considerations above held.

To on this account the conclusion of the Report of Criminal Expert Examination 3617/2014 – IC for:

"Thus, considering what was said and examined, the Experts conclude that **in the samples of tissue cut from the panties, from the shorts and from the undershirt there was the presence of human blood and of PSA,** suggestive of the presence of semen, **nevertheless the presence of spermatozoid was not confirmed:…"**
**(Purposeful notes)**

It is realized, then, that, at this second moment, the experts present more detailed information about the examination made, for confirmation of semen in the clothes. The explain that, with exception to the acid phosphatase and spermatozoids, they do not have methodology for identification of the other components of the semen; that the PSA is found exclusively in the semen, but in women's serum with cancer of the breast, in urine of women ingesting testosterone and with syndrome of polytheistic, in maternal milk and in men's urine after the ejaculation, this being, higher levels in the semen as well. They recognize that the PSA is a huge tool and largely used by the forensic community as a marker of the presence of semen, but, on the other hand, its isolated identification does not allow it to confirm unequivocally its presence. Finally, the ratify the conclusion, emphasizing that in the samples of the tissue cut from the panties, shorts and undershirt there was found the presence human blood and of PSA, suggestive of the presence of semen, remembering the presence of spermatozoids was not confirmed.

On this account, contrary to what happened to on the first opportunity, now the experts do not show conclusive result, but just suggestive one of the presence of semen.

It is known that the award decree must be based on huge evidence of the materiality and commission of the crime. That is to say, to there be conviction it is necessary that the historic constitution of the facts be carried out, to show what has happened in truth and if the practice of the Wrongful act can be attributed to the defendant. That is, it is necessary to establish, as far as possible, for fair solution of the criminal prosecution, and this being the destination to the proceeding, it is through the finding of facts that the best possible representation of this thuth is sought.

Likewise, there is no doubt that the criminal contemporary proceeding comprises three models of evaluation or examination of the evidence, to wit: legal system, of the breast of the court and judicial discretion. The latter, adopted in our legal system, "*The judge builds his breast by free examination of the evidence produced in judicial adversary, not being able to base his decision exclusively of informative elements collected from the investigation, excepted for the provision evidence, not repeatable .and relieved"*, but must have it in motivated way. It the principle of the motivated judicial discretion provide in the article 155, of CPP. What distinguishes the system of judicial discretion is the liberty of the judge in the examination of the probative elements that,



AUTENTICAÇÃO
Confere com o original



although it exists, it is contained in the obligation of justification of the choices adopted , by the evidence legitimately obtained, with explanation of the road run until the conclusion. As a matter of fact, *"If it is certain that the judge gets subjected to the evidence in the records, it is note less certain that he does not get subordinated to any aprioristic criterion to find by them the material veracity    The criminal judge is, his own conscience   prepared so".*(**Recitals of the Code of Criminal Procedure, item VII).**

This show that the breast of the Judge is not connected to any specific or isolated means of probative evidence. Therefore, even though the expert evidence be the means to satisfy the lack of technical knowledge's that the judge needs for the finding or facts, *"The shall be subjected to the report, being he able to accept it or reject it all or in part"*, in accordance with the provision in the article 182, of CPP.

In this range, despite the examinations carried out by the experts, I do not surmise the possibility of supporting the award decree in suggestive conclusion, mainly because the very experts emphasize that the isolated identification of PSA does not allow it to confirm unequivocally the presence of semen.

It could also be admitted that the oral evidence produced in Court would be sufficient to confirm the materiality of the crime. Hereto I I do not see sufficient strength to support the award decree.

The defendant **LUCAS CARVALHO** denies vehemently the materiality of the crime. As a matter of fact, heard in two opportunities, he presents similar versions, as seen on pg. 50/52 and 306/307.

On her part, the victim ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ was questioned in Court by means of interview held by videoconference and, in certain way, she ratified the declarations presented in on trier of facts. The media with record of the testimony was attached to pg. 296. It is well true that reproduction *ipis litteris* of the original version cannot be required, since it is about a tender child, consequently, psychically immature. But, in summary, she came to say again that the defendant took off her clothes twice, spread some cream in her genitalia and lay on her.

There is no doubt about the probative value of the victim´s word, mainly in crimes of this nature that, in its majority, are committed secretly. On the other hand, in current case, other circumstances must also be evaluated, since, in my opinion, can mitigate excessively the probative force of the planned statements by the minor. It is essential to remember that, when it is about child, there expectance of fanciful talk, it being able to be even suggested by an adult, or influenced by the context where e  the child lives,  since there is lack of maturity in her/him to realize the meaning and consequences of  her/his  attitude, besides his statement being subject to divergences that can come from the attempt of protecting  the aggressor and his family, since in this specific offense, in more parts of the cases  the aggressor is a member of the family or one very close affectively.

By the foregoing, the oral evidence judicial ized also revealed that the sexual abuse is something that surrounds and terrify the family of the victim. And no wonder, since the minor´s




AUTENTICAÇÃO
Confere com o origin al

father, Luis Alves Nepomuceno, said that *"his wife was abused sexually at the age of 16 and she still suffers in consequence of this, and the responsible has never been arrested; that this situation was known by the family; that    l slept in the same room with the deponent and his wife on a mattress on the ground; that though the hose had two rooms, Isabel feared the darkness, reason why she slept in their room; that never have they commented to Isabel the sexual abuse suffered by her mother… "* This maybe may justify the way the father questioned the girl about the bleeding, since he said he *"looked at the shorts of Isabel and saw it was soaked of blood; that at the moment he asked Isabel what had happened, if it was Lucas who had made something to her; that he explains that asked if it was because only him was in the upper floor; that he asked what Lucas had done and Isabel said that he was lying on her…"* pf. 272/273. And he also can explain the reason why the mother, Raquel Pereira da Costa often asked the girl about eventual abuse suffered by her as came back from aunt's house and, even in the face of the suspicion, since, according to her *"…for two times as Isabel returned from ant Maria Cecilia claimed pain in the genitalia… (pf. 273),* she permitted the girl to attend the house.

On top of that, the minor underwent service of emergency at the Hospital Regional de Guará, on 02.03.2014 (Feb 3), according to form attached to pf. 290/291. On the occasion, the pediatrician got that *"the child was examined by a psychologist who referred that same said clearly that there was penetration …"* However, in amendment to the Report of Examination of the Body of the Offense NO. 04281/14, the experts highlighted *"That there not objective sigs of sexual intercourse or libidinous act adverse to the carnal knowledge", pf. 282.*

Finally, and to weaken eve more the factual statement presented by the infant, relatives of hers came to inform in Court that it is about a child habituated to lie (pf. 302v and 305)

To this end, and by all that was expended, the fragility of the probative set is latent as the own materiality of the crime, it being necessary to remember that the doubt must fight in favor of the defendant.

### 2. PROVISION

By the foregoing, I consider State right to punish **DISMISSED** to **ACQUIT** the **defendant LUCAS CARVALHO ROLLO,** already qualified in the records, from the imputation attributed to him, based on the article 386, item **II**, of CPP.

Consequently, the bases that required the ruling of provisional detention do not exist anymore, reason why I revoke the decision on pg. 88/89 and order the issue of **WRIT OF RELEASE** in favor of the defendant, if for another reason he is not in prison.

Without costs.

Let it be published. Let it be recorded. Let summons be done.

Let it be filed opportunely.

Taguatinga-DF, February 03, 2015.



AUTENTICAÇÃO
Confere com o original



**WAGNO ANTÔNIO DE SOUZA**
Judge
Included in the agenda: ----/----/----     20/20

JUDICIAL DISTRICT OF BRASÍLIA – BAILIFFS

**Proceeding NO. (Format CNJ):00091571920148070007**
Proceeding NO. (Format SISTJ): 20140710094042
**Class: Criminal Action – Ordinary Proceeding**
**Party Plaintiff: PROSECUTION SERVICE**
**Party Defendant: L.C.R**

# Certificate

I certify on faith that I went to CDP on 02/03/15 (Feb 3), at 11:59 pm, and made the DELIVERY of the writ of release issued in favor of LUCAS CARVALHO ROLLO, to clerk on duty Mr. André-192239-4, who received it and drew his aware.




I also inform that the clerk on duty told me that mister **LUCAS CARVALHO ROLLO** would be released.

Next, I also certify that I served mister **LUCAS CARVALHO ROLLO** with the entire text of the writ(reading to him) the decision that granted his liberty.

-I served him with the sentence rendered, occasion when he expressed his intent of not appealing, but was well aware of the time for appeal.

Federal District, February 9. 2015

**HERMIONE SILVA**
**Bailiff**

**\*Document signed digitally. The authenticity of the document can be verified on the site of TJDFT-http:// www.tdft.jus.br**

2411028    -00100001120000000 – 09/02/20150930    -1/    1



AUTENTICAÇÃO
Confere com o original



PROJUDI – Proceeding 0017372-86.2016.8.07.0015. – Ref. mov.1.1- Signed digitally by Luiz Fernando Leite : 319047
02/01/2019 (Feb. 1): PROCEEDING DIGITALIZATION :Arq.: Execution/Commitment

<div align="center">

Brazilian Judiciary Power
**Court of Justice of the Federal District and the Territories**

</div>

**Agency:**     1st CRIMINAL DIVISION
**Class:**     APPEAL
**Proceeding NO:**     **20140710094042APR**
        **(0009157-19.2014.8.07.0007)**

**Appellant(s):**     M.P.D.D.F.E.T
**Appellee(s):**     L.C.R.
**Assignee (s)**     Associate Justice ROMÃO C. OLIVEIRA
**Co – Assignee:**     Associate Justice ESDRAS NEVES
**Judgment NO:**     872600

<div align="center">

**AMENDMENT**

</div>

CRIMINAL LAW. ARTICLES 217-A, *CAPUT*, (TWICE) ACCORDING TO THE ART. 71, ALL OF THE CODE OF CRIMINAL PROCEEDING. CONVITION.PROSECUTION SERVICE APPEAL GARANTED. If the victim´s testimonies, in harmony with the other evidence taken to the records, especially Examination of Confirmation of Biological Material and Test of DNA, proves that the defendant committed libidinous acts adverse to the carnal knowledge with the victim of 6 years of age for more than one time, the judgment of acquittal is reversed to convict him for the practice of the offense specified in the article 217-A, *caput*, of the Criminal Code for two times in continuous wrongful conduct.

Code of Verification: 2015AC09391MRWB2HGSM06CZ608
Office of Associate Justice ROMÃO C. OLIVEIRA



AUTENTICAÇÃO
Confere com o original



PROJUDI – Proceeding 0017372-86.2016.8.07.0015. – Ref. mov.1.1- Signed digitally by Luiz Fernando Leite : 319047
02/01/2019 (Feb. 1): PROCEEDING DIGITALIZATION :Arq.: Execution/Commitment

Appeal 2014071009442APR

### JUDGMENT

Mr. Associate Justices of the **1ˢᵗ CRIMINAL DIVISION** of the Court of Justice of the Federal District and of the Territories, **ROMÃO C.OLIVEIRA** – Assignee, **ESDRAS NEVES**– Co – Assignee, **MARIO MACHADO** – 1ˢᵗ Voting member, under the presiding justice of Mr. Associate Justice **ROMÃO C.OLIVEIRA,** agree to render the following decision: to **GRANT. UNINANIMOUS,** in accordance with the minutes of the judgment and tachygraphy notes.

Brasília (DF), June 3, 2015.

**Document signed electronically**
**ROMÃO C.OLIVEIRA**
Assignee

**Code of Verification: 2015ACO9391MRWB2HGSMO6CZ608**
**Office of the ASSOCIATE JUSTICE ROMÃO C.OLIVEIRA**



AUTENTICAÇÃO
Confere com o original



PROJUDI – Proceeding 0017372-86.2016.8.07.0015. – Ref. mov.1.1- Signed digitally by Luiz Fernando Leite : 319047
02/01/2019 (Feb. 1): PROCEEDING DIGITALIZATION :Arq.: Execution/Commitment

Appeal 2014071009442APR

## REPORT

It is about appeal filed by Prosecution Service of the Federal District and of the Territories in the face of sentence referred to of pg. 380/389-v that acquitted L.C.R. from the practice of the offense provided in the article 217-A, *caput*, (for several times) of Criminal Code, based on the article 386, item II, of CPP.

With the reasons of pg. 406/412, the accusatory organ requires the conviction of the appellee, according to the declaration, alleging, in principle, that the evidence in the records are sufficient to sustain the decree of conviction.

The brief of appellee is seen on pg. 424/448.

The high Justice Prosecution expresses an opinion for the recognition and granting of the appeal (pg. 461/462-v).

It is the report.

**Code of Verification: 2015ACO9391MRWB2HGSMO6CZ608**
**Office of the ASSOCAITE JUSTICE ROMÃO C.OLIVEIRA**



AUTENTICAÇÃO
Confere com o original



PROJUDI – Proceeding 0017372-86.2016.8.07.0015. – Ref. mov.1.1- Signed digitally by Luiz Fernando Leite : 319047
02/01/2019 (Feb. 1): PROCEEDING DIGITALIZATION :Arq.: Execution/Commitment

Appeal 2014071009442APR

## OPINIONS

### Mr. Associate Justice ROMÃO C. OLIVEIRA – Assignee

The appeal file meets the presumptions of admissibility, reason why it is heard.

The following is collected from the accusatory instrument (pf. 2/4):

> *From indeterminate date until February 02, 2014, about 5:45 pm, in the SHVP, Rua 06, Chácara 279, Casa 32, Vicente Pires/DF, **the defendant L.C.R,** knowingly and willy, for several times practice libidinous acts r with the child* ▮▮▮▮▮▮▮▮▮▮
>
> *occasion of the facts.*
> *According to enclosed records o police investigation on February 02, 2014, the defendant invited the victim into his room and harassed her sexually, through the practice of libidinous acts consisting I putting her clothes off, touching her body, inclusively in her privates, groping her, lying on her and approaching his penis the victim privates, among others.*
> *Questioned the child-victim states the sexual abuses suffered (pg. 30/38), alleging also that such facts had already occurred before, in several opportunities.*
> *In accordance with the Report of Verification of Biological Material (pg. 57/65), "in the samples of tissue cut from the panties, shorts and undershirt there was confirmation of the presence of human blood and semen". And, pursuant to Report of DNA test (pg. 67/71), the presence of biological material of the defendant was found in the panties, shorts and in the sheet"*

According to the report, Prosecution Service requires the conviction of the defendant, according to the declaration, alleging, in principle, that the evidence in the records are sufficient to sustain the decree of conviction.

It is, since, for the Panel, to examine the evidence collected.

In court, the defendant denied the wrongful practice (pg. 275 and verse), stating the dynamics of the facts the following way:

> *(...) the declarant alleges that the facts there described are not true, that the*



**AUTENTICAÇÃO**
Confere com o original



*declarant alleges he was at a barbecue event with his family; that L. had arrived from the work with his girl and went to the picnic barbecue; that L. kept drinking at the picnic barbecue and asked the declarant if he wanted lift towards the place he lived, that he lived with M.C.; that before arriving at home, already in Vicente Pires, L. asked the declarant if he wanted to take a hot drink; that the stopped at a dive and consumed a hot drink; that L. was with them; that at the bar L. bought two boxes of beer, that on arriving at M.C.'s house , L. sat on the sofa to watch football; that the declarant told L. that he would go out to ride skate with his friends; that after 45 minutes he returned in order to take a shower; that when he returned L. was playing with the dog; that the declarant only saw L. on the lower floor; that declarant did not see L. on the upper floor; that before taking a shower he went to his room just to take a piece (sic) of clothes; and while this L. remained on the lower floor; that he carried the piece(s) of clothes and entered the bath room to take a shower; that after 15 minutes he heard L. calling his name; that L. knocked at the door of the bath room; that the declarant put on a towel around his body and opened the door; that L. was carrying the panties of L. in her hand full of blood; that L. asked if the declarant had molested her or lay on her; that the declarant told L. that he would never to that with him since the were friends and use to drink together; that at this moment while L. was in the bathroom L. did not attack the declarant; that L. told the declarant to go down with him; that L. remained on the lower floor; that they went downstairs and went to the bathroom on the lower floor and there was L. with her body naked; that L. had just taken a shower and was already dried; that L. again asked L. if the declarant had lain on her or molested her; that L. looked at her father and next at the declarant and nodded (saying yes); that that the declarant implored telling L. that he would never do that to a friend; that he also told L. that he would never do that and she realized what he was saying; that at such moment L. started attacking the declarant; that the declarant was attacked by. L.'s right hand while in he left hand he kept the shorts and panties of L. with blood; that the declarant did not attack L. bust jus defended saying that he done anything; that when he went to the bathroom and saw L. he did not see any blood in the bathroom nor between the legs of L.; that he does know why there was blood in the panties and shorts of L.; that next L. took the cell and said he would call her family; that the declarant went upstairs and changed clothes; that the declarant went up to his own room; that the declarant remembers the left side of his face was swollen and he got to bleed in the neck and behind the ear; that the first person to arrive in his room was J.; that J said to the declarant that he was being accused of raping L. and therefore he had to take (the declarant) to police station; that he did not undergo any examination; that in the United States the declarant did no what to of his life; that he thought that because he spoke English he would get a better job in Brazil; that in Brazil he got to work for the English course Wizard, for a month by way of probation; that he did not make good he was employed; that the declarant wants to teach advanced Class, but there was not vacancy; that kept on playing with younger children; with J. ten years old, H. ten years old and with another girl of about five years old; that did not use to play with L; that "ano" (sic) liked her because she used to create troubles with the other children(...).*

On the other hand, the victim I.L.C.N., heard by the Section of Technical Support, of the Special Police Station for Protection of Children and Adolescents, pg. 34/42, told the following version:



AUTENTICAÇÃO
Confere com o original



Interviewer: - And then, did anything bad happen, or that made your family worry about you that you would like say? L. spread some product in me and I went to take a shower and papa asked why I would take a shower if we still should walk, that it was not time to take a shower. Then my father spanked L. That almost got him dead. Then my father gave a ring to my grandmother and saying come everybody over here or else I will kill L. Then my father told my mother: "be strong and don't cry anymore".

Interviewer: - Who is L?

Child: - L is a friend of mine. He is grandma M's relative.

Interviewer: - Do you know the product that he spread on you?

Child: - It was a white product that he spread on my pussy and on my behind.

Interviewer: - Could you show me where the pussy and behind are (a doll anatomically similar to girls was shown to the child).

Child: - (Pointed out the parts related to the genital organs in the doll).

Interviewer: - Where did he catch this product?

Child: - The product was in the bathroom.

Interviewer: - Where did you go when he spread this product on you?

Child: - It was in his bedroom, at my grandma's house (granny M) my father's Mother.

Interviewer: - Was there a time when he did this more time to you? Example: it was during the day, in the afternoon or at night?

Child: - In the morning, (...) closer to lunch.

Interviewer: - You told that your had gone to the bathroom to take a shower, correct? (The child nodded). Why did you decide to take a shower at this time?

Child: - Because I was full of blood.

Interviewer: - Where was blood?

Child: - There was blood in my behind, in my shorts and in my pussy.

Interviewer: - Do you know where this blood came from?

Child: - from L's cock.

Interviewer: - could you show me what the cock is?

Child: (Showed the part concerning the genital organs in dummy, undressing it).

Interviewer: - Has L molested you on other occasions before the day your father got



AUTENTICAÇÃO
Confere com o original



*to know it?*

*Child: - Yes. First time this began was when I left the my friend's party. I forgot the name.*

*Interviewer: - How old were you?*

*Child: - I was six years old (she is still six years old).*

*Interviewer:  In what places did he do this to you?*

*Child: - Every day. It was always in his bedroom.*

*Interviewer: - Where was your family when dis happened?*

*Child: - My father went to work and left me at grandma's home. The day my father discovered, the hid L at the hose of uncle J., but there was not that type of cream that L. spread would on me.*

*Interviewer: - I see. Did your pussy ever bleed when he did this?*

*Child: - No.*

*Interviewer: - And the buttocks?*

*Child: - No.*

*Interviewer: - Did L. molest you at all times you went to your grandma M.'s house or was there time when he did not do it?*

*Child: - He did it every day.*

*Interviewer: - Has he ever given any gift or sweets?*

*Child: - No .My father gave him money and bought marijuana. He also drinks beer and brandy.*

*Interviewer: - As he molested you, did you feel he smelled brandy or note that he had used marijuana?*

*Child: - No. He had not used it.*

*Interviewer: Has he ever claimed secret?*

*Child: To not tell my father.*

*Interviewer: - Did he say that something would happened if you reveled what he did to you?*

*Child: No.*

In court (video of pg. 256), the child told the same version, appearing  entangled  to talk about the facts  and saying all time that shed did not remember. Nevertheless, as she insisted in remembering something more, she stated details showing that the facts aforesaid are still clear in





her mind.

Besides, the words of the victim´s father are of much value, collected on pg. 271/272;

> (...) that he was spending some days at this Ant M.C., with the victim due to the fact his wife was hospitalized; that in this hose J., N., J., J., J. and his daughter M.E. and L; that L. is an adoptive son of another ant M.A; that L. lives at ant M.C.´s house.; that when the facts occurred he was already living at the ant M.C.´s house for about 15 days; that he slept with the daughter I. in the room, just the two; that while he watched the football game on television. I. played with the little she dog; that the little she dog went upstairs at the house; that I. went up after the little she dog and stayed upstairs; that after 15minutes he started calling I.. telling her to come downstairs and she did not answer; after crying louder, I. came downstairs and said she wanted to take a shower; that the deponent said it was still early that hey would have a shower after having walked; that L. insisted in taking a shower and said she was bleeding, that at this moment he looked the shorts of I. and saw it was soaked with blood, that at this he asked I. what had happened, if it was L. who did something to her; that he explains that he asked if it had been L. because only him was upstairs; that he asked what L. had done and I. said he was lying on her; that at this moment he lost control and went after L. and saw that this was taking a shower, that nocked at the door as L. opened it, when he attacked him; that he did get to go in the bedroom where L. was; that L. denied and said he done nothing; that he telephoned his ant and asked her to come home and also telephoned his chief who is a lawyer asked for orientation; that his arrived accompanied with other relatives, J., N., J., J., C., Ant N., S.; that said to her ant that he otherwise he would kill L.; that all these persons saw the shorts of I.. dirty with blood which she wore ; that I. always lived with the deponent and had never had bleed before this day; that the deponent and more four relatives went to the police station (J., J., the deponent, I. and L); that they were taken



AUTENTICAÇÃO
Confere com o original



> *to the 21st DP, that this day his daughter was heard and told everything; that the deponent, too, was heard; that next they went to the IML (Institute of Medical Jurisprudence); that the panties and shorts of  stayed at the IML; that he never had some  misunderstanding with L; that they had a tranquil familiarity with him; that he got to accompany L. to distribute curriculum together with his wife; that the relationship between L. and I. was normal and he played with her; normally; that L. is a drug addict, inclusively sign of drug was found in his bedroom by the police. That before the fact he said would go out to smoke some spiff with his friends (...).*

The victim´s mother also stated that for two times the child returnee from ant M.C.´s house (place of the facts) with pain in the genitalia treated it with balm against chafing (pg. 273/274):

> *(...) the day of the facts she was hospitalized in psychology care clinic and did not see the facts; that she was already hospitalized for about two month when the facts happened, for shed had tried the suicide; that before being hospitalized the deponent worked and while she worded she left the I.  Under care of the ant M.C., at the house where the facts occurred; that I. spent the day there and was  collected at night; that L. was maltreated at the school, reason why she was taken away from the school and  left under Ant M.C.´s care, during the day; the I. was with M.C. for two months before being*

> *hospitalized; that in January 2013 L. came to live an M.C. and in the past she lived with his mother in the United States; that in the period L. was under care of ant M.C., L. already lived in the house; that the  relationship with L. was good and the family was united, and got to distribute curriculum with this; that he talked with L. normally; that L. understand well Portuguese and speaks it fluently; that simply has difficulty in writing Portuguese; that L. is adoptive son; that  L. told the deponent he fought with  his adoptive farther for reason of being drugs addict and that in one theses fights they were taken to the police station in the United States; that I. . never complained about L.´s*





*conduct before the occurrence of the facts; that I . . for two times after returning from ant M.C.'s house   alleged pain in the genital; that the deponent treated with balm against chafe and did not suspect that it was about abuse; that the deponent after the occurrence of the facts asked I.. if when mom had spread the  pomade it was L. who had done something, and the victim answered that L. had lain on her and touched her vagina with the fingers; that L.  said that she did not tell her mom because L. told her to not tell anyone; (...) that before this fact I. had  had no bleed nor had it afterward; (...) that after the fact her state  of health got  worse and decided with her husband  that the deponent  and I.. would go to Piauí where  the deponent's mother lives; that currently the deponent is stable(...)*

Besides, N.C.F.'s testimony (pg. 301/303) is highlighted, who the a relative of the accused and of the victim and escorted the girl to the hospital.

*(...) that before the facts all of them were at J.'s house for a picnic barbecue, that there on L., I. and L. left together for ant M.C.'s home; that later on L. called the telephone of  L.'s mother M.C. who was still at J.'s house; that L. asked his mother  to home immediately or else he would kill L.; that immediately  his brother J., the deponent's husband and the J.'s wife, N., went to the house of M.C. his cousin; that next J. and his mother M.C. went; that next the deponent and her cousin went; that on arriving  saw L. very nervous having I.'s clothes in his hands; while L. was in M.C.'s bedroom, the deponent's mother accompanied with J., her brother and  her husband held the door; that her husband said he did not know yet what had  happened in fact; but that he was at the door to impede L. to enter same was very nervous; that he could see that  in I..'s panties and shorts there was a great quantity of blood and that it also seemed a bit humid; that all asked L. to relax; that enter her bedroom accompanied with L. and there was  N.; her sister- in –la; that other women of the family also entered; that the deponent asked L. what had happened; that I.  appearing to be tranquil answered L. had spread cream on her pussy and on her behind; that in the beginning I. did not want*



AUTENTICAÇÃO
Confere com o original



to tell; that I. accepted the deponent´s idea of doing a drawing and when explaining the drawing she said that L. had spread cream on her buttocks and on her pussy; that the deponent asked I.. If L. had done something more, when I. answered no; that next L. telephoned to his chief who in his capacity of policeman placed L. under arrest; that L. J., the deponent´s husband, L. and I. went to the police station; that when I. arrived at   M.C.´s house L. Had already taken a shower; that next day morning, about  10:30, a telephone call was made to L. who said  that was at the Hospital of Guará with I; that L. said  he had not taken I.. to be examined  but had gone to have a consultation, since  his arm  and  ankle were hurt; that she went to hospital thinking that I. also  would be examined;  that  that it was the deponent that entered with I.. for consultation; that firstly she saw a pediatrician and next a social worker and a psychologist who heard I.´s statement; that the pediatrician sent I. to an experienced  gynecologist; that the  gynecologist examined I. and  nothing wrong was found;  that I.. answered negatively the questions made by the gynecologist saying that L. had not touched here and that  there was no pain as she  urinated or pooed.  That after that I. was send to the psychologist, this in same day; that I.. entered  first and next, the  deponent; that the deponent only remembers that the psychologist  did not believe  a 100% in L. neither in I; that she explained that she did not believe a 100% in I, since this had already remained a  long  time with the deponent and the deponent fond I that it was an outlying  child;  that  R. once commented with the deponent that D. then with about 09 years of age had put off I.´s dapper, with about 03 years of age and hugged  her in the back, but that R. did no attitude; that D.. is J.´s son, the deponent´s brother; that she knows that D. was already raped; , having heard it from herself; that while R. was hospitalized I. remained in her mother´s house; that L. was always very careful with I; that the   sheet apprehended was taken away from a bedroom is L.´s one upstairs; that this bedroom was of J., J., and M.E (...)





AUTENTICAÇÃO
Confere com o original

In addition, there are expert examinations made. In Body of the Offense Examination (pg. 279/280), it got evidenced that there was not carnal knowledge or violence. In the Medic Record it was also registered that the examinations detected anal region without alterations (pg. 290).

Nevertheless, the child´s shorts and panties had spots of blood and were brought for technical examination. In the Examination of Biological Material Confirmation (pg. 61/64), it got concluded that: (…) *in the samples of tissue cut from the panties, from the shorts and from the undershirt, there was presence of human blood and semen, notwithstanding, the presence of spermatozoid was not confirmed; and that in the sample of tissue cut from the sheet the presence of human blood was confirmed (…)*

In the Report of DNA Test (pg. 70/73-A), it was concluded:

-In the sample of genital secretion a sole genetic profile was identified, proceeding from a female person identical to the profile identified in the biological sample collected from I.L.C.N.

-In the sample obtained from undershirt a sole genetic profile was identified, proceeding from a male person, identical to the profile identified in the biological sample collected from L.C.R. There is the probability of the selection for granted of a person not related showing the same profile of about of 1 in 38,000,000,000,000,000,000,000,000 (one in thirty-eight septillion).

-Nothing indicates that in the sample cut from the shorts and from the sheet a mixture of genetic material was observed from at least two persons, a male person one and a female one. The profile observed in more quantity in this mixture is derived from a male person and is identical to the profile identified in the biological sample collected from L.C.R. The profile observed in less quantity in this mixture is identical to the profile identified in the biological sample collected from I.L.C.N.

-In the sample obtained from the panties the genetic material from at least two persons. The profile observed in more quantity in this mixture is derived





from a male person and identical to the profile identified in the biological sample collected from I.L.C.N The profile observed in less quantity is identical to the profile identified in the markers of the chromosome Y, there was observed that in the sample of perigenital, from the panties, from the shorts, from the undershirt and rom the sheet a haplotype of the sole chromosome Y that is identical to the haplotype identified in the sample collected from L.C.R. The probability of the selection for granted of a person not related showing the same haplotype if of about of 1 in 14,928 (one in fourteen thousand nine hundred twenty-eight)

In my opinion, the expert report, under the terms it was written, reinforces the probative evidence in relation to the commission of the wrongful conduct behold that, in connection with the other evidence obtained, proves the abuses suffered by the child victim.

The answers to questions (pg. 316/317) and 319/322) do not contradict the precedent reports; the only indicate the fallibility of the technique used, that, in fact, is very low. In one of the examination, the possibility of a same profile being found in the male population is of one to thirty-eight septillions, in another examination is of one to fourteen thousand, approximately, with the highlight that the observation of coincident profiles in the markers of the chromosome Y indicates same origin or same patrilineal lineage among the individuals that produce the samples (pg. 73/73-A).. However, it is unlikely that the sample collected from the materials (shorts, panties, undershirt and sheet) be of another person of same patrilineal lineage, like the father or another relative, since the defendant is adopted, and, thus, dos not have genetics identical to other members of the family who attended the house.

Besides, the reports, even with a small margin of suspicion, connected to the other evidence of the records, are sufficient to confirm the version presented by the victim.

It behooves to register that the crime of rape of vulnerable individual dos not requires the presence of violence or serious threat against the victim and the offense to the sexual dignity is what is necessary. It is, then, nonsense to talk about acquittal.

As a matter of fact, special credibility is to be given to the victim's word; above all it meets





AUTENTICAÇÃO
Confere com o original

the other elements of evidence   existing in the records.

The jurisprudence that emanates from the high Superior Court of Justice aims to make it clear that, practiced without the presence of witnesses; the victim's word has great validity as evidence. Check-over:

> *CRIMINALLIABILITY. INDICENT ASSAULT. ACQUITTAL IN SENCOND DEGREE. REVALUATION OF THE EVIDENCE. THE VICITIM'S WORD. SPECIAL RELEVANCE. LACK OF CIRCUMSTANTIAL EVIDENCE. APPEAL GRANTED. I. Hypothesis wen the sentence availed of, primordially, the victim's word – a girl of only 8 years of age, on occasion of the fact -, and of the psychological report, considered coherent together, to ground the decree of conviction. II. In the crimes of rape and violent incident assault, the victim's word has great validity as evidence, especially because in in most cases, these offenses, by their own nature, do not count on witnesses and neither leave signs. Precedents. III. Appeal granted according with the Consignee's opinion. (REsp 700.800/RS, Consig. Minister GILSON DIPP, FIFITH DIVIOSION, judged on 03/22/21005, DJ 04/18/2005 p. 384).*



> *PENAL AND PROCEDURAL. PENAL – RAPE AND INDICENT ASSAULT – NULITIES – LACK OF OCCURENCE. – CRIMES CONSIDERED FELONY STATUS – TOTAL IMPRISONMENT (SYSTEM) - CONVICTION BASED ON SEVERAL EWVIDENCE COLLECTED DURING THE CRIMINAL FINDING OF FACTS. (....) On the other hand, as to the allegation of occurrence of nullity in   conviction based exclusively on the victim's word, the writ is dismissal,. By the nature of the v. judgment, it is verified that the conviction was based on several other  evidence, among them, the victim's word that, in such case, gains special relevance,  since that generally these crimes are committed on the sly. (...) – Order denied. (HC 29.412/RJ, Assign. Minister JORGE SCARTEZZINI, FIFTH DIVISION. Judged on 10/14/2003. DJ 12/19/2003 p. 531).*

The jurisprudence of this high Court of Justice held opinion that, the offenses against morality and decency, the victim's word, when in harmony with the probative evidence, is sufficient to authorize the conviction.



In this way, there is no doubt that the conduct practiced by the appellant meets the normative parameters included in the article 217-A, *caput, of the Code or Criminal Procedure.*

Prosecution Service requires the conviction by the art. 217-A, *caput,* of the CP for several times. The victim said that the abuses happened every day, in the defendant's bedroom, during the time her father was at work and left her at the house of the grandma (pg. 39). In court the victim said that the facts had happened other times, but she did not get to say how many times or and when



AUTENTICAÇÃO
Confere com o original

it occurred first time. (Video of pg. 296).

The victim´s mother, too, informed that the girl, in two opportunities, showed redness on the region of the vagina as she came back from the grandmother´s house but she believed it just abrasion.

The shame shown by the victim in her testimony  in court does not allow it to indicate with precision how many times the sexual abuses occurred, but it got clear that there were other occurrences besides on February 2, 2014.

Therefore, the defendant is convicted as carrying the punishments in the article 217-A, *caput,* of the CP, for two times, according to art. 71 of the CP.

I start on the dissymmetry of the punishment.

Examining the conditions provided in the article 99, of the Criminal Code, it is verified that the culpability, reasons, circumstances and consequences of the offense are normal of the type.  The defendant if first-time offender (pg. 85). The witnesses who knew the defendant (pg. 299, 300, 301 and 305) did not indicate any behavior that could damage his social conduct or value negatively his personality. The victim´s conduct did not contribute to the practice of offense.

The conditions being favorable to the defendant, the punishment is fixed in 8 (eight) years in confinement, minimal basis for the offensive specie, that gets materialized with the inexistence of aggravations and mitigations or causes of criminal aggravation or prison good time.

For the second offense  perpetrated in continuity, same punishment is imposed on the basis of 8 (eight) years of imprisonment, considering the factual conditions of the crime not altered and the personal markers of the defendant.

In this way, offensive conducts twice proved, and based on the article  71, of the Criminal Code,  the  sanction must be aggravated in 1/6 (one sixth), the final punishment being concretized in 9 (nine) years and 4 (four) months in confinement.

Imprisonment shall be the system for execution of the sentence, in the face of the provision in the article 33, pa 2, "a", of the Repressive Statute.

After it becoming res judicata, let usual annotations and communications be made.

By the foregoing, let the court´s appeal be granted.

It is the opinion.





**Mr. Associate Justice ESDRAS NEES – Co-assignee**

Assignee

**Mr. Associate Justice MARIO MACHADO – Voting member**

Co-Assignee

## D E C I S I O N

TO GRANT UNANIMOUSLY

Code of Verification: 2015ACO9391MRWB2HGSMO6CZ608

**Office of the ASSOCAITE JUSTICE ROMÃO C.OLIVEIRA**





PROJUDI – Proceeding 0017372-86.2016.8.07.0015. – Ref. mov.1.1- Signed digitally by Luiz Fernando Leite da Silva: 319047

02/01/2019 (Feb 1)): PROCEEDING DIGITALIZATION: Arq.: Execution/Commitment

> TJDFT
> PRIMEIRA TURMA
> CRIMINAL FLS....

## TJDFT Brazil's Judiciary Power
### Court of Justice of the   Federal District And the Territories
### OFFICE OF THE FIRST CRIMINAL DIVISION

---

### CERTIFICATE
### TRANSITED  IN REM JUDCATAM
### APR: 2014 07 1 009404-2

I certify on faith that the v. judgments of pg. 468-475 and 490-493 became res judicata to **PROSECUTION SERVICE OF THE FEDERAL DISTRICT AND  OF THE TERRITORIES** on July 21, 2015.

Brasília – DF, July 22, 2015.

(Initialed) Camila de Sena Silvério

Servant  at  First Criminal Division

Reg. 317403

---

### REMITTITUR
This date I send these records to SURER

Brasília-DF, July 22, 2015

(initialed) Camila de Sena Silvério

Servant at  First Criminal Division

Reg. 317403





PROJUDI — Proceeding 0017372-86.2016.8.07.0015. – Ref. mov.1.1- Signed digitally by Luiz Fernando Leite da Silva: 319047

02/01/2019 (Feb 1)): PROCEEDING DIGITALIZATION: Arq.: Execution/Commitment

# TJDFT

Brazil´s Judiciary Power
Court of Justice of the Federal District And the Territories

| | |
|---|---|
| **Agency:** | 1st CRIMINAL DIVISION |
| **Class:** | MOTION FOR MORE DEFINITE STATEMENT (NEW APPEAL) |
| **Proceeding NO:** | **2014071009402APR** |
| | **(0009157-19.2014.8.07.0007)** |
| Appellant(s): | L.C.R. |
| **Appealed:** | M.P.D.D.F.E.T. |
| **Assigne:** | Associate Justice ROMÃO C. OLIVEIRA |

**Judgment NO:** 877600

## AMENDMENT

PROCEDURAL CRIMINAL. MOTION FOR MORE DEFINITE STATEMENT. INEXISTENCE
OF DEFFECTS. EMBARGOS DISMISSED.

It is to deny motion for more definite statement when material error, obscurity, contradiction or
omission in the judgment appealed, especially when the appealing party aims to discuss again the
matter of the merits, desiring procedural effects for the purpose of litigation.

Code of Verification: 2015ACO9391MRWB2HGSMO6CZ608
Office of the ASSOCAITE JUSTICE ROMÃO C.OLIVEIRA



AUTENTICAÇÃO
Confere com o original



PROJUDI — Proceeding 0017372-86.2016.8.07.0015. – Ref. mov.1.1- Signed digitally by Luiz Fernando Leite da Silva: 319047

02/01/2019 (Feb 1)): PROCEEDING DIGITALIZATION: Arq.: Execution/Commitment

Motion for more definite statement in the Appeal 20140710094042APR

## JUDGMENT

Mr. Associate Justices of the **1ˢᵗ CRIMINAL DIVISION** of the Court of Justice of the Federal District and of the Territories, **ROMÃO C. OLIVEIRA** – Assignee, **MÁRIO MACHADO** – 1ˢᵗ Voting member, **SANDRA DE SANTIS** – 2ⁿᵈ Voting member, agree, under the presiding justice of Mr. Associate Justice **ROMÃO C. OLIVEIRA**, to render the following decision: **TO GRANT. UNANIMOUSLY**, according to minutes of judgment and tachygraphy notes.

Brasília (DF), June 25, 2015.

Document Signed Electronically
**ROMÃO C. OLIVEIRA**
Assignee

**Code of Verification: 2015ACO9391MRWB2HGSMO6CZ608**
**Office of the ASSOCAITE JUSTICE ROMÃO C.OLIVEIRA**





PROJUDI — Proceeding 0017372-86.2016.8.07.0015. – Ref. mov.1.1- Signed digitally by Luiz Fernando Leite da Silva: 319047
02/01/2019 (Feb 1)): PROCEEDING DIGITALIZATION: Arq.: Execution/Commitment

# TJDFT

Brazil´s Judiciary Power
Court of Justice of the   Federal District and the Territories
Office the Chief Justice

Organ:          OFFICE OF THE CHIEF JUSTICE

Class:  .        APPEAL TO SUPERIOR COURT OF JUSTICE   IN THE CRIMINAL APPEAL

Proceeding;    2014.07.1.009404-2

Appellant:      L.C.R.

Attorney;       CLÁUDIA TEREZA SALES DUARTE

Appellee:       M.P.D.F.T

## D E C I S I O N

I – This about an appeal to  Superior Court of Justice  file  based on the article 105, item III,
section "a", of the Federal Constitution, against an judgment rendered by the First Criminal
Division of this Court of Justice, whose amendment is written under the following terms:

*CRIMINAL LAW. ARTICLES 217-A, CAPUT, (TWICE) ACCORDING TO THE ARTICLE
71, ALL OF THE CRIMINAL CODE. CONVICTION. COURT´S APPEAL GRANTED.*

*In in the victim´s document, in harmony with the other evidence brought to the records,
especially Examination of Confirmation of Biological Material and Test of DNA, it is proved
that the defendant practiced libidinous acts adverse to the carnal knowledge with the minor
of 6t years of age for more than one time, the judgment of acquittal gets reversed to convict
him  for the practice of  the offense specified in the article 217-A, caput, of the Criminal
Code for two times in continuous wrongful conduct.*

The appellant alleges violation to the articles 156, 158.167, and 386, item II, all of the Code



AUTENTICAÇÃO
Confere com o original



GOVERNMENT EXHIBIT 1_20-MJ-8171-BER_177

of Criminal Procedure, pleading his acquittal, due to the lack of adequate evidence to convict him..

II – The appeal is in time, the parties are real and the interest to appeal is present.

**P.J. – Court of Justice of the Federal District and the Territories**
**Office the Chief Justice**

Step by step of the constitutional presumptions of admissibility.

The appeal to the Superior Court of Justice does deserve to be admitted. This because the Judging division concluded with the existence of evidence of commission and materiality of the offense, so that the examination of the appellant´s challenge would require re-examination of factual probative evidence brought to the records, what proves infeasible in our appellate venue, according to the provision in the legal enunciation 7 of the Judicial Precedent of the STJ (Superior Court of Justice).

III – By the foregoing, **I DENY the proceeding of the appeal to the Superior Court of Justice.**

Let it be published.

Document signed digitally on 08/27/2015 3:44:12 pm
Associate Justice **GETULIO DE MORAES OLIVEIRA**
Chief Justice of the Superior Court of Justice of
The Federal District and the Territories

(STAMP)> Code of verification: ORZL2015.SRDG, DYL7, HY3D, OGE2

Appeal to the Superior Court of Justice in the Criminal Appeal 2014.07.1.009404-2
Document signed digitally according to MP NO 2.200-2/2001
http:/www.tjdft.jus.br/servicos/autenticacao-de-documentos-eletronicos
Informing the code of verification




**A010**

SUREC – SUBOFFICE OF CONSTITUTIONAL APPEALS

**PUBLICATION**

DOCKET OF ADMISSIBILITY DISCRETION – 472/2015

Availability:                    DJ-e 09/01/2015 (Sep 1)-pg. 59/62

Publication:                First following week day – Law NO 11.419/2006

Proceeding Number:   2014.07.1.009404-2

Brasília, September 1, 2015

Ryan de Chantal Zanchet e Santos – Subsecretary

(STAMP)> Code of verification: ORZL2015.SRDG,DYL7,HY3D,OGE2

Appeal to the Superior Court of Justice in the Criminal Appeal 2014.07.1.009404-2

Document signed digitally according to MP NO 2.200-2/2001

http:/www.tjdft.jus.br/servicos/autenticacao-de-documentos-eletronicos

informing the code of verification



**AUTENTICAÇÃO**
Confere com o original



PROJUDI — Proceeding 0017372-86.2016.8.07.0015. — Ref. mov.1.1- Signed digitally by Luiz Fernando Leite da Silva: 319047

02/01/2019 (Feb 1)): PROCEEDING DIGITALIZATION: Arq.: Execution/Commitment

(e-STJ Fl.626)

# Superior Court of Justice

## AREsp 785.771/DF

### MATTER UNDER ADVISEMENT

I take these records under advisement for judgment to Hon. Mr **Minister NEFI CORDEIRO** (Assignee).
Brasília, November 16, 2015.

---

STJ – COORDINATION OF THE SISTH DIVISION
*Signed by LUANA CASECA RUFFO, Judiciary Expert
on November 16, 2015

---

(in 3 vol. and attached proceedings)

*Signed electronically according to the article 1, pa 2 item III section "b" of the Law 11.419/20067
Electronic document VDA13214825 signed electronically according to the article 1, pa 2, item III, of the Law NO 11.419/2006.
Signatory: LUANA CASECA RUFFO, COORDINATION OF THE SIXTH DIVISION signed on: 11/16/2015 8:47:30 am
Code of control of document: B13822C3-88F0-4029-94D7-ABB78D6FFB9E

---

Electronic Document attached do the proceeding on 11/16/2015 0n 8:47...usuary LUANA CASECA RUFFO.





PROJUDI – Proceeding 0017372-86.2016.8.07.0015. – Ref. mov.1.1– Signed digitally by Luiz Fernando Leite da Silva: 319047

02/01/2019 (Feb 1)): PROCEEDING DIGITALIZATION: Arq.: Execution/Commitment

## INTEROLOCUTORY APPEAL   IN APPEAL TO THE SUPERIOR COURT OF JUSTICE NO 785.771-DF (2015/0241297-4)

**ASSIGNEE: MINISTER NEFI CORDEIRO**
**APPELLANT:**      L.C.R.
**ATTORNEY:**       CLÁUDIA TEREZA SALES DUARTE
**APPELLEE:**       PROSECUTION SERVICE OF THE FEDERAL DISTRICT AND THE
                    ERRITORIES

### DECISION

This about appeal file in the face the decision     the Chief Justice of the Court of Justice of the Federal District and the Territories, that unadmitted the proceeding of the appeal to the Superior Court of Justice based on the article 105, III, "a", of the Federal Constitution, in the face of the bar contained in Precedent 7/STJ (pg. 593/594).

In this appeal the defense alleges that the examination of the reasons of the appeal to the Superior Court of Justice does no demand   reexamination of the facts, but the  legal  valuation of evidence consisting in gauging; before the pertinent legislation, if certain probative  means is suitable or not  to prove a legal situation (pg. 695/602).

The brief of appellee presented, the Federal Prosecution Service opinioned in favor of denial of the appeal (pg. 616/625).

It is the report.

I Decide.

The now appellant, sentenced as carrying the sanctions in the article 217-A, *caput* two times), and based on the article 1. Of the CP, to a punishment of 9 and 4 months of imprisonment, in his reasons of appeal to the Superior Court of Justice, points out violation to the articles 158 and 386, item II, V and VII, both of the CPP. In summary he *question precisely the validity of the only evidence  the conviction was based on, that is the expert evidence suggestive and not conclusive of the materiality of the offers, connecting to it the word of a victim of 6 years of age, to whom credibility cannot be given before the other evidence collated (pg. 577). The appellant also arguments that in the samples collected there is not genetic material form L.C.R., that is, the answers to the questions made lead to the ratification of the first report which indicated genetic material from the defendant and to the ratification of the defense's thesis, by means of the technical assistants, that there not materiality of the crime. If connected to these results, the reports of the INL are conclusive by the lack of carnal knowledge or another libidinous act. If so, there is not materiality of the crime of rape of vulnerable individual or, at least, it is doubtful (pg. 579).*

The appellant requires, therefore, granting of the appeal to the Superior Court of Justice, in order that the defendant be acquitted from the crime provided in the article 217-A on the CP.



AUTENTICAÇÃO
Confere com o original



The Lower Court held present sufficient circumstantial evidence on commission of materiality to convict the now appellant, in judgments whose amendment has the following text (pg. 531):

*CRIMINAL LAW. ARTICLES 217-A, CAPUT, (TWICE) ACCORDING TO THE ARTICLE 71, ALL OF THE CRIMINAL CODE. CONVICTION. COURT'S APPEAL GRANTED.*

*In in the victim's document, in harmony with the other evidence brought to the records, especially Examination of Confirmation of Biological Material and Test of DNA, it is proved that the defendant practiced libidinous acts adverse to the carnal knowledge with the minor of 6t years of age for more than one time, the judgment of acquittal gets reversed to convict him for the practice of the offense specified in the article 217-A, caput, of the Criminal Code.*

On examination of the appeal, in the part of interest to the outcome of action, the Court "a quo" opinioned (pg. 543/545):

*(...)*

**In my opinion, the expert report, under the terms it was written, reinforces the probative evidence in relation to the commission of the wrongful conduct behold that, in connection with the other evidence obtained, proves the abuses suffered by the child victim.**

*The answers to questions (pg. 316/317) and 319/322) do not contradict the precedent reports; the only indicate the fallibility of the technique used, that, in fact, is very low. In one of the examination, the possibility of a same profile being found in the male population is of one to thirty-eight septillions, in another examination is of one to fourteen thousand, approximately, with the highlight that the observation of coincident profiles in the markers of the chromosome Y indicates same origin or same patrilineal lineage among the individuals that produce the samples (pg. 73/73-A).. However, it is unlikely that the sample collected from the materials (shorts, panties, undershirt and sheet) be of another person of same patrilineal lineage, like the father or another relative, since the defendant is adopted, and, thus, does not have genetics identical to other members of the family who attended the house.*

*Besides, the reports, even with a small margin of suspicion, connected to the other evidence*





*of the records, are sufficient to confirm the version presented by the victim.*

*It behooves to register that the crime of rape of vulnerable individual dos not requires the presence of violence or serious threat against the victim and the offense to the sexual dignity is what is necessary. It is, then, nonsense to talk about acquittal.*

*As a matter of fact, special credibility is to be given to the victim´s word; above all it meets the other elements of evidence   existing in the records.*

*The jurisprudence that emanates from the high Superior Court of Justice aims to make it clear that, practiced without the presence of witnesses; the victim´s word has great validity as evidence. Check-over:*

*(...)*

*The jurisprudence of this High Court of Justice held opinion that, in the crimes against the morality and conduct, the victim´s word, when in harmony with the probative evidence, is sufficient to authorize the conviction.*

*In this way, there is no doubt that the conduct practice by the appellant accommodates to the normative  parameters included in the article 217-A, caput, of the Criminal Coe.*

In this context, the lower Court, sovereign in the examination of the factual-probative matter, having  concluded with  the existence  of sufficient evidence  for the conviction, refuting the allegation of lack of materiality,  so much as in  motion for more definite statement it emphasized that eventual inconsistences verified among the technical evidence do not get to turn into contradictions (pg. 565); to rule out such opinion is to affront  Precedent 7/STJ, since it would be necessary to confront  the facts and  evidence  of  the records.

It is also registered  that, in the sexual crimes, the victim´s word, since it is coherent with the other evidence  in the records, has great validity as element  of conviction, above all because in the more part of the cases, such offenses are perpetrated on the sly and may not leave circumstantial evidence. By the way:

*CRIMINAL AND CRIMINAL PROCEDURE. COURT´S INTERNAL APPEAL. – APPEAL TO THE SUPERIOR COURT OF JUSTICE.  INDICENT ASSAULT. ACQUITTAL. PRECEDENT 7/STJ.- THE VICTIM´S WORD.  WEIGHT OF EVIDENCE. OFFICIAL EXPERT REPORT. NON-OBLIGATION.  VICTIM UNDER 14 YEARS.  ABSOLUTE PRESUMPTION.  REMARK OF THE*





*ASSIGNEE'S OPINION. FELLONOUS NATURE OF THE OFFENSE.*

1. *The right to appeal, in order to reverse the judgment that concluded with the sufficiency of evidence of the commission and materiality of the offense of incident assault, would demand alteration to factual-probative principles established in the ordinary instance, what is vetoed in venue of appeal to the Superior Court of Justice, under the terms of the enunciation in Precedent 7/STJ.*

2. **The principle that the victim's word has high probative value is conso0lidated i9n this Superior Court of Justice, considering that crimes of this nature does not leave circumstantial evidence and, as a rule, neither count them on witnesses.**

3. **It is not appropriate to talk about nullity in the hypothesis of conviction, by indecent assault, in consequence of lack of official expert report, if the commission and materiality of the crime is demonstrated by other elements in the records.**

4. *There is in this Court the opinion according to which the presumption of violence in the cases of rape or indecent assault against a minor of fourteen years old in the crimes committed prior to the force of the Law 12.015/09, is absolute, and not relative. Remark of the Assignee's opinion.*

5. *The rape and indecent assault committed before the Law NO 12.015/2009, even if by presumed violence, that is, from which physical injury or death do not result, constitute felony statues crimes. Opinion of the Third Section.*



AUTENTICAÇÃO
Confere com o origin...



08/31/2016

**Details of the Intern**                    **SIAPEN-WEB**

|  | History |  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|---|

**Criminal Record 98504**

**Name:  LUCAS CARVALO ROLLO**

| History date | Description | Clerk | Status | Proceeding | Release reason | Criminal Unit | Sector | History type |
|---|---|---|---|---|---|---|---|---|
|  | Release from the criminal Unit; CDP-Center of Provisional Detention |  |  |  |  |  |  |  |
| 04/02/2015 | Destination; ACQUITTED; Reason: according to Writ 107/2014 |  | 5 |  |  | CDP |  |  |
| ------- | Change from-- - Cell: CDP – Center of Provisional Detention Reason |  | ---- |  |  | ----- |  |  |
| 12/12/2014 | Request |  | M |  | Change | CDP |  |  |



AUTENTICAÇÃO
Confere com o original



**08/31/2016** **Aspen-web**

Writ

107/2014  ( )  ( )

Procedural Searches in the Regional and Superior Courts

|  |  |  |  |
|---|---|---|---|
|  |  |  |  |

SAIAPEN**WEB**

# UNREADABLE





PROJUDI – Proceeding 0017372-86.2016.8.07.0015. – Ref. mov.1.1- Signed digitally by Luiz Fernando Leite da Silva: 319047

02/01/2019 (Feb 1)): PROCEEDING DIGITALIZATION: Arq.: Execution/Commitment

# Superior Court of Justice

## AREsp 785771/DF

### CERTIFICATE OF TRANSIT AND TERM OF REMANDING

I certificate that the former decision referred became res judicata on August 19, 2016.

I register the remanding of these records to the Court of Justice of the Federal District and of the Territories.

Brasília-DF, August 23.2016.

COORDINATION OF THE SIXTH DIVISION

*Signed by MARCIA VELLOSO DOS SANTOS

On August 23, 2016, at 2:41:51 pm

3 Volumes

0 Attached proceedings

**Signed electrically under the terms of the Article 1 pa 2 item III section "b" of the Law 11.419/2006 .**





PROJUDI — Proceeding 0017372-86.2016.8.07.0015. – Ref. mov.1.1- Signed digitally by Luiz Fernando Leite da Silva: 319047 02/01/2019 (Feb 1)): PROCEEDING DIGITALIZATION: Arq.: Execution/Commitment

## JUDICIARY POWER

## COURT OF JUSTICE OF THE FEDERAL DISTRICT AND OF THE TERRITORIES

TJDFT.

### ACKNOWLEGMENT

I certify that, this date, I received the records.

To register, I have written this.

Brasília/DF, 09/21/2016

Márcia de Souza Vieira

Judiciary Expert

Reg. 319263





| TJDFT 1th | TJDFT 2th | STJ | STF |
|-----------|-----------|-----|-----|





PROJUDI – Proceeding 0017372-86.2016.8.07.0015. – Ref. mov.1.1- Signed digitally by Luiz Fernando Leite da Silva: 319047

02/01/2019 (Feb 1)): PROCEEDING DIGITALIZATION: Arq.: Execution/Commitment

**SIAPEN-WEB**        http://Siapen.sesipe.df.gov.br/internoDetalhe.facés?id=312747





PROJUDI – Proceeding 0017372-86.2016.8.07.0015. – Ref. mov.1.1- Signed digitally by Luiz Fernando Leite da Silva: 319047 02/01/2019 (Feb 1)): PROCEEDING DIGITALIZATION: Arq.: Execution/Commitment

### BRAZILIAN JUDICIARY POWER

**Court of Justice of the Federal District and of the Territories**　　　　　(T J D F T)

## COURT OF EXECUTION OF THE SENTENCE OF THE DF (F. DISCTRICT)-

## BRASILIA-DF

**Judgment Liquidation Account**

| | |
|---|---|
| **Criminal Record:** | **2016062380** |
| **Defendant:** | **LUCAS CARVALHO ROLLO** |
| **Filliation:** | **ANGELINA CARVALHO ROLLO** |
| | **THOMAS OWEN ROLLO** |
| **Date of Birth:** | ▮▮▮▮▮▮ |

**Other names:**

**Proceduring Pref.:**　　　**NO**

**1st Execution**

**Proceeding NO: 00173728820188070015**
**Criminal incidence:  art. 217-A, caput of the Criminal Code**
**Punishment:  9 years and 4 months**
**System: Imprisonment (H)  Recidivist:**　　　　　**NO**

**Date of fact:   02/02/2014**
**Suspension (art. 288, CPP):**　　　　**Date of Valid Notification:**
**Acknowledgment of**
 **Information: 04/14/2014**　　　**Acknowledgment of Amendment:**
**Suspension (Law NO 9.099/95):**　　　　**Revocation Date:**
**Information Date:**　　　　**Information Recognizance:**
**Sentence Date:02/03/2015 (Feb 3)  Sentence Publication:02/03/2015**
**Judgment Date:08/27/2015**　　**Judgment Publication:08/27/2015**
**Accusation Res Judicata:   07/21/2015**　　**Accusation Res Judicata:08/19/2016**

**Lower Court:2ND CRIM.COURT**　　**Lower Proceeding:  2014071009404-2**
**Police Investigation:**　　**107/2014**　　**Proceeding:**　　**38thPol.Station**
　　　　　　　　　　　　　　　　　　　　　　　　　　**(Vicente Pires)**


AUTENTICAÇÃO
Confere com o original



**Deprivation of rights executed:**
**Deprivation of Liberty executed: 6 months**
**Limitation:   6 months         Probable Prescription: 2007/2021?**

**Commitments and Releases**

| Commitment | Release | Reason | Period |
|---|---|---|---|
| 04/16/2014 | 04/17/2014 | Discharge of imprisonment | 2 days |
| 06/06/2014 | 02/03/2016 | Discharge of imprisonment | 7 months and 28 days |
| | | Execution: | 8 months |

**Liquidation**

| Current System: | Imprisonment | Remission: | |
|---|---|---|---|
| Sentence Executed: | 8 months | remaining sentence: | 8 years and 8 months |
| Total Punishment: | 9 years and 4 months | Effective Date for Calculation | |

**EXECUTION LONGER THAN OR EQUAL TO TOTAL PUNISHMENT? NO**
Probable End of Punishment:                **Art. 75, of CP**
Probable End of the Benefit:

**Liquidation of judgment updated according to the articles 10 and 76, both of the Criminal Code, as well as for exhibition of the time remitted in days**

| 1312107 | 10/03/2016 (Oct 3) 12:19 pm |
|---|---|





PROJUDI – Proceeding 0017372-86.2016.8.07.0015. – Ref. mov.1.1- Signed digitally by Luiz Fernando Leite da Silva: 319047

02/01/2019 (Feb 1)): PROCEEDING DIGITALIZATION: Arq.: Execution/Commitment

TJDFT
Brazil´s Judiciary Power
**Court of Justice of the   Federal District**
**And the Territories**

## COURT SENTENCE EXECUTING OF THE DF (FEDERAL DISTRICT)

**Records NO 00173728620168070015**
(Proceeding article NO 20160110975576)

### D E C I S I O N

Considering the sentence of conviction **transited in rem judicata definitely**, let the update of the Judgment Liquidation Account be made and provided, and let  Writ of Detention be issued as well.

There not being a retained attorney, the Public Defender Office is, at first, appointed to act in favor of the defendant.

Let it be known to the parties, the Defense having to show awareness of the appointment.

Distrito Federal, October 3, 2018.

. . .

### VINÍCIUS SANTOS SILVA
ACTING JUDGE OF THE DF

Document signed digitally            -            10/03/2016 (Oct 3) 11:46 am

Document signed digitally, according to MP NO 2.200-2/2001, Law NO 11.419/2006, resolution of Projudi, of the TJFR/OE
Validation of this on http://seeu.pje.jus.br/seej/-identificador: PJ5VX.3YQ487YDRE.VWQBA







L/LEI
2020 FEB 13 A 11: 25
DEPARTMENT OF STATE

**BRAZILIAN EMBASSY**
WASHINGTON, D.C.

No. 5

The Embassy of the Federative Republic of Brazil presents its compliments to the Department of State and, in reference to Note 61, dated August 8, 2019, has the honor to present the complementary supporting documents requested by U.S. authorities from the Brazilian Ministry of Justice and Public Safety for the extradition of Brazilian national LUCAS CARVALHO ROLLO.

2.     The Embassy of Brazil hereby forwards the duly translated and certified Minutes of Hearing regarding the witness's statement and a copy of the photograph that the victim positively identified as LUCAS CARVALHO ROLLO.

3.     Therefore, the Embassy of Brazil reiterates its interest in the extradition of LUCAS CARVALHO ROLLO and requests the good offices of the Department of State towards making the necessary arrangements for his apprehension and extradition to Brazil.

The Brazilian Embassy avails itself of this opportunity to renew to the Department of State the assurances of its highest consideration.

Washington D.C., February 5, 2020





PROJUDI - Case: 0017372-86.2016.8.07.0015 - Ref. mov. 65.1 – Digitally signed by Samuel Augusto Souza Freitas
January 08ᵗʰ, 2020: OTHER DECISIONS. File: Minutes of the Hearing



| **TJDFT** | Judicial Branch of the Federal Government APPELLATE COURT OF THE FEDERAL DISTRICT AND THE TERRITORIES Sentence Execution Court of the Federal District |
|---|---|

## MINUTES OF THE HEARING

**Record Nr. 0017372-86.2016.8.07.0015**
**Convict: LUCAS CARVALHO ROLLO** Dossier Nr.

On December 18ᵗʰ, 2019, the Honorable State Judge Dr. LEILA CURY and the Federal Prosecution Service, in the person of Dr. MÁRCIA MILHOMENS SIROTHEAU CORREA, appeared with me, Secretary of Hearings, in this city of Brasilia/DF, in the courtroom of the Sentence Execution Court. The hearing of the GENITOR of the victim ▆▆▆▆ present at the VEP courtroom, assisted by the Public Defender, Dr. JULIA MARIA SEBES BECHARA was carried out through audiovisual media. **_The Federal Prosecution Service made no request. Upon being given the floor,_** the Defense made no request. **_Then, the Honorable Judge rendered the following decision_**: 1- The formality requested in the document contained with mov. 40.2 was fulfilled, in the sense that the genitor of the victim ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ RG ▆▆▆▆ SSP/PI, declared, before the attendees, Federal Prosecution Service, Public Defender and this Judge, that the person in the photograph contained in mov. 40.3, presented at the hearing, corresponds to the convict Lucas Carvalho Rollo, who raped the minor. 2 - Notify the International Cooperation Unit, of the Federal Prosecution Service, sending a copy of the media recorded at the hearing and of this minutes, requesting the cooperation for transcription and translation, into English, and subsequent referral to this Court, to produce evidence for the extradition of the convict LUCAS CARVALHO ROLLO. 3 – With all done, await the return of the duly translated documents for later referral to the Coordination of Extradition and Transfer of Convicts of the Ministry of Justice. There being nothing further to declare, I close these minutes, which, after being read and agreed, is duly signed. I, Samuel Augusto Souza Freitas, typed it.

**The Honorable JUDGE:**

**FEDERAL PROSECUTION SERVICE:**

**DEFENSE:**

**WITNESS:** Raquel Peruma da Ceita

| SENTENCE EXECUTION COURT OF THE FEDERAL DISTRICT | Fórum Professor Júlio Fabbrini Mirabete SRTVS - QD. 701 - lote 8 - Bloco N, 2ª andar, Brasília/DF, CEP: 70340-000 |
|---|---|

Document digitally signed, in compliance with MP Nr. 2.200-2/2001, Act Nr. 11.419/2006, Projudi resolution, of TJPR/OE
Validation hereof on http://seeu.pje.jus.br/seeu/ - Identifier: PJ5K4 D8MGL 4BR8Y 425VK

PROJUDI - Case: 0017372-86.2016.8.07.0015 - Ref. mov. 65.1 – Digitally signed by Samuel Augusto Souza Freitas
January 08th, 2020: OTHER DECISIONS. File: Minutes of the Hearing

**TJDFT**  Judicial Branch of the Federal Government
APPELLATE COURT OF THE FEDERAL DISTRICT AND THE TERRITORIES
Sentence Execution Court of the Federal District

| SENTENCE EXECUTION COURT OF THE FEDERAL DISTRICT | Fórum Professor Júlio Fabbrini Mirabete<br>SRTVS - QD. 701 - lote 8 - Bloco N, 2º andar, Brasília/DF, CEP: 70340-000 |
| --- | --- |

Document digitally signed, in compliance with MP Nr. 2.200-2/2001, Act Nr. 11.419/2006, Projudi resolution, of TJPR/OE Validation hereof on http://seeujudes.tjs.br/resous Identifier: PJ0K4 DBMGL 4BRBY 4Z9VK

23/08/2018                                   Condenado por estupro no DF vive nos EUA como soldado do Exército - JBr.



O foragido estaria vivendo nos EUA como soldado do exército americano (Foto: Reprodução/Facebook)

O mandado de prisão foi expedido em agosto passado. Lucas nasceu em Florianópolis (SC), mas possui cidadania americana por ser filho adotivo de uma brasileira com um americano. Contudo, ele voltou ao País no fim de 2013. Na época, morava na casa de um familiar dos pais adotivos no DF. Na residência em Vicente Pires, ele passou a conviver com a vítima.

A mãe da criança relata que na época ninguém desconfiava de nada. "Eu estava enfrentando uma depressão e fiquei internada por um tempo. Meu marido trabalha como motorista, então não tinha ninguém para ficar com a minha filha durante a jornada dele. Por isso, a tia do meu esposo e falou que poderia cuidar dela até que eu melhorasse", relata. Foi aí que Lucas, na época com 20 anos, e a vítima passaram a conviver.

Scanned by CamScanner

 **TJDFT**  Poder Judiciário da União
TRIBUNAL DE JUSTIÇA DO DISTRITO FEDERAL E DOS TERRITÓRIOS
Vara de Execuções Penais do Distrito Federal

## TERMO DE AUDIÊNCIA

**Autos nº 0017372-86.2016.8.07.0015**
**Sentenciado: LUCAS CARVALHO ROLLO** Prontuário nº

Ao 18 de dezembro de 2019, nesta cidade de Brasília/DF, na sala de audiências da Vara de Execuções Penais, presentes o MM. Juíza de Direito, Dr. LEILA CURY e o Ministério Público, na pessoa do(a) Dr.(ª) MÁRCIA MILHOMENS SIROTHEAU CORREA, comigo, secretário(a) de audiências foi aberta a audiência de oitiva da GENITORA da vítima PEREIR[_____] presente na sala de audiências da VEP, assistido pelo Defensor(a) Público(a), Dr(a). JÚLIA MARIA SEIXAS BECHARA. Iniciada a audiência, procedeu-se à oitiva, registrada por meio de audiovisual. *O Ministério Público nada requereu*. *Dada a palavra à Defesa*, nada requereu. *Em seguida, pelo MM. Juiz foi proferida a seguinte decisão*: **1-** Cumprida a formalidade solicitada no bojo do documento constante junto ao mov. 40.2, no sentido de que a genitora da vítima [_____]
[_____] RG [_____] SSP/PI, declarou diante dos presentes, Ministério Público, Defensoria Pública e esta Magistrada, que a pessoa estampada na fotografia constante de mov. 40.3 que ora foi exibida corresponde ao sentenciado Lucas Carvalho Rollo que estuprou a menor. **2-** Oficie à Secretaria de Cooperação Internacional, do Ministério Público Federal, remetendo cópia da mídia gravada em audiência e do presente termo, solicitando a cooperação para a transcrição e tradução, para o Inglês, e posterior remessa a este Juízo, para fins de instrução do processo de Extradição do sentenciado LUCAS CARVALHO ROLLO. **3 -** Tudo feito, aguardem o retorno dos documentos devidamente traduzidos para posterior remessa à Coordenação de Extradição e Transferência de Pessoas Condenadas do Ministério da Justiça. Nada mais havendo, encerrou-se o presente termo que, lido e achado conforme, vai devidamente subscrito. Eu, Samuel Augusto Souza Freitas, o digitei.

**MM. JUIZ:**

**MINISTÉRIO PÚBLICO:**

**DEFESA:**

**TESTEMUNHA:** Raquel Perulma da Costa

VARA DE EXECUÇÕES PENAIS DO DF  |  Fórum Professor Júlio Fabbrini Mirabete
SRTVS - QD. 701 - lote 8 - Bloco N, 2º andar, Brasília/DF, CEP: 70340-000

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em http://aseu.pje.jus.br/seeu/ - Identificador: PJ5K4 DBMGL 4BRBY 425VK

PROJUDI - Processo: 0017372-86.2016.8.07.0015 - Ref. mov. 65.1 - Assinado digitalmente por Samuel Augusto Souza Freitas
08/01/2020: OUTRAS DECISÕES. Arq: Termo de Audiência



**TJDFT** | Poder Judiciário da União
**TRIBUNAL DE JUSTIÇA DO DISTRITO FEDERAL E DOS TERRITÓRIOS**
Vara de Execuções Penais do Distrito Federal

Documento assinado digitalmente, conforme MP nº 2.200-2/2001, Lei nº 11.419/2006, resolução do Projudi, do TJPR/OE
Validação deste em http://seeu.pje.jus.br/seeu/ - Identificador: PJ5K4 DBMGL 4BRBY 425VK

**VARA DE EXECUÇÕES PENAIS DO DF** | *Fórum Professor Júlio Fabbrini Mirabete*
*SRTVS - QD. 701 - lote 8 - Bloco N, 2º andar, Brasília/DF, CEP: 70340-000*